## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| MARK ROBERTSON; GEORGE CURRY; TONY EGBUNA FORD; and RICKEY CUMMINGS, on their own behalf, and on behalf of a class of similarly situated prisoners, §§§§§§§§§ | |
| *Plaintiffs*, §§ | |
| v. §§ | **Case No. _____** |
| BRYAN COLLIER, Executive Director of Texas Department of Criminal Justice; BOBBY LUMPKIN, Director of the Correction Institutions Division of the Texas Department of Criminal Justice; DANIEL DICKERSON, Warden of the Allan B. Polunsky Unit. §§§§§§§§§§ | |
| *Defendants*. § | |

## ORIGINAL COMPLAINT

1.      For 23 years, Texas has subjected all male death row defendants to mandatory and indefinite solitary confinement, a psychologically and physically damaging practice that violates the federal and state constitutional rights of the 185 men currently condemned to die at the hands of the state.

2.      All male death row prisoners in Texas are subjected to a blanket policy restricting them to their 8 by 12 feet cells for 22 to 24 hours a day, during which time they are deprived of human interaction.  In addition to restricting their access to medical care and their ability to meet confidentially with their attorneys, Texas's solitary confinement policy causes severe physical and psychological harm.  Indeed, the conditions on Texas's death row have been characterized as

"some of the U.S.'s most brutal death row conditions."[1]  These conditions violate the prisoners' constitutional rights.

3.    The National Commission of Correctional Health Care (NCCHC) has stated in no uncertain terms that "[p]rolonged (greater than 15 consecutive days) solitary confinement is cruel, inhumane, and degrading treatment, and harmful to an individual's health," and "should be eliminated as a means of punishment."[2]

4.    Solitary confinement exceeding 15 days has been shown to have irreversible negative effects.[3]  As a result, medical experts—along with the United Nations—describe indefinite or prolonged solitary confinement as "torture."[4]  Despite this consensus, death row prisoners in Texas spend an average of 17 years and 7 months confined alone in their cells, until they are executed by the State of Texas.[5]

5.    As early as 1890, the U.S. Supreme Court recognized the harm caused by solitary confinement, stating that: "A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community."[6]

---

[1] *Inside Polunsky*, Solitary Watch, https://solitarywatch.org/resources/multimedia/photography/polunsky/.
[2] *Solitary Confinement (Isolation)*, NAT'L COMM'N CORRECTIONAL HEALTH CARE (Apr. 10, 2016), https://www.ncchc.org/solitary-confinement.
[3] U.N. Secretary-General, *Interim Report of the Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. Doc. A/66/268, ¶ 26 (Aug. 5, 2011).
[4] *WMA Statement on Solitary Confinement*, WORLD MED. ASS'N (2019), https://www.wma.net/policies-post/wma-statement-on-solitary-confinement/; *The United Nations Standard Minimum Rules for the Treatment of Prisoners*, UNITED NATIONS OFFICE ON DRUGS AND CRIME (Dec. 2015), https://www.unodc.org/documents/justice-and-prison-reform/Nelson_Mandela_Rules-E-ebook.pdf.
[5] *Faces of Death Row*, J. McCullough and B. Hasson, TEX. TRIBUNE (Nov. 29, 2022), https://apps.texastribune.org/death-row/#:~:text=Here%20is%20a%20look%20at,7%20months%20on%20death%20row.
[6] *In re Medley*, 134 U. S. 160, 168 (1890).

6.      Plaintiffs Mark Robertson, George Curry, Tony Egbuna Ford, and Rickey Cummings (collectively "Plaintiffs") bring this action on behalf of themselves and all other similarly situated individuals (the "Class Members") incarcerated on death row at the Allan B. Polunsky Unit ("Polunsky Death Row Unit" or the "Unit"),[7] a facility operated by the Texas Department of Criminal Justice ("TDCJ") in which all male Texas death row prisoners are incarcerated, to challenge the conditions of their confinement.  Through their chosen policies, Defendants have violated the constitutional and statutory rights of Plaintiffs and Class Members by holding them in solitary confinement, without cause or relief, and impermissibly infringing on their right to counsel.

## History

7.      The Allan B. Polunsky Unit of the Texas correctional system opened in November 1993, and it is located outside Livingston, Texas, which is 75 miles north of downtown Houston. Almost 3,000 prisoners are incarcerated at the Allan B. Polunsky Unit, including the "supermax," the highest security prisoners in the Texas Department of Criminal Justice system.  Since 1999, all of Texas's male death row prisoners have been incarcerated at the Polunsky Death Row Unit.

8.      Prior to 1999, TDCJ incarcerated all death-sentenced prisoners at the O.B. Ellis Unit in Huntsville, Texas ("Ellis Unit").

9.      At the Ellis Unit, TDCJ did not automatically place all death-sentenced inmates in permanent solitary confinement.   Instead, upon information and belief, TDCJ conducted individualized risk assessments for each prisoner, and many death-sentenced inmates had the opportunity to participate in work activities, group activities, and educational programs.  Many were also permitted occasional contact visits.

---

[7] This complaint specifically and only concerns the Polunsky Death Row Unit.

10.    In 1999, TDCJ moved all of the state's male death row prisoners from the Ellis Unit to the Polunsky Death Row Unit, citing overcrowding concerns.[8]  At the Polunsky Death Row Unit, pursuant to TDCJ and Defendants' policy, all persons sentenced to death are placed in solitary confinement and must be continuously held in isolation while they await execution.

11.    Medical visits for prisoners sentenced to death and held at the Polunsky Death Row Unit are sporadic, and mental and physical health providers are often forced to converse with their patients openly on the row, where other prisoners and prison guards can easily overhear conversations regarding private mental and physical health concerns.  Legal visits can take weeks to schedule and occur in a public setting where conversations are easily overheard.  The conditions of legal calls are similarly deficient, with strict time limits imposed on calls.

### Nature of the Violations

12.    Rather than assessing the need for solitary confinement on an individual basis, Defendants impose a blanket policy of holding all male death row prisoners confined at the Polunsky Death Row Unit in solitary confinement, in conditions far worse than those imposed on prisoners who were convicted of similar crimes but did not receive death sentences.  This policy addresses no legitimate security or penological need, and serves no purpose but to heighten the mental anguish to which Plaintiffs and Class Members are subjected.

13.    Defendants' solitary confinement policy is arbitrary and needless.  Further, Plaintiffs and Class Members have no opportunity to challenge their conditions of confinement, and Defendants have provided no alternative to the extreme solitary conditions under which all Plaintiffs and Class Members are held.

---

[8] Female prisoners who have been sentenced to death by the State of Texas are incarcerated in a separate facility and are not the subject of this Complaint.

14.     In addition to subjecting Plaintiffs and Class Members to torturous solitary confinement conditions in the Polunsky Death Row Unit, Defendants have worked to deprive them of their constitutionally and statutorily protected right to counsel by denying access to adequate facilities for legal visits.  These conditions make it impermissibly difficult to preserve attorney-client privilege, and undercut the protections upon which the attorney-client relationship depends.

15.     Individually and collectively, the conditions at the Polunsky Death Row Unit violate the rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article I § 13 of the Texas State Constitution, as well as statutory protections to the right to counsel.  Accordingly, Plaintiffs and Class Members seek relief from Defendants to address these grave violations of their constitutional and statutory rights.

## I.    PARTIES

### A.  Plaintiffs

#### 1.  Mark Robertson

16.     Plaintiff Mark Robertson is a 54-year-old prisoner who was sentenced to death in 1991.  He has spent the past 31 years on death row and approximately 21 years in solitary confinement on death row at the Unit.

17.     Mr. Robertson is highly intelligent, with an IQ measured at 120.  During his time on death row, extreme isolation and lack of stimulation—such as human interaction or exercise—have taken an immense toll on his mental and physical health.  Since being placed in solitary confinement, Mr. Robertson has gained significant weight, and his cardiac health has declined, with no practicable way to exercise regularly.  He has also developed tinnitus (ringing in his ears).

18.    Since being placed in permanent solitary confinement, Mr. Robertson has developed symptoms of PTSD, as well as extreme anxiety and stress.  Mr. Robertson's prolonged detention in solitary confinement has caused, and exacerbated, his mental health issues.

19.    TDCJ placed Mr. Robertson in solitary confinement due to his underlying sentence and not as a result of any violations of prison rules. Mr. Robertson has filed grievances, dated March 21, 2022 (solitary), May 20, 2022 (solitary), and May 13, 2022 (attorney access), challenging Defendants' practices at the Polunsky Death Row Unit limiting his access to counsel and requiring that he be held in solitary confinement.  He has exhausted his administrative remedies.

### 2.  George Curry

20.    Plaintiff George Curry is a 55-year-old prisoner who was sentenced to death in 2014.  He has spent the past seven years in solitary confinement on death row at the Unit.

21.    Since being placed in solitary confinement, Mr. Curry's physical health has deteriorated.  He has developed dangerously high blood pressure and suffers from chronic liver problems.  While Mr. Curry was previously going to health services on a quarterly basis for his liver, those visits have been reduced to once a year due to staffing and pandemic concerns, preventing Mr. Curry from receiving necessary health care.

22.    Mr. Curry's mental health has also declined due to his solitary confinement.  He experiences paranoia and anxiety, and he suffers from depression as a result of his confinement.  Mr. Curry's prolonged detention in solitary confinement have caused, and exacerbated, his mental health issues.

23.    TDCJ placed Mr. Curry in solitary confinement due to his underlying sentence and not as a result of any violation of any prison rules.  Mr. Curry has filed grievances, dated March

28, 2022 (solitary), and May 31, 2022 (attorney access), challenging Defendants' practices at the Polunsky Death Row Unit limiting his access to counsel and requiring that he be held in solitary confinement.  He has exhausted his administrative remedies.

### 3. Tony Egbuna Ford

24.     Plaintiff Tony Egbuna Ford is a 49-year-old prisoner who was sentenced to death in 1993.  He has spent the past 28 years on death row, and the past 22 years in solitary confinement on death row at the Unit.

25.     Mr. Ford is creative and thoughtful, and the extreme isolation he experiences every day has drastically damaged his mental health.  Once able to interact with other prisoners and engage in productive activities at the Ellis Unit, Mr. Ford has suffered significant physical and mental health traumas since being transferred to permanent isolation at the Polunsky Death Row Unit.

26.     A self-described "health nut," Mr. Ford is unable to get sufficient nutrients from the food available at the Polunsky Death Row Unit.  The pigmentation in his skin has faded, and his body struggles to heal from injuries.

27.     Mr. Ford additionally suffers from depression, and he is unable to engage with books or activities in a manner he once enjoyed at the Ellis Unit.  Mr. Ford's prolonged detention in solitary confinement have caused and exacerbated his mental health issues which have gone untreated at the Polunsky Death Row Unit.

28.     TDCJ placed Mr. Ford in solitary confinement due to his underlying sentence and not as a result of any violations of prison rules.  Mr. Ford has filed grievances, dated March 27, 2022 (solitary), May 23, 2022 (attorney access), and June 9, 2022 (mental health) (on or about), challenging Defendants' practices at requiring that he be held in solitary confinement at the

Polunsky Death Row Unit, and limiting his access to counsel and mental health resources.  He has exhausted his administrative remedies.

### 4.  Rickey Cummings

29.    Plaintiff Rickey Cummings is a 33-year-old prisoner who was sentenced to death in 2013.  He has spent the past nine years in solitary confinement on death row at the  Unit.

30.    Mr. Cummings is intelligent, and he cares deeply about his fellow prisoners. Mr. Cummings's physical health has deteriorated significantly since he was placed in solitary confinement, resulting in weight gain and the onset of hypertension.

31.    Mr. Cumming's mental health has sharply declined as a result of solitary confinement as well.  He reports feeling imminently under attack, as though the walls are closing in on him, and the mental suffering of his fellow prisoners' weighs heavily on him.  He has developed anxiety, but because of the lack of privacy when medical providers occasionally walk through the Polunsky Death Row Unit, he is unable to seek medical or psychiatric help.

32.    Mr. Cumming's prolonged detention in solitary confinement has caused and exacerbated his mental health issues.

33.    TDCJ placed Mr. Cummings in solitary confinement due to his underlying sentence and not as a result of any violations of prison rules.

34.    Mr. Cummings has filed grievances, dated May 13, 2022 (solitary), and June 14, 2022 (attorney access), challenging Defendants' practices at the Polunsky Death Row Unit limiting his access to counsel and requiring that he be detained in solitary confinement.  He has exhausted his administrative remedies.

**B. Defendants**

35.     Defendant Bryan Collier is the Executive Director of TDCJ.  In this capacity, he is responsible for protecting the constitutional rights of all individuals in the custody of TDCJ, including prisoners housed on death row.   Additionally, Defendant Collier determines rules, regulations, and policy regarding the management, personnel, and overall operation of TDCJ, including the Polunsky Death Row Unit.  He authorizes or condones the unconstitutional policy of incarcerating all male death row prisoners in permanent solitary confinement as well as the attorney visitation policies described herein.   Therefore, Defendant Collier directly and proximately caused the constitutional violations set forth below.  At all relevant times, Defendant Collier was acting under color of law and as an official representative of TDCJ.  Defendant Collier is sued in his official capacity for injunctive relief and in his personal capacity for damages.  He is a resident of Texas and can be served at:

> TDCJ Executive Director, Texas Department of Criminal Justice
> Price Daniel Building
> 209 West 14th Street, 5th Floor
> Austin, TX 78701

36.     Defendant Bobby Lumpkin is the Director of the Correctional Institutions Division ("CID") of TDCJ.  The CID is responsible for the confinement of all adult felony prisoners who are sentenced to incarceration in a secure facility, and it oversees a number of support functions such as Laundry, Food, and Supply; Mail Systems Coordinators Panel; Offender Transportation; Office for Disciplinary Coordination; Plans and Operations; Safe Prisons/PREA Management Office; Security Operations; and Security Threat Group Management Office.  As Director of the CID, Defendant Lumpkin is responsible for protecting the constitutional rights of TDCJ prisoners, including those sentenced to death.  He authorizes or condones the unconstitutional death row policies described herein as well as the attorney visitation practices and, therefore, directly and

proximately caused the constitutional violations set forth below.  At all relevant times, Defendant Lumpkin was acting under color of law and as an official representative of TDCJ.  Defendant Lumpkin is sued in his official capacity for injunctive relief and in his personal capacity for damages.  He is a resident of Texas and can be served at:

> Office of the Attorney General for the State of Texas
> Law Enforcement Defense Division
> P.O. Box 12548
> Austin, Texas 78711

37.    Defendant Daniel Dickerson is the Warden of the Allan B. Polunsky Unit. Defendant Dickerson in responsible for overseeing the well-being of prisoners incarcerated at the Polunsky Death Row Unit, as well as the facility as a whole, among other things.  As Warden, he is obligated to protect the constitutional rights on TDCJ prisoners at the Allan B. Polunsky Unit, including those sentenced to death.    Defendant Dickerson authorizes or condones the unconstitutional death row policies described herein, as well as the attorney visitation policies.  As such, he directly and proximately caused the constitutional violations set forth below.  At all relevant times, Defendant Dickerson was acting under color of law and as an official representative of TDCJ.  Defendant Dickerson is sued in his official capacity for injunctive relief and in his personal capacity for damages.  He is a resident of Texas and can be served at:

> Allan B. Polunsky Unit
> 3872 FM 350 South
> Livingston, TX 77351

## II.    JURISDICTION AND VENUE

38.    Plaintiffs bring this action pursuant to 42 U.S.C. § 1983; the Constitution of the United States, specifically, Art. I, § 9, cl. 3 and the Fifth, Sixth, and Eighth Amendments of the Constitution; 18 U.S.C. § 3599; 28 U.S.C. § 2202; and the Texas Constitution, specifically Art. I § 13.

39.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

40.     This Court has jurisdiction over Defendants because several Defendants reside in this District and all Defendants are residents of the State of Texas.

### III.     FACTUAL AND LEGAL BACKGROUND

**A. Conditions of Confinement at the  Polunsky Death Row Unit for Prisoners with Death Sentences**

**1.     Solitary Confinement**

41.     At the Polunsky Death Row Unit, all prisoners sentenced to death are forced to spend between 22 and 24 hours a day alone in cells that vary from 7 by 11 feet to 8 by 12 feet. The cell contains only a sink, a toilet, a thin mattress, and a small window.[9]



42.     Prisoners sentenced to death are permitted a very limited number of short phone calls—a policy that came about as a result of the pandemic and may be taken away or further limited in the future—and they are not allowed to leave their cells to interact with other prisoners,

---

[9] *Inside Polunsky*, Solitary Watch (last visited Dec. 19, 2022), https://solitarywatch.org/resources/multimedia/photography/polunsky/.

even for meals.  These prisoners sleep, eat, and live most of their lives alone in this tiny cell.  At a maximum, they leave this cell only once per day (on days when TDCJ allows "recreation"), when they are moved to individual concrete-and-metal cages and permitted to exercise alone.

43.    Despite the documented importance of recreational activity to both physical and mental health, prisoners at the Polunsky Death Row Unit regularly go weeks without adequate recreational time.  Although the Death Row Plan adopted by the TDCJ in 2004 states that Level I offenders at the Polunsky Death Row Unit are to have either seven 1-hour opportunities for out-of-cell physical recreations per week, five 2-hour opportunities per week, or four 3-hour opportunities per week,[10] Defendants consistently fail to adhere to this policy.  The recreational needs of Level II and Level III offenders at the Polunsky Death Row Unit are similarly left unmet, in violation of Defendants' own policies.[11]

44.    Likewise, prisoners sentenced to death are not permitted in-cell arts and crafts projects to engage their minds, despite the explicit allowance of such activities in the Death Row Plan.[12]  Defendants similarly disregard the mandate that "[o]ffenders in Death Row Segregation shall be provided the opportunity to take a shower seven (7) days per week."[13]

**2. Inadequate Access to Medical Care**

45.    With little opportunity to interact with guards or medical providers, prisoners at the Polunsky Death Row Unit who are experiencing physical traumas or illnesses often must wait

---

[10] *Death Row Plan*, Texas Department of Criminal Justice, Correctional Institutions Division (October 2004) at 17, available at: https://tifa.org/wp-content/uploads/2014/02/Administrative-Segregation-Death-Row-Plan-1.pdf.  According to the Death Row Plan, death-sentenced offenders are classified as Level I, II, or II, with Levels II and III requiring "more intensive supervision due to poor institutional behavior."  *Id.*  However, even death row prisoners categorized as Level I are denied privileges and restricted in ways that general population prisoners with similar—or worse—institutional records are not.

[11] *Id.* at 20 (requiring four 1-hour opportunities per week and three 1-hour opportunities per week for Level II and III, respectively).

[12] *Id.*

[13] *Id.*

hours—or days or weeks—to receive medical care.  Likewise, while general population prisoners at the Allan B. Polunsky Unit may be able to approach a guard for assistance or help other prisoners in need, Plaintiffs and Class Members are completely isolated and helplessly alone in the event of a medical crisis.

46.    On the rare occasions when prisoners at the Polunsky Death Row Unit do receive medical attention, it is cell-side, and the close quarters of the isolation cells mean that death-sentenced prisoners are unable to speak privately with the few medical providers that visit this portion of the facility, inhibiting the prisoners' ability to have private or sensitive conversations with medical staff.[14] As a result, unless a death-sentenced prisoner's mental health has been allowed to degrade to such a degree that the need for intervention can be seen from the cell door or from a short public conversation, no further mental health assistance is available.

47.    The Polunsky Death Row Unit does not offer adequate monitoring of mentally ill prisoners who are sentenced to death—a fact that is particularly troubling in light of the traumatic impact of solitary confinement on mental health—and staffing shortages have made medication distribution and regular wellness checks exceedingly difficult and irregular for these prisoners in particular.

### 3.    Inadequate Access to Counsel

48.    For prisoners at the Polunsky Death Row Unit, legal visits are few and far between. When these visits are held, they are conducted through heavy glass and via outdated and poorly functioning phones.  No physical contact is permitted during the visits, and any legal papers must

---

[14] As recently as June 2022, courts have found that extreme medical staffing shortages such as the ones contributing to the lack of adequate healthcare—including the lack of mental health care and use of short, inadequate "drive-by mental health encounters"—for prisoners at the Polunsky Death Row Unit are in stark violation of the Constitution.  *See Jensen v. Shinn*, Cause No. 2:12-cv00601-ROS (D. Ariz. June 30, 2022), Order, ECF No. 4335.

be passed through a guard.  The threat of recording looms over every privileged conversation, as signs in the visitation area warn that conversations are actively monitored and recorded by TDCJ.  There are only two private rooms for attorney visits, and they are rarely available.  Defendants' policy generally forbids physical contact between Death Row prisoners and their visitors at the Polunsky Death Row Unit.  For expert visits, TDCJ policy requires a court order in order for a prisoner to be unshackled.[15]  This policy significantly hinders these prisoners' ability to meet with or be examined by experts—and thus severely inhibits prisoners' ability to build and develop comprehensive legal defenses.  The inability to fully engage in physical examinations with experts is particularly harmful to the legal defenses of people on death row because of the critical role that evidence related to physical and mental health plays in capital sentencing.

49.    Although Defendants' policies require that attorney visits be conducted in a designated area, away from general non-attorney visits, the physical set up of the visiting room often results in attorney and non-attorney visits taking place within inches of each other, at times shoulder-to-shoulder. This setup violates TDCJ and Defendants' own stated policies  and deprives death row prisoners of their right to attorney-client confidentiality.

50.    Rather than taking place in private rooms, legal visits between counsel and Plaintiffs and Class Members are instead conducted in the general visitation room, with dozens of other prisoners, attorneys, non-attorney visitors, and correctional employees present.  Clients and attorneys interact through thick-pane glass windows, with prisoners on one side and attorneys on the other.  Booths purportedly reserved for attorney-client visits are often given to family or other non-legal visitors, while legal visits are being conducted in neighboring booths.  This situation

---

[15] *See Beatty v. Collier*, No. 4:22-CV-03658, 2022 WL 16722364, at *2 (S.D. Tex. Nov. 4, 2022).

further restricts prisoners' access to counsel and increases the risk that privileged conversations will be recorded or overheard.

51.     Visitors must sit shoulder-to-shoulder, making it impossible for an attorney to communicate with his or her client in confidence, without others in the visitation room overhearing the conversation.  There is no separation between booths on the visitors' side.[16]  The enclosures on the client's side include open grates that permit sound to travel between prisoners and to nearby guards.



52.     These problems are exacerbated by the broken phone equipment that is used for communications between prisoners and visitors.  This situation often requires counsel and their clients to raise their voices to a yell in order to be heard by the person on the other side of the glass, with the result that confidentiality is, again, compromised and conversations inhibited.

53.     The risk of being overheard, particularly coupled with the constant monitoring of conversations, constitutes a direct violation of TDCJ and Defendants' policy 3.81(V)(G)(1), which

---

[16] *Take a "Tour" of the Polunsky Unit Where Randy Is Currently Housed*, Randy Halprin (last visited Dec. 19, 2022), http://www.randy-halprin.net/virtual-tour-polunsky-unit.html.

states that, "the warden or designee shall respect the privacy of the [legal] visit and maintain a sufficient distance from the visiting offender and attorney or designated representative to preserve the privacy of communications between them."  Taking into account the fact that parole board and state board clemency investigators, among others, use these same booths to communicate with prisoners, it is unsurprising that Plaintiffs feel they are unable to speak freely with their counsel.

54.    The unconstitutional conditions of the Polunsky Death Row Unit's visiting rooms hinder prisoners' ability to put on a meaningful legal defense or appeal, particularly with respect to the presentation of mitigation evidence that often requires the client to disclose extremely painful and private memories and experiences.  The ability to present a meaningful defense or appeal is additionally compromised by the difficulty in gathering information supported by expert opinion.  The one visiting room that can accommodate testing—including equipment needed to assess prisoners' intelligence quotient, or "IQ"—is rarely available.  Without a court order, Death Row prisoners are handcuffed during expert visits—even those with no disciplinary record or who require the use of their hands to perform various tests for the visiting expert.  This renders some of the requisite testing virtually impossible.

55.    These problems are exacerbated by the difficulty Plaintiffs face in even accessing their counsel.  In the majority of cases, counsel are only permitted to communicate with their death-sentenced clients by making in-person visits to the Polunsky Death Row Unit.  The Allan B. Polunsky Unit is located in the small town of Livingston, Texas, a significant drive from most major cities, as well as most courts and law offices.[17]  Attorneys face unreasonable difficulties scheduling in-person visits, which are often cancelled at the last minute without adequate

---

[17] The Allan B. Polunsky Unit is 78 miles from downtown Houston, 213 miles from Austin, 274 miles from San Antonio, and 216 miles from Dallas.

notification.  In-person visits can take weeks to schedule, and no priority is given to clients with upcoming execution dates.

56.    Remote legal communications do not provide much, if any, relief.  While the Polunsky Death Row Unit has temporarily increased the availability of attorney-client phone calls due to the COVID-19 pandemic, the calls are limited in time, and there is no guarantee the policy will continue.  Normally, counsel must demonstrate "exigent circumstances," such as an imminent court filing deadline, to schedule a phone call with a client on Death Row.  Even then, Defendants' policies cause delays in scheduling phone calls, with the result that either deadlines are missed, or counsel are unable to meet their obligations to their clients and the courts.  The phones used for these calls are also deficient, and it is often very difficult, if not impossible, for counsel and client to hear each other.

57.    It takes multiple weeks for Plaintiffs and Class Members to receive legal mail, if it arrives at all. And if legal mail does arrive, it is sometimes opened by TDCJ staff outside of Plaintiffs' and class members' presence: an unequivocal violation of attorney client privilege.

58.    These problems have a unique and disproportionate impact on prisoners who are sentenced to death, who both face greater restrictions on their access to counsel than prisoners not sentenced to death, and who have a greater need to access expert evidence and legal counsel considering the gravity of the punishment and the nature of the appeals processes.

59.    Death row prisoners are equally restricted in their own access to legal materials. By policy, Defendants only permit death row prisoners "indirect" access to the law library and legal materials.  Plaintiffs and Class Members are not allowed physical access to the law library or its contents; rather, they must fill out a request form—which is often unavailable—that is then sent to the law library.  The prisoners must provide the exact citation of any statute, case, or

document they wish to see.  The law library then provides copies of the requested documents to the prisoner.  Prisoners who cannot remember, or do not know, the specific statute or caselaw needed to assist their legal endeavors are accordingly unable to use the law library.

60.    Defendants' interference with Plaintiffs' ability to meaningfully access and confer with their attorneys violates the U.S. Constitution, the Texas Constitution, and statutory law.

## B.  Recent Court Condemnation of The Use of Long-Term Solitary Confinement

61.    In recent years, courts have increasingly scrutinized the use of long-term solitary confinement as a potential violation of the Eighth Amendment.  While long-term solitary confinement does not *per se* violate the Eighth Amendment, "[t]here is a line where solitary confinement conditions become so severe that its use is converted from a viable prisoner disciplinary tool to cruel and unusual punishment."[18]

62.    The U.S. Court of Appeals for the Fifth Circuit acknowledges that the "length of [solitary] confinement cannot be ignored in deciding whether the confinement meets constitutional standards."[19]  The court has also acknowledged that it is "more than plausible" that decades of solitary confinement can cause serious physical and psychological deterioration "sufficiently serious to invoke Eighth Amendment concerns."[20]

63.    The Fifth Circuit is not alone: other circuit courts have also recently acknowledged the immense damage caused by prolonged solitary confinement.

64.    In one prominent example, the U.S. Court of Appeals for the Fourth Circuit recently held that prolonged solitary confinement creates a substantial risk of serious physiological and

---

[18] *Hope v. Harris*, 861 F. App'x. 571, 582 (5th Cir. 2021) (quoting *Gates v. Collier*, 501 F.2d 1291, 1304 (5th Cir. 1974)).
[19] *Id.* at 583 (citing *Hutto v. Finney*, 437 U.S. 678, 686 (1978)); *Fussell v. Vannoy*, 584 F. App'x. 270, 272 (5th Cir. 2014) (citing *Hutto v. Finney*, 437 U.S. 678, 686 (1978)).
[20] *Hope*, 861 F. App'x. at 584; *Fussell*, 584 F. App'x. at 271.

emotional harm, and violates the Eighth Amendment.[21]  In that case, Defendants relied on previous Fourth Circuit cases that had upheld "squarely analogous" conditions of confinement.[22]  However, the Fourth Circuit distinguished these cases based on advancements in the scientific research into the psychological harms of solitary confinement.  In doing so, the court cited "dozens of empirical analyses as well as observations of the challenged conditions" demonstrating serious psychological risks posed by solitary confinement, which post-dated the previous cases.[23]

65.    The U.S. Court of Appeals for the Third Circuit has also recognized harms caused by prolonged solitary confinement since 2017.[24] Recently, the Third Circuit held that keeping a prisoner in isolation for a prolonged period of time could be grounds for a jury to find deliberate indifference to a substantial risk of serious harm – the required showing for an Eighth Amendment violation.[25]  In making this determination, the Third Circuit held that it is "well established in both case law and scientific and medical research that prolonged solitary confinement . . . poses a substantial risk of serious psychological and physical harm."[26]  The court listed "a degree of stupor, difficulties with thinking and concentration, obsessional thinking, agitation, irritability, difficulty tolerating external stimuli," anxiety, panic, "depression, post-traumatic stress disorder, psychosis, hallucinations, paranoia, claustrophobia, and suicidal ideation" as psychological harms created by prolonged solitary confinement, as well as the risk of disintegration of the "individual's very identity."[27]  Physical harms of prolonged solitary confinement recognized by the Third Circuit

---

[21] *Porter v. Clarke*, 923 F.3d 348, 361 (4th Cir. 2019).

[22] *Id.* at 358–59.

[23] *Id.*

[24] *See Palakovic v. Wetzel*, 854 F.3d 209, 225–26 (3d Cir. 2017).

[25] *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 447 (3d Cir. 2020). However, the court held that defendants were entitled to qualified immunity, as the right to avoid such confinement was not clearly established at the time of defendants' actions. *Id.* at 451.

[26] *Id.* at 441.

[27] *Id.* at 442.

included high rates of suicide, self-mutilation, "dangerous weight loss, hypertension, [] heart abnormalities, [and] aggravation of pre-existing medical problems."[28]

66.      In reaching this conclusion, the Third Circuit rejected the state's argument that keeping capital prisoners in solitary confinement served a legitimate penological purpose.[29] Defendants in the case argued that capital prisoners have "nothing left to lose" and thus, keeping them in solitary confinement served a legitimate penological purpose of isolating "more dangerous" individuals.[30]  The court noted that defendants offered no evidence about the plaintiff-prisoner's individualized risks.[31]  The Third Circuit further found that the nothing-left-to-lose argument was not "entirely accurate," as death row prisoners can lose privileges for breaking rules.[32]  Indeed, the ability to earn privileges is an impetus for good behavior by condemned prisoners.

67.      Both *Porter v. Pennsylvania* (3rd Cir.) and *Porter v. Clarke* (4th Cir.) specifically addressed the interaction between deliberate indifference and the harms of solitary confinement, particularly in light of recent scientific developments.  As noted by the Fourth Circuit,

> [T]he extensive scholarly literature describing and quantifying the adverse mental health effects of prolonged solitary confinement that has emerged in recent years provides circumstantial evidence that the risk of such harm "was so obvious that it had to have been known." *Makdessi*, 789 F.3d at 136. As the district court correctly pointed out, "**[g]iven [State D]efendants' status as corrections professionals, it would defy logic to suggest that they were unaware of the potential harm that the lack of human interaction on death row could cause**." *Porter*, 290 F. Supp. 3d at 532.[33]

---

[28] *Id.*
[29] *Id.* at 446–47.
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.* (emphasis added).

68.    Additionally, Plaintiffs and Class Members have repeatedly conveyed to Defendants and/or individuals under their direction or control that the prolonged, relentless solitude has deeply and negatively impacted their mental and physical health.

**C. The Permanent and Automatic Nature of Solitary Confinement for Death Row Prisoners at the  Unit Contravenes Accepted Practices and Serves No Penological Purpose**

69.    Texas's policy of housing all male death row prisoners in solitary confinement permanently, on the basis of their sentence alone, violates the Eighth Amendment and the Texas Constitution and flies in the face of the weight of authority and best correctional practices, which counsel for limited use of short-term solitary confinement based only on specific and identifiable circumstances unique to each prisoner.

**1.    Scientific Evidence on the Lasting Psychological and Physical Harms of Solitary Confinement**

70.    Researchers have extensively documented the physical and psychological harms caused by solitary confinement specifically—and social isolation more generally—in a substantial body of peer-reviewed literature spanning decades.  There is no longer any question that prolonged solitary confinement causes severe harm.

71.    Solitary confinement isolates prisoners from social interactions, restricts their environmental stimulation, and strips them of control over their daily lives.  Such treatment results in a host of well-documented, harmful psychiatric outcomes.  Empirical studies of prisoners incarcerated in solitary confinement document "stress-related reactions (such as decreased appetite, trembling hands, sweating palms, heart palpitations, and a sense of impending emotional breakdown); sleep disturbances (including nightmares and sleeplessness); heightened levels of anxiety and panic; irritability, aggression, and rage; paranoia, ruminations, and violent fantasies; cognitive dysfunction, hyper-sensitivity to stimuli, and hallucinations; loss of emotional control,

mood swings, lethargy, flattened affect, and depression; increased suicidality and instances of self-harm; and, finally, paradoxical tendencies to further social withdrawal."[34]

72.     These harms should come as no surprise; it is well established in psychological literature that "meaningful social contact is a fundamental human need."[35] Psychological research has established that the human brain is "wired to connect" to other people, and denying the brain that ability increases physical morbidity and mortality.[36]

73.     Not only are these documented harms severe, but they are also highly prevalent[37] and often irreversible[38] among those restricted to prolonged solitary confinement.

74.     Beyond studies that focus specifically on the effects of solitary confinement, ample research documents the harm of social isolation in society at large.  For example, one study found that lack of social connection heightened health risks in a manner consistent with smoking 15 cigarettes per day or alcohol abuse, and in a manner that is twice as harmful to physical and mental health as obesity.[39]  One study linked perceived social isolation with health consequences such as "depression, poor sleep quality, impaired executive function, accelerated cognitive decline, poor

---

[34] Craig Haney, *The Psychological Effects of Solitary Confinement: A Systematic Critique*, 47 CRIME & JUSTICE 365, 372 (2018) (summarizing the many studies on solitary confinement).

[35] Craig Haney, *The Science of Solitary: Expanding the Harmfulness Narrative*, 115 NW. U. L. REV. 211, 223 (2020) (emphasis added).

[36] *Id.* at 224.

[37] *See* Haney, *supra* at 372 n.33 (noting that in a study of solitary confinement at Pelican Bay State Prison in California "[e]very symptom of psychological stress and trauma but one (fainting) was experienced by more than half of the assessed prisoners [in solitary confinement]; many were reported by two-thirds or more and some by nearly everyone").

[38] U.N. Secretary-General, *Interim Report of the Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. Doc. A/66/268, ¶ 26 (Aug. 5, 2011) (describing surveyed literature that indicates that "some of the harmful psychological effects of isolation can become irreversible" after 15 days).

[39] *See* Amy Novotney, *The Risks of Social Isolation*, AM. PSYCH. ASS'N (May 2019), https://www.apa.org/monitor/2019/05/ce-corner-isolation (citing Julianne Holt-Lunstad et al., *Loneliness and Social Isolation as Risk Factors for Mortality: A Meta-Analytic Review*, 10 PERSPECTIVES PSCYH. SCI 227 (2015)).

cardiovascular function and impaired immunity at every stage of life."[40]  Another study found that loneliness was associated with a 40 percent increase in risk of dementia.[41]

75.    Interest in the impact of social isolation has increased over the past two years in response to the COVID-19 pandemic and, as such, the scientific evidence establishing the deleterious effects of social isolation has expanded exponentially.  One such study reviewed the literature on psychiatric symptoms resulting from quarantine, reporting that the negative impacts include post-traumatic stress symptoms, confusion, and anger.[42]  The study further noted that periods of isolation, even when fewer than ten days, can create psychiatric symptoms lasting up to three years.[43]

76.    The research on the impact of social isolation on humans is clearer than ever, and there is no reason to believe that social isolation in the context of solitary confinement in prison is somehow immune from the documented severe psychological and physical harm that results from isolation in general.

77.    Although medical ethics prohibit randomized experiments to study the effects of solitary confinement in humans, experiments in animal research have confirmed the causal relationship between solitary confinement and irreversible psychological harm.  Documented effects of social isolation in animal research include "change[s to] the brain chemistry of animals in ways that negatively affect the cellular mechanisms of aging, . . . depression-like behavior in mammals, and suppress[ion] of the animal immune response to illness," as well as anxiety-like

---

[40] *See id.* (citing Louise C. Hawkley & John P. Capitanio, *Perceived Social Isolation, Evolutionary Fitness and Health Outcomes: A Lifespan Approach*, 370 PHILOSOPHICAL TRANSITIONS OF THE ROYAL SOC'Y B: BIOLOGICAL SCIS. 20140114 (2015)).

[41] *See id.* (citing Angelina R. Sutin et al., *Loneliness and Risk of Dementia*, 75 J. GERONTOLOGY 1414 (2020)).

[42] Samantha K. Brooks et al., *The Psychological Impact of Quarantine and How to Reduce It: Rapid Review of the Evidence*, 395 LANCET 912 (2020).

[43] *Id.*

behavior, impaired working memory, and disruptions of brain activity.[44]  Perhaps the most concerning takeaway from this line of research is the following: "the damaging effects of social isolation on laboratory animals are so well documented that they have led governmental and scientific funding organizations, such as the National Research Council, to prohibit researchers from placing animals in completely isolated conditions for prolonged periods."[45]  Yet, Defendants have forced Plaintiffs and Class Members—through systematic policy—to remain in social isolation for decades.

78.    Extensive research on the harms of physical inactivity—including the risk of high blood pressure, Type-2 diabetes, coronary heart disease, anxiety and depression, certain cancers, and falls for older adults—additionally highlights the damage caused by forcing prisoners to spend 22 to 24 hours per day alone in an 8  by 12 feet cell.[46]  Just as social interaction is a fundamental human need, so too is physical activity.

### 2.    Indefinite Nature of Solitary Confinement on Death Row

79.    Solitary confinement at the Polunsky Death Row Unit is permanent as a matter of prison policy;[47] male prisoners sentenced to death in the State of Texas are required to be held in solitary confinement from the day they are sentenced until the day they are executed.  Combined,

---

[44] *See* Haney, *supra* at 225 n.33 (citing Jennie R. Stevenson et al*., Oxytocin Administration Prevents Cellular Aging Caused by Social Isolation*, 103 PSYCHONEUROENDOCRINOLOGY 52, 52–53 (2019); Yu Gong et al., *Dynamic Changes in Hippocampal Microglia Contribute to Depressive-Like Behavior Induced by Early Social Isolation,* 135 NEUROPHARMACOLOGY 223 (2018); John P. Capitanio et al., *Loneliness in Monkeys: Neuroimmune Mechanisms*, 28 CURRENT OPINION BEHAV. SCI. 51, 51 (2019); Wenjuan Wu et al., *Social Isolation Stress Enhanced Liver Metastasis of Murine Colon 26-L5 Carcinoma Cells by Suppressing Immune Response in Mice*, 66 LIFE SCI. 1827, 1827-28 (2000); Candela Zorzo et al., *Adult Social Isolation Leads to Anxiety and Spatial Memory Impairment: Brain Activity Pattern of COx and c-Fos*, 365 BEHAV. BRAIN RES. 170, 170–71 (2019)).

[45] *Id.* at 226.

[46] *See Risks of Physical Inactivity*, JOHNS HOPKINS, https://www.hopkinsmedicine.org/health/conditions-and-diseases/risks-of-physical-inactivity (last visited Dec. 19, 2022) (describing established risks of physical activity).

[47] *See infra* ¶ 118.

Plaintiffs have spent a total of approximately 59 years in solitary confinement. Class members who have been at the Polunsky Death Row Unit since the day death row was moved there from the Ellis Unit have each spent 23 years in permanent, relentless solitude without any close human contact except with guards when they are being hand cuffed, transported, or disciplined.

### 3. Automatic Nature of Solitary Confinement on Death Row

80. Despite the serious concerns about use of prolonged solitary confinement highlighted above, Defendants have not chosen to use solitary confinement sparingly and only in combination with comprehensive safeguards, as counseled by medical literature, case law, and other authorities.

81. Defendants do not conduct any risk assessment or harm analysis whatsoever before condemning every male prisoner sentenced to death in the State of Texas to solitary confinement at the Polunsky Death Row Unit. Instead, *all* male prisoners sentenced to death are held in solitary confinement at the Polunsky Death Row Unit, as a blanket policy.

82. There is no opportunity for death row prisoners to challenge this universally applied policy or seek an exception based on their individualized circumstances. There is likewise no means for death row prisoners to seek different conditions of confinement, or to be integrated into the general population of high-security prisoners at the Allan B. Polunsky Unit.

83. The arbitrary nature of incarcerating certain prisoners in permanent, isolated conditions based on their sentence alone, combined with the lack of procedural safeguards surrounding use of solitary confinement, contravenes accepted practices.

84. A 2016 U.S. Department of Justice ("DOJ") report on the use of restrictive housing in prisons recommends that "[c]orrectional systems should always be able to clearly articulate the specific reason(s) for a prisoner's placement and retention in restrictive housing," and that the

specific reason should be supported by objective evidence.[48]  Furthermore, the report states that "[r]estrictive housing should always serve a specific penological purpose."[49]

85.     A report by the National Institute of Justice, the research and evaluation branch of the DOJ, found that "almost no literature documents the utility of [administrative segregation] or demonstrates that the use of [restrictive housing] has achieved specific aims in demonstrable ways . . . . [I]t is virtually impossible to find empirical evidence supporting its utility or efficacy."[50]

86.     That Plaintiffs and Class Members have been sentenced to death does not alone justify the harmful and arbitrary conditions of their confinement compared to other prisoners held in high security at the Allan B. Polunsky Unit, many of whom have been convicted of similar or even more violent crimes.

87.     In 2005, forensic psychologists conducted a study comparing the institutional violence histories of death-sentenced prisoners with those of prisoners not sentenced to death at a maximum-security facility in Missouri.  The study found similar rates of institutional violence for death-sentenced prisoners as compared to those sentenced to life without parole.[51]  The rates of both groups were also significantly lower than those of parole-eligible prisoners.[52]

88.     In light of these findings, and others like them, it is no wonder why United Nations Mandela Rule 45 states that solitary confinement "shall not be imposed by virtue of a prisoner's sentence."[53]

---

[48] U.S. DEP'T JUSTICE, REPORT AND RECOMMENDATIONS CONCERNING THE USE OF RESTRICTIVE HOUSING, FINAL REPORT, JANUARY 2016, Off. of the Deputy Att'y General, Dep't of Justice Archives, at 94 (2016).
[49] Id.
[50] Natasha A. Frost & Carlos E. Monteiro, *Administrative Segregation in U.S. Prisons: Executive Summary* 4, Nat'l Inst. of Justice (Mar. 2016).
[51] Mark D. Cunningham et al., *Is Death Row Obsolete? A Decade of Mainstreaming Death-Sentenced Inmates in Missouri*, 23 BEHAV. SCI. L. 307, 316–19 (2005).
[52] Id.
[53] UN GENERAL ASSEMBLY, MANDELA RULES 14 (2015), https://www.unodc.org/documents/justice-and-prison-reform/Nelson_Mandela_Rules-E-ebook.pdf.

89.     Best correctional practices dictate that an individualized assessment and classification must be taken for death row prisoners, rather than automatically condemning these individuals, through a blanket policy, to solitary confinement for the remainder of their lives.  In a brief before the U.S. Supreme Court in support of prisoners challenging a death row solitary confinement policy, corrections directors and administrators—including former directors of several state prison systems around the country—cited evidence showing that objective factors, such as age and disciplinary history, are more predictive for security purposes than is conviction status.[54]

90.     The ABA's Standards for Criminal Justice, Treatment of Prisoners instructs that, while death-sentenced prisoners might be separated from other prisoners, they should be housed in comparable conditions to those of the general population, with solitary confinement being used only for brief periods, only for compelling reasons of security, crime, or discipline, and only with adequate process to challenge solitary confinement.[55]  The Polunsky Death Row Unit's current policy does not align with a single one of those recommendations.

91.     A group of former corrections officials recently filed an amicus brief in connection with a petition for a writ of certiorari in *Hope v. Harris*.[56]  These former corrections officials describe long-term solitary confinement as a "costly, ineffective form of punishment that does not advance penological goals or improve prison security," which causes severe psychological and physical harm.[57]  The brief highlights eight states that undertook "substantial, system-wide

---

[54] June 4, 2014, Brief of Amici Curiae Correctional Experts in Support of Appellee at 21, ECF No. 36-1, *Prieto v. Clarke*, No.13- 8021 (4th Cir. Mar. 10, 2015).
[55] ABA STANDARDS FOR CRIMINAL JUSTICE, TREATMENT OF PRISONERS STANDARD 23–2.6(a), at 50 (3d ed. 2011).
[56] Brief of Former Corrections Directors as Amici Curiae in Support of Petitioner, No. 21-1065, *Hope v. Harris*, (U.S. June 18, 2021).
[57] *Id.* at 4.

reforms, reducing the population of people in solitary confinement from nearly 100,000 to approximately 60,000 in four years," which led to a "significant *decrease* in prison violence."[58]

92.    Recently filed settlements also reflect the growing understanding of long-term solitary confinement as a harmful and ineffective policy.  The Louisiana State Penitentiary reached a settlement agreement in 2021 overhauling the prison's long-time policy of housing all death-sentenced prisoners in solitary confinement.[59]   The Pennsylvania Department of Corrections entered into a similar 2020 settlement agreement overhauling its policy of automatic solitary confinement for all death-sentenced prisoners.[60] Also, after the Florida Department of Corrections was sued in 2017 over allegations that its policy of automatically placing Florida prisoners sentenced to death in permanent solitary confinement violated prisoners' constitutional rights, it entered into a settlement involving a number improvements to the conditions of confinement.[61] The improvements include using "best efforts" to offer eligible death row prisoners a specified amount of out-of-cell time in a communal dayroom and in an outdoor exercise space.

93.    Plaintiffs' and Class Members' placement in solitary confinement is due to Defendants' blanket policy of incarcerating male death row prisoners in solitary confinement; their isolation has nothing to do with any individualized considerations or concerns over a prisoner's behavior.

---

[58] *Id.* at 15–16.

[59] *Hamilton v. Vannoy*, 3:17-CV-00194 (M.D. La. Feb. 9, 2022), ECF No. 110-1, Sept. 28 2021, Settlement Agreement.

[60] *Reid v. Wetzel*, No. 1:18-CV-176, 2020 WL 8184695, at *6 (M.D. Pa. Apr. 9, 2020), appeal dismissed sub nom. *Reid v. Sec'y Pa. Dep't*, No. 20-2115, 2020 WL 8184867 (3d Cir. Aug. 20, 2020), cert. denied sub nom. *Poplawski v. Wetzel*, 141 S. Ct. 1244, 208 L. Ed. 2d 633 (2021).

[61] *Davis v. Dixon,* 3:17-cv-820-MMH-PDB, (M.D. Fla. Apr. 28, 2022), ECF No. 115-1, Nov. 17, 2021, Settlement Agreement.

94.     Defendants' arbitrary requirement to house all male death row prisoners in permanent solitary confinement does not promote safety and security, is inconsistent with correctional best practices, and serves no penological purpose.

95.     The conditions that Plaintiffs and Class Members are subjected to as a result violates national and international norms, and the prisoners detained in prolonged solitary confinement suffer severe harm as a result.

## IV.    CLASS ALLEGATIONS

96.     The named Plaintiffs bring this action, on behalf of themselves and all others similarly situated, to assert the claims alleged in this Complaint on a common basis.

97.     A class action is a superior means, and the only practicable means, by which the named Plaintiffs and Class Members can challenge Defendants' unlawful practices with regards to the conditions at the Polunsky Death Row Unit.

98.     Plaintiffs are satisfactory representatives for purposes of representing the class of similarly situated prisoners on death row at the Polunsky Death Row Unit.  Plaintiffs seek to represent the Class Members, a class consisting of: all male death row prisoners incarcerated in permanent solitary confinement at the Polunsky Death Row Unit, none of whom have been or will be given meaningful review of their placement in solitary confinement (in violation of the Eighth Amendment, Due Process Clause of the Fourteenth Amendment, and Texas Constitution Art. I § 13), and all of whom have restricted access to counsel as a result of Defendants' chosen policies (in violation of the Sixth Amendment).

99.     This action is brought and may properly be maintained as a Class action pursuant to Rule 23(a)(1)–(4) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

100.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

101.    The class is so numerous that joinder of all members is impracticable.  Fed. R. Civ. P. 23(a)(1).  As of October 14, 2022, there are 185 male prisoners in solitary confinement at the Polunsky Death Row Unit.  Over 75% of these prisoners have been kept in solitary confinement for more than 10 years.[62]

102.    There are questions of law and fact common to the members of the class.  Fed. R. Civ. P. 23(a)(2).  These include, but are not limited to, (1) whether Defendants' policy that all death row prisoners be housed in prolonged solitary confinement constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments; (2) whether this policy also violates the due process rights of the prisoners guaranteed by the Fourteenth Amendment; (3) whether Defendants' policies regarding prisoners' access to counsel and to the law library violates prisoners' Sixth Amendment rights; and (4) whether there is a penological reason to house prisoners for years in solitary confinement solely because they were sentenced to death, and without a showing that they currently pose a danger or security risk to other prisoners or prison officials.

103.    The claims of the named Plaintiffs are typical of those of the class.  Fed. R. Civ. P. 23(a)(3).  The named Plaintiffs and the Class Members all suffer deprivation of basic human needs due to the same conditions of confinement. While the exact nature of the harms suffered differs slightly for each prisoner, the source of the harm for each individual is the same policy and practice of placing all death row prisoners in conditions of prolonged solitary confinement, a practice that

---

[62] *See Faces of Death Row*, J. McCullough and B. Hasson, TEX. TRIBUNE (Aug. 30, 2022), https://apps.texastribune.org/death-row/#:~:text=Here%20is%20a%20look%20at,7%20months%20on%20death%20row.

has been shown to cause serious mental and physical harm. Additionally, Plaintiffs and Class Members have had their access to counsel restricted in a similar way as a result of Defendants' policies.

104.    Plaintiffs are capable of fairly and adequately representing and protecting the interests of the class. Fed. R. Civ. P. 23(a)(4). Plaintiffs do not have interests that are inconsistent with those of the class, and they are adequately represented by counsel, who are experienced in class action cases and civil rights, specifically prisoners' rights, litigation.

105.    This action is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1). The numerous class members create a risk that prosecution of separate actions by individuals would result in inconsistent and varying adjudications that would establish incompatible standards of conduct for Defendants. Additionally, prosecution of separate actions by individuals would substantially impede the ability of other members to protect their interests.

106.    This action is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) because Defendants' policies of subjecting all death row prisoners to solitary confinement and restricting access to counsel are applicable to all Class Members, injunctive relief is an appropriate remedy for all members of the class, and there exist common questions of law and fact.

## V.    CLAIMS FOR RELIEF

### Count I

**Declaratory Judgment and Injunctive Relief for Violations of the Eighth Amendment (Cruel and Unusual Punishment) Against All Defendants in Their Official Capacities**

107.    Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs as if fully set forth herein.

108.    Plaintiffs bring this claim on their own behalf, and on behalf of the Class, against all Defendants.

109.    Defendants' policy and practice of automatically placing all death row prisoners at the Polunsky Death Row Unit in permanent solitary confinement has deprived and continues to deprive Plaintiffs and Class Members of essential human needs.  This practice violates their human dignity and their constitutional right to be free from cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution.[63]  Specifically, Defendants' policies and practices are cruel and unusual because they deprive Plaintiffs of the basic necessities of human existence, impose serious and irreparable psychological and physical injury, and violate present-day concepts and standards of human dignity.

110.    The physical and psychological consequences of long-term isolation reflect a severe denial of human fundamental needs, including but not limited to lack of human interaction, sensory stimulation, sufficient sleep, and adequate physical exercise.[64]

111.    The extensive deprivation of basic human needs causes intense psychological anguish, and this unnecessary and wanton infliction of pain is likely to result in lasting psychological and physical injury to Plaintiffs and Class Members.

112.    The indefinite and undetermined length of solitary confinement the Plaintiffs and Class Members are subjected to poses significant risk of incapacitation and permanent mental illness and physical harm.

113.    Defendants' policy of indefinite and lengthy placement in solitary confinement inflicts disproportionate punishment on Plaintiffs and Class Members.

---

[63] *Hope*, 861 F. App'x. at 582.
[64] *See Porter*, 974 F.3d at 441 (citing *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F. 3d  549, 566–68 (3rd Cir. 2017) (detailing severe consequences of prolonged isolation).

114.     Incarcerating prisoners in these cruel conditions simply because they were sentenced to death serves no valid legal purpose.  This policy has no legitimate rationale and does not serve any security needs.  In fact, to the extent that solitary units are occupied by people who do not pose the greatest risk to the prison, this policy runs counter to penological and security interests.  This is underlined by the fact that automatic solitary confinement is a direct result of Defendants suspending their own adopted "Work Capable" policy since 2000.[65]

115.     Literature condemning prolonged and indefinite solitary confinement is extensive and unanimous in its conclusions on the harms of solitary confinement.  Such practices are also denounced by the international community and condemned by medical and legal organizations alike.  Defendants have been on notice and continue to be on notice of all the deprivations stated above and yet have upheld the death row policy.

116.     The mental anguish and suffering arising out of the conditions that Plaintiffs and Class Members are subject to, and their long-term effects, should be evident to Defendants and to any reasonable person.  Furthermore, Defendants have been made aware, through administrative grievances and written complaints, that Plaintiffs and Class Members are presently suffering substantial and ongoing injury.

117.     As a direct and proximate result of Defendants' constitutional violations described above, Plaintiffs and Class Members have been and will be irreparably injured. Plaintiffs and Class Members will have no adequate remedy at law for Defendants' actions.  Plaintiffs and Eighth Amendment Class Members will suffer irreparable harm to their constitutional rights unless

---

[65] *Death Row Plan*, Texas Department of Criminal Justice, Correctional Institutions Division (October 2004), available at: https://tifa.org/wp-content/uploads/2014/02/Administrative-Segregation-Death-Row-Plan-1.pdf; Merel Pontier, *CRUEL BUT NOT UNUSUAL THE AUTOMATIC USE OF*..., 26 Tex. J. on C.L. & C.R. 117, n.830 (2020).

Defendants are enjoined from continuing their unlawful policies, practices and/or customs which have directly and proximately caused these constitutional abuses.

118.    Additionally, an actual controversy exists regarding the constitutionality of Defendants' practices and policies concerning the placement of all death row prisoners in solitary confinement.  A declaration on this issue will resolve that portion of the controversy between the parties, and the Court's determination of the issues will guide Defendants' actions.

## Count II

**Declaratory Judgment and Injunctive Relief for Violations of Texas Constitution Art. I § 13 (Cruel or Unusual Punishment) Against all Defendants in Their Official Capacities**

119.    Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs as if fully set forth herein.

120.    Plaintiffs bring this claim on their own behalf, and on behalf of the Class, against all Defendants.

121.    The allegations outlined in Count I apply equally under the Texas Constitution as under the Eighth Amendment.[66]

122.    Each of the allegations set forth in Count I must also be considered separately pursuant to the distinct phrasing of the Texas Constitution's cruel *or* unusual clause.  Art. I § 13 of the Texas Constitution prohibits "cruel *or* unusual punishment"—offering, on the plain text, a broader protection than that of the Eighth Amendment. [67]  Even without this distinction, however,

---

[66] *See Cantu v. State*, 939 S.W.2d 627, 645 (Tex. Crim. App. 1997); *see also Duran v. State*, 363 S.W.3d 719, 723 (Tex. App. 2011) (no distinction between analysis of cruel and unusual punishment under the Eighth Amendment and cruel or unusual punishment under the Texas Constitution).

[67] Tex. Const. Art. I § 13 (emphasis added). This difference in phrasing ("cruel *or* unusual" as compared with the Eighth Amendment's "cruel *and* unusual") suggests that the Art. I § 13 of the Texas Constitution may provide broader protections than its federal counterpart. For example, California's state constitution also prohibits "cruel *or* unusual" punishment, CA Const. Art. I § 6 (emphasis added), and California's Supreme Court has interpreted that provision to provide greater protection than the Eighth Amendment, based on both

Defendants' actions and policies that violate the Eighth Amendment's prohibition on cruel and unusual punishment likewise violate the Texas Constitution.[68] Specifically, the serious physical and psychological deterioration that Plaintiffs and Class Members in this case have suffered due to their lengthy incarcerations in solitary confinement qualify as "cruel or unusual punishment" and thus violate the Texas Constitution.

123.    The Texas Constitution provides an equitable remedy for all violations of Article 1 § 13.[69]  Additionally, an actual controversy exists regarding the constitutionality of Defendants' practices and policies regarding the placement of all death row prisoners in solitary confinement. A declaration on this issue will resolve that portion of the controversy between the parties, and the Court's determination of the issues will guide Defendants' actions.

### Count III

**Declaratory Judgment and Injunctive Relief for Violations of Due Process (Fourteenth Amendment) Against all Defendants in Their Official Capacities**

124.    Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs as if fully set forth herein.

---

the framers' intent and the plain and natural meaning of the text. *People v. Anderson*, 493 P.2d 880. 889, 100 Cal. Rptr. 152, 171 (Ca. 1972).  Similarly, the Texas Constitution must be given its plain and natural meaning, *Gallagher v. State,* 690 S.W.2d 587, 591–92 (Tex. Crim. App. 1985), and Texas' constitutional framers intended for the Texas Constitution to provide greater protections of individuals against the government than those provided by the federal government.  *See* James C. Harringon, *Framing a Texas Bill of Rights Argument,* 24 St. Mary's L.J. 399, 404 (1993) ("The delegates saw the United States Constitution as protecting the privileged and moneyed minorities from the democratic majority and the Texas Constitution as shielding the democratic majority from the economically advantaged minorities").

[68] Texas Courts generally interpret Art. I § 13 of the Texas Constitution as prohibiting the same conduct as the Eighth Amendment.  *See Cantu*, 939 S.W.2d at 645 (there is "no significance in the difference between the Eighth Amendment's 'cruel and unusual' phrasing and the 'cruel or unusual' phrasing of Art. I, § 13 of the Texas Constitution."); *Duran v. State*, 363 S.W.3d 719, 723 (Tex. App. 2011) (no distinction between analysis of cruel and unusual punishment under the Eighth Amendment and cruel or unusual punishment under the Texas Constitution); *see also Nichols v. State*, No. 10-17-00401-CR, 2019 WL 5078682, at *1 (Tex. App.— Waco Oct. 9, 2019, pet. ref'd).

[69] *See City of Beaumont v. Bouillion*, 896 S.W.2d 143, 148–49 (Tex. 1995) ("any provision of the [Texas] Bill of Rights is self-executing to the extent that anything done in violation of it is void") (citation omitted); *Huckabay v. Moore*, 142 F.3d 233, 242 (5th Cir. 1998) ("the only remedy afforded by [the Texas Constitution] is equitable relief from governmental actions taken in violation of its dictates") (citation omitted).

125.    Plaintiffs bring this claim on their own behalf, and on behalf of the Class, against all Defendants.

126.    By denying Plaintiffs and Class Members any review whatsoever of their prolonged placement in solitary confinement and not giving them the ability to be removed from their complete isolation, Defendants are denying Plaintiffs and Class Members liberty without due process of law in violation of the Fourteenth Amendment to the U.S. Constitution.

127.    The conditions and the length of confinement to which Plaintiffs and Class Members are subjected constitute an atypical and significant hardship as compared with the ordinary incidents of prison life for three reasons: (1) the complete isolation on death row; (2) the indefinite nature of their confinement; and (3) their inability to challenge their placement in solitary confinement.

128.    The conditions of death row are unjustifiably severe.  Prisoners are forced to live in complete isolation.  Their ability to exercise is limited, and they are afforded few visits and are denied even minimal mental stimulation.

129.    Plaintiffs and Class Members have been held in these devastating conditions for as long as 23 years.  Nearly 80 percent of the death row prisoners currently incarcerated at Polunsky have been held in solitary confinement for more than ten years.

130.    Plaintiffs and Class Members are placed in solitary confinement without any form of review or due process. Further, prisoners have no avenue to challenge their placement in permanent isolation, and there is no review policy in place.

131.    Defendants have violated, and continue to violate, the due process rights of Plaintiffs and Class Members by forcing them to live in conditions that amount to atypical and

significant hardship without procedural protections.  No evidence suggests that this policy promotes safety and security of the prison and its staff.

132.    As a direct and proximate result of Defendants' constitutional violations described above, Plaintiffs and Class Members will be irreparably injured.  Plaintiffs and Class Members will have no adequate remedy at law for Defendants' actions.  Plaintiffs and Class Members will suffer irreparable harm to their constitutional rights unless Defendants are enjoined from continuing their unlawful policies, practices and/or customs which have directly and proximately caused these constitutional abuses.

133.    Additionally, an actual controversy exists regarding the constitutionality of Defendants' practices and policies regarding the placement of all death row prisoners in solitary confinement.  A declaration on this issue will resolve that portion of the controversy between the parties, and the Court's determination of the issues will guide Defendants' actions.

## Count IV

**Declaratory Judgment and Injunctive Relief for Violations of the Constitutional and Statutory Right to Counsel Against all Defendants in Their Official Capacity (Sixth Amendment, Fourteenth Amendment and 18 U.S.C. § 3599)**

134.    Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs as if fully set forth herein.

135.    The combined hindrances of scheduling, lack of contact visits, substandard communication equipment and conditions, and inability to communicate with counsel without being overheard by third parties virtually guarantees that Plaintiffs are unable to meaningfully access counsel in aid of any defense, appeal, or related legal proceeding.

136.    Defendants are currently violating the constitutional and statutory right to counsel of Plaintiffs and Class Members through unnecessary restrictions implemented in the name of "security."  However, those considerations cannot override the rights of Plaintiffs and Class

Members, and in any event do not rationally relate to the limitations imposed on the right to counsel.

137.    As described above, Plaintiffs are not provided with adequate facilities where they can meet with their counsel in private.  Instead, Defendants provide attorney-client meetings in the same location and during the same timeframes as general visits.  As a result, Plaintiffs' counsel are forced to sit shoulder-to-shoulder with members of the public visiting other prisoners, in the same room as the Unit guards, while attempting to engage in privileged communications with Plaintiffs through the use of phones that often require counsel to raise their voices in order to be heard.  Presumably, these conversations are also recorded—until recently, signage above the public and attorney meeting booths clearly stated that all conversations through the phones in the area are monitored.  To pass legal materials to their clients, attorneys must hand them over to these same guards who may review them to determine that they are "legal" in nature.

138.    The facilities made specifically for attorney-client meetings are also inadequate, being substantially similar to the general meeting spaces in terms of proximity to others, general lack of privacy, and substandard equipment that makes it difficult to hear in the best of conditions. Prisoners easily hear guards speaking on the other side of the supposedly private booths. In addition, some of these facilities actively record attorney-client conversations. Defendants' policies, therefore, substantially compromise the confidentiality between Plaintiffs and counsel to the point of near evisceration.

139.    It has long been established that the right to counsel is the right to effective counsel.[70]  The Sixth Amendment of the U.S. Constitution guarantees Plaintiffs' right to effective assistance of counsel, a right that is made obligatory on the states by the Fourteenth Amendment.[71]

---

[70] *See McMann v. Richardson*, 397 U.S. 759, 770 n.14 (1970) (citations omitted).
[71] *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963).

140.    Further, federal law extends the right to counsel "throughout every subsequent stage of available judicial proceedings, including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications for writ of certiorari to the Supreme Court of the United States, and all available post-conviction process."[72]

141.    While 18 U.S.C. § 3599 is typically limited to the appointment (and, as necessary, funding) of counsel, federal courts do have the authority to intervene in cases where the attorney in question is unable or unwilling to assist the defendant in legal proceedings.[73]  Indeed, although a defendant may "technically ha[ve] counsel for purposes of § 3599," if said counsel is not adequately representing him, it is as though that counsel does not exist.[74]  Defendants' actions and the visiting conditions at the Polunsky Death Row Unit have effectively eliminated counsel's ability to adequately represent their client(s) and, as such, Defendants are unlawfully impeding Plaintiffs' and Class Members' access to counsel.

142.    Courts have previously found conditions similar to the ones described in this Complaint to violate the attorney-client privilege protected by a prisoner's Sixth Amendment right to access effective counsel and imposed on states via the Fourteenth Amendment.[75]

143.    Defendants' policy of forcing attorneys to drive long distances to communicate with clients is also unduly restrictive of Plaintiffs' right to access effective counsel.[76]

---

[72] 18 U.S.C. § 3599(e).

[73] *Battaglia v. Stephens*, 824 F.3d 470, 473–74 (5th Cir. 2016).

[74] *Id.* at 474.

[75] *See People v. Torres*, 218 Cal. App. 3d 700, 708 (Ct. App. 5th Dist. 1990) (holding that practice of having officers within three to four feet of prisoners who are meeting with their lawyers "would have a chilling effect on attorney-client communications," and was thus a violation of prisoner's right to confidentiality); *Wright v. State*, 300 S.E.2d 147, 149 (Ga. 1983) (attorney-client relationship unconstitutionally impaired by analogous conditions where partitioned room required conversing at a level loud enough to be overheard by other prisoners and guards).

[76] *Nunez v. Boldin*, 537 F. Supp. 578, 582 (S.D. Tex. 1982), *appeal dismissed* 692 F.2d 755 (5th Cir. 1982) (prohibiting attorney visits after 3:30 p.m. in rural area was unduly restrictive); *see also Wolfish v. Levi*, 573 F.2d 118, 133 (2d Cir. 1978) (remedial order affirmed where "attorney visits were made in the general visiting

144.    While access to attorney-client phone calls increased during the pandemic, that does not eliminate the need for in-person contact visits.  Moreover, the attorney-client phone calls are subject to significant limitations on time, generally being cut off after thirty minutes, and use similarly substandard equipment such that it is sometimes impossible for one participant in the conversation to hear the other.

145.    The Polunsky Death Row Unit does not allow contact visits between Plaintiffs and their counsel. When faced with complete bans on contact visitation, several federal courts have held that prisoners—including those on death row—have a constitutional right to contact visits with counsel.[77]    At least one of these courts has found that contact visits are necessary for meaningful consultation, and that an outright ban on such visits is unduly restrictive.[78] Defendants' prohibition on contact visits between death row prisoners and their counsel serves no compelling penological interest.

146.    As a result of Defendants' policies, Plaintiffs have been prejudiced by, among other things, the inability to discuss sensitive topics with attorneys necessary for certain claims and actions (such as habeas actions, and claims commonly raised therein), the inability of attorneys to contact their clients on short notice in emergency situations, and the risk of undue delay in their cases due to the limitations imposed on attorney contact.

---

rooms during visiting hours thereby entailing long delays, limiting the attorney's time with his client, and totally vitiating confidentiality").

[77] *See e.g.*, *Mann v. Reynolds*, 46 F.3d 1055, 1063–64 (10th Cir. 1995) (holding arbitrary prohibition of contact visits between death row prisoners and attorneys violated the Sixth Amendment); *Ching v. Lewis*, 895 F.2d 608, 610 (9th Cir. 1990); *Bach v. People of State of Ill.*, 504 F.2d 1100, 1102 (7th Cir. 1974) ("We think that contact with an attorney and the opportunity to communicate privately is a vital ingredient to the effective assistance of counsel and access to the courts.") (citation omitted). .

[78] *Mann*, 46 F.3d at 1060–61.

147.    Defendants have impeded Plaintiffs' right to counsel as related to their underlying convictions and sentencing, and Defendants have further impaired counsel from performing their obligations to their clients.

## Count V

**Damages for Violations of the Eighth Amendment (Cruel and Unusual Punishment) Against all Defendants in Their Individual Capacities**

148.    Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs as if fully set forth herein.

149.    Defendants individually and together in their individual capacity continuously implemented the policies alleged above.

150.    Plaintiffs and class members, as TDCJ prisoners confined to Death Row, were and are protected by the Texas Constitution and the Constitution of the United States; they bring this action pursuant to 42 U.S.C. § 1983.

151.    Defendants were acting under the color or pretense of State law, customs, practices, usage, or policy at all times mentioned herein as correctional officers and/or supervisors who had certain duties imposed upon them with regard to Plaintiffs' placement, care, and treatment. Additionally, during all periods in question, Defendants were well aware of the Plaintiffs' constitutional rights, including their right to be free from cruel and unusual punishment.

152.    Defendants' policies and practices violate standards for human dignity and the constitutional right to be free from cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution.  Defendants' policies and practices are cruel and unusual because they deprive Plaintiffs of basic human needs, impose serious and irreparable psychological and physical injury and violate present-day concepts and standards of human dignity.

153.    As a direct and proximate result of Defendants' constitutional violations, Plaintiffs suffered damages in an amount to be proven at trial.

## Count VI

**Damages for Violations of Due Process (Fourteenth Amendment) Against all Defendants in Their Individual Capacities**

154.    Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs as if fully set forth herein.

155.    Defendants individually and together in their individual capacities continuously implemented the policies alleged above.

156.    Plaintiffs and class members, as TDCJ prisoners confined to Death Row, were and are protected by the Texas Constitution and the Constitution of the United States; they bring this action pursuant to 42 U.S.C. § 1983.

157.    Defendants were acting under the color or pretense of State law, customs, practices, usage, or policy at all times mentioned herein as correctional officers and/or supervisors who had certain duties imposed upon them with regard to Plaintiffs' placement, care, and treatment. Additionally, during all periods in question, Defendants were well aware of the Plaintiffs' constitutional rights, including their right to be free from cruel and unusual punishment.

158.    Defendants' policies and practices violate the Fourteenth Amendment of the U.S. Constitution by denying Plaintiffs liberty without due process of law. Plaintiffs are denied any review whatsoever of their prolonged placement in solitary confinement and are denied the ability to be removed from their complete and prolonged isolation.

159.    As a proximate result of Defendants' constitutional violations, Plaintiffs suffered damages in an amount to be proven at trial.

## Count VII

**Damages for Violations of the Constitutional and Statutory Right to Counsel Against all Defendants in Their Individual Capacities (Sixth Amendment, Fourteenth Amendment, and 18 U.S.C. § 3599)**

160.    Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs as if fully set forth herein.

161.    Defendants individually and together in their individual capacity continuously implemented the policies alleged above.

162.    Plaintiffs and class members, as TDCJ prisoners confined to Death Row, were and are protected by the Texas Constitution and the Constitution of the United States; they bring this action pursuant to 42 U.S.C. § 1983.

163.    Defendants were acting under the color or pretense of State law, customs, practices, usage, or policy at all times mentioned herein as correctional officers and/or supervisors who had certain duties imposed upon them with regard to Plaintiffs' placement, care, and treatment. Additionally, during all periods in question, Defendants were well aware of the Plaintiffs' constitutional rights, including their right to be free from cruel and unusual punishment.

164.    Defendants' policies and practices deny Plaintiffs their constitutional right to access to counsel while incarcerated on death row.

165.    As a proximate result of Defendants' constitutional violations, Plaintiffs suffered damages in an amount to be proven at trial.

## VI.    PRAYER FOR RELIEF

WHEREFORE, the named Plaintiffs and Class Members pray for judgment against the Defendants:

a.    Declaring that this lawsuit is maintainable as a class action pursuant to Rules 23(a) and 23(b)(1)–(2) of the Federal Rules of Civil Procedure;

b. Declaring that Defendants' policies and practices of confining all prisoners sentenced to death row in indefinite solitary confinement with no opportunity for review violates the Eight and Fourteenth Amendments of the U.S. Constitution and Article I § 13 of the Texas Constitution;

c. Declaring the Defendants' policies and practices of denying Plaintiffs access to counsel violates the Sixth Amendment of the U.S. Constitution;

d. Granting permanent injunctive relief enjoining Defendants and their predecessors, successors, present or former agents, representatives, those acting in privity and concern with them, or on their behalf, from violating the Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution and the Article I § of the Texas Constitution;

e. Awarding Plaintiffs the compensatory damages they have sustained as a consequence of Defendants' federal and state Constitutional violations;

f. Awarding Plaintiffs punitive and nominal damages;

g. Awarding Plaintiffs and Class Members costs and reasonable attorney's fees;

h. Granting Plaintiffs prejudgment and post-judgment interest; and

i. Granting such other and further relief as the Court deems just and proper.

## VII.    DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a **trial by jury** on all issues so triable.

Dated:  January 26, 2023                    Respectfully submitted,

                                                    By:    */s/  Catherine Bratic*
                                                            Catherine Bratic
                                                            Texas Bar No. 24087204
                                                            SDTX No. 2678020
                                                            Sydney Rupe
                                                            Texas Bar No. 24116999
                                                            SDTX No. 3520686
                                                            Chloe Warnberg*

Texas Bar No. 24131741
HOGAN LOVELLS US LLP
609 Main Street, Suite 4200
Houston, TX 77002
Telephone: (713) 632-1400
Facsimile: (713) 632-1401
catherine.bratic@hoganlovells.com
sydney.rupe@hoganlovells.com
chloe.warnberg@hoganlovells.com

Pieter Van Tol**
Jack Shaked**
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
Telephone : (212) 918-3000
Facsimile : (212) 918-3100
pieter.vantol@hoganlovells.com
jack.shaked@hoganlovells.com

*Counsel for Plaintiffs*

\* Application for admission pending
\*\* Motion for *pro hac vice* admission
forthcoming