**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

| | |
|---|---|
| MARK ROBERTSON; GEORGE CURRY; TONY EGBUNA FORD; RICKEY CUMMINGS; and LUCKY WARD, on their own behalf, and on behalf of a class of similarly situated prisoners, §§§§§§§§§ | |
| *Plaintiffs*, § | **Civil Action No. 9:23-CV-0023-MAC-ZJH** |
| v. § | **JURY TRIAL DEMANDED** |
| BRYAN COLLIER, Executive Director of Texas Department of Criminal Justice; BOBBY LUMPKIN, Director of the Correction Institutions Division of the Texas Department of Criminal Justice; DANIEL DICKERSON, Warden of the Allan B. Polunsky Unit; Corrections Officer CRYSTAL ANTHONY; and DOES 1-10, §§§§§§§§§§§ | |
| *Defendants*. § | |

# TABLE OF CONTENTS

                                                                                                          **Page**

I.    PARTIES ..............................................................................................................4

      A.    Plaintiffs ..................................................................................................4

            1.    Mark Robertson ............................................................... 5

            2.    George Curry ..................................................................... 5

            3.    Tony Egbuna Ford ............................................................. 6

            4.    Rickey Cummings............................................................... 7

            5.    Lucky Ward ........................................................................ 8

      B.    Defendants ...............................................................................................9

II.   JURISDICTION AND VENUE ........................................................................11

III.  FACTUAL AND LEGAL BACKGROUND ......................................................11

      A.    Conditions of Confinement in the Polunsky Death Row Unit............................11

            1.    Permanent Solitary Confinement in Unsafe and Unhygienic Conditions  11

            2.    Inadequate Access to Medical Care........................................ 17

            3.    Inadequate Access to Counsel ............................................... 21

            4.    Retaliation Against Plaintiffs and Class Members .................................. 27

      B.    Defendants' Policy of Permanent and Automatic Solitary Confinement in the
            Polunsky Death Row Unit .......................................................................29

            1.    Defendants' Policy Contravenes Accepted Research and Practice .......... 29

            2.    Defendants' Policy Serves No Penological Purpose ................................ 31

IV.   CLASS ALLEGATIONS ................................................................................32

V.    CLAIMS FOR RELIEF...................................................................................35

      Count I — Declaratory Judgment and Injunctive Relief for Violations of the Eighth
            Amendment (Cruel and Unusual Punishment) Against Defendants Collier,
            Lumpkin, Dickerson, and the Doe Defendants in Their Official Capacities .........35

      Count II — Declaratory Judgment and Injunctive Relief for Violations of Texas
            Constitution Art. I § 13 (Cruel or Unusual Punishment) Against Defendants
            Collier, Lumpkin, Dickerson, and the Doe Defendants in Their Official Capacities
            ........................................................................................................38

Count III — Declaratory Judgment and Injunctive Relief for Violations of Due Process (Fourteenth Amendment) Against Defendants Collier, Lumpkin, and Dickerson in Their Official Capacities ........................................................................................................38

Count IV — Declaratory Judgment and Injunctive Relief for Violations of the Constitutional and Statutory Right to Counsel Against Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants in Their Official Capacity (Sixth Amendment, Fourteenth Amendment, 18 U.S.C. §§ 1983, 3599, 28 U.S.C. §§ 2254, 2255, Tex. Code Crim. Proc. Art. 11.071(a)) ..............................................41

Count V — Declaratory and Injunctive Relief for Retaliation Against Plaintiffs for Exercising their First Amendment Right to Petition by Denying Plaintiffs' Access to the Courts Against  All Defendants in Their Official Capacities (First Amendment, Fourteenth Amendment, and 42 U.S.C. § 1983) .............................43

Count VI — Damages for Violations of the Eighth Amendment (Cruel and Unusual Punishment) Against Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants in Their Individual Capacities ...........................................................45

Count VII — Damages for Violations of Due Process (Fourteenth Amendment) Against Defendants Collier, Lumpkin, and Dickerson in Their Individual Capacities ......47

Count VIII — Damages for Violations of the Constitutional and Statutory Right to Counsel Against Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants in Their Individual Capacities (Sixth Amendment, Fourteenth Amendment, 18 U.S.C. §§ 1983, 3599, 28 U.S.C. §§ 2254, 2255, and Tex. Code Crim. Proc. Art. 11.071(a)) ................................................................................47

Count IX — Damages for Retaliation Against Plaintiffs for Exercising their First Amendment Right to Petition by Denying Plaintiffs' Access to the Courts Against Defendants Warden Daniel Dickerson and Corrections Officer Crystal Anthony, and the Doe Defendants in Their Individual Capacities (First Amendment, Fourteenth Amendment, and 42 U.S.C. § 1983) ...................................................48

VI.     PRAYER FOR RELIEF ........................................................................................49

VII.    DEMAND FOR JURY TRIAL ............................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Hernandez v. Abbott*,
  2020 WL 5539093 (E.D. Tex. Aug. 24, 2020) ........................................................................47

*In re Medley*,
  134 U. S. 160 (1890) ..................................................................................................................1

**Statutes**

18 U.S.C. § 3599 ..................................................................................11, 33, 34, 40, 41, 48

28 U.S.C. § 1331 ............................................................................................................11

28 U.S.C. § 1343 ............................................................................................................11

28 U.S.C. § 1367 ............................................................................................................11

28 U.S.C. § 1391(b) ........................................................................................................12

28 U.S.C. § 2202 ............................................................................................................11

28 U.S.C. § 2254 ....................................................................................33, 34, 41, 48

28 U.S.C. § 2255 ....................................................................................33, 34, 41, 48

42 U.S.C. § 1983 ....................................................................................................*passim*

Tex. Code Crim. Proc. Ann. art. 37.071 .....................................................................32

Tex. Code Crim. Proc. Art. 11.071(a).................................................33, 34, 40, 41, 48

**Rules**

Fed. R. Civ. P., Rule 23(a) ...........................................................................................49

Fed. R. Civ. P., Rule 23(a)(1) ...............................................................................33, 34

Fed. R. Civ. P., Rule 23(a)(2) ...............................................................................33, 34

Fed. R. Civ. P., Rule 23(a)(3) ...............................................................................33, 34

Fed. R. Civ. P., Rule 23(a)(4) ...............................................................................33, 35

Fed. R. Civ. P., Rule 23(b)(1) ...............................................................................35, 49

Fed. R. Civ. P., Rule 23(b)(2) ...........................................................................33, 35, 49

**Constitutional Provisions**

Texas Constitution, Article I § 13 ........................................................................ *passim*

U.S. Constitution First Amendment....................................................................... *passim*

U.S. Constitution Fifth Amendment ...................................................................... *passim*

U.S. Constitution Sixth Amendment ...................................................................... *passim*

U.S. Constitution Eighth Amendment .................................................................... *passim*

U.S. Constitution Fourteenth Amendment .............................................................. *passim*

U.S. Constitution Art. I, § 9, cl. 3 .................................................................................11

**Non-Periodical Publications**

*A Solitary Failure: The Waste, Cost and Harm of Solitary Confinement in Texas*,
    ACLU and TEX. CIV. RIGHTS PROJECT (Feb. 2015),
    https://www.aclutx.org/sites/default/files/field_documents/SolitaryReport_201
    5.pdf .............................................................................................................................31

ABA STANDARDS FOR CRIM. JUSTICE, TREATMENT OF PRISONERS STANDARD 23–
    2.6(a), at 50 (3d ed. 2011)..........................................................................................32

AFSCME Tex. Correctional Empl. (Jan. 20, 2014), available at
    https://www.texasobserver.org/texas-prison-guard-union-calls-curtailment-
    solitary-confinement-death-row/................................................................................32

Craig Haney, *The Psychological Effects of Solitary Confinement: A Systematic
    Critique*, 47 CRIME & JUSTICE 365, 372 (2018)......................................................30

Craig Haney, *The Science of Solitary: Expanding the Harmfulness Narrative*, 115
    NW. U. L. Rev. 211, 223 (2020) ...............................................................................31

*Death Row Plan*, Texas Department of Criminal Justice, Correctional Institutions
    Division (October 2004), available at: https://tifa.org/wp-
    content/uploads/2014/02/Administrative-Segregation-Death-Row-Plan-1.pdf; ................3, 37

*Faces of Death Row*, J. McCullough and B. Hasson, TEX. TRIBUNE (Aug. 30,
    2022), https://apps.texastribune.org/death-row/. ..............................................2, 34

*Health Effects of Black Mold (Stachybotrys Chartarum)*, AIR OASIS,
    https://www.airoasis.com/blogs/articles/health-effects-black-mold-
    stachybotrys-chartarum (last visited April 23, 2023) ................................................12

*Inside Polunsky*, Solitary Watch,
https://solitarywatch.org/resources/multimedia/photography/polunsky/ ............................1, 12

*Interim Report of the Special Rapporteur of the Human Rights Council on Torture
and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. Doc.
A/66/268 ¶ 26 (Aug. 5, 2011) ...................................................................................................31

J. McCullough and B. Hasson, *Faces of Death Row*, TEX. TRIBUNE (Apr. 24,
2023), https://apps.texastribune.org/death-row/. ................................................................2, 34

Letter from Lance Lowry, President Local 3807 .........................................................................32

Mark D. Cunningham et al., *Is Death Row Obsolete? A Decade of Mainstreaming
Death-Sentenced Inmates in Missou*ri, 23 BEHAV. SCI. L. 307, 316–19 (2005) .....................32

Merel Pontier, *CRUEL BUT NOT UNUSUAL THE AUTOMATIC USE OF* ..., 26
Tex. J. on C.L. & C.R. 117, n.830 (2020) ................................................................................37

Natasha A. Frost & Carlos E. Monteiro, *Administrative Segregation in U.S.
Prisons: Executive Summary* 4, Nat'l Inst. of Justice (Mar. 2016).........................................32

Tamara Tuuminen and Kyösti Sakari Rinne, *Severe Sequelae to Mold-Related
Illness as Demonstrated in Two Finish Cohorts*, 8 FRONTIERS IN
IMMUNOLOGY 1 (April 3, 2017) ...............................................................................................12

*The United Nations Standard Minimum Rules for the Treatment of Prisoners*,
UNITED NATIONS OFFICE ON DRUGS AND CRIME (Dec. 2015),
https://www.unodc.org/documents/justice-and-prison-
reform/Nelson_Mandela_Rules-E-ebook.pdf ...........................................................................1

*WMA Statement on Solitary Confinement*, WORLD MED. ASS'N (2019),
https://www.wma.net/policies-post/wma-statement-on-solitary-confinement/ ........................1

## AMENDED COMPLAINT

1.     For 23 years, Texas has subjected all male death row prisoners to mandatory and permanent solitary confinement and, through the implementation of this practice, it has violated the constitutional rights of the 184 men currently condemned to die at the hands of the state.

2.     Defendants apply a blanket policy restricting Plaintiffs and all other male death row prisoners to an 8-by-12-feet cell for 22 to 24 hours a day, depriving them of any meaningful human interaction.   This treatment, characterized as "some of the U.S.'s most brutal death row conditions,"[1] is applied without any individualized risk assessment.  Defendants' implementation of their solitary confinement policy causes severe harm, restricts Plaintiffs' access to medical care, and impedes Plaintiffs' abilities to meet confidentially with their attorneys.

3.     Solitary confinement exceeding 15 days has irreversible negative effects and has been described by medical experts—as well as by the United Nations—as "torture."[2]  In as early as 1890, the U.S. Supreme Court recognized the harm caused by solitary confinement, stating that:

> A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community.[3]

4.     Despite this consensus, death row prisoners in Texas spend an average of 17 years and 11 months confined, alone, in unsanitary cells, until they are executed by the State of Texas.[4]

---

[1] *Inside Polunsky*, Solitary Watch, https://solitarywatch.org/resources/multimedia/photography/polunsky/.
[2] *See, e.g.*, *WMA Statement on Solitary Confinement*, WORLD MED. ASS'N (2019), https://www.wma.net/policies-post/wma-statement-on-solitary-confinement/; *The United Nations Standard Minimum Rules for the Treatment of Prisoners*, UNITED NATIONS OFFICE ON DRUGS AND CRIME (Dec. 2015), https://www.unodc.org/documents/justice-and-prison-reform/Nelson_Mandela_Rules-E-ebook.pdf.
[3] *In re Medley*, 134 U. S. 160, 168 (1890).
[4] J. McCullough and B. Hasson, *Faces of Death Row*, TEX. TRIBUNE (Apr. 24, 2023), https://apps.texastribune.org/death-row/.

Defendants' implementation of this practice, and the resulting harm to Plaintiffs, amounts to cruel and unusual punishment in violation of the prisoners' constitutional rights.

5.      Plaintiffs Mark Robertson, George Curry, Tony Egbuna Ford, Rickey Cummings, and Lucky Ward (collectively "Plaintiffs") bring this action on behalf of themselves and all other similarly situated individuals ("Class Members") incarcerated on death row at the Allan B. Polunsky Unit ("Polunsky Death Row Unit" or "Unit"),[5] a facility operated by the Texas Department of Criminal Justice ("TDCJ") in which all male Texas death row prisoners are incarcerated, to challenge the conditions of their confinement. Defendants have violated the constitutional and statutory rights of Plaintiffs and Class Members by holding them, without cause or relief, in inhumane conditions and impermissibly infringing on their right to counsel.

6.      The Allan B. Polunsky Unit in Livingston, Texas, opened in November 1993. It confines almost 3,000 prisoners, including the highest security Texas prisoners. Prior to 1999, TDCJ incarcerated all death-sentenced prisoners at the O.B. Ellis Unit in Huntsville, Texas ("Ellis Unit"). At the Ellis Unit, TDCJ did not automatically place all death-sentenced prisoners in permanent solitary confinement. Instead, TDCJ conducted individualized assessments to determine their confinement conditions, and many death-sentenced prisoners participated in work activities, group activities, and educational programs, and had expanded visitation rights.

7.      In 1999 and 2000, TDCJ moved all of the state's male death row prisoners from the Ellis Unit to the Polunsky Death Row Unit. At the Polunsky Death Row Unit, TDCJ adopted the new practice of placing all death row prisoners in permanent solitary confinement until execution.

8.      For most prisoners, including those convicted of capital murder but do not receive a death sentence, Defendants conduct an individualized assessment to determine the appropriate

_____

[5] This Amended Complaint only concerns male prisoners at the Polunsky Death Row Unit.

conditions of confinement, including the use (if any) of solitary confinement.  Defendants do not do this for Plaintiffs or Class Members.  Instead, Defendants, of their own accord, impose a blanket practice of holding all male death row prisoners in solitary confinement for the duration of their incarceration, with no opportunity for Plaintiffs or Class Members to challenge these conditions.

9.      This arbitrary policy addresses no legitimate security or penological need, and subjects Plaintiffs and Class Members to inhumane conditions.  Prisoners in the Polunsky Death Row Unit are confined to tiny, unhygienic cells—often infested with black mold, cockroaches, and other vermin—for all but a few hours per week.  TDCJ guards subject death-sentenced prisoners to regular abuse, including starvation and humiliation.

10.     These policies and practices[6] violate TDCJ's own "Death Row Plan."[7]  In 2004, four years after all male death-sentenced prisoners were transferred from the Ellis Unit to the Polunsky Death Row Unit, TDCJ officials adopted a "Death Row Plan" to govern recreation time, work status, and other conditions on death row.  Section I(E)(1) of the Death Row Plan automatically assigns all death row prisoners to solitary confinement for up to one year before they can be deemed "Work Capable"—except that the work capable program has been "suspended" since 1999 and no Plaintiff has ever been assessed for work capable status at the Polunsky Death Row Unit.  As a result, this policy, as currently implemented by Defendants, imposes extreme solitary confinement across the board, with no reprieve.  Under the Death Row Plan, death-

---

[6] Defendants' policies and practices—including, but not limited to, staff shortages—cause the unconstitutional conditions described herein. Plaintiffs understand that many of TDCJ's policies are not publicly available but expect will be revealed in discovery.

[7] *Death Row Plan*, Texas Department of Criminal Justice, Correctional Institutions Division (October 2004) [hereafter "Death Row Plan"], attached hereto as Exhibit A.  Specifically, Defendants' current policies and practices violate Sections I(D) ("Work Capable Review"), I(E) ("Death Row Segregation"), I(F) ("Subsequent Reviews"), II(A) ("Visiting"), II(D) ("In-Cell Programs"), III ("Management of Death Row Work Capable"), IV(A) ("Confinement Procedures"), IV(C) ("Recreation Schedule"), IV(D) ("Visitation"), IV(E) ("Meals"), IV(G) ("Property"), IV(H) ("Showering"), and IV(I) ("Correspondence").

sentenced prisoners are assigned to one of three "levels,"[8] but even prisoners assigned to the least-restrictive level must remain alone in their cells except for limited recreation periods and showers. Defendants have effectively abandoned their own Death Row Plan, keeping Plaintiffs and Class Members in extreme conditions that violate TDCJ's own minimum standards of treatment.

11.     Defendants' practices at the Polunsky Death Row Unit also have the effect of unconstitutionally restricting access to medical care and legal counsel.  When death-sentenced prisoners do receive medical attention, they often must converse with healthcare providers from their cells, speaking through cracks in the steel doors.  Other prisoners and guards can overhear conversations regarding private mental and physical health concerns.  Legal visits and calls can take weeks or months to schedule, are limited and thus hard to schedule, and occur in a public setting where conversations are easily overheard.

12.     Individually and collectively, the conditions at the Polunsky Death Row Unit violate the rights guaranteed by the First, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article I § 13 of the Texas Constitution, as well as statutory rights to counsel. Plaintiffs and Class Members seek relief from Defendants to address these violations of their constitutional and statutory rights.

## I.    PARTIES

### A.    Plaintiffs

13.     TDCJ has placed each Plaintiff in solitary confinement at the Polunsky Death Row Unit due to his underlying sentence and without any individualized assessment.  As described below, Plaintiffs have exhausted their administrative remedies.

---

[8]  According to the Death Row Plan, death-sentenced offenders are classified as Level I, II, or II, with Levels II and III requiring "more intensive supervision due to poor institutional behavior." *Id.*  However, even death row prisoners categorized as Level I are denied privileges and restricted in ways that general population prisoners with similar—or worse—institutional records are not.

1.  **Mark Robertson**

14.    Plaintiff Mark Robertson is a 54-year-old prisoner sentenced to death in 1991.  He has been on death row for 32 years and held in solitary confinement at the Unit since 2000.

15.    Extreme isolation and lack of stimulation—such as human interaction or exercise—have taken an immense toll on Mr. Robertson's mental and physical health.  Since being placed in solitary confinement, Mr. Robertson has gained significant weight, and his cardiac health has declined.  Severe sensory deprivation—a product of his conditions in the Polunsky Death Row Unit—has caused him to develop myopia (near sightedness) and tinnitus (ringing in his ears).  Mr. Robertson has also developed symptoms of PTSD, extreme anxiety, and depression.  His prolonged detention in the unsafe and unhygienic conditions of solitary confinement, along with the denial of access to medical care, at the Unit both caused and exacerbated these health issues.

16.    Mr. Robertson is in state habeas proceedings.  The conditions at the Unit have inhibited his ability to communicate with his attorneys and meaningfully contribute to his case.

17.    Mr. Robertson has filed grievances, dated March 21 (solitary), May 20 (solitary), and May 13, 2022 (attorney access), challenging Defendants' practices at the Polunsky Death Row Unit limiting his access to counsel and requiring that he be held in solitary confinement.

2.  **George Curry**

18.    Plaintiff George Curry is a 55-year-old prisoner sentenced to death in 2014.  He has spent the past nine years in solitary confinement at the Unit.

19.    Since being placed in solitary confinement, Mr. Curry's mental and physical health have deteriorated.  He has developed dangerously high blood pressure and suffers from chronic liver problems.  Yet, in 2020, Mr. Curry's health service visits were reduced from quarterly to once a year, preventing Mr. Curry from receiving necessary healthcare.  Conditions at the Unit—

including extreme stress, lack of recreation, and black mold exposure—cause his Eczema to flare up, which he treats with a skin cream that he was prescribed in 2018. On April 4, 2023, after running out of the cream, Mr. Curry requested a refill—which TDCJ still had not provided as of May 9, 2023. Mr. Curry also suffers from paranoia, anxiety, and depression. Mr. Curry's prolonged detention in the unsafe and unhygienic conditions of solitary confinement, along with the denial of access to medical care, at the Unit caused, and exacerbated, these health issues.

20.    Mr. Curry has filed grievances, dated March 28 (solitary) and May 31, 2022 (attorney access), challenging Defendants' practices at the Polunsky Death Row Unit limiting his access to counsel and requiring that he be held in solitary confinement.

### 3.    Tony Egbuna Ford

21.    Plaintiff Tony Egbuna Ford is a 49-year-old prisoner sentenced to death in 1993. He has been on death row for the past 30 years and in solitary confinement at the Unit since 1999.

22.    Once able to interact with other prisoners and engage in productive activities at the Ellis Unit, Mr. Ford has suffered significant physical and mental health traumas since being transferred to permanent isolation. Mr. Ford suffers from depression, and his symptoms have worsened due to his solitary confinement and TDCJ's repeated denials of his requests for mental health treatment. For example, he used to let the sun shine into his cells, but now keeps his window blacked out and himself isolated. He is unable to engage with books, art, or other activities in a manner he once enjoyed. Mr. Ford is also unable to get sufficient nutrients from food at the Unit, causing the pigmentation in his skin to fade and his body to struggle to heal from injuries. Mr. Ford's prolonged detention in the unsafe and unhygienic conditions of solitary confinement, along with the denial of access to medical care, at the Unit caused, and exacerbated, these health issues.

23.     Mr. Ford has filed grievances, dated March 27 (solitary), May 23 (attorney access), and June 9, 2022 (mental health), challenging Defendants' practices holding him in solitary confinement at the Polunsky Death Row Unit and limiting access to counsel and mental healthcare.

### 4.  Rickey Cummings

24.     Plaintiff Rickey Cummings is a 33-year-old prisoner who was sentenced to death in 2013.  He has spent the past ten years in solitary confinement on death row at the Unit.

25.     Mr. Cummings' mental health has sharply declined as a result of solitary confinement.  He feels imminently under attack, and the mental suffering of his fellow prisoners weighs heavily on him.  He developed anxiety, but because of the lack of privacy when medical providers occasionally walk through the Unit, he is unable to seek medical help.  Mr. Cummings' physical health has also deteriorated since he was placed in solitary confinement, resulting in weight gain and the onset of hypertension.  Mr. Cummings' prolonged detention in the unsafe and unhygienic conditions of solitary confinement at the Unit caused and exacerbated these health issues.  The denial of medical care at the Unit has also caused him unnecessary pain: for example, he developed a wound on his head due to the use of dirty clippers by a barber during intake, which TDCJ has not adequately treated despite his repeated requests.

26.     Mr. Cummings is currently in federal habeas proceedings challenging his conviction.  Because of the conditions detailed below, he has been unable to meet with this attorneys prior to key hearings regarding his habeas petition.

27.     Mr. Cummings has filed grievances, dated May 13 (solitary) and June 14, 2022 (attorney access), challenging Defendants' practices at the Unit limiting his access to counsel and requiring that he be detained in solitary confinement.

5. **Lucky Ward**

28.    Plaintiff Lucky Ward is a 58-year-old prisoner sentenced to death in 2020.  He has spent the past three years in solitary confinement at the Unit.

29.    Mr. Ward's mental and physical health have suffered due to the unsafe and unhygienic conditions of confinement at the Polunsky Death Row Unit.  Before being sentenced to death, Mr. Ward was diagnosed with multiple mental health disorders—including bipolar disorder and schizoaffective disorder—which he managed through medication, including the antipsychotic medication Seroquel.  Since arriving at the Polunsky Death Row Unit, Mr. Ward has not had access to Seroquel, and the alternative medications he is currently receiving (Abilify and Celexa) are not effective.  TDCJ guards routinely ridicule him as a "psych patient," and, when Mr. Ward raises concerns about his mental health, he is treated as a disciplinary problem instead of given treatment.  Mr. Ward's extreme isolation and inability to access necessary medication and treatment have exacerbated his mental health disorders.

30.    Mr. Ward has also suffered physical injuries as a result of his conditions of confinement and lack of access to medical care, including a broken leg that remains swollen more than three years after the initial injury and causes him pain every time he is forced to squat to be handcuffed.  Mr. Ward was diagnosed with chronic obstructive pulmonary disease in 1989, but he currently does not have an inhaler, despite being prescribed one in 2021 and 2022.

31.    Mr. Ward is currently litigating his direct appeal, and investigation for an initial state habeas proceeding is underway.  The conditions at the Polunsky Death Row Unit, as described below, have inhibited his ability to access his attorney.  Additionally, when Mr. Ward arrived at the Polunsky Death Row Unit, he was in the midst of a mental health crisis. His lack of

access to counsel meant he had no advocate to intervene to ensure his flagrant symptoms were addressed, which caused him pronounced harm.

**B.**    **Defendants**

32.    Defendant Bryan Collier is the Executive Director of TDCJ.  He is responsible for protecting the constitutional rights of all individuals in the custody of TDCJ, including those on death row.  Defendant Collier determines rules, regulations, and policy regarding the management, personnel, and overall operation of TDCJ, including the Polunsky Death Row Unit, and thus has the authority to compel or constrain conditions of confinement at the Unit.  He authorizes or condones the unconstitutional policy of permanent solitary confinement, the unsafe and unhygienic conditions of confinement at the Polunsky Death Row Unit, and the attorney visitation policies described herein and, therefore, directly and proximately caused the constitutional violations set forth below.  At all relevant times, Defendant Collier acted under color of law and as an official representative of TDCJ.  Defendant Collier is sued in his official capacity for injunctive relief and in his personal capacity for damages.  He is a resident of Texas.

33.    Defendant Bobby Lumpkin is the Director of the Correctional Institutions Division ("CID") of TDCJ.  The CID is responsible for the confinement of all adult felony prisoners who are sentenced to incarceration in a secure facility and oversees a number of support functions.  As Director of the CID, Defendant Lumpkin is responsible for protecting the constitutional rights of TDCJ death-sentenced prisoners.  Defendant Lumpkin has the authority to compel or constrain conditions of confinement at the Polunsky Death Row Unit.  He authorizes or condones the unconstitutional policy of incarcerating all male death row prisoners in permanent solitary confinement, the unsafe and unhygienic conditions of confinement at the Polunsky Death Row Unit, and the attorney visitation policies described herein and thus directly and proximately caused

the constitutional violations set forth below.  At all relevant times, Defendant Lumpkin acted under color of law and as an official representative of TDCJ.  Defendant Lumpkin is sued in his official capacity for injunctive relief and in his personal capacity for damages.  He is a resident of Texas.

34.    Defendant Daniel Dickerson is the Warden of the Allan B. Polunsky Unit.  He is responsible for overseeing the well-being of prisoners incarcerated at the Polunsky Death Row Unit, as well as the facility as a whole.  As Warden, he is obligated to protect the constitutional rights of TDCJ prisoners at the Allan B. Polunsky Unit, including those sentenced to death. Defendant Dickerson has the authority to compel or constrain conditions of confinement at the Polunsky Death Row Unit.  He authorizes or condones the unconstitutional policy of incarcerating all male death row prisoners in permanent solitary confinement, the unsafe and unhygienic conditions of confinement at the Polunsky Death Row Unit, and the attorney visitation policies described herein and, therefore, directly and proximately caused the constitutional violations set forth below.  At all relevant times, Defendant Dickerson acted under color of law and as an official representative of TDCJ.  Defendant Dickerson is sued in his official capacity for injunctive relief and in his personal capacity for damages.  He is a resident of Texas.

35.    Defendant Crystal Anthony is a Corrections Officer in the Allan B. Polunsky Unit. Defendant Anthony is responsible for the well-being of prisoners at the Polunsky Death Row Unit and is one of the guards in charge of their daily movements, including if and when they meet with their attorneys.  Defendant Anthony has the authority to compel or constrain conditions of confinement at the Polunsky Death Row Unit.  Defendant Anthony is sued in her official capacity for injunctive relief and in her personal capacity for damages.  She is a resident of Texas.

36.    Plaintiffs have reviewed public and other records available to them in order to ascertain the true and full names and identities of all defendants in this action, but Plaintiffs have

no further knowledge or information at this time regarding all responsible parties and are unable to ascertain the identity of defendants in this action designated as Does 1–10 (collectively, "Doe Defendants"). The Doe Defendants are sued herein under fictitious names for the reason that their true names and identities are currently unknown to Plaintiffs, except that they may be connected in some manner with the named defendants, such as being supervisors, employees, or agents of Defendants. Plaintiffs will seek to amend this Complaint once they have discovered the true names, capacities, activities, and responsibilities of the Doe Defendants.

## II.   JURISDICTION AND VENUE

37.   Plaintiffs bring this action pursuant to 42 U.S.C. § 1983; the United States Constitution, specifically Art. I, § 9, cl. 3 and the Fifth, Sixth, Eighth, and Fourteenth Amendments; 18 U.S.C. § 3599; 28 U.S.C. § 2202; and the Texas Constitution, Art. I, § 13.

38.   This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. This Court has jurisdiction over Defendants because all Defendants are residents of Texas.

39.   Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Eastern District of Texas because all or a substantial part of the events giving rise to the claims occurred in Polk County.

## III.   FACTUAL AND LEGAL BACKGROUND

### A.   Conditions of Confinement in the Polunsky Death Row Unit

#### 1.   Permanent Solitary Confinement in Unsafe and Unhygienic Conditions

40.   In the Polunsky Death Row Unit, all prisoners are forced to spend between 22 and 24 hours a day alone in cells no larger than 8 by 12 feet. Each cell contains only a sink, a toilet, an elevated structure to sleep on, a thin mattress (sometimes), and a small window.



41.      Prisoners in the Polunsky Death Row Unit spend all but a few hours a week alone in these tiny cells, and eat all their meals there.  They are not allowed any communal or meaningful physical interactions with others, and they live in extreme social isolation and sensory deprivation.

42.      Toxic black mold has infested the Polunsky Death Row Unit since it opened.  Black mold exposure can cause severe health effects, including neurological damage, respiratory symptoms, increased blood pressure, and chronic illness.[10]  These harmful effects increase based on the amount and duration of exposure.[11]  Black mold even grows in air vents at the Unit and is then blown into the air, meaning it causes health defects far beyond the surfaces on which it grows.

43.      In the Polunsky Death Row Unit, exposure to this toxin is constant.  Black mold infests nearly every cell at the Unit, and Plaintiffs and Class Members spend 22 to 24 hours per day in their cells, unable to escape its effects.  For example, in 2019 and 2020, Mr. Curry's cell was infested with black mold that covered almost the entire back wall of his cell and was clearly visible through the cell door.  Despite repeated requests to TDCJ to remove the black mold, including a grievance filed by Mr. Curry in January 2020, TDCJ did not adequately remedy the

---

[9]  *Inside Polunsky*, SOLITARY WATCH (last visited April 21, 2023), https://solitarywatch.org/resources/multimedia/photography/polunsky/ (window in cell with mold).
[10]  *See, e.g.*, Tamara Tuuminen and Kyösti Sakari Rinne, *Severe Sequelae to Mold-Related Illness as Demonstrated in Two Finish Cohorts*, 8 FRONTIERS IN IMMUNOLOGY 1 (April 3, 2017); *Health Effects of Black Mold (Stachybotrys Chartarum)*, AIR OASIS, https://www.airoasis.com/blogs/articles/health-effects-black-mold-stachybotrys-chartarum (last visited April 23, 2023).
[11]  *Id.*

situation.   Mr. Curry was forced to rely on denture adhesive—which he bought from the commissary—to plug the leaks in his cell, which only led to additional black mold buildup around the adhesive.  Mr. Curry was only moved to a different cell after his lawyer contacted the Polunsky Death Row Unit.  TDCJ then moved another death-sentenced prisoner into the mold-infested cell that Mr. Curry had vacated.  Mr. Curry's blood pressure increased so noticeably during the time he lived in the mold-infested cell that TDCJ increased the dosage of his blood pressure medication; his blood pressure did not decrease again until after he moved cells.  Mr. Robertson has also experienced health problems due to the mold: After it rains, he often wakes up in the middle of the night struggling to breathe, due to new mold growth in his cell.

44.    These conditions have worsened every year since the Unit opened, yet Defendants have not taken adequate measures to remedy the black mold, nor have Defendants provided Plaintiffs and Class Members with adequate cleaning supplies to remove black mold from their cells themselves.  At some points, TDCJ has painted over black mold at the Unit in an attempt to conceal rather than address the health risk.  Despite these efforts, black mold has visibly spread across the Unit, such that any person walking through—including Defendants—would see it.

45.    In addition to black mold, cockroaches and insects are widespread in the Polunsky Death Row Unit.  For example, Mr. Cummings' cell is infested with cockroaches.  Although he has used tape and paper to try to limit the infestation, they are inescapable in his small cell.  When Mr. Curry was on C Pod between 2018 and 2020, there were multiple instances when he returned from recreation to see that TDCJ guards had left his food tray in his cell, and cockroaches were crawling in his food.  During the same period, TDCJ guards once handed Mr. Curry a food tray that had a live cockroach on it.

46.    TDCJ often moves death-sentenced prisoners to new cells that have not been cleaned and are coated with dirt, pubic hair, urine, blood, and other bodily fluids—which the prisoners are forced to clean themselves, generally with cleaning products they must buy through the prison commissary.  In August 2019, TDCJ moved Mr. Cummings to a cell in which the walls and toilet were covered in blood from another prisoner who had recently been beaten and subsequently died from a heart attack.  When Mr. Cummings refused to enter the cell, TDCJ guards forcibly shoved him into the cell and secured him on the bunk, resulting in a Use of Force Report. Mr. Cummings was forced to sleep in the bloody cell without a mattress, and later forced to clean the other man's blood off the cell himself.

47.    Prisoners in the Polunsky Death Row Unit are regularly limited to just three showers per week and, in some weeks, are not given an opportunity to shower at all.  This practice violates both the Constitution and the Death Row Plan, which promises death-sentenced prisoners the opportunity to shower seven days a week.  For example, in January 2023, Mr. Curry was only afforded a shower twice in two weeks.

48.    On some days, TDCJ allows "recreation," during which a prisoner is moved from his cell to an individual concrete-and-metal cage to exercise alone.  But prisoners in the Unit regularly go several days or weeks without recreation.  From the beginning of November 2021 to late January 2022, Mr. Cummings, Mr. Curry, and other death-sentenced prisoners at the Unit did not have any recreation.  Every three months, the Unit goes on "lockdown," during which death-sentenced prisoners are denied recreation for approximately ten to fourteen days. Most recently, Mr. Robertson has not been afforded recreation from April 22, 2023, until at least May 9, 2023.

49.    As research suggests, this denial of recreational activity seriously harms Plaintiffs' and Class Members' physical and mental health.  For example, although Mr. Ford tries to stay

active in his cell, prolonged solitary confinement and lack of recreation have caused him to develop sores on his hips from being sedentary for too long.

50.     These deprivations have been so extreme—though not uncommon in the Polunsky Death Row Unit—that Mr. Cummings and Mr. Curry participated in a hunger strike in January 2022 to persuade TDCJ to meet their basic hygiene needs.

51.     Meals provided to prisoners in the Polunsky Death Row Unit sometimes consist entirely of a "food loaf," which is leftover (sometimes rotten) food that is ground up and baked into a loaf.  TDCJ uses food loaves as punishment and even lists "food loaf" on TDCJ Security Detention Level Review forms and the Death Row Plan as an official restriction available for any death-sentenced prisoner.  TDCJ guards are responsible for delivering food trays, and they sometimes deny multiple meals in a row to individual prisoners in the Polunsky Death Row Unit.

52.     The Polunsky Death Row Unit prohibits non-expert contact visits.  With the exception of rare expert examinations, no named Plaintiff has had a contact visit at the Unit.  Until recently, prisoners sentenced to death were permitted only one five-minute phone call per week, which they sacrificed if the intended recipient did not answer the call.  Even the opportunity to make these weekly calls was not guaranteed.  In December 2022, TDCJ provided all prisoners at the Allan B. Polunsky Unit with tablets, but the tablets provided to death row prisoners are severely limited in their capabilities.  Because Defendants have not adopted any formal policy regarding the use of these tablets, the continuation of even these limited functionalities is subject to Defendants' whims.

53.     The unsafe, unsanitary, and unconstitutional conditions described herein are even worse in "F Pod," a section of the Polunsky Death Row Unit where TDCJ places prisoners who have severe mental illness, incur disciplinary infractions, or are simply disliked by the guards.

After Mr. Ford filed a lawsuit against TDCJ around 2012, TDCJ moved him to F Pod, which he describes as "hell." Death-sentenced prisoners in F Pod are deprived of even minimal stimulation: boards cover the windows and doors of the cells, no mattresses or blankets are provided, and "food loaves" are served regularly—if meals are provided at all. Defendants allow TDCJ guards in F Pod—including Officers Flores, Mongarro, and Fortner—to physically and mentally abuse death-sentenced prisoners with impunity. For example, TDCJ guards regularly deny food to F Pod prisoners for multiple days at a time; when the prisoner is near starvation and begging for food, the guards will provide him with a food loaf that may contain glass or bugs, which the prisoner has no choice but to eat. Guards on F Pod also regularly "trade" food trays to starving prisoners in exchange for them lightening the guards' workload by giving up a shower or recreation period.

54.    Between November 2022 and February 1, 2023, Mr. Ward was in F Pod for a stretch of approximately 70 days, during which he lost 20-25 pounds due to TDCJ guards denying him food. Mr. Ward was so hungry that he traded his showers and recreation for food trays on multiple occasions, as many F Pod prisoners are forced to do. While on F Pod in 2022, Mr. Ward was denied a mattress for a two week period, and he regularly went two or three weeks without a shower. Mr. Ford and Mr. Robertson have also spent time in F Pod and been subjected to these torturous conditions for multiple periods of consecutive months. The threat of F Pod looms over *every* prisoner in the Polunsky Death Row Unit.

55.    In January 2023, Terence Andrus, a death-sentenced prisoner with severe mental health issues, was confined in F Pod after being abruptly returned from the Wayne Scott mental health unit, where he had been prescribed medication to address psychotic symptoms. TDCJ refused to provide Mr. Andrus with this medication after he returned to the Polunsky Death Row Unit. On January 21, 2023, Mr. Andrus committed suicide in F Pod by hanging himself after being

denied multiple meals and suffering other abuse from TDCJ guards. Several prisoners in F Pod described the guards' treatment of Mr. Andrus as torture, and TDCJ promised to move witnesses out of F Pod if they changed their statements or agreed not to speak out.

56.     Defendants are aware of the unsafe and harmful conditions in the Polunsky Death Row Unit, but have failed to take steps to remedy them. Death row prisoners have repeatedly raised the extreme and unsafe conditions in the Polunsky Death Row Unit to the attention of TDCJ officials, including Defendants. Plaintiffs have filed multiple grievances regarding these issues. In December 2021, death row prisoners at the Unit sent a petition to Defendant Dickerson, the Regional Director, and the TDCJ Board of Directors asking TDCJ to, among other things, fix leaks in the cells, address the insect infestation, address the black mold in the cells and vents, and clean the recreation yards of bird feces. Prisoners in the Polunsky Death Row Unit also participated in a hunger strike in January 2022 to raise awareness about the unconstitutional conditions.

57.     In a 2023 letter to Defendant Dickerson, members of the Federal Public Defender office for the Western District of Texas reported abusive behavior by TDCJ guards towards prisoners in the Polunsky Death Row Unit, including: "a [TDCJ] staff member calling a mentally ill inmate 'bat-shit crazy' loud enough for other inmates and staff to hear, lying to that inmate in a way that played on his paranoia, and denying that inmate a mattress, blanket and other basic needs until his condition deteriorated enough for him to be sent out for treatment." This barbaric treatment—which Plaintiffs and Class Members have endured for multiple years and will endure indefinitely without court intervention—is nothing short of inhumane.

   2.    **Inadequate Access to Medical Care**

58.     Defendants have a policy and practice of not providing death-sentenced prisoners with timely medical responses and treatment, and they do not have an adequate system for

responding to healthcare emergencies.  Unlike general population prisoners at the Allan B. Polunsky Unit, Plaintiffs and Class Members have little opportunity to interact with guards or medical providers, meaning they often must wait hours—or days or weeks—to receive medical care, if they receive it at all.  In the event of a medical crisis, Plaintiffs and Class Members are completely isolated and helplessly alone; their only options are to kick the door, scream, or wait for a security check, which is supposed to occur once every 30 minutes but sometimes does not.

59.     When death-sentenced prisoners do make requests for necessary medical care, their pleas for help regularly go unanswered.  Guards often respond by telling death-sentenced prisoners to file sick call requests, but such requests are not answered for multiple weeks or months—or, in some cases, never at all.  Mr. Ward and Mr. Ford have both been told multiple times that TDCJ never received sick call requests that they submitted, and Mr. Curry is currently still waiting for a response to a sick call request that he filed more than a month ago.  Medical personnel occasionally "make rounds" at the Unit, but they regularly ignore prisoners calling out to them for help and fail to provide treatment even to prisoners clearly suffering from a mental or physical health issue.

60.     Under Defendants' policies and practices, death-sentenced prisoners often do not receive medical assistance until their health condition has reached an extreme.  For example, Mr. Ward broke his leg shortly after arriving at the Polunsky Death Row Unit in 2020, but he did not receive any medical attention until *more than 30 days* after he first told TDCJ.  While waiting, Mr. Ward showed his swollen and disfigured leg to multiple nurses making medical rounds, who told him that his leg was broken but that they could not do anything to help.  Finally, a doctor took an x-ray and confirmed Mr. Ward's leg was broken, and Mr. Ward was taken to the hospital and placed in a boot.  A few weeks later, after Mr. Ward protested being denied a medical shower, TDCJ guards pulled him from his cell, beat him, gassed him, removed his boot, and threw him

back into his cell—leaving his broken leg mangled and exposed. Within the next three days, when Defendant Dickerson was at the Unit, Mr. Ward personally told Defendant Dickerson about the extreme difficulties he faced in getting medical attention for his injury, showed Defendant Dickerson his bootless broken leg, and asked Defendant Dickerson for his boot back. Nevertheless, guards did not return Mr. Ward's boot until thirty days after the incident, in accordance with Defendants' policy regarding confiscation of property, and some parts of the boot were still missing. Mr. Ward filed a grievance regarding the incident but never received an answer. Now, more than two years later, Mr. Ward's leg is still swollen and painful. TDCJ has ignored his request for medical shoes and unsuccessfully tried to address the swelling by increasing Mr. Ward's blood pressure medication three times. Mr. Ward is fearful that his continued inability to access treatment for his leg will result in an eventual need for amputation, but, at this point, he is powerless to prevent that outcome.

61.    As another example, Mr. Robertson was diagnosed with hypertension by a doctor in the Dallas County Jail, who prescribed him a beta blocker on two separate occasions (in approximately 2009 and 2012). Both times, when Mr. Robertson returned to the Polunsky Death Row Unit, TDCJ refused to provide him his prescribed medication, despite Mr. Robertson's pleas. After being taken off his blood pressure medicine for the second time, Mr. Robertson began to experience cardiac symptoms, which he believes were caused by his untreated and worsening hypertension. Only after this lawsuit was filed did TDCJ diagnose Mr. Robertson with hypertension and provide him with a year's prescription of beta blockers. This history of medical neglect suggests that Mr. Robertson's continued access to his medication after the prescription expires will be in jeopardy and will turn on the inappropriate consideration of factors other than his medical needs.

62.     Each Plaintiff has similarly been denied access to necessary medical care while incarcerated in the Polunsky Death Row Unit, resulting in preventable pain and unnecessary exacerbation of symptoms.  Conditions, practices, and policies at the Polunsky Death Row Unit—which are authorized or condoned by Defendants—cause these denials of necessary medical care and affect all death-sentenced prisoners.

63.     Defendants' policies and practices also prevent death row prisoners from receiving their prescribed medications.  For example, Mr. Ward takes Tegretol to prevent seizures.  From January to May 2023, TDCJ did not provide Mr. Ward with his Tegretol for at least three consecutive days on five separate occasions, resulting in Mr. Ward experiencing seizures that caused him to fall out of his bunk onto the concrete floor.

64.     TDCJ similarly denies prisoners in the Polunsky Death Row Unit access to necessary mental healthcare.  Each named Plaintiff suffers from untreated mental health conditions—including depression, anxiety, bipolar disorder, and schizoaffective disorder—caused or exacerbated by their conditions and further worsened by the denial of adequate treatment.  For example, Mr. Ford has repeatedly pleaded with TDCJ to reinstate his access to one-on-one mental health counseling, which he previously received at the Ellis Unit as a critical component of treatment for his depression.  Mr. Ford has made these requests in the form of sick call requests, verbal requests, and grievances—all of which TDCJ has ignored.  His symptoms have worsened as a result.  Similarly, Mr. Ward has repeatedly told TDCJ about his worsening mental health symptoms and ineffective medication, including by filing several I-60 forms and sick call requests.  TDCJ has deflected Mr. Ward's pleas for help, telling him they never received his request or that he would have to wait six months to see a doctor.  The only doctor Mr. Ward has seen regarding these issues responded by suggesting Mr. Ward did not suffer from any psychiatric disorders, but

rather was experiencing anger and depression; the doctor then (contradictorily) increased Mr. Ward's dosage of the antipsychotic Abilify, a medication that thus far had been ineffective in treating Mr. Ward.  Mr. Ward's symptoms have noticeably worsened since he has been in the Polunsky Death Row Unit.  Mr. Ward has personally told Defendant Dickerson about his inability to access necessary mental health treatment, resulting in his symptoms worsening.

65.    Two prisoners who committed suicide in the past two years in the Unit—Terence Andrus and Brandon Daniel—were similarly denied repeated requests for necessary medical treatment, and instead received ridicule, neglect, and abuse from guards.  A general population prisoner who was sweeping the hallway saw Mr. Andrus hanging in his cell and told the guard accompanying him (who had not noticed).  Approximately 10 to 20 minutes passed between the prisoner noticing Mr. Andrus hanging in his cell and TDCJ guards opening the cell door.

66.    When prisoners in the Polunsky Death Row Unit do receive medical attention, they generally must do so from their cells, within earshot of guards and other prisoners.  This lack of privacy inhibits the prisoners' ability to have private conversations with the few medical staff providers that do visit the Unit, which in turn poses obstacles to the prisoners' ability to receive adequate mental health care.  When a death-sentenced prisoner is having an extreme mental health crisis, TDCJ responds by moving them into the torturous conditions of F Pod instead of providing them mental health treatment.

3.    **Inadequate Access to Counsel**

67.    For prisoners in the Polunsky Death Row Unit, legal visits are few and far between. When these visits are held, they are conducted through heavy glass and via poorly functioning phones.  No physical contact is permitted during the visits, and any legal papers must be passed through guards who often read and/or attempt to confiscate the materials.  Legal mail is often

similarly read and/or confiscated.  The threat of recording looms over every privileged conversation, as signs in the visitation area warn that conversations are monitored and recorded by TDCJ and guards often stand within earshot.  The only three semi-private rooms for attorney visits are rarely available, and one is only available for expert visits.

68.    Although Defendants' policies require that attorney visits be conducted in a designated area, away from general non-attorney visits, legal visits between counsel and death-sentenced prisoners are conducted in the general visitation room, with dozens of other prisoners, attorneys, non-attorney visitors, and correctional employees present within earshot.  Visitors must sit shoulder-to-shoulder, making it impossible for an attorney to communicate with his or her client in confidence, without others in the visitation room overhearing the conversation.  Taking into account that parole board and state board clemency investigators, among others, use these same booths to communicate with prisoners, it is unsurprising that Plaintiffs feel they are unable to speak freely with their counsel.  Guards often stand within six feet of attorneys, well within hearing distance, or even walk up right behind attorneys unannounced.  The area is also equipped with cameras.  Clients and attorneys interact through thick-pane glass windows, with phones that barely work.  This situation often requires counsel and their clients to raise their voices to a yell in order to be heard by the person on the other side of the glass, further compromising confidentiality.



69.     Booths purportedly reserved for attorney-client visits are often given to family or other non-legal visitors, or even left empty, while legal visits are conducted in neighboring public booths.  There is no separation from booths on the visitors' side.  The enclosures on the client's side include open grates that permit sound to travel between prisoners and nearby guards.  Subsequent to the initial filing of the Original Complaint on January 26, 2023, fiberglass has been added to the doors on the prisoner side and fiberglass partitions have been added to the open booths on the attorney side.  However, these fiberglass additions do not completely enclose either side of the booth, and therefore neither block sound nor ensure confidentiality.

70.     The inadequate visitation conditions, and constant monitoring of conversations, constitutes a direct violation of Defendants' policy 3.81(V)(G)(1), which states that, "the warden or designee shall respect the privacy of the [legal] visit and maintain a sufficient distance from the visiting offender and attorney or designated representative to preserve the privacy of communications between them."

71.     Attorneys and their clients are also unable to securely share legal materials with one another.  In order to show one another legal materials, they must first be given to a guard, who must "inspect" them but, according to TDCJ, does not "read" them.  These guards often "inspect" these materials out of sight of prisoners or their attorneys, and on multiple occasions guards have confiscated materials that they did not think were legal materials, including habeas petition documents.  For example, in January 2022, a guard and lieutenant confiscated habeas petition documents from a prisoner and yelled at the prisoner for asking them to give the documents to his attorney.  This practice is a blatant violation of attorney-client privilege and  undermines the ability of attorneys to effectively represent their clients.

72.    The unconstitutional conditions of the Polunsky Death Row Unit's visiting rooms hinder prisoners' ability to put on a meaningful legal defense or appeal, particularly with respect to the presentation of mitigation evidence that often requires the client to disclose painful and private memories and experiences, which prisoners reasonably do not feel comfortable sharing in a non-private environment.  The ability to present a meaningful defense or appeal is additionally compromised by the guards' consistent violation of attorney-client privilege, which prejudices the ability of attorneys to fully communicate with, and therefore represent, their clients.

73.    Physical contact between death row prisoners and their visitors is generally forbidden by Defendants.  For expert visits, TDCJ policy requires a court order in order for a prisoner to be unshackled for testing – even if the prisoner has no disciplinary record or requires the use of his hands to engage with the expert's analysis.  This renders some expert testing virtually impossible.  This policy significantly hinders these prisoners' ability to meet with or be examined by experts—thus severely inhibiting prisoners' ability to build and develop comprehensive legal defenses.  The inability to fully engage with experts and legal advocates is particularly harmful to the legal defenses of death row prisoners because of the critical role that evidence related to physical and mental health plays in capital sentencing.

74.    These problems are exacerbated by the difficulty Plaintiffs face in even accessing their counsel.  The Allan B. Polunsky Unit is located in Livingston, Texas, a significant drive from the nearest airport or major city.[12]  Attorneys face unreasonable difficulties scheduling in-person visits, which are sometimes cancelled without warning once the attorney has already arrived at the

---

[12] The Allan B. Polunsky Unit is 78 miles from downtown Houston, 83 miles from Beaumont, 213 miles from Austin, 274 miles from San Antonio, and 216 miles from Dallas.

prison. In-person visits can take weeks to schedule, and no priority is given to clients with upcoming execution dates.

75. Remote legal communications do not provide much, if any, relief. While the Polunsky Death Row Unit has temporarily increased the availability of attorney-client phone calls due to the COVID-19 pandemic, the calls are limited in time, and there is no guarantee the policy will continue. Normally, counsel must demonstrate "exigent circumstances," such as an imminent court filing deadline, to schedule a phone call with a client on death row. Even then, Defendants' policies cause delays in scheduling phone calls, with the result that either deadlines are missed, or counsel are unable to meet their obligations to their clients and the courts. The phones used for these calls are also deficient, and it is often very difficult, if not impossible, for counsel and client to hear each other. Meanwhile, attorneys can hear guards and other prisoners in the background, demonstrating that these calls are not confidential.

76. It takes multiple weeks for Plaintiffs and Class Members to receive legal mail, if it arrives at all. If legal mail does arrive, it is sometimes opened by TDCJ staff outside of Plaintiffs' and Class Members' presence—an unequivocal violation of attorney client privilege. Prisoners have had clearly marked incoming legal mail, including case materials and engagement letters, opened, read, and in some cases confiscated. Outgoing legal mail is also often opened and scanned, and then taped up before it is sent out.

77. These problems have a unique and disproportionate impact on prisoners who are sentenced to death, who both face greater restrictions on their access to counsel than prisoners not sentenced to death, and who have a greater need to access expert evidence and legal counsel considering the gravity of the punishment and the nature of the appeals process.

78.     The named Plaintiffs have personally experienced many of the above-mentioned violations of their right to effective counsel.  For example, on May 12, 2022, Mr. Robertson and his federally-appointed habeas attorney were unable to meet confidentially, and were instead forced to meet in  a booth surrounded by visiting family members and friends, all of whom could easily overhear Mr. Robertson's conversation and see any legal materials being used.  These conditions at the Polunsky Death Row Unit—which preclude confidential attorney-client conversations—prevented Mr. Robertson from sharing some personal details that were relevant to his state and federal habeas proceedings.  On May 27, 2022, Mr. Ford met with his federal habeas attorneys.  Although he requested one of the available booths reserved for attorney visits, he was put in a general visitation booth, next to another booth where a prisoner was able to view Mr. Ford's attorneys and their legal materials.  During this visit, Corrections Officer Moore intercepted and read legal materials that Mr. Ford was exchanging with his attorneys, and refused to allow Mr. Ford and his attorneys to use a sealed envelope to pass those materials back and forth confidentially.  On another occasion, on June 6, 2022, Mr. Ford met with his attorney and was given legal materials related to this case.  Guards inspected those materials, and Corrections Officer Yanazzo confiscated them, informing Mr. Ford that he could not take legal materials back to his cell.  Most recently, after Mr. Ward met with his criminal defense attorney on April 25, 2023, he returned to his cell and found that his legal papers had been searched.  He has experienced this multiple times.  These are all clear and gross violations of the attorney-client privilege and named Plaintiffs' constitutional and statutory rights.

79.     Defendants' interference with Plaintiffs' ability to meaningfully access and confer with their attorneys violates the U.S. Constitution, the Texas Constitution, and statutory law.

4.    **Retaliation Against Plaintiffs and Class Members**

80.    Plaintiffs and Class Members have been retaliated against for filing this § 1983 class action and exercising their First Amendment right to petition.  This retaliation has taken the form of greater restrictions on their access to attorneys and legal mail.

81.    On January 26, 2023, Plaintiffs filed the Original Complaint on behalf of all Class Members.  Soon after, Defendants began, suddenly and without prior notice, significantly restricting the number and length of attorney—contradicting Defendants' Policy allowing visits "for any length of time."  *See* BP-03.81 Section V(A).  Defendants have also applied new rules restricting the hours that attorneys can meet with the clients, and limiting the ability for attorneys from the same firm to meet with each other's clients.  Legal visits have even been cancelled after the attorneys have already arrived.  These new policies, complex and not announced in advance, have resulted in many attorneys being denied access to their clients despite having scheduled appointments.

82.    Plaintiffs were directly affected by these arbitrary changes in policy. On March 23, 2023, Mr. Cummings' attorney was unable to meet with him to discuss a motion for an evidentiary hearing related to his federal habeas application.  When Mr. Cummings' attorney informed Defendant Crystal Anthony of this issue, Defendant made a reference to the Original Complaint, telling Mr. Cummings' attorney that she should "be careful what you ask for."

83.    In general, since filing the Original Complaint, the ability of attorneys to schedule calls or meetings with class members has markedly worsened.  One attorney has been unable to schedule a meeting with her client for months and has therefore been unable to adequately prepare their client's habeas petition.  Another attorney who had a morning meeting at the prison, was not allowed to stay into the afternoon to meet a separate client; no reason was given.  In addition,

Defendants continue to interfere with legal documents and mail.  These actions have had the intent and effect of deterring Plaintiffs and Class Members from exercising their constitutional rights to petition and access the courts.

84.    Defendants have also interfered with Plaintiffs' ability to respond to Defendants' Motion to Dismiss.  On May 3, 2023, Plaintiffs' counsel conducted a preliminary legal call with Mr. Ward to discuss this lawsuit.  Usually, the hallway outside the phone booths used for legal calls is relatively empty, with one or two guards passing through; during this call, however, Mr. Ward observed *eleven* TDCJ guards walking past his booth, stopping within two feet of the booth's door (which is open at the bottom and top), and making eye contact with him.  TDCJ officials record the law firms with whom a prisoner has a legal call and, upon information and belief, these eleven TDCJ guards knew that Mr. Ward was on the phone with Plaintiffs' counsel.  Mr. Ward believed they were trying to intimidate him.  Similarly, Plaintiffs' counsel also conducted a legal phone call with Gary Green (another prisoner at the Polunsky Death Row Unit) regarding this lawsuit on May 8, 2023.  Mr. Green is handicapped and does not move easily.  Usually, when Mr. Green has a legal call, TDCJ guards place him in the booth, reach through the slot in the door to hand him the phone, and then close the slot.  During Mr. Green's call with Plaintiffs' counsel, however, the guards did not close the slot, meaning anyone standing outside the door could hear his conversation.  Due to his disability, which keeps him relatively immobile. Mr. Green did not turn his body to check the slot or see if any guards were standing outside during his confidential legal call.  At least one other prisoner in the Polunsky Death Row Unit has expressed hesitancy to speak with Plaintiffs' counsel out of fear of retaliation from TDCJ guards.

85.    These fears are well founded.  There is a pattern and practice in the Polunsky Death Row Unit of retaliating against prisoners exercising their constitutional rights to petition and access

the courts.  For example, after Mr. Ford filed a lawsuit against TDCJ in approximately 2012, guards in the Polunsky Death Row Unit pulled him out of his cell, strip searched him, and placed him in an isolation cage while they searched his cell; when he was returned to his cell, all his property was packed up neatly in the corner, except for the paper copy of his complaint—which was strewn across the floor with boot prints all across it.  Shortly thereafter, Mr. Ford was moved to F Pod, where he was starved and abused for multiple months.  As described above, TDCJ guards punish death-sentenced prisoners with a variety of torture methods, including withholding food for days at a time, which contributes to an omnipresent threat of retaliation against all Plaintiffs and Class Members who consider exercising their constitutional rights.

**B.    Defendants' Policy of Permanent and Automatic Solitary Confinement in the Polunsky Death Row Unit**

**1.    Defendants' Policy Contravenes Accepted Research and Practice**

86.    TDCJ's policy of housing all male death row prisoners in solitary confinement permanently, on the basis of their sentences alone, violates the Eighth Amendment, Fourteenth Amendment, and the Texas Constitution and contravenes established research, which counsel for limited use of short-term solitary confinement based on circumstances unique to each prisoner.

87.    Solitary confinement in the Polunsky Death Row Unit is permanent as a matter of prison policy: male prisoners sentenced to death in the State of Texas are required to be held in solitary confinement from the day they are sentenced until the day they are executed.  Unlike for general population, Defendants do not conduct any risk assessment or harm analysis whatsoever before condemning every male prisoner sentenced to death in the State of Texas to solitary confinement.  Further, despite the Death Row Plan specifically contemplating a review process to determine if death row inmates are Work Capable —a process presently available to female death row inmates and previously available to all death row inmates—the program is indefinitely

29

suspended for male inmates.[13]  Combined, the named Plaintiffs have spent approximately 64 years in solitary confinement.  Class Members—who have been in the Polunsky Death Row Unit since it opened—have each spent 24 years in permanent, relentless solitude without any close human contact, except when they are being handcuffed, transported, or disciplined.

88.    There is no opportunity for death row prisoners to challenge this universally applied policy or seek an exception based on their individualized circumstances.  There is likewise no means for death row prisoners to seek different conditions of confinement, or to be integrated into the general population of high-security prisoners at the Allan B. Polunsky Unit.

89.    Researchers have extensively documented the physical and psychological harms caused by solitary confinement specifically—and social isolation more generally—in peer-reviewed literature spanning decades.  For example, empirical studies of prisoners incarcerated in solitary confinement document stress-related reactions, sleep disturbances, anxiety, panic, paranoia, ruminations, cognitive disfunction, hyper-sensitivity to stimuli, lethargy, and depression, among other health detriments.[14] Collectively, Plaintiffs have experienced all of these symptoms during their years of isolation.  These harms should come as no surprise; it is well established that "meaningful social contact is a fundamental human need."[15] Not only are these documented harms severe, but they are also often irreversible[16] for people kept in prolonged solitary confinement.

90.    Defendants' implementation of their solitary confinement practice is particularly egregious given the unsanitary, unsafe, and inhumane conditions described above.  Defendants

---

[13]  Death Row Plan, *supra* n.7 at 3.
[14] Craig Haney, *The Psychological Effects of Solitary Confinement: A Systematic Critique*, 47 CRIME & JUSTICE 365, 372 (2018) (summarizing the many studies on solitary confinement).
[15] Craig Haney, *The Science of Solitary: Expanding the Harmfulness Narrative*, 115 NW. U. L. Rev. 211, 223 (2020) (emphasis added).
[16] U.N. Secretary-General, *Interim Report of the Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. Doc. A/66/268, ¶ 26 (Aug. 5, 2011).

choose to hold all male death row prisoners in torturous conditions proven to cause severe and irreversible harm to the prisoners' mental health, and then refuse to provide even minimal mental health treatment. Thus, instead of following accepted research, Defendants' policies unnecessarily create, perpetuate, and exacerbate a dangerous environment for all involved.

91.     As penological professionals, Defendants are aware of the harmful effects of their policies.[17] Indeed, TDCJ's own 2019 Restrictive Housing Plan, which is not publicly available, states: "Offenders in extended restrictive housing may develop symptoms of acute anxiety or other mental health issues; therefore, regular psychological assessment and treatment is necessary to preserve the behavioral health of these offenders."

### 2.   **Defendants' Policy Serves No Penological Purpose**

92.     According to the National Institute of Justice, it is "virtually impossible to find empirical evidence supporting [the] utility or efficacy" of administrative segregation.[18] The largest correctional officers union in Texas has also called on TDCJ to change its automatic solitary confinement policy, calling it "a waste of valuable security personnel and money."[19]

93.     That Plaintiffs and Class Members have been sentenced to death does not justify the harmful and arbitrary conditions of their confinement. This is particularly true given that prisoners held in high security at the Allan B. Polunsky Unit—who have been convicted of similar (or worse) crimes and often have worse prison disciplinary records—are not subject to the same

---

[17] *See generally A Solitary Failure: The Waste, Cost and Harm of Solitary Confinement in Texas*, ACLU and TEX. CIV. RIGHTS PROJECT (Feb. 2015), https://www.aclutx.org/sites/default/files/field_documents/SolitaryReport_2015.pdf (report about harms of solitary confinement, which relied on information provided by TDCJ officials and prisoners).

[18] Natasha A. Frost & Carlos E. Monteiro, *Administrative Segregation in U.S. Prisons: Executive Summary* 4, Nat'l Inst. of Justice (Mar. 2016).

[19] Letter from Lance Lowry, President Local 3807 AFSCME Tex. Correctional Empl. (Jan. 20, 2014), available at https://www.texasobserver.org/texas-prison-guard-union-calls-curtailment-solitary-confinement-death-row/.

policy of automatic, indefinite, and unchallengeable solitary confinement.  Further, during death penalty sentencing under Texas law, juries are not asked to make any findings of fact regarding whether solitary confinement is warranted.[20]  And studies have shown that death-sentenced prisoners often have lower rates of institutional violence compared to parole-eligible prisoners.[21]

94.    Defendants' arbitrary requirement to house all male death row prisoners in permanent solitary confinement, without any individualized determination of the need for such torture, does not promote safety and security, causes long term health detriments, is inconsistent with correctional best practices, and serves no penological purpose.  Yet Defendants have subjected Plaintiffs and Class Members to torturous conditions for years, causing them severe and irreversible harm.

## IV.    CLASS ALLEGATIONS

95.    The named Plaintiffs bring this action, on behalf of themselves and all others similarly situated, to assert the claims alleged in this Complaint on a common basis.

96.    A class action is a superior means, and the only practicable means, by which the named Plaintiffs and Class Members can challenge Defendants' unlawful practices with regards to the conditions in the Polunsky Death Row Unit.

97.    Plaintiffs are satisfactory representatives for purposes of representing the class of similarly situated prisoners on death row in the Polunsky Death Row Unit.  Plaintiffs seek to represent the Class Members, a class consisting of: all male death row prisoners incarcerated in permanent solitary confinement in the Polunsky Death Row Unit, none of whom have been or will be given meaningful review of their placement in solitary confinement (in violation of the Eighth

---

[20] *See* Tex. Code Crim. Proc. Ann. art. 37.071.
[21] *See, e.g.*, Mark D. Cunningham et al., *Is Death Row Obsolete? A Decade of Mainstreaming Death-Sentenced Inmates in Missou*ri, 23 BEHAV. SCI. L. 307, 316–19 (2005).

Amendment, Due Process Clause of the Fourteenth Amendment, and Texas Constitution Art. I, §13), and all of whom have restricted access to counsel as a result of Defendants' chosen policies (in violation of the Sixth Amendment, the Due Process Clause of the Fourteenth Amendment, 18 U.S.C. § 3599, 28 U.S.C. §§ 2254, 2255, and Tex. Code Crim. Proc. Art. 11.071(a))).

98.    This action is brought and may properly be maintained as a class action pursuant to Rule 23(a)(1)–(4) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

99.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

100.    The class is so numerous that joinder of all members is impracticable.  Fed. R. Civ. P. 23(a)(1).  As of May 3, 2023, there are 184 male prisoners in solitary confinement at the Polunsky Death Row Unit, 75% of whom have been in solitary confinement for 10 or more years.[22]

101.    There are questions of law and fact common to the members of the class.  Fed. R. Civ. P. 23(a)(2).  These include, but are not limited to: (1) whether Defendants' policy that all male death row prisoners be housed in inhumane conditions of permanent solitary confinement constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments; (2) whether this policy also violates the due process rights of the prisoners guaranteed by the Fourteenth Amendment; (3) whether Defendants' policies regarding prisoners' access to counsel violates prisoners' Sixth Amendment and Fourteenth Amendment rights and statutory rights under 18 U.S.C. § 3599, 28 U.S.C. §§ 2254, 2255, and Tex. Code Crim. Proc. Art. 11.071(a)); and (4) whether there is a penological reason to house prisoners for years in solitary confinement solely

---

[22] *See Faces of Death Row*, J. McCullough and B. Hasson, TEX. TRIBUNE (Aug. 30, 2022), https://apps.texastribune.org/death-row/.

because they were sentenced to death, and without a showing that they pose a danger or security risk to other prisoners or prison officials.

102.    The claims of the named Plaintiffs are typical of those of the class.  Fed. R. Civ. P. 23(a)(3).  The named Plaintiffs and the Class Members all suffer deprivation of basic human needs due to the same conditions of confinement. While the exact nature of the harms suffered differs slightly for each prisoner, the source of the harm for each individual is the same policy and practice of placing all death row prisoners in conditions of prolonged solitary confinement, which, as implemented by Defendants, has caused serious mental and physical harm to all Plaintiffs and Class Members.  In addition, Plaintiffs and Class Members have had their access to counsel restricted in similar ways as a result of Defendants' policies and have all been similarly retaliated against by Defendants for the same perceived act.

103.    Plaintiffs are capable of fairly and adequately representing and protecting the interests of the class.  Fed. R. Civ. P. 23(a)(4).  Plaintiffs do not have interests that are inconsistent with those of the class, and they are adequately represented by counsel, who are experienced in class action cases and civil rights, specifically prisoners' rights, litigation.

104.    This action is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1).  The numerous Class Members create a risk that prosecution of separate actions by individuals would result in inconsistent and varying adjudications that would establish incompatible standards of conduct for Defendants.  Additionally, prosecution of separate actions by individuals would substantially impede the ability of other members to protect their interests.

105.    This action is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) because Defendants' policies of subjecting all death row prisoners to solitary

confinement and restricting access to counsel apply to all Class Members, injunctive relief is an appropriate remedy for all Class Members, and there exist common questions of law and fact.

## V.    CLAIMS FOR RELIEF

### Count I — Declaratory Judgment and Injunctive Relief for Violations of the Eighth Amendment (Cruel and Unusual Punishment) Against Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants in Their Official Capacities

106.    Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs as if fully set forth herein.

107.    Plaintiffs bring this claim on their own behalf, and on behalf of the Class, against Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants.

108.    Defendants' policy and practice of automatically placing all death row prisoners at the Polunsky Death Row Unit in unsafe and unhygienic conditions of permanent solitary confinement has deprived, and continues to deprive, Plaintiffs and Class Members of their constitutional right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments of the U.S. Constitution.  Specifically (and as alleged in detail above), Defendants' policies and practices are cruel and unusual because they deprive prisoners in the Polunsky Death Row Unit of the minimal civilized measure of life's necessities and inflict unnecessary and wanton pain that has resulted—and, without court intervention, will continue to result—in severe psychological and physical injury to Plaintiffs and Class Members.

109.    Defendants' policy of automatic and permanent placement in solitary confinement inflicts disproportionate punishment on Plaintiffs and Class Members.  The inhumane conditions at the Polunsky Death Row Unit blatantly violate present day standards of human dignity.

110.    The unsafe and unhygienic conditions of the Polunsky Death Row Unit are evident to Defendants and to any reasonable person.  Defendants have also been made aware of such

conditions through administrative grievances, written complaints, letters, national media attention, and discussions with Plaintiffs, Class Members, and others.

111.    Defendants' policies also fail to provide necessary medical care and treatment to Plaintiffs and Class Members, and Defendants have engaged in a pattern and practice of failing to provide for reasonable and/or timely medical care to Plaintiffs and Class Members.  Defendants have been made aware by grievances, discussions, and letters submitted by Plaintiffs, Class Members, and others that practices and policies governing access to medical treatment in the Polunsky Death Row Unit result in the denial of necessary medical care to death-sentenced prisoners, which causes unnecessary and wanton pain to Plaintiffs and Class Members.

112.    Incarcerating prisoners in these cruel conditions simply because they were sentenced to death serves no valid legal purpose.  This policy has no legitimate rationale and does not serve any security needs.  In fact, to the extent that solitary units are occupied by people who do not pose the greatest risk to the prison, this policy runs counter to penological and security interests.  This is underlined by the fact that automatic solitary confinement is a direct result of Defendants suspending their own adopted "Work Capable" policy since 1999.[23]

113.    As a direct and proximate result of Defendants' constitutional violations described above, Plaintiffs and Class Members have been and will be irreparably injured.  Plaintiffs and Class Members will have no adequate remedy at law for Defendants' actions.  Plaintiffs and Eighth Amendment Class Members will suffer irreparable harm to their constitutional rights unless Defendants are enjoined from continuing their unlawful policies, practices and/or customs which have directly and proximately caused these constitutional abuses.

---

[23] *Death Row Plan*, Texas Department of Criminal Justice, Correctional Institutions Division (October 2004), available at: https://tifa.org/wp-content/uploads/2014/02/Administrative-Segregation-Death-Row-Plan-1.pdf; Merel Pontier, *CRUEL BUT NOT UNUSUAL THE AUTOMATIC USE OF…*, 26 Tex. J. on C.L. & C.R. 117, n.830 (2020).

114.    Additionally, an actual controversy exists regarding the constitutionality of Defendants' practices and policies concerning the placement of all death row prisoners in solitary confinement.  A declaration on this issue will resolve that portion of the controversy between the parties, and the Court's determination of the issues will guide Defendants' actions.  Defendants have the authority to change conditions of confinement in the Polunsky Death Row Unit.

**Count II — Declaratory Judgment and Injunctive Relief for Violations of Texas Constitution Art. I § 13 (Cruel or Unusual Punishment) Against Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants in Their Official Capacities**

115.    Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs as if fully set forth herein.

116.    Plaintiffs bring this claim on their own behalf, and on behalf of the Class, against Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants.

117.    The allegations outlined in Count I apply equally under the Texas Constitution as under the Eighth and Fourteenth Amendments.

118.    Each of the allegations set forth in Count I must also be considered separately pursuant to the distinct phrasing of the Texas Constitution's cruel *or* unusual clause.  Art. I § 13 of the Texas Constitution prohibits "cruel *or* unusual punishment"—offering, on the plain text, a broader protection than that of the Eighth Amendment.  Even without this distinction, however, Defendants' actions and policies that violate the Eighth Amendment's prohibition on cruel and unusual punishment likewise violate the Texas Constitution.  Specifically, the serious physical and psychological deterioration that Plaintiffs and Class Members in this case have suffered due to their lengthy incarcerations in unsafe and unhygienic conditions of solitary confinement qualify as "cruel or unusual punishment" and thus violate the Texas Constitution.

119.    In violating Plaintiffs' and Class Members' rights under Article I § 13 of the Texas Constitution as set forth herein, Defendants were acting without legal authority, and thus their actions are *ultra vires*.

120.    The Texas Constitution provides an equitable remedy for all violations of Article 1 § 13.  Additionally, an actual controversy exists regarding the constitutionality of Defendants' practices and policies regarding the placement of all death row prisoners in solitary confinement. A declaration on this issue will resolve that portion of the controversy between the parties, and the Court's determination of the issues will guide Defendants' actions.  Defendants have the authority to change conditions of confinement in the Polunsky Death Row Unit.

**Count III — Declaratory Judgment and Injunctive Relief for Violations of Due Process (Fourteenth Amendment) Against Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants in Their Official Capacities**

121.    Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs as if fully set forth herein.

122.    Plaintiffs bring this claim on their own behalf, and on behalf of the Class, against Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants.

123.    By denying Plaintiffs and Class Members any review whatsoever of their prolonged placement in solitary confinement and not giving them the ability to be removed from their complete isolation, Defendants are denying Plaintiffs and Class Members liberty without due process of law in violation of the Fourteenth Amendment to the U.S. Constitution.

124.    The conditions and the length of confinement to which Plaintiffs and Class Members are subjected constitute an atypical and significant hardship as compared with the ordinary incidents of prison life for three reasons: (1) the complete isolation on death row; (2) the

indefinite nature of their confinement; and (3) their inability to challenge their placement in solitary confinement.

125.    The conditions of death row are unjustifiably severe.  Forced to live in complete isolation, prisoners in the Polunsky Death Row Unit spend 22 to 24 hours of their day in unhygienic cells infested with black mold, cockroaches, and other vermin.  The ability to exercise is limited, and they are afforded few visits and are denied even minimal mental stimulation.  On top of those unconstitutional conditions, death row prisoners endure humiliation, starvation, and abuse at the hands of TDCJ guards.

126.    Plaintiffs and Class Members have been held in these devastating conditions for as long as 23 years.  Three-quarters of prisoners currently incarcerated in the Polunsky Death Row Unit have been held in solitary confinement for ten or more years.

127.    Unlike the Polunsky general prison population and female death row prisoners, Plaintiffs and Class Members are placed in solitary confinement without any form of review or due process.  Further, Plaintiffs and Class Members have no avenue to challenge their placement in permanent isolation.

128.    Defendants have violated, and continue to violate, the due process rights of Plaintiffs and Class Members by forcing them to live in conditions that amount to atypical and significant hardship without procedural protections.  No evidence suggests that this policy promotes safety and security of the prison and its staff, on the contrary, research and best practices indicate the opposite.

129.    As a direct and proximate result of Defendants' constitutional violations described above, Plaintiffs and Class Members will be irreparably injured.  Plaintiffs and Class Members will have no adequate remedy at law for Defendants' actions.  Plaintiffs and Class Members will

suffer irreparable harm to their constitutional rights unless Defendants are enjoined from continuing their unlawful policies, practices and/or customs which have directly and proximately caused these constitutional abuses.

130.    Additionally, an actual controversy exists regarding the constitutionality of Defendants' practices and policies regarding the placement of all death row prisoners in solitary confinement.  A declaration on this issue will resolve that portion of the controversy between the parties, and the Court's determination of the issues will guide Defendants' actions.

**Count IV — Declaratory Judgment and Injunctive Relief for Violations of the Constitutional and Statutory Right to Counsel Against Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants in Their Official Capacity (Sixth Amendment, Fourteenth Amendment, 42 U.S.C. § 1983, 18 U.S.C. § 3599, 28 U.S.C. §§ 2254, 2255, Tex. Code Crim. Proc. Art. 11.071(a))**

131.    Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs as if fully set forth herein.

132.    Plaintiffs bring this claim on their own behalf, and on behalf of the Class, against Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants.

133.    The combined hindrances of scheduling, lack of contact visits, substandard communication equipment and conditions, searching of privileged legal documents, and inability to privately communicate with counsel in-person virtually guarantees that Plaintiffs are unable to meaningfully access counsel in aid of any defense, appeal, or related legal proceeding.

134.    Having been sentenced to death, Plaintiffs have a statutory right under Texas law to competent counsel in their application for a writ of habeas corpus.  *See* Tex. Code Crim. Proc. Art. 11.071(a).

135.    Defendants are currently violating the constitutional and statutory right to counsel of Plaintiffs and Class Members through unnecessary restrictions implemented in the name of

"security."  However, those considerations (to the extent they are legitimately invoked) cannot override the rights of Plaintiffs and Class Members, and in any event do not rationally relate to the limitations imposed on the right to counsel.

136.    As described above, Plaintiffs are not provided with adequate facilities where they can meet with their counsel in private.  Instead, Defendants provide attorney-client meetings in the same location and during the same timeframes as general visits.  As a result, Plaintiffs' counsel are forced to sit shoulder-to-shoulder with members of the public visiting other prisoners, in the same room as the Unit guards, while attempting to engage in privileged communications with Plaintiffs through the use of phones that often require counsel to raise their voices in order to be heard.  Presumably, these conversations are also recorded—until recently, signage above the public and attorney meeting booths clearly stated that all conversations through the phones in the area are monitored.  To transfer legal materials, clients and their attorneys must hand them over to these same guards who often review them to determine that they are "legal" in nature and sometimes refuse to release them without cause.

137.    The facilities made specifically for attorney-client meetings are also inadequate, being substantially similar to the general meeting spaces in terms of proximity to others, general lack of privacy, and substandard equipment that makes it difficult to hear in the best of conditions. Prisoners easily hear guards speaking on the other side of the supposedly private booths. In addition, some of these facilities actively record attorney-client conversations. Defendants' policies, therefore, substantially compromise the confidentiality between Plaintiffs and counsel to the point of near evisceration.

138.    While access to attorney-client phone calls increased during the pandemic, that does not eliminate the need for in-person contact visits.  Moreover, the attorney-client phone calls

are subject to significant limitations on time, generally being cut off after thirty minutes. The prisoners use similarly substandard equipment such that it is sometimes impossible for one participant in the conversation to hear the other, and the calls are never fully private.

139. The Polunsky Death Row Unit does not allow contact visits between Plaintiffs and their counsel. Prisoners have a constitutional right to contact visits with counsel. Defendants' prohibition on contact visits between death row prisoners and their counsel serves no compelling penological interest.

140. As a result of Defendants' policies, Plaintiffs have been prejudiced by, among other things, the violation of attorney-client privilege and resulting inability to discuss sensitive topics with attorneys—such as deeply personal history and mental health issues that interfere with representation—which are necessary for certain claims and actions (such as habeas actions, and claims commonly raised therein); the inability of attorneys to contact their clients on short notice in emergency situations; and the risk of undue delay in their cases due to the limitations imposed on attorney contact.

141. As a direct and proximate result of Defendants' constitutional and statutory violations described above, Plaintiffs and Class Members will be irreparably injured. Plaintiffs and Class Members will have no adequate remedy at law for Defendants' actions. Plaintiffs and Class Members will suffer irreparable harm to their constitutional rights unless Defendants are enjoined from continuing their unlawful policies, practices and/or customs which have directly and proximately caused these constitutional abuses.

142. Additionally, an actual controversy exists regarding the constitutionality of Defendants' practices and policies regarding attorney-client meetings and communications. A

declaration on this issue will resolve that portion of the controversy between the parties, and the Court's determination of the issues will guide Defendants' actions.

**Count V — Declaratory and Injunctive Relief for Retaliation Against Plaintiffs for Exercising their First Amendment Right to Petition by Denying Plaintiffs' Access to the Courts Against All Defendants in Their Official Capacities (First Amendment, Fourteenth Amendment, and 42 U.S.C. § 1983)**

143.    Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs as if fully set forth herein.

144.    Plaintiffs bring this claim on their own behalf, and on behalf of the Class, against all Defendants.

145.    In retaliation for Plaintiffs and Class Members exercising their First Amendment right to petition and state a claim pursuant to 42 U.S.C. § 1983, Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants interfered with Plaintiffs and Class Members' access to effective counsel by inhibiting their ability to meet with their attorneys and violate the confidentiality of their legal materials and legal mail. The purpose of this interference was to deter Plaintiffs and Class Members from continuing to exercise their First Amendment rights. As a result a number of Plaintiffs and Class Members have been deterred from exercising their First Amendment rights.

146.    As noted above, Plaintiffs exercised their First Amendment rights and filed the Original Complaint on January 26th, 2023. Close to a month after, the above listed Defendants instituted and enforced the meeting policy described above.[24] Defendants have also interfered with Plaintiffs' ability to respond to Defendants' Motion to Dismiss.[25]

---

[24] *See supra* at ¶¶ 81–85.
[25] *See supra* at ¶ 84.

147.    As a result of this retaliation, Defendants have severely limited the ability of prisoners to communicate with their attorneys – whether that be through confiscating or reading their legal correspondence, canceling their in-person meetings, or reading their legal materials when they are able to meet. These actions put the cases and/or petitions of Plaintiffs and Class Members at risk.  This adverse act has deterred Plaintiffs and Class Members from further exercising their constitutional rights and would likely deter the reasonable person from exercising their constitutional rights. The past pattern of retaliation present at Polunsky, described above, has also contributed to this deterrence.

148.    As Warden, Defendant Dickerson affirmatively implemented the change of policy for attorney client meetings.  In addition Defendant Dickerson was deliberately indifferent to the other instances of retaliation described above (e.g., interference with legal mail, and legal materials) as he has been made aware of these types of unconstitutional acts via multiple grievances and letters from prisoners and yet has failed to adequately supervise his staff to stop these violations.

149.    Separately, Defendant Anthony has retaliated against Plaintiff Rickey Cummings for filing the Original Complaint under 42 U.S.C. § 1983.  As described above, around a month after filing the Original Complaint, Defendant Anthony prevented Rickey Cummings from meeting with his attorney and told his attorney that they should "be careful what you ask for." This retaliation threatened the success of Rickey Cummings' federal habeas petition.

150.    Defendants Dickerson, Anthony, and the Doe Defendants, have improperly retaliated against Plaintiffs and Class Members for the exercise of their First Amendment right to petition and state a claim pursuant to 42 U.S.C. § 1983.  In doing so Defendants have interfered

with the exercise of Plaintiffs' and Class Members' constitutional rights and violated their right against retaliation under 42 U.S.C. § 1983.

151.    As a direct and proximate result of Defendants' constitutional and statutory violations described above, Plaintiffs and Class Members will be irreparably injured.  Plaintiffs and Class Members will have no adequate remedy at law for Defendants' actions.  Plaintiffs and Class Members will suffer irreparable harm to their constitutional rights unless Defendants are enjoined from continuing their unlawful policies, practices and/or customs which have directly and proximately caused these constitutional abuses.

152.    An actual controversy exists regarding the constitutionality of Defendants' practices and policies regarding attorney-client meetings and communications subsequent to the filing of this action.  A declaration on this issue will resolve that portion of the controversy between the parties, and the Court's determination of the issues will guide Defendants' actions.

**Count VI — Damages for Violations of the Eighth Amendment (Cruel and Unusual Punishment) Against Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants in Their Individual Capacities**

153.    Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs as if fully set forth herein.

154.    Plaintiffs bring this claim on their own behalf, and on behalf of the Class, against Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants, who individually and together, in their individual capacities, continuously implemented the policies alleged above.

155.    Plaintiffs and Class Members, as TDCJ prisoners confined to Death Row, were and are protected by the Texas Constitution and the Constitution of the United States; they bring this action pursuant to 42 U.S.C. § 1983.

156.    Defendants were acting under the color or pretense of State law, customs, practices, usage, or policy at all times mentioned herein as correctional officers and/or supervisors who had certain duties imposed upon them with regard to Plaintiffs' placement, care, and treatment. Additionally, during all periods in question, Defendants were well aware of the Plaintiffs' constitutional rights, including their right to be free from cruel and unusual punishment.

157.    Defendants' policies and practices violate standards for human dignity and the constitutional right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments of the U.S. Constitution.  Defendants' policies and practices are cruel and unusual because they deprive Plaintiffs of basic human needs, impose serious and irreparable psychological and physical injury and violate present-day concepts and standards of human dignity.

158.    As a direct and proximate result of Defendants' constitutional violations, Plaintiffs suffered damages in an amount to be proven at trial.

**Count VII — Damages for Violations of Due Process (Fourteenth Amendment) Against Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants in Their Individual Capacities**

159.    Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs as if fully set forth herein.

160.    Plaintiffs bring this claim on their own behalf, and on behalf of the Class, against Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants who individually and together, in their individual capacities, continuously implemented the policies alleged above.

161.    Plaintiffs and Class Members, as TDCJ prisoners confined to Death Row, were and are protected by the Texas Constitution and the Constitution of the United States; they bring this action pursuant to 42 U.S.C. § 1983.

162.    Defendants were acting under the color or pretense of State law, customs, practices, usage, or policy at all times mentioned herein as correctional officers and/or supervisors who had certain duties imposed upon them with regard to Plaintiffs' placement, care, and treatment. Additionally, during all periods in question, Defendants were well aware of the Plaintiffs' constitutional rights, including their right to be free from cruel and unusual punishment.

163.    Defendants' policies and practices violate the Fourteenth Amendment of the U.S. Constitution by denying Plaintiffs liberty without due process of law. Plaintiffs, unlike female death row prisoners and the Polunsky general prison population, are denied any review whatsoever of their prolonged placement in solitary confinement under severe conditions and are denied the ability to be removed from their complete and prolonged isolation.

164.    The clearly established Fifth Circuit law placed Defendants on notice that severe confinement conditions of an indefinite duration, such as those present here, pose an "atypical and significant hardship" implicating Plaintiffs' established liberty interest.  Additionally, a court in this district has specifically found that extended solitary confinement at Polunsky presents "atypical and extraordinary circumstances necessary to implicate a liberty interest." *Hernandez v. Abbott*, 2020 WL 5539093, at *15 (E.D. Tex. Aug. 24, 2020), *report and recommendation adopted*, 2020 WL 5534522 (E.D. Tex. Sept. 15, 2020).

165.    As a proximate result of Defendants' constitutional violations, Plaintiffs suffered damages in an amount to be proven at trial.

**<u>Count VIII — Damages for Violations of the Constitutional and Statutory Right to Counsel Against Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants in Their Individual Capacities (Sixth Amendment, Fourteenth Amendment, 42 U.S.C. § 1983, 18 U.S.C. § 3599, 28 U.S.C. §§ 2254, 2255, and Tex. Code Crim. Proc. Art. 11.071(a))</u>**

166.    Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs as if fully set forth herein.

167.    Plaintiffs bring this claim on their own behalf, and on behalf of the Class, against Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants, who individually and together, in their individual capacities, continuously implemented the policies alleged above.

168.    Plaintiffs and Class Members, as TDCJ prisoners confined to Death Row, were and are protected by the Texas Constitution and the Constitution of the United States; they bring this action pursuant to 42 U.S.C. § 1983.

169.    Defendants were acting under the color or pretense of State law, customs, practices, usage, or policy at all times mentioned herein as correctional officers and/or supervisors who had certain duties imposed upon them with regard to Plaintiffs' placement, care, and treatment. Additionally, during all periods in question, Defendants were well aware of the Plaintiffs' constitutional rights, including their right to be free from cruel and unusual punishment.

170.    Defendants' policies and practices deny Plaintiffs their constitutional and statutory right to access to counsel while incarcerated on death row.

171.    As a proximate result of Defendants' constitutional violations, Plaintiffs suffered damages in an amount to be proven at trial.

**Count IX — Damages for Retaliation Against Plaintiffs for Exercising their First Amendment Right to Petition by Denying Plaintiffs' Access to the Courts Against Defendants Warden Daniel Dickerson and Corrections Officer Crystal Anthony, and the Doe Defendants in Their Individual Capacities (First Amendment, Fourteenth Amendment, and 42 U.S.C. § 1983)**

172.    Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs as if fully set forth herein.

173.    Plaintiffs bring this claim on their own behalf, and on behalf of the Class, against Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants, who individually and together in their individual capacity continuously implemented the policies alleged above.

174.    Plaintiffs and Class Members, as TDCJ prisoners confined to Death Row, were and are protected by the Texas Constitution and the Constitution of the United States; they bring this action pursuant to 42 U.S.C. § 1983.

175.    Defendants were acting under the color or pretense of State law, customs, practices, usage, or policy at all times mentioned herein as correctional officers and/or supervisors who had certain duties imposed upon them with regard to Plaintiffs' placement, care, and treatment. Additionally, at all relevant times, Defendants were aware of the Plaintiffs' constitutional rights, including their right to be free from cruel and unusual punishment.

176.    Defendants engaged in retaliation against Plaintiffs and Class Members for exercising their constitutional right to petition and file claims under 42 U.S.C. § 1983.

177.    As a proximate result of Defendants' constitutional and statutory violations, Plaintiffs suffered damages in an amount to be proven at trial.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Class Members pray for judgment against the Defendants:

a.    Declaring that this lawsuit is maintainable as a class action pursuant to Rules 23(a) and 23(b)(1)–(2) of the Federal Rules of Civil Procedure;

b.    Declaring that Defendants' blanket policy of confining all male prisoners on death row to indefinite solitary confinement, with no opportunity for review, violates the Eighth Amendment Cruel and Unusual Punishment Clause and the Fourteenth Amendment Due Process Clause of the U.S. Constitution, and Article I § 13 of the Texas Constitution;

c.    Declaring the Defendants' policies and practices governing access to legal counsel violate the Sixth and Fourteenth Amendments of the U.S. Constitution, 18 U.S.C. § 3599, 28 U.S.C. §§ 2254, 2255, and Tex. Code Crim. Proc. Art. 11.071(a));

d.    Granting permanent injunctive relief requiring that Defendants and all persons acting in concert with them under color of state law hereinafter allow for regular out-of-cell time and lift suspension of the Work Capable Program, as detailed in the Death Row Plan (October 2004), which allows for individualized determinations in the administration of the Plan, consistent with the Cruel and Unusual Punishment Clause of the Eighth Amendment, Due Process Clause of the Fourteenth Amendment, and Article I § 13 of the Texas Constitution;

e.    Granting permanent injunctive relief by requiring Defendants and all persons acting in concert with them under color of state law to develop and implement, as soon as practical, a plan to eliminate the substantial risk of serious harm that Plaintiffs and Class Members suffer due to Defendants' imposition of permanent solitary confinement in unsafe and unhygienic conditions, failure to provide adequate access to medical care, and interference with access to counsel. Defendants' Plan shall include at a minimum the following:

    1.    providing Plaintiffs and Class Members the minimal civilized measure of life's necessities, including: timely access to quality medical care, including medication and medical personnel; daily recreation and showers; a hygienic living environment; edible and nutritious food; mattresses and blankets; and a living environment free from abuse;

    2.    allowing Plaintiffs and Class Members their constitutional right to access to counsel including: ensuring private meeting conditions, removing obstacles to attorney-client meetings, allowing for contact attorney visits, and prohibiting the listening to, reading, or confiscation of attorney-client communications; and

    3.    ensuring staffing sufficient for the effectuation of these conditions and rights.

f.    Granting permanent injunctive relief as may be necessary to eliminate the policies and practices of Defendants and all persons acting in concert with them under color of state law that retaliate against Plaintiffs and Class members for exercising their Constitutional rights, including, *inter alia*,  inhibiting their ability to meet with their attorneys and violating the confidentiality of their legal materials and legal mail, in violation of the First and Fourteenth Amendment, and 42 U.S.C. § 1983;

g.    Awarding Plaintiffs and Class Members the compensatory damages they have sustained as a consequence of Defendants' federal constitutional, state constitutional, and statutory violations;

h.    Awarding Plaintiffs and Class Members punitive and nominal damages;

i.    Awarding Plaintiffs and Class Members costs and reasonable attorney's fees;

j.    Granting Plaintiffs and Class Members all applicable interests; and

k.    Granting such other and further relief as the Court deems just and proper.

## VII.    <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a **trial by jury** on all issues so triable.

Dated:  May 11, 2023                     Respectfully submitted,

                              By:    */s/  Catherine Bratic*
                                     Catherine Bratic
                                     Texas Bar No. 24087204

                                     Chloe Warnberg
                                     Texas Bar No. 24131741
                                     HOGAN LOVELLS US LLP
                                     609 Main Street, Suite 4200
                                     Houston, TX 77002
                                     Telephone: (713) 632-1400
                                     Facsimile: (713) 632-1401
                                     catherine.bratic@hoganlovells.com
                                     chloe.warnberg@hoganlovells.com

                                     Pieter Van Tol*
                                     Jack Shaked*
                                     Soo Bin Ahn*
                                     HOGAN LOVELLS US LLP
                                     390 Madison Avenue
                                     New York, NY 10017
                                     Telephone : (212) 918-3000
                                     Facsimile : (212) 918-3100
                                     pieter.vantol@hoganlovells.com
                                     jack.shaked@hoganlovells.com
                                     soobin.ahn@hoganlovells.com

                                     James Ettinger*
                                     HOGAN LOVELLS US LLP
                                     1999 Avenue of the Stars, Suite 1400
                                     Los Angeles, CA 90067
                                     jay.ettinger@hoganlovells.com
                                     Telephone: (310) 785-4600
                                     Facsimile: (310) 785-4601

                                     *Counsel for Plaintiffs*
                                     * Admitted  *pro hac vice*