1                    UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF TEXAS (LUFKIN DIVISION)

3    MARK ROBERTSON, et al,
                                  Case No. 9:23-cv-00023-MAC-ZJH
4              Plaintiffs,

5    v.                           Beaumont, Texas
                                  August 19, 2024
6    BRYAN COLLIER, et al,        2:04 p.m.

7              Defendants.

8
                   TRANSCRIPT OF MOTION HEARING
9             BEFORE THE HONORABLE ZACK HAWTHORN
                UNITED STATES MAGISTRATE JUDGE
10
     APPEARANCES:
11   For the Plaintiffs:          Mark C. Sparks, Esq.
                                  Elijah C. Smith, Esq.
12                                The Ferguson Law Firm
                                  3155 Executive Blvd
13                                77705
                                  Beaumont, TX 77701
14
                                  Catherine Bratic, Esq.
15                                Hogan Lovells US LLP – Houston
                                  609 Main Street, Suite 4200
16                                Houston, TX 77002

17                                Samuel Dougherty, Esq.
                                  Attorney at Law
18                                390 Madison Avenue
                                  New York, NY 11217
19
     For the Defendants:          Michael J. Calb, Esq.
20                                Matthew James DeMarco, Esq.
                                  Office of the Attorney General of
21                                Texas
                                  Law Enforcement Defense Division
22                                P O Box 12548
                                  Austin, TX 78711-2548
23
     Clerk/Court Recorder:        Tonya Piper
24

25

```
 1    Transcription Service:        Chris Hwang
                                    Abba Reporting
 2                                  PO Box 223282
                                    Chantilly, Virginia  20153
 3                                  (518) 302-6772

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Proceedings recorded by electronic sound recording;
      transcript produced by transcription service.
25
```

1           (Call to order at 2:04 p.m.)

2                 THE CLERK:  All rise.

3                 THE COURT:  Thank you, please be seated.  The Court

4     calls case number 923-CV-23.  It's titled Mark Robertson and

5     others v. Bryan Collier and others.  We're set this afternoon

6     for a hearing on a motion to dismiss that was filed by the

7     Defendants.

8                 Who's here for the Plaintiff -- Plaintiffs?

9                 MR. SPARKS:  Your Honor, Mark Sparks and Elijah Smith

10    from the Ferguson Firm and Catherine Bratic and Sam Dougherty

11    from Hogan Lovells on behalf of Plaintiffs.

12                THE COURT:  All right, thank you.

13                And who's here for the Defendants?

14                MR. CALB:  It's Michael Calb and Matthew DeMarco from

15    the -- we're Assistant Attorney Generals for the Defendants.

16                THE COURT:  All right.  Plaintiffs asked for a

17    hearing.  I normally don't have hearings on motions to dismiss

18    because it's pretty much based on the pleadings.  So what do

19    you want to tell -- what do you all want to tell me?

20                MR. SPARKS:  I think Ms. Bratic could probably or

21    probably Mr. Dougherty just point out some of the things --

22                THE COURT:  Sure.

23                MR. SPARKS:  -- that we think are important.

24                THE COURT:  Okay.

25                MR. SPARKS:  I understand.  We're grateful for the

1    Court giving us the hearing.

2              THE COURT:  Okay, all right.  Who's first?

3              MS. BRATIC:  Yeah.

4              THE COURT:  If you want to talk from the podium,

5    please.  Thank you.

6              MS. BRATIC:  Yeah, go ahead.  And I normally would

7    not go first on the other side's motion to dismiss, but I think

8    we wanted this hearing, Your Honor, to answer your question

9    because we appreciate that there's over 100 pages of briefing

10   on this motion to dismiss.  There's a number of claims.  And

11   basically just wanted to make sure that we were available to

12   the Court to address some of those kind of complex

13   constitutional questions.

14             For my part, I'm going to just address the question

15   of standing and the points that I think are important.  And

16   then, I'll pass over to my colleague, Mr. Dougherty, who will

17   address the substance of the claims.

18             But the overall point here, so we were concerned that

19   the Defendant's motion to dismiss was in addition to being

20   based on some misstatements of the law, based on a number of

21   pretty blatant mischaracterizations of the pleadings.

22             For example, the Defendants have contended that

23   Plaintiffs do not say that their cells are dirty when the

24   amended complaint describes cells that are covered in black

25   mold and other people's blood with cockroach infestations.

1          So to describe that as Plaintiffs do not contend that

2     their cells are dirty is a pretty blatant mischaracterization

3     of the pleadings here.

4          The fact is that Polunsky death row contains some of

5     the United States' most brutal death row conditions, which are

6     described in detail in the complaint and also which describes

7     the severe psychological and physical harms that have come to

8     these Plaintiffs as a result of those conditions.

9          Those conditions are more than sufficient to state a

10    claim under 5th Circuit precedent including Hope v. Harris and

11    unfortunately far exceed the conditions that have been

12    challenged in other conditions of confinement litigation around

13    the country.

14         So for the Defendants to assert that this is mere

15    displeasure and no one's alleging that their cells are dirty is

16    frankly just an attempt to make their conduct immune from

17    scrutiny.

18         On the question of standing, I want to highlight that

19    the Plaintiffs have alleged concrete and particularized harms

20    in connection with each cause of action, which is all that's

21    required at the motion to dismiss stage.

22         In that analysis, the Defendants have suggested that

23    the Court should conduct the standing analysis basically

24    factual allegation by factual allegation.

25         See, you know, is Plaintiff A alleging that his cell

1    was moldy?  Is Plaintiff B alleging that he had cockroaches in

2    his food?  That is not how the analysis should be conducted

3    under 5th Circuit precedent.  It's not done based on factual

4    allegations.

5           The standing analysis is done on a claim basis.  So

6    the only question is under Rumsfeld, it only has to be one.

7    Has any one of these Plaintiffs alleged that they have been

8    injured due to the conditions of their confinement?

9           And in Hope v. Harris, the 5th Circuit said that

10   conditions of confinement can and should be aggregated for the

11   purposes of evaluating an Eighth Amendment claim.

12          And that's because that's how those Plaintiffs

13   experience them.  They don't experience just one part of it.

14   They experience those conditions of confinement as a whole.

15   And so for standing, the question is do those conditions as a

16   whole injure them?  Have they alleged that they injured them?

17          But even if we were to look, you know, on an

18   allegation by allegation basis, I think that the complaint will

19   still past muster because as you'll see in the Defendant's

20   motion to dismiss, they admit that even for the specific

21   factual allegations, at least one Plaintiff has alleged that

22   there is standing to challenge exposure to mold to challenge

23   the FPod, which is the super strength kind of punitive wing of

24   death row where even worse things happen to challenge the lack

25   of nutrition, challenge lack of recreation time.

1            So even under that standard, which we do not think is

2      the correct one that the Court should apply, we think the

3      complaint would pass muster.

4            I would also note for purposes of evaluating standing

5      that for conditions that are obviously safe and likely to cause

6      harm, the Plaintiff can simply plead that those conditions

7      exist.

8            And I would refer to Helling v. McKinney, which was a

9      1993 Supreme Court case that actually dealt with secondhand

10     smoke.

11           And in that case, the Supreme Court said you don't

12     have to wait till you get lung cancer for us all to know that

13     secondhand smoke is noxious to one's health.

14           And if your cellmate is smoking in the same cell as

15     you, that's harmful and you don't have to plea to specific

16     injury that you're coughing up a black lung here before you can

17     sue.

18           By the same token, the Supreme Court said in that

19     case, a plaintiff need not await a tragic event.  They can

20     complain about demonstrably unsafe drinking water, without

21     waiting for an attack of dysentery.

22           So I think those are the conditions that we're

23     dealing with here.  We're dealing with blood on the walls,

24     toxic black mold, roaches in food, inmates being denied

25     recreation and proper nutrition when being held in a cell 23

1    hours a day, 24 hours a day on the many times when they don't

2    get any rec or shower time.  And those conditions are obviously

3    harmful to one (sic) health, much more so than second hand

4    cigarette smoke.

5         So even if we were not dealing with injuries here,

6    which we are, that would be sufficient.  These conditions are

7    obviously harmful enough that the standing analysis presumes

8    that those conditions would cause injury.

9         Before I turn over to my colleague, I just want to

10   address standing and jurisdiction over the retaliation and

11   access to counsel claims.

12        On the retaliation claim, the Plaintiffs have pled

13   that less than a month after they filed this lawsuit, the

14   Defendants changed their policies to severely restrict attorney

15   visits.  And those changes were accompanied by comments to

16   Defendants and their counsel along the lines of be careful what

17   you wish for.

18        There were also specific threats to Mr. Cummings and

19   his attorney.  Mr. Cummings was from prevented from meeting

20   with an attorney.  And 11 guards eavesdropped on a conversation

21   between Mr. Ward and our law firm.

22        Those claims of retaliation allege injuries that are

23   far greater than the injuries held to confer standing by the

24   5th Circuit in Hope v. Harris.

25        In that case, the injuries from retaliation were

1    simply being moved from one cell to another and having a

2    typewriter confiscated.  So we would submit that the injuries

3    here are more than sufficient to clear the bar under that

4    precedent.

5        And finally, as to the access to counsel claim,

6    there's also a jurisdictional question here whether the

7    Defendants have essentially alleged that, yes, they would argue

8    that, yes, these individuals do have a right to access to

9    counsel, which for Mr. Ward is a constitutional right.  For Mr.

10   Robertson, it's a state statutory right because he's in state

11   habeas proceedings.  And for Mr. Cummings, it's a federal

12   statutory right because he's in federal habeas proceedings.

13       But they can't, basically is what the Defendants

14   argue, they say it -- okay, you have a -- may have a

15   constitutional right to have counsel, but if someone takes that

16   away, you don't get to have a lawsuit.

17       Well, that's simply not correct.  This is a lawsuit

18   under 1983, which gives an individual a right to assert a claim

19   for enforcing an underlying right either found in the

20   Constitution or in a federal statute.

21       Whereas state has chosen to act in the realm of due

22   process for via state statute.  For example, the state access

23   to counsel law that applies in Mr. Robertson's case, 1983 also

24   gives an individual a right to assert a claim on that basis.

25       And finally, as to injury in fact for denial of

1    access to counsel, it is not required, contrary to what the

2    Defendant suggests, that a plaintiff show that their litigation

3    was prejudiced, that they would have won a case but for this

4    interference and then they lost the case.

5          That, I mean, as we all know as people who litigate,

6    it's often impossible to show that one specific fact caused you

7    to win or lose a claim.  And that's simply not what's required

8    under the precedent of the 5th Circuit access to counsel

9    claims.

10         The 5th Circuit has said that prejudice is presumed

11   in situations where the government intentionally interferes

12   with an attorney-client relationship.

13         So in Guild v. Securus Techs, the 5th Circuit found

14   that allegations that the Plaintiffs were prejudiced by

15   recording and sharing by the government of their confidential

16   telephone calls was sufficient to support a presumption of

17   prejudice at the pleading stage.

18         So, here, the plaintiffs have alleged that guards,

19   the government who very adverse party, confiscated materials,

20   were forced to meet with their counsel in environments that

21   were monitored by guards and open to the public.

22         All of them have had legal materials inspected.  That

23   is specifically the type of harm that in Guild v. Securus

24   Techs, the 5th Circuit said would support a presumption of

25   prejudice for interference with the attorney-client

1    relationship.

2            So I'm going to hand over to -- for the substance of

3    the claims to my colleague, Sam Dougherty, who will address the

4    kind of 12(b)(6) motions and qualified immunity.

5            THE COURT:  Who's going to talk about class

6    certification?

7            MS. BRATIC:  We are not here on class certification

8    today.  So I think the answer is nobody.

9            THE COURT:  Okay.  Well, that's kind of what I'm

10   getting hung up on.

11           MS. BRATIC:  Uh-huh.

12           THE COURT:  And it's going to be very difficult to

13   grant or deny a motion to dismiss when you're trying to certify

14   a class because you've got to show individual issues don't

15   predominate or common issues of law in fact over individual

16   issues.  And then, you're complicating with the injury in fact

17   analysis.

18           It's really hard for me to, you know, without knowing

19   who my Plaintiffs are, or who the Plaintiffs are to decide the

20   motion to dismiss.

21           I -- in other words, if I grant it, deny it, grant it

22   in part, deny it in part, on some of these let's say standing

23   on this person, no Sixth Amendment violation on him, but a

24   Sixth Amendment violation on him, and then I have to go to a

25   class certification stage, well, then that's going to be

1   incongruent because we've got 180 more potential Plaintiffs out

2   there to deal with.

3          So Mr. Sparks?

4          MR. SPARKS:  I think subclasses are something that

5   could help with that.  I actually prepared a handout on each

6   Plaintiff and identified the injuries alleged in the complaint,

7   pinpoint cite to the complaint for the Court for my little

8   portion of the argument.

9          But to answer the Court's question, in every class

10  action, there's always individualized (indiscernible) issues.

11  And I think the Court points out a great point.

12         Because if we're going to certify, we need to know

13  who we're certifying, what we're certifying, and where we're

14  certifying.

15         These are all people in Polunsky death row as I

16  understand, it seemed to me that there would be some

17  overarching consistent practices and procedures that would

18  certainly for injunctive relief be right for certification.

19         THE COURT:  But you've handled a ton of them.

20         MR. SPARKS:  Yes.

21         THE COURT:  Class certification's always the first

22  one to go to merits, right?

23         MR. SPARKS:  Yes.

24         THE COURT:  So why is this -- it seems to me like

25  we're jumping into merits giving lip service to class

1    certification and just kind of keeping it in the background.

2           MR. SPARKS:  It seems that way to me, too, Your Honor

3    --

4           THE COURT:  Oh.

5           MR. SPARKS:  -- but we had to defend the motion to

6    dismiss obviously.

7           I think what I've been doing like we started to do in

8    TPC, we just abandoned the class actions in those cases, but

9    what we initially do is we set up a docket control order.  As

10   you know, it bifurcates.

11          But what always, always happens is there's some

12   leakage of the merits into the class certification context

13   because you can't do class certification discovery without some

14   wink or nod to the merits.  So, yes, most of our PCOs in the

15   class actions that I handle do have a bifurcated type of

16   approach to it.

17          THE COURT:  Well, what do you want me to do here?

18   Like let's say I get something out, you know, whenever, two

19   months, I don't know.

20          MR. SPARKS:  Right.

21          THE COURT:  And then, assuming there's no

22   interlocutory appeals, whatever, then do I need to start paying

23   attention to class cert -- you are going to move to certify the

24   class or we just going to keep it in the background or focus on

25   summary judgment?

 1          MR. SPARKS:  I think you make us to do the work and

 2   make us make the decision.

 3          THE COURT:  Okay, well.

 4          MR. SPARKS:  What you do with respect, well --

 5          THE COURT:  Yeah.

 6          MR. SPARKS:  -- what I tell us to do is you all need

 7   to go work out a document control order when you deal with

 8   class certification first with some merits discovery, but not

 9   open merits discovery.

10          And then, Plaintiffs need to file a motion for class

11   certification after they have sufficient data to do so.  And at

12   that point, I think we handle class certifications, Your Honor.

13          THE COURT:  All right.

14          MR. SPARKS:  In all the -- like in TPC, they were

15   adamant TPC was originally, but they were adamant that they

16   wanted a class certification done first.  So that's what we

17   typically hear from defendants when we get -- when we have a

18   class action allegations.

19          THE COURT:  All right.  Mr. Dougherty?

20          MS. BRATIC:  If I can --

21          THE COURT:  Yes, ma'am?

22          MS. BRATIC:  -- just make, sorry, one quick point on

23   the standing issue first.  I just want to be clear that under

24   the precedent of the Supreme Court in Rumsfeld, the task is

25   standing should not result in a winnowing of the plaintiffs

1    essentially that this plaintiff has standing, that plaintiff

2    doesn't because under Article 3, all that's necessary is that

3    one plaintiff has standing for this Court to have jurisdiction

4    over the lawsuit and be able to proceed.  So I just wanted to

5    clarify that point.

6         It may be the case that when my colleague is speaking

7    that that is where we have to discuss whether there should be a

8    winnowing of claims by individuals, but for standing, once one

9    Plaintiff has standing is all that's required.

10        THE COURT:  Okay.  Mr. Dougherty?

11        MR. DOUGHERTY:  Thank you again, Your Honor.

12   Appreciate your time today.

13        I just want to make a few points for you.  The first

14   is as to the Eighth Amendment claim, as you know, the standard

15   there is the same as for standing and that is an aggregate

16   unlike what the Defendants say when they attempt to parse out

17   each individual allegation individually and say that they are

18   not enough on their own.

19        That's not the standard under Hope v. Harris, where

20   again, it is everything added together.  Be that as it may,

21   even if you were to take them individually, many of these

22   claims would be sufficient.

23        For example, the black mold that we see throughout

24   the unit and covering the cell of the wall in particular was

25   sufficient in Hope.  We also have next to no recreation.

1     That's also been sufficient in a number of cases, including

2     _Maze_ and _Dillard_.

3          And then, we also have severe lack of access to

4     medical care.  We have a named Plaintiff Mr. Ward, who broke

5     his foot and it took the Defendants a month, 30 days, to get

6     him a medically prescribed boot.  They then took away the boot

7     for no other reason.  And it took them another 30 days to give

8     it back to him.

9          Now, years later, Mr. Ward's broken foot is still

10    swollen and still painful, again, as a result of the lack of

11    access to medical care.

12         The -- so that's -- as you know, Your Honor, that's

13    the first prong and the Eighth Amendment violation, right, as

14    to the actual conditions.

15         And the second prong is deliberate indifference.  And

16    here, it is true that there is a subjective standard in that

17    you have to allege that each Defendant knew about the

18    conditions and did nothing to stop them.

19         But as we see in _Farmer_, the Supreme Court case, the

20    subjective standard can use circumstantial evidence.  And it's

21    also a question of fact, such that if there's something that's

22    sufficiently obvious, like for example cockroaches throughout

23    the unit or black mold throughout the unit, or policies

24    mandating 23 hours of individual time in a cell, that would be

25    sufficient we posit for the Defendants to know about what harm

1    is being perpetrated against the Plaintiffs.

2              Moving on to the Fourteenth Amendment claim, we have

3    lack of due process, here, unlike what Defendants argue, we do

4    not need to allege a specific statute that provides a liberty

5    interest in challenging the Plaintiff's conditions.

6              Instead, we can infer -- I'm sorry, instead, we can

7    look at the nature of the conditions which we just reviewed.

8    That alone is enough to create a liberty interest according to

9    the Supreme Court in Wilkinson and the 5th Circuit in

10   Wilkerson.

11             Again, moving on to the -- our Sixth Amendment access

12   to counsel claim that is in dispute that Mr. Ward, who is a

13   direct appeal should have access to his counsel.

14             He has not been able to, according to the Defendant's

15   policies.  They have interrupted and cancelled meetings with

16   Mr. Ward's lawyers.  And which is, you know, in effect, a

17   violation of his right to effective counsel under Strickland.

18             We also have a Fourteenth Amendment access to counsel

19   claim for all the Plaintiffs, including Mr. Robertson, who has

20   a state habeas petition and Mr. Cummings, who has a federal.

21             For Mr. Robertson in particular, the state of Texas

22   under Article 11.071(a) has provided guarantees for access to

23   counsel under state habeas -- under state habeas proceedings.

24   And by -- through their policies, they have denied Mr.

25   Robertson the ability to enjoy that right.

1          Now by providing that right, we know again under

2   Supreme Court precedent in McFarland that -- I'm sorry under

3   Smith that the Defendants must protect that right.  They have

4   not done so.

5          And then, for Mr. Cummings under the federal habeas,

6   we have statutory support for his right to counsel under §3599

7   of the U.S. Code.

8          And then, finally, I want to quickly address

9   qualified immunity, which is a defense that the Defendants are

10  alleging.

11         And under qualified immunity, you have to show a

12  violation of a constitutional right, as well as conduct that is

13  unreasonable in light of clearly established law.

14         And here, for the reasons I just articulated as in

15  our complaint -- in our opposition, we have alleged violations

16  of a number of constitutional rights.

17         And as for the clearly established right, the second

18  prong, there have been a number -- there have been 5th Circuit

19  cases including Valigura, excuse me for that pronunciation

20  there, where the Court found there that there -- plaintiffs

21  have an interest in being free from cruel and unusually

22  punishment, Eighth Amendment, and that that is clearly

23  established law, which we would posit also applies here.

24         Happy to answer any questions.

25         THE COURT:  I'm good, thank you, Mr. Dougherty.

1              Mr. DeMarco, Mr. Calb?

2              Oh, yes, sir?

3              MR. SPARKS:  I still have my little bit.  I'm going

4    to --

5              THE COURT:  Okay.

6              MR. SPARKS:  I just know I'll skip mine, but I have

7    my little chart, I gave it to opposing counsel.  Can I --

8              THE COURT:  Yes, sir.

9              MR. SPARKS:  -- give her a copy?

10             THE COURT:  He's -- Ms. Piper.  Okay.

11             MR. SPARKS:  And it just discusses - it shows the

12   location in the complaint where each individualized Plaintiff

13   so you can see what they're alleging their damages are.

14             And we also have -- and I'm not going to -- I'm

15   supposed to _Ultra Vires_, but I think the Court can see in the

16   law required on that one.  This is in reference to damages and

17   to show that it's more than de minimis damages.

18             Your Honor, we have courtesy copies of all of this

19   including the Defendant's materials that we'd like to offer the

20   Court.  We have binders if the Court is interested.  If not,

21   will take them away with us.  Would the Court be interested in

22   our --

23             THE COURT:  Courtesy copies of what?

24             MR. SPARKS:  The briefing.

25             THE COURT:  Oh, I've got it right here.

1          MR. SPARKS:  You've got everything?

2          THE COURT:  Yes, sir, in this binder, yeah.

3          MR. SPARKS:  Great, Your Honor, that's it.

4          THE COURT:  Okay.

5          MR. SPARKS:  We don't have anything else.  We

6   appreciate your all's time.

7          THE COURT:  All right.  Yes, sir.

8          MR. DEMARCO:  Good afternoon, Your Honor.

9          THE COURT:  Good afternoon.

10          MR. DEMARCO:  I would like to begin just, Your Honor,

11   on the issue of standing, I do think that a class action, we

12   need to be able to identify what claims as of which are being

13   brought by whom.

14          To have standing, a Plaintiff must satisfy three

15   elements.  Injury in fact, which is concrete and particularized

16   actual and imminent, causal connection between the injury and

17   the conduct complained of, and the likelihood that a favorable

18   decision will redress the injury.

19          That a suit may be a class action adds nothing to the

20   question of standing.  In a putative class action, the named

21   plaintiffs who represent a class must allege and show that they

22   personally have been injured, not that the injury has been

23   suffered by other unidentifiable members of the class to which

24   they belong in which they purport to represent.  And that's

25   Lewis v. Casey, Supreme Court.

1          As for the access to counsel, an inmate who has

2     standing to the challenge has access to the courts if he has

3     suffered an actual injury stemming from the purported

4     restriction.  He must plead actual prejudice with respect to

5     contemplated or existing litigation such as an inability to

6     meet a filing deadline or to present a claim as of which

7     Plaintiffs have pled none.

8          Plaintiffs allege that inmates at Polunsky death row

9     face various restrictions to accessing their counsel

10    in -- regarding visits and phone calls with attorneys,

11    receiving legal mail, violations of the attorney-client

12    privilege, intimidation tactics.

13         However, Plaintiffs do not assert that these alleged

14    restrictions resulted in any actual prejudice, which caused

15    harm to any contemplated or existing litigation.  As such, they

16    lack standing.

17         With regards to the retaliation claims, Plaintiffs

18    also must be dismissed for lack of standing because even if

19    viewed separate and apart from their access to counsel claims,

20    they still fail.

21         The shower-related claims I know the Plaintiffs claim

22    to have been injured by insufficient water access or shower

23    access, they lose on those grounds.

24         Plaintiffs allege generally that inmates on Polunsky

25    death row are sometimes deprived of mattresses, none of which

1    claim to be currently deprived of a mattress, again must fail.

2              Insect-related claims fail to allege any concrete

3    injuries.  There's also case law that insects are a fact of

4    life in East Texas.

5              THE COURT:  Can we just agree, probably not, that

6    there's some injury if there's insects in your food that you're

7    about to eat?  I mean, really?

8              MR. DEMARCO:  Your Honor, I have eaten bugs before.

9              THE COURT:  Well, I understand that, but that's -- I

10   mean, the allegations I have to believe to be true is he had

11   roaches crawling around in his food.  And say that they also

12   need to show or allege some kind of prejudice to that.  I mean,

13   come on.

14             MR. DEMARCO:  Your Honor, the allegation is that it

15   occurred one time.

16             THE COURT:  Uh-huh.  Uh-huh.  Other than that, the

17   food loaf is pretty good, other than the insects?

18             MR. DEMARCO:  Your Honor, I can't comment on the

19   food.

20             THE COURT:  Okay, have you ever had food loaf?

21             MR. DEMARCO:  I have not had the pleasure yet.

22             THE COURT:  All right.

23             MR. DEMARCO:  I have eaten at officer dining hall,

24   but not the food loaf.

25             THE COURT:  Okay.  The officers eating food loaf?

 1              MR. DEMARCO:  I'm unaware, Your Honor.

 2              THE COURT:  Okay.

 3              MR. DEMARCO:  In regards to the mold-related claims,

 4    Plaintiffs allege that cells on Polunsky death row are often

 5    infested with black mold.

 6              However, with the exception of Robertson and Curry,

 7    the remaining Plaintiffs fail to allege any concrete injuries

 8    regarding damages from the mold.

 9              As far as FPod, the only Plaintiff who claimed to

10    have actually spent time on FPod was Ward.  And that was from

11    November of 2022 to February of 2023.  And Ford, for an

12    unspecified period in 2012.  Robertson for an unspecified

13    period.

14              And of those three, only Ward specifies any injuries

15    from his time on FPod.  And Plaintiffs cannot establish

16    standing just on the mere fact that they may be placed in FPod

17    in the future.

18              Related to the food, Ford and Ward do claim to have

19    lost weight from insufficient food.  However, Robertson, Curry,

20    and Cummings do not claim to have any -- suffered any

21    nutritional defects.

22              And then, as far as the recreational restrictions,

23    while they do specify injuries resulting from insufficient

24    recreation, Cummings and Ward do not.  As such, those claims

25    should be dismissed.

1       In regards to the Eighth Amendment claims, Your

2  Honor, to state an Eighth Amendment claim, 1983, a plaintiff

3  must allege a right secured by the Constitution and violation

4  of that right by one or more state actors.

5       It's been well settled that the Constitution does not

6  mandate comfortable prisons and that prison conditions may be

7  restrictive and even harsh without running afoul of the Eighth

8  Amendment.

9       A prisoner must satisfy a two-part test consisting of

10  objective subjective components to state an Eighth Amendment

11  conditions of confinement claim.

12       First, objectively, the prisoner must allege the

13  existence of conditions so serious as to deprive prisoners of

14  the minimal measures of alleged necessity as well as to deny

15  the prisoners some basic human right.

16       While a prisoner need not await a tragic event before

17  seeking relief, he must at the very least show that condition

18  of confinement poses an unreasonable risk of serious damage to

19  his future health.

20       Second, under the subjective component, a prisoner

21  must establish that the responsible prison officials acted with

22  deliberate indifference to his conditions of confinement.

23       To satisfy that component, must allege indicating

24  that the prison official was aware of facts from which the

25  inference could be drawn that a substantial risk of serious

1    harm exists and that they subjectively drew the inference that

2    the risk existed and disregarded that risk.

3         The alleged conditions are not sufficiently extreme.

4    Only where solitary confinement conditions are based on inhuman

5    or barbaric conditions do they satisfy the Eighth Amendment

6    objective component.

7         A common thread which is actual in claims is the

8    deprivation of basic elements of hygiene, but Plaintiffs allege

9    no extreme deprivations of basic hygiene.

10        Rather, they allege conditions of confinement which

11   rest entirely on the indefinite nature of their solitary

12   confinement housing, coupled with alleged exposure of mold and

13   insects and restrictions to showers, food, and mattresses.

14        And at the risk of repeating myself, Your Honor, I

15   will now pass it over to my colleague, Mr. Calb.

16        THE COURT:  Okay.  Thank you, sir.

17        MR. CALB:  Thank you, Your Honor.

18        THE COURT:  You're welcome.

19        MR. CALB:  Just to go back to why it's important to

20   look at all of these conditions individually, you know, we look

21   at the standing question, yes, one individual Plaintiff could

22   have standing.  And that could be enough for the other

23   Plaintiffs if he has a claim based on a series of or a

24   confluence of conditions that in and of itself would state an

25   Eighth Amendment claim.

1        But the point here is that no individual Plaintiff

2   has sufficiently alleged a confluence of conditions which in of

3   itself would violate the Eighth Amendment's objective

4   component.  So just to make that clear.

5        We're not saying that no Plaintiff has suffered any

6   injury.  We're saying that no Plaintiff has suffered sufficient

7   injury such to make up the objective component of an Eighth

8   Amendment claim.  And that's sort of laid out in our brief in

9   detail.

10        And it's hard to do an oral argument because there's

11   different, you know, facets of each -- the complaint's over 50

12   pages long.  And there's lots of allegations that are barred by

13   the statute of limitations.  There were others that are former

14   conditions that they're no longer allegedly present.  So

15   there's a lot of nuance that I think needs to be addressed.

16   And that's done in the briefing.

17        But I'll move on just for the sake of time to the

18   remaining claims.  Plaintiffs bring a Texas constitution claim.

19   Basically, it's the Texas state constitution version of the

20   Eighth Amendment.  It's Article 1, Section 13.

21        And there's case law that you -- the state is immune

22   from those types of claims.  You can't bring a state

23   constitutional claim in federal court.  It's Pennhurst v.

24   Halderman (sic).

25        In McKinney v. Abbott, the 5th Circuit specifically

1     held that you can't bring a Texas constitutional claim for

2     injunctive relief regardless of the type of relief sought in

3     federal court.

4            There's an exception for *Ultra Vires* Act and that's

5     what they're trying to fall under here.  And the *Ultra Vires*

6     exception is pretty narrow and it does not apply.

7            Here, you know, they specifically allege in their

8     complaint the Defendants have the authority to compel or

9     constrain conditions of confinement.

10           And yet, they're simultaneously arguing that they're

11    acting *Ultra Vires*, which means that they're acting outside the

12    scope of their authority in dictating the conditions of

13    confinement.

14           It's not the case where that applies, Your Honor.  So

15    we would argue that the Texas constitutional claim should be

16    dismissed on sovereign immunity grounds.

17           The Fourteenth Amendment procedural due process

18    claim, you know, one case that I'll admit I didn't find when I

19    was drafting the motion to dismiss, but on reply, I noted for

20    the Court, it's a footnote in a 1981, 5th Circuit case, but it

21    makes it very clear, it's Parker v. Cook, where back when the

22    5th Circuit encompassed Florida, they were looking at Florida

23    death row and the conditions imposed there.

24           And it was -- the court was deciding whether or not

25    there was a liberty interest such that it would give rise to

1    due process protections.

2           And they said in a footnote that, you know, because

3    death row inmates are never placed in the general population or

4    given any expectation of being placed in the general

5    population, it appears that no liberty interest is affected

6    when you're placed in administrative segregation.  That's

7    exactly the same situation here.

8           As Plaintiffs allege very clearly in their complaint,

9    there's a blanket policy of placing every single male death row

10   inmate in solitary confinement in the conditions on Polunsky

11   death row automatically based on their death sentence.  There's

12   no discretion.  That's actually what they're challenging.  They

13   want individualized assessments.

14          But because of that automatic nature of the transfer

15   from their conviction into Polunsky death row with all the

16   attendant circumstances and conditions, there's no expectation

17   of any other conditions, and therefore, no liberty interest

18   giving rise to due process protections.

19          Now that's what the Court held in 1981.  We

20   understand that since then, there's been jurisprudence that has

21   sort of clarified what the test is.

22          And you know, under the new test in Sandin v. Conner,

23   I guess not that new, it's 1995, the Court asks whether the

24   conditions pose an atypical and significant hardship on the

25   inmate in relation to the ordinary incidence of prison life.

 1          Now, again, what is the appropriate baseline for

 2     atypically?  What's atypical?  You know, the cases that are

 3     cited by Plaintiff, we have Wilkerson and Wilkinson.  One's 5th

 4     Circuit, one's Supreme Court.

 5          In both of those cases, there was a decision by a

 6     prison authority as to what level of custody the inmates would

 7     be placed in.  You know, they have discretion to place them in

 8     certain custody level.  That's not the case here.

 9          This is a unique circumstance like the 5th Circuit

10     addressed in Parker v. Cook and like the 4th Circuit addressed

11     in Prieto, which is a more recent decision, post Sandin, which

12     applies the same test and says basically, you know, in where it

13     is, in Sandin, was -- I'm sorry, Sandin was a test that

14     established the atypicality.

15          And then, Prieto v. Clark in 2014, the 4th Circuit,

16     held that when you're looking at the atypical and significant

17     hardship, you have to look at where the inmate's expected to

18     be, which is essentially exactly what the 5th Circuit decided

19     in 1981 in the Parker decision.

20          THE COURT:  Well, okay.  So you have the Ellis unit

21     in 99, which is they moved them from there.  One of the

22     Plaintiffs used to be on the Ellis unit.  So I mean --

23          MR. CALB:  Your Honor, I have a footnote addressing

24     that.

25          THE COURT:  Okay.

```
 1            MR. CALB:  It's specifically that basically to the

 2    extent they're challenging a decision that happened in 1999

 3    beyond the statute of limitations.

 4            THE COURT:  Well --

 5            MR. CALB:  They're citing -- sorry, not to cut you

 6    off.

 7            THE COURT:  I think what -- I mean, the argument is

 8    our hands are tied.  This is death row.  Everybody gets it.

 9    It's a blanket policy, but it's not.  I mean, it's -- they used

10    have them in a different security protocol up until 1999.

11            And then they just built the Polunsky unit, built

12    death row.  And then, everybody got put in there.

13            MR. CALB:  Your Honor, these are blanket policy now

14    that's specifically --

15            THE COURT:  Right.

16            MR. CALB:  -- what's alleged in their complaint.  So

17    what matters for determining whether there's a liberty interest

18    is what they can expect when got their criminal

19    sentence -- when they got their death sentences.

20            And certainly, to the extent they want an injunction,

21    you know, which they do, that you have to look at what

22    happened --  what the conditions -- what the sorry what the

23    liberty interest would be now in giving them a different, you

24    know, potential conditions.

25            And there isn't any because the only condition they
```

1    can expect to have are to continue to be on Polunsky death row

2    with all the attendant conditions.

3         And I think, you know, while the Prieto obviously

4    decision's outside the circuit, it really did address the exact

5    same circumstances here.

6         And then, we have the 5th Circuit ruling in Does v.

7    Abbott in 2015 that in a very I would argue analogous

8    circumstance where you have the -- you have sorry sex offenders

9    who are not given any additional process when they have to

10   endure restrictions based on their sex offense because they

11   received process at their trial, their criminal trial.

12        And then, because it flowed automatically -- sorry,

13   because the sex offender restrictions flow automatically from

14   that sentence, there's no additional process required.  We

15   would argue the same thing is true here.

16        And more importantly, especially for qualified

17   immunity purposes, we have this Clark -- so we have this Parker

18   v. Cook decision, which is settled law in this jurisdiction

19   that in this exact type of circumstance, there's no liberty

20   interest giving rise to due process protections.

21        And -- but assuming there is a liberty interest, we

22   also argue that the process they receive is sufficient.  During

23   the death sentencing portion of their criminal trials, all the

24   Plaintiffs received a full hearing evidentiary in which they

25   could present evidence and there was the ability to determine

1    whether or not they pose as future danger to society.  That's

2    one of the questions required for a death sentence.  And --

3              THE COURT:  Okay.  What about women?

4              MR. CALB:  Women are part of the class or --

5              THE COURT:  I understand that --

6              MR. CALB:  Yeah.

7              THE COURT:  -- but women aren't -- they are not on

8    Polunsky death row or at least they have -- they don't have the

9    restrictions that the men do?  And then, the women on death row

10   the jury made the same finding, correct?

11             MR. CALB:  Correct.

12             THE COURT:  Okay.

13             MR. CALB:  The question --

14             THE COURT:  How do you explain that?

15             MR. CALB:  My -- I guess the difference is -- I'm

16   talking purely in terms of whether or not it's sufficient for

17   due process.

18             THE COURT:  Well, you said a jury made a decision

19   that they constitute beyond a reasonable doubt a continuing

20   threats of violence or whatever to society.

21             MR. CALB:  Uh-huh.

22             THE COURT:  Danger to society.  And you said, well, a

23   jury's already found they did.  Well, they found women did too

24   that are sentenced to death, but they're not on

25   death -- Polunsky death row either.

1          MR. CALB:  Right, I understand the discrepancy.  I

2    can't tell you the reasoning behind that.  What I can tell

3    you --

4          THE COURT:  What about the people in which they

5    answered yes to the mitigation special issue?  They're not on

6    death row.

7          MR. CALB:  The point of this argument, Your Honor, is

8    pretty narrow.  I'm not trying to --

9          THE COURT:  I think the point of the argument you're

10   trying to make is a jury has already made a determination that

11   they constitute a continuing threat to society.  And that's the

12   process that they got.

13         It doesn't sound like a very good process if the jury

14   made the same determination on a female, but yet, she doesn't

15   get the same treatment.

16         MR. CALB:  So --

17         THE COURT:  Or to someone in which the jury found

18   favorably on the mitigation special issue, they don't get the

19   same special treatment either.

20         MR. CALB:  We're talking purely about procedural due

21   process, which is noticing an opportunity to be heard.  Whether

22   there's discrepancies in the outcome, whether there's, you

23   know, different nuances of how that works, you can question

24   whether it's sufficient right for various purposes, but --

25         THE COURT:  Well, that's what I'm questioning whether

 1    that's sufficient.

 2            MR. CALB:  Right, purely as -- there's no question,

 3    let me baseline it.  There's no question that at the criminal

 4    trials, they had notice and opportunity to be heard.

 5            THE COURT:  About where they should be designated in

 6    TDCJ?

 7            MR. CALB:  About whether or not they contested

 8    whether or not they were -- they met the standards to be -- to

 9    receive a death penalty.

10            THE COURT:  I understand that.  But it doesn't -- the

11    special issues that they decide in the penalty phase have

12    nothing to do with security level designation.

13            MR. CALB:  I think there's -- I would quarrel with

14    that only because there is case law that, you know, when jury's

15    supposed to look when they're determining future dangerousness,

16    they are supposed to think about the danger they pose in

17    prison.  There's case law, both state and federal court, saying

18    that that's part of the analysis.  Absolutely.

19            THE COURT:  I understand that, but some juries have

20    said, yes, they do, but they found favorable forum and the

21    mitigation special issue.

22            MR. CALB:  That's true.  Again, Your Honor, I'm

23    really only saying something very basic here is that because

24    they received due process in their trial at all and because the

25    death sentence is the reason why they're in the conditions of

1    confinement that they're in, automatically the fact that they

2    receive procedurally sufficient due process at their criminal

3    trials at all regardless of nature was met the standards of

4    notice and opportunity to be heard.  That's all I'm saying.

5    That's the primary argument I'm making here.

6            Because of that, they don't need additional process.

7    Once they get to prison and it's, you know, it's going to be

8    basically a renewed determination of something.  But again, we

9    don't need to get there because there was no liberty interest

10   is my argument primarily.

11           THE COURT:  Okay.

12           MR. CALB:  Okay.  You know, there's lots of this case

13   law as cited in the briefing.

14           All right, and for the Sixth Amendment access to

15   counsel claim, there's a few problems.  You know, they didn't

16   bring their First Amendment claim, First Amendment access to

17   counsel claim, although that would also fail.  I'm explain in a

18   second.

19           They brought it as a Sixth Amendment claim.  Sixth

20   Amendment only applies to, you know, your criminal case and

21   your first right of appeal.  The only Plaintiff who is still at

22   that stage or at least who was at the time of the briefing is I

23   believe Ward.

24           THE COURT:  So are you saying they don't have a right

25   to counsel on their state habeas claims?

1    MR. CALB:  So whether they have a right to counsel is

2    different.

3           THE COURT:  Right.

4           MR. CALB:  So there's -- well, they have a right to

5    it under their state statutes that say they -- they don't

6    actually -- there's -- let me see is there -- yeah, there's a

7    statutory provision which provide -- which says they have

8    entitlement to counsel.  It's Section 13, I'm sorry 3599, but

9    courts have construed that as a funding statute not to rise to

10   liability.  There's no --

11          THE COURT:  How about we do this?  Let's just say

12   according to your rule, if it's not a trial or direct appeal,

13   then if somebody hired somebody to represent him on their state

14   habeas claims that TDCJ can prevent that lawyer and client from

15   ever talking?

16          MR. CALB:  No, that's not what I'm saying, Your

17   Honor.  There's a First Amendment access to courts claim.  That

18   would be the proper mechanism for bringing that claim.  They

19   didn't bring that claim.  They specifically said Sixth

20   Amendment claim, which does not apply to any of the claims

21   except for Ward.

22          But assuming it's a First Amendment claim access to

23   courts, that's how it would be properly brought, the big

24   problem is as was mentioned in the standing context, they don't

25   have any sufficient injuries.  They haven't alleged actual

1    prejudice to litigation.

2         You know, Curry doesn't allege any interference.

3    Robertson says he was denied privacy during one meeting, but

4    doesn't allege any prejudice resulting from that lack of

5    privacy.

6         Ford says the guards intercepted documents once and

7    took documents another time.  It doesn't say any resulting

8    prejudice.  Cummings says he was unable to meet with his habeas

9    counsel one time, but does not assert any resulting prejudice.

10        And Ward says guards searched through his documents

11   before a meeting and intimidated him being they were in the

12   presence of his attorney-client communication one time.  And

13   again, it doesn't assert that that resulted in any prejudice.

14        They mentioned this motion to dismiss and there, you

15   know, might have resulted in their -- it might have impacted

16   their ability to respond to this motion to dismiss, but I will

17   posit Your Honor, that the motion to dismiss is entirely on the

18   pleadings and it's unclear what they need to talk to their

19   client about to discuss whether they client -- whether the

20   pleading was sufficient to state a claim.

21        But even there, they didn't really allege

22   specifically how that prejudiced them in this ruling since

23   there hasn't been one.

24        You know, I'll notice the case that they cited is

25   Guild v. -- I forget the exact, the Guild case cited by

1    Plaintiffs.

2         That -- in that case, the government recorded and

3    shared the evidence for the other side.  That was the case

4    where the prison guards or whoever was involved actually

5    recorded the conversation and provided it in a way that

6    prejudiced their cases.  They provided it to the government in

7    some fashion.

8         It was not just a, you know, incidental situation

9    where people were overhearing conversations or they're, you

10   know, monitoring the hallway while these conversations are

11   taking place, which is what is being alleged here.

12        You know, in terms of -- and I'll get to  -- let me

13   just turn to that now since we're already sort of touching on

14   it.

15        The First Amendment retaliation claims, you know, you

16   need three elements.  You need a specific constitutional right.

17   You need the intent to retaliate.  You need a retaliatory

18   adverse act, right?  There is no retaliatory adverse act here

19   that's being alleged.

20        Mere threats, which are alleged.  They're alleged

21   threats are not under clearly established law are not

22   sufficient to constitute an adverse act to make a First

23   Amendment retaliation claim.

24        Threatening language and verbal harassment, said the

25   (indiscernible) court is not sufficient.  In Bell v. Woods, the

 1    5th Circuit said plaintiff has not stated a retaliation claim

 2    because he's alleged only threat, not a retaliatory adverse

 3    act.

 4           And Plaintiffs cite to cases to refute that claim.

 5    They recite to Brown v. Taylor and Jackson v. Cain.  But in

 6    both of those cases, the Court held that the threats were

 7    evidence of causation, not that the threats themselves

 8    constituted the adverse acts.

 9           There were other adverse acts in those cases that

10    were sufficient to meet that element of the First Amendment

11    retaliation claim.  So I'll make sure that, you know,

12    distinguish those claims.

13           So, and then last, I'll touch on qualified immunity.

14    Our view is that, you know, all of these claims to the extent

15    they're being brought against Defendants in their individual

16    capacities are barred by qualified immunity.  With the rest of

17    the claims that I mentioned, you know, we have the Fourteenth

18    Amendment claim.

19           You know, the 5th Circuit decision in Parker in our

20    view, precludes any finding of individual liability for the

21    lack of due process, as does -- and for the Sixth Amendment

22    claim, you know, it's -- it's the -- there's lots of case law

23    that you require an actual prejudice that our clients

24    reasonably relied on that when they, you know, when they had

25    the restrictions on attorney-client phone calls, et cetera.

1          In fact, a lot of those restrictions that they're

2    claiming, I forgot to mention this, Your Honor, I'll end with

3    this, is that there, you know, restrictions that they're

4    claiming had been upheld by the court in many instances.

5    There's no absolute right to unfettered access to your attorney

6    in prison.

7          There is a right to access to your attorney.  And we

8    acknowledge that fully, but the restrictions that they're

9    complaining about, for example, no contact visits have

10   been -- has been upheld by the Supreme Court as being okay.  No

11   unshackled contact visits absolutely been upheld as being okay.

12         The other restrictions, you know, sometimes

13   difficulty in getting access to a phone call by the timing and

14   these restrictions on, you know, how long it takes to get it

15   set up, there's no hard and fast rule on that, Your Honor.  And

16   for qualified immunity, that should save us.

17         But even in terms of the claim for injunctive relief

18   as to which qualified immunity wouldn't attach, we posit that

19   none of those restrictions are sufficient enough to violate the

20   First Amendment or the Sixth Amendment regardless of which

21   analysis you undertake because there's been no actual prejudice

22   alleged.

23         So with that, I'll close, Your Honor.

24         THE COURT:  All right, thank you.

25         MR. CALB:  Any questions?

1               THE COURT:  No, sir.

2               MR. DOUGHERTY:  Your Honor, do you mind if I address

3    a couple points?

4               THE COURT:  Yes, sir.

5               MR. DOUGHERTY:  Thank you, I'll be very quick.  So I

6    wanted to clean up some of the things that Defendants again

7    tried to misrepresent.

8               So, first, about the insects, there are multiple

9    allegations about insects from Mr. Curry and Mr. Cummings.  And

10   additionally, we also alleged that the insect problem has

11   gotten worse every year.

12              As for the claim that there's no harm from mold and

13   lack of hygiene, you know, I would point the Court to paragraph

14   43 of the complaint, where we allege that Mr. Robertson wakes

15   up at night having trouble breathing because of the mold.

16              And I'll also, you know, again, as to the lack of

17   hygiene, just mention that Mr. Cummings was forced into a cell,

18   covered in blood, chained to a bed, and then was forced to

19   clean it himself.  That speaks for itself.

20              And then, finally, as to retaliation claims that we

21   have, there is case law that talks about how if you have a

22   chronology of events, that will -- that is helpful when making

23   that claim.

24              Here, we have the original complaint was made and

25   less than a month later, Polunsky changed its policies and

1    created a new confusing and seemingly arbitrary policy where

2    they would cancel visits with attorneys.  They would stand

3    behind the defendant -- the Plaintiffs during their meetings

4    with the attorneys, and they would refuse to allow the

5    attorneys to provide their clients with legal documentation.

6            THE COURT:  You don't have to answer this --

7            MR. DOUGHERTY:  That's all I have.

8            THE COURT:  -- but if you talk to the attorneys, do

9    they just tell them, guys, you all need to leave?  I had that

10    happen to me one time.  Some guard just sat there.  I said get

11    out of here and he left.  I mean, did they ever just tell them

12    leave, I'm talking to my client?

13            MR. DOUGHERTY:  I believe in the complaint we have

14    that they -- the attorneys at least on one occasion was also

15    intimidated.  I don't that in front of me, but I don't know the

16    answer to that question.

17            THE COURT:  Right, okay.

18            MR. DOUGHERTY:  Yeah.

19            MS. BRATIC:  I can -- I mean, visit on the record but

20    I think, you know, we did and this is described in the

21    complaint have a sort of surreal experience speaking to one of

22    our clients while the -- while we were briefing these arguments

23    where 11 different guards walked by.

24            And our phone call took hours because each time, our

25    client would go away, the guard walking by staring at me was

1    standing here.  I told him to go away.  Okay, he went away.

2    Now here's another one.  There were 11 guards who walked by at

3    that time.  So to answer that question.

4         And as well, I'm standing, I'll address the point

5    about standing, which was, Judge, to your kind of hypothetical

6    question of whether that would confer standing if you have a

7    plaintiff whose in the middle of state habeas proceedings, so

8    he has a state statutory right to access counsel and the

9    government says, well, your counsel can never meet with you.

10   Guild v. Securus Techs was a 5th Circuit case that they asked

11   directly for the principle.  You do not have to wait to lose

12   your lawsuit.  You do not have to wait to lose your state

13   habeas claim before you have standing to complain about lack of

14   access to counsel.

15        When the government is very obviously like that,

16   intentionally trying to interfere with the attorney-client

17   relationship, prejudice is presumed.  You don't have to wait to

18   show injury.

19        And there's a distinction in the case law there

20   between prejudice where access to counsel claims and injury,

21   which is normally what's required for other types of claims.

22        And that difference in the language is precisely

23   because we presume prejudice when the government intentionally

24   does things like that that we know will have harmful effects.

25        THE COURT:  Well, what I was asking him about was,

1    you know, they basically said you can't have a Sixth

2    Amendment -- well, I interpreted their argument, that you can't

3    have a Sixth Amendment claim unless it's a trial or direct

4    appeal, because you don't have a constitutional right to

5    counsel.

6             And so, my state -- my hypothetical is for state

7    habeas proceedings.  Somebody hires a lawyer, can they just

8    prevent all access?

9             And he told me that that's not a Sixth Amendment

10   violation, that's a First Amendment violation to access to

11   courts.

12            So I really wasn't asking it about standing per se.

13   I was just questioning about how is there not a Sixth Amendment

14   violation -- can there only be Sixth Amendment violations when

15   counsel is required?

16            MS. BRATIC:  Right, the --

17            THE COURT:  Under the Sixth Amendment I guess.

18            MS. BRATIC:  Right, so we would say no, but again, on

19   the -- if it's a standing question, we do have one plaintiff

20   who is in direct appeals, but 1983 allows them to make a claim

21   that their access to counsel of even statutory has been

22   violated.

23            And that also applies even though 1983 we normally

24   would think as protective federal statutory rights, it also

25   protects state statutory rights when the state has taken the

1    initiative to act in an area that is covered by due process.

2            And the citation on that is U.S. ex. rel. Smith v.

3    Baldi.  It's a 1953 Supreme Court case.  So I, you know, a bit

4    old, but certainly still applies to the principle as really law

5    that when the state chooses to act in this arena, they have to

6    respect due process in doing so and can't arbitrarily just you

7    can't speak to your lawyers.

8            THE COURT:  Okay.  Anything else from anybody?  Yes?

9            MR. DEMARCO:  No, Your Honor.

10           THE COURT:  Oh, okay.  Okay, it's going to be a while

11   before I get something out.  I'm doing my best, but there's a

12   lot to go through here.  And you know, I've got to dot all my

13   I's and cross all my T's, obviously.

14           So I'm sorry it's taken this long to have the

15   hearing, but continue to be patient with me, please.

16           MR. SPARKS:  We're grateful for the Court's time.

17           THE COURT:  Okay, all right.  Okay, we're adjourned.

18           THE CLERK:  All rise.

19       (Proceedings concluded at 2:57 p.m.)

20

21

22

23

24

25

1                        **CERTIFICATE**

2

3

4         I, Chris Hwang, court approved transcriber, certify

5 that the foregoing is a correct transcript from the official

6 electronic sound recording of the proceedings in the above-

7 entitled matter.

8

9

10

11         /s/ *Chris Hwang*

12      _____     September 5, 2024

13      Chris Hwang            Date

14      Court Reporter

15

16

17

18

19

20

21

22

23

24

25