IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | |
|---|---|
| MARK ROBERTSON,<br>GEORGE CURRY,<br>TONY EGBUNA FORD,<br>RICKEY CUMMINGS, and<br>LUCKY WARD,<br><br>       Plaintiffs,<br><br>vs.<br><br>BRYAN COLLIER,<br>BOBBY LUMPKIN,<br>DANIEL DICKERSON,<br>CRYSTAL ANTHONY,<br>DOES 1-10, and<br>RONALD IVEY,<br><br>       Defendants. | NO. 9:23-CV-00023-MAC |

## REPORT AND RECOMMENDATION

Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals ("Class Members") incarcerated on death row at the Allan B. Polunsky Unit ("Polunsky Death Row Unit" or "Polunsky Unit"), a facility operated by the Texas Department of Criminal Justice ("TDCJ"), pursuant to 42 U.S.C. § 1983. Plaintiffs filed their *Original Complaint* on January 26, 2023, in the Southern District of Texas, Houston Division, and it was transferred to the Eastern District of Texas on January 30, 2023. (Dkt. #1, 7.) Plaintiffs filed an *Amended Complaint* against Defendants on May 11, 2023, seeking relief under 18 U.S.C. § 3599, 28 U.S.C. §§ 2202, 2254 and 2255, Article 11.071(a) of the Texas Code of Criminal Procedure, and the Texas Constitution. (Dkt. #22.) The Defendants filed a *Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6)* on July 10, 2023, which is pending before the court and referred to the undersigned

magistrate judge for consideration and recommendation disposition. (Dkt. #22, 29.) The undersigned has reviewed the *Amended Complaint*, the Defendants' *Motion to Dismiss*, and the Plaintiffs' Response and recommends granting the *Motion to Dismiss*, in part.

## I.    <u>APPLICABLE LAW</u>

Under Federal Rule of Civil Procedure 12(b)(1), the district court has the authority to dismiss an action for lack of subject matter jurisdiction based on: (1) the complaint alone, (2) the complaint supplemented by undisputed facts, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Williamson v. Tucker*, 654 F.2d 404, 413 (5th Cir. 1981). The court generally can decide disputed issues of material fact in order to determine whether or not it has jurisdiction. *Montez v. Department of the Navy*, 392 F.3d 147, 149 (5th Cir. 2004).

Federal Rule of Civil Procedure 12(b)(6) permits the dismissal of a complaint if it fails to state a claim upon which relief may be granted. A complaint does not need detailed factual allegations, but a plaintiff must allege sufficient facts to show more than a speculative right to relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Dismissal for failure to state a claim is appropriate if the complaint does not include enough facts to state a claim that is plausible on its face. *Id*. at 570. Conclusory allegations and a formulaic recitation of the elements of a cause of action will not suffice to prevent dismissal for failure to state a claim. *Id*. at 555. A plaintiff must plead facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Thus,

while the court must accept all factual allegations as true, it "do[es] not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Plotkin v. IP Axess*., 407 F.3d 690, 696 (5th Cir. 2005); *see also Iqbal*, 556 U.S. at 679.

Section 1983 provides a private right of action for the deprivation of rights, privileges, and immunities secured by the Constitution or laws of the United States.  A complaint under § 1983 must allege that the acts complained of occurred under color of state law and that the complaining parties were deprived of rights guaranteed by the Constitution or laws of the United States.  *Daniels v. Williams*, 474 U.S. 327 (1986); *Piotrowski v. City of Houston*, 51 F.3d 512, 515 (5th Cir. 1995); *Gray v. Brazoria Cnty*., No. 3:16-CV-109, 2017 WL 713797, at *3 (S.D. Tex. 2017). A complaint under § 1983 must also allege that the constitutional or statutory deprivation was intentional or due to deliberate indifference and not the result of mere negligence.  *Farmer v. Brennan*, 511 U.S. 825 (1994). Plaintiffs suing public officials under § 1983 must file short and plain complaints that must be factual and not conclusive. *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995) (en banc).

## II.    BACKGROUND

A.  Plaintiffs

All Plaintiffs are death row inmates currently held in solitary confinement at the Polunsky Unit.  "Plaintiffs seek to represent the Class Members, a class consisting of: all male death row prisoners incarcerated in permanent solitary confinement in the Polunsky Death Row Unit, none of whom have been or will be given meaningful review of their placement in solitary confinement (in violation of the Eighth Amendment, Due Process Clause of the Fourteenth Amendment, and Texas Constitution Art. I, §13), and all of whom have restricted access to counsel as a result of Defendants' chosen policies (in violation of the Sixth Amendment, the Due

Process Clause of the Fourteenth Amendment, 18 U.S.C. § 3599, 28 U.S.C. §§ 2254, 2255, and Tex. Code Crim. Proc. Art. 11.071(a))." (Dkt. #22, p. 32-33.)

Plaintiff Robertson is 54 years of age. He was sentenced to death in 1991 and has been on death row for more than 30 years and held in solitary confinement since 2000. Plaintiff Curry is 55 years old. He was sentenced to death in 2014 and has been in solitary confinement for nine years. Plaintiff Ford is 49 years old. He was sentenced to death in 1993 and has been in solitary confinement since 1999. Plaintiff Cummings is 33 years of age, was sentenced to death in 2013, and has been in solitary confinement for more than 10 years. Plaintiff Ward is 58 years old. He was sentenced to death in 2020 and has been in solitary confinement since.

B. <u>Defendants</u>

Defendant Bryan Collier, Executive Director of TDCJ, is responsible for agency rules, policies, and operations, including the Polunsky Death Row Unit. Plaintiffs allege he has authority over conditions of confinement and has authorized or condoned permanent solitary confinement, unsafe and unsanitary conditions, and restrictive attorney visitation policies, directly causing the constitutional violations alleged. He is sued in his official capacity for injunctive relief and in his personal capacity for damages.

Defendant Bobby Lumpkin, Director of TDCJ's Correctional Institutions Division, oversees the confinement of felony prisoners. He has authority over the Polunsky Death Row Unit and is responsible for protecting prisoners' constitutional rights. Plaintiffs allege he has authorized or condoned permanent solitary confinement, unsafe and unsanitary conditions, and restrictive attorney visitation policies, directly causing the violations alleged. He is sued in his official capacity for injunctive relief and in his personal capacity for damages.

Defendant Daniel Dickerson, Warden of the Polunsky Unit, is responsible for the well-being of prisoners and overall facility operations. He has authority over conditions of confinement and has authorized or condoned permanent solitary confinement, unsafe and unsanitary conditions, and restrictive attorney visitation policies, directly causing the violations alleged. He is sued in his official capacity for injunctive relief and in his personal capacity for damages. He was succeeded by Defendant Ivey, who pursuant to Federal Rule of Civil Procedure 25(d), is substituted for Defendant Dickerson with respect to his official capacity claims.

Defendant Crystal Anthony is a Corrections Officer at the Polunsky Unit, responsible for prisoners' daily movements, including attorney access. She has authority over confinement conditions and is sued in her official capacity for injunctive relief and personal capacity for damages.

The Doe Defendants are presently unidentified supervisors, employees, or agents of the named Defendants whose actions allegedly contributed to the constitutional violations.

C.  Plaintiffs' Factual Allegations[1]

The Polunsky Unit opened in Livingston, Texas, in November 1993. Prior to 1999, TDCJ incarcerated all death-sentenced prisoners at the O.B. Ellis Unit in Huntsville, Texas ("Ellis Unit"). At the Ellis Unit, TDCJ did not automatically place all death-sentenced prisoners in permanent solitary confinement. Instead, TDCJ conducted individualized assessments to determine their confinement conditions, and many death-sentenced prisoners participated in work activities, group activities, and educational programs, and had expanded visitation rights.

---

[1]  Pleadings are generally given a liberal reading when addressing a motion to dismiss for failure to state a claim, and plaintiffs' claims are assumed to be true. FED. R. CIV. P. 12(b)(6). Accordingly, Plaintiffs' factual allegations are summarized in this report as true, without regard to factual support.

In 1999 and 2000, TDCJ moved all male death row prisoners from the Ellis Unit to the Polunsky Unit. At the Polunsky Unit, TDCJ adopted the new practice of placing all death row prisoners in permanent solitary confinement until execution.

Other prisoners at the Unit, including those convicted of capital murder but not sentenced to death, undergo an individualized assessment to determine the appropriate conditions of confinement, including the use (if any) of solitary confinement. However, Plaintiffs are not provided this assessment and are instead placed in solitary confinement for the duration of their incarceration without an opportunity to challenge these conditions. TDCJ does not conduct individualized risk assessments on death row inmates and there is no opportunity to challenge this policy or seek an exception based on individualized circumstances. There is also no means for prisoners on death row to seek different conditions of confinement. In 2004, TDCJ adopted a "Death Row Plan" to govern recreation time, work status, and other conditions on death row. Section I(E)(1) of the Death Row Plan automatically assigns all death row prisoners to solitary confinement for up to one year before they can be deemed "Work Capable"—except that the work capable program has been "suspended" since 1999 and no Plaintiff has ever been assessed for work capable status at the Polunsky Death Row Unit. According to the Death Row Plan, death-sentenced offenders are classified as Level I, II, or III, with Levels II and III, requiring "more intensive supervision due to poor institutional behavior." However, Defendants are not following the guidance of their own Death Row Plan because there is no disparity in how death row inmates are confined—*all* are housed in solitary confinement with limited recreation and showers regardless of which level they are assigned.

Plaintiffs' cells in the Polunsky Unit Death Row Unit are 8 by 12 feet and contain only a sink, toilet, elevated structure to sleep on, a thin mattress (sometimes), and a small window.

Plaintiffs spend all but a few hours per week in their cells, including mealtime. They are not permitted any communal or meaningful physical interaction with others and live in an extreme state of social isolation and sensory deprivation.

### 1. Mold

Toxic black mold has infested the Polunsky Death Row Unit since it opened. It is found in nearly every cell on the unit, grows in the air vents, and is expelled into the air. Death row inmates are constantly exposed to this toxin. Plaintiff Curry filed a grievance in 2020 to remove the mold, but TDCJ did not adequately resolve the situation. Although Plaintiff Curry was moved to a different cell within the Unit, TDCJ housed another inmate in the moldy cell. Plaintiff Curry alleged the moldy conditions made his blood pressure increase and Plaintiff Robertson alleges breathing problems caused by mold growth. Defendants have not provided Plaintiffs with cleaning supplies but have painted over the mold to conceal it. The mold is visible such that any person walking through would see it.

### 2. Insects / Cockroaches / Cleanliness

Plaintiffs allege that cockroaches and insects are widespread in the Polunsky Death Row Unit. When Plaintiff Curry was on C-Pod between 2018 and 2020, there were multiple instances when cockroaches were crawling in his food, and he was given a food tray with a live cockroach on it. Also, TDCJ routinely moves death row inmates into uncleaned cells coated with dirt, bodily fluids, and hair, which they are forced to clean themselves, often using supplies purchased from the commissary.

In August 2019, TDCJ placed Plaintiff Cummings in a cell where the walls and toilet were smeared with blood from a prisoner who had recently been beaten and later died of a heart attack. When Cummings refused to enter, guards forcibly shoved him inside and secured him to

the bunk, generating a *Use of Force Report*.  He was forced to sleep there without a mattress and scrubbed the blood from the cell himself.

### 3.  Showers

Death row inmates are limited to three showers per week, and some weeks are not given an opportunity to shower at all.  This deprivation violates TDCJ's Death Row Plan.  In January 2023, Plaintiff Curry was only allowed a shower twice in two weeks.

### 4.  Recreation

On some days, TDCJ provides "recreation," which consists of moving a prisoner from his cell to a small concrete-and-metal cage to exercise alone.  However, death-sentenced prisoners often go days or weeks without any recreation at all.  From November 2021 through late January 2022, for example, Plaintiffs Cummings and Curry, and others, were denied all recreation. Every three months the Unit enters "lockdown," during which prisoners are denied recreation for ten to fourteen days. More recently, Plaintiff Robertson received no recreation from April 22, 2023, through at least May 9, 2023.  Plaintiff Ford alleges that solitary confinement without recreation has caused painful sores on his hips from being sedentary too long. In January 2022, Plaintiffs Cummings and Curry undertook a hunger strike to demand that TDCJ meet their most basic hygiene needs.

### 5.  Food

Meals provided to death row inmates sometimes consist entirely of a "food loaf," which is leftover (sometimes rotten) food ground up and baked into a loaf.  TDCJ uses food loaves as punishment and lists food loaf on the Death Row Plan as an official restriction available for any inmate sentenced to death.  Correctional officers are responsible for delivering food trays and sometimes inmates are denied multiple meals in a row.

6. *Limited Visits*

Non-expert contact visits to inmates on death row are prohibited. Except for rare examinations by experts, no Plaintiff has had a contact visit since arriving at the unit. Until recently, prisoners sentenced to death were only permitted one five-minute phone call per week. In December 2022, TDCJ provided all prisoners at the unit with tablets. However, the tablets provided to death row inmates are severely limited in their capabilities and, as no formal policy has been adopted regarding the use of the tablets, the ability to use them is subject to Defendants' discretion.

7. *F-Pod*

Conditions are worse in F-Pod, where TDCJ houses prisoners who have severe mental illnesses, incurred disciplinary infractions, or—as the Plaintiffs allege—are simply disliked by guards. Prisoners on F-Pod are deprived of even minimal stimulation. Boards cover the windows and doors of the cells, no mattresses or blankets are provided, and if meals are provided at all, they consist of food loaf. TDCJ assigned Plaintiffs Ford and Ward to F-Pod. Between November 2022 and February 1, 2023, Plaintiff Ward was in F-Pod for a stretch of approximately 70 days, during which he lost 20-25 pounds due to TDCJ guards denying him food. He was so hungry that he traded his showers and recreation for food trays on multiple occasions. In 2022, Plaintiff Ward was denied a mattress for a two week period, and he regularly went for two or three weeks without a shower. Plaintiffs Ford and Robertson have also spent time in F-Pod. Plaintiffs allege that an F-Pod prisoner committed suicide in January 2023 because he was denied medication to address psychotic symptoms and multiple meals.

8. *Notice*

Plaintiffs have filed multiple grievances regarding these issues. In December 2021, death row prisoners at the Unit sent a petition to Defendant Dickerson, the Regional Director, and the TDCJ Board of Directors asking TDCJ to, among other things, fix leaks in the cells, address the insect infestation, address the black mold in the cells and vents, and clean the recreation yards of bird feces. Prisoners in the Polunsky Death Row Unit participated in a hunger strike in January 2022 to raise awareness about the conditions. In 2023, members of the Federal Public Defender office for the Western District of Texas reported abusive behavior by TDCJ in the Polunsky Death Row Unit by letter to Defendant Dickerson.

9. *Inadequate Medical Care: Denial of Requests for Medical Attention*

Defendants have a policy and practice of not responding to Plaintiffs' medical needs in a timely manner due to an inadequate system for responding to health care emergencies. Unlike prisoners in the general population section of the Polunsky Unit, death row prisoners are completely isolated and have little chance to interact with guards or medical providers. As a result, they often have to wait hours, days, or weeks to receive medical care. If a medical crisis arises, the only remedy is to kick the door, scream, or wait for a security check, which is supposed to occur every 30 minutes.

Plaintiffs Ward and Ford have been told multiple times that TDCJ never received sick call requests that they submitted, and Plaintiff Curry waited over a month for a sick call request. Medical personnel occasionally "make rounds" at the Unit, but they regularly ignore prisoners calling out to them for help and fail to provide treatment even to prisoners clearly suffering from a mental or physical health issue. For example, Plaintiff Ward broke his leg shortly after arriving at the Polunsky Death Row Unit in 2020, but he did not receive any medical attention until more

than 30 days after he first reported it to TDCJ. Finally, he was taken to the hospital and placed in a boot. A few weeks later, after Plaintiff Ward protested being denied a medical shower and TDCJ guards pulled him from his cell, beat him, gassed him and removed his boot. Ward personally told Defendant Dickerson about the situation and filed a grievance regarding the incident but never received a response. Ward is fearful that his continued inability to access treatment for his leg will result in an eventual need for amputation.

### 10.  Inadequate Medical Care: Denial of Prescribed Medications

Plaintiff Robertson was diagnosed with hypertension by a doctor in the Dallas County Jail, who prescribed him a beta blocker on two separate occasions (in approximately 2009 and 2012). Both times, when Plaintiff Robertson returned to the Polunsky Death Row Unit, TDCJ refused to provide him his prescribed medication, and he began to experience cardiac symptoms.[2] Plaintiff Ward was denied seizure medicine for at least three consecutive days from January to May 2023.

### 11.  Inadequate Medical Care: Lack of Mental Health Treatment

Plaintiffs suffer from untreated mental health conditions, including depression, anxiety, bipolar disorder, and schizoaffective disorder. Plaintiff Ford repeatedly asked for access to one-on-one mental health counseling, which he received at the Ellis Unit. Plaintiff Ward complained repeatedly about worsening mental health symptoms and ineffective medication, but "TDCJ has deflected Plaintiff Ward's pleas for help, telling him they never received his request or that he would have to wait six months to see a doctor."  When prisoners in the Polunsky Death Row Unit do receive medical attention, they generally must do so from their cells, within earshot of

---

[2] After Robertson filed this lawsuit, TDCJ provided him with a year's prescription of beta blockers.

guards and other prisoners.  When a death-sentenced prisoner is having an extreme mental health crisis, TDCJ transfers them to F-Pod instead of providing them mental health treatment.

### 12. Inadequate Access to Counsel

Plaintiffs allege that Defendants denied them adequate access to counsel.  Death row inmates are allowed only a few visits with counsel that are conducted through heavy glass and poorly functioning phones.  No physical contact is permitted, and legal papers must be passed through guards, who often read or attempt to confiscate the papers.  Legal mail is often similarly read or confiscated.  Although prison policies require attorney visits in a designated area, away from general non-attorney visitors, legal visits occur in the general visitation room with dozens of other inmates and visitors present.  Visitors sit shoulder-to-shoulder, making it impossible to communicate privately.  These conditions hinder Plaintiffs' ability to put on a meaningful legal defense or appeal and are especially concerning in regard to mitigation evidence, which often requires disclosure of painful and private memories.  Plaintiffs do not feel comfortable discussing these issues in a non-private environment.

The Polunsky Unit is a significant drive from the nearest city or airport.  Defense counsel face unreasonable difficulties in scheduling in-person visits, which are sometimes cancelled without warning once counsel has arrived at the unit.  Further, while the availability of attorney-client phone calls increased due to the COVID-19 pandemic, calls are limited in duration and there is no guarantee the policy will be continued.  Counsel are normally required to demonstrate exigent circumstances, such as an imminent filing deadline, to schedule a phone call.  Even when a call is scheduled, the phones are deficient and make it difficult for counsel and their client to hear each other.  During calls, counsel can hear guards and other prisoners in the background, demonstrating that the calls are not confidential.

Plaintiff Robertson states that on May 12, 2022, he was unable to meet confidentially with counsel because they were forced to meet in a booth surrounded by visiting family members and friends, all of whom could overhear the conversation and see legal materials being used. The lack of confidentiality prevented him from sharing personal details that were relevant to his state and federal habeas proceedings. On May 27, 2022, Plaintiff Ford met with his federal habeas attorneys and, although they requested a booth designated for attorney visits, Ford was forced to meet with counsel in a general visitation booth where inmates were able to view their legal materials. During the same visit, Correctional Officer Moore intercepted and read legal materials Plaintiff Ford was exchanging with counsel and refused to allow Ford and counsel to use a sealed envelope to confidentially pass materials. After Plaintiff Ward met with counsel on April 25, 2023, he returned to his cell and found his legal papers were searched.

### 13. Retaliation Against Plaintiffs and Class Members

Plaintiffs allege that Defendants retaliated against them for filing this § 1983 class action. Soon after Plaintiffs filed the original complaint on January 26, 2023, Defendants began to significantly restrict the frequency and duration of legal visits by implementing new rules that restricted attorney visitation hours and limited the ability of attorneys with the same firm to meet with each other's clients. This policy effectively denied many attorneys' accesses to their clients despite scheduled appointments.

On March 23, 2023, Plaintiff Cummings' counsel was denied a meeting to discuss an evidentiary motion related to his habeas petition. When counsel spoke with Defendant Anthony about this issue, she replied by making a reference to the original complaint and told counsel to "be careful what she wished for."

Since the original complaint was filed, the attorneys' ability to schedule calls or meetings has markedly worsened. One attorney was unable to schedule an appointment with her client for months, which prevented her the ability to adequately prepare the client's habeas petition. Another attorney who had a morning meeting at the unit was not allowed to stay into the afternoon to meet a different client.

Defendants interfered with Plaintiffs' ability to respond to the *Motion to Dismiss*. On May 3, 2023, counsel conducted a preliminary call with Plaintiff Ward to discuss this lawsuit. Usually, the hallway outside the phone booths used for legal visits is relatively empty. However, on this occasion, Plaintiff Ward saw eleven correctional officers walk past his booth, stop within two feet of the door, and establish eye contact with him in an effort to intimidate him. There is a pattern and policy on death row of retaliating against prisoners for exercising their constitutional rights.

## III.    JURISDICTION AND STANDING

The Constitution limits the federal judicial power to "cases" and "controversies." U.S. Const. art. III, § 2. "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). At the preliminary motion-to-dismiss phase, standing is properly resolved by reference to allegations of the complaint. U.S. Const. art. 3, § 2, cl. 1. "[F]ederal courts lack jurisdiction if no named Plaintiff has standing." *Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019); *see also O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("[I]f none of the named Plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.").

Standing requires that a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Haverkamp v. Linthicum*, No. 24-40709, 2025 WL 2621975, at *4 (5th Cir. Sept. 11, 2025) (internal citations omitted). "An injury in fact can be a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights, to take just a few common examples. Moreover, the injury must be actual or imminent, not speculative–meaning that the injury must have already occurred or be likely to occur soon." *Food and Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (citations omitted). The second element—causation—requires that the plaintiff show a predictable chain of events leading from the government action to the asserted injury—in other words, that the government action has caused or likely will cause injury in fact to the plaintiff. *Id.* at 385.

Defendants attack Plaintiffs' standing in three ways. First, Defendants argue that none of the Plaintiffs allege a concrete, particularized injury-in-fact resulting from insect exposure, retaliation or restrictions on access to counsel, showers, or mattresses, and therefore, lack standing. These arguments are addressed individually below.

Second, regarding the remaining conditions-of-confinement claim (mold, food, and recreation), Defendants argue that standing does not apply to Plaintiffs collectively but instead must be determined on a more particular basis depending on the condition's reach and whether it affected the plaintiff directly. This argument fails. Courts repeatedly hold that "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 53 n.2 (2006); *see also Murthy v. Missouri*, 603 U.S. 43, 57 (2024) ("A proper case or controversy exists only *when at least one plaintiff* establishes that he has standing to sue.") (cleaned up) (emphasis added) (quoting *Raines*,

521 U.S. at 818; *Texas v. United States*, 50 F.4th 498, 514 (5th Cir. 2022) (same).  Therefore, if an individual plaintiff alleges a particularized injury traceable to the defendants' conduct, his standing is conferred upon all plaintiffs.

Third, Defendants contend that because Plaintiffs are not presently housed on F-Pod, they lack standing to assert claims seeking prospective injunctive relief.  This challenge is discussed below.

A.    F-Pod: All Plaintiffs Lack Standing for Injunctive Relief, but Have Standing for Compensatory Damages

At some point during their incarceration, TDCJ assigned Plaintiffs Ward, Ford, and Robertson to F-Pod.  Of the three, only Plaintiff Ward alleges resulting injury from his confinement in F-Pod.  Ward alleges that between November 2022 and February 1, 2023, he was housed in F-Pod and lost 20-to-25 pounds because correctional officers regularly denied him food.  This satisfies his burden to show injury-in-fact, traceable to the Defendants and likely to be redressed by a favorable decision—as to past injuries.

Defendants further argue that, because no Plaintiff—including Ward—is presently housed in F-Pod, none has standing to pursue injunctive or declaratory relief regarding its conditions.    Although any death row prisoner "can" be subject to transfer to F-Pod, Plaintiffs do not allege that there is a substantial risk that a transfer will occur.  *Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019) (for an injury-in-fact to be imminent, "there must be at least a substantial risk that the injury will occur"); *but see Helling v. McKinney*, 509 U.S. 25, 33 (1993) (holding that a plaintiff "need not await a tragic event) ("[A] prison inmate … could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery.")  Here, the Plaintiffs here do not allege an imminent transfer to F-Pod or that their complaints

relating to F-Pod are likely to be redressed by a favorable decision. As a result, all Plaintiffs lack standing to pursue a claim for injunctive or declaratory relief regarding conditions in F-Pod.

B.    Retaliation: All Plaintiffs Lack Standing[3]

The purpose of allowing inmate retaliation claims under § 1983 is to ensure that prisoners are not unduly discouraged from exercising constitutional rights. 42 U.S.C.A. § 1983; *Morris v. Powell,* 449 F.3d 682 (5th Cir. 2006). "To prevail on a claim of retaliation, a prisoner must establish (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his exercise of that right, (3) a retaliatory adverse act, and (4) causation." *McDonald v. Steward,* 132 F.3d 225, 231 (5th Cir.1998). Moreover, a prisoner "must allege more than *de minimis* retaliation to proceed with such a claim." *Morris,* 449 F.3d at 684–85. To satisfy the *de minimis* test, an inmate must allege adverse acts that rise "to the level of that which would deter the exercise of a constitutional right." *Id.* at 686 (citing *Davidson v. Chestnut,* 193 F.3d 144, 149–50 (2d Cir. 1999) (holding that being transferred to a more dangerous prison environment satisfies the *de minimis* test); *see also Gonzalez v. Trevino,* No. 5:20-CV-52, 2021 WL 7184963, at *3 (S.D. Tex. 2021*), R. & R. adopted in part sub nom. Gonzalez v. Webb Cnty.*, No. 5:20-CV-52, 2022 WL 190709 (S.D. Tex. 2022).

Plaintiffs filed the *Original Complaint* on January 26, 2023. In the *Amended Complaint,* Plaintiffs allege that they have a right to file lawsuits and protect themselves against Defendants' unconstitutional actions, and that the Defendants retaliated against them for filing this lawsuit by

---

[3] Defendants challenge the Plaintiffs' claims for Retaliation and Access-to-Counsel collectively. Although the two claims are related, they are governed by different standards. A retaliation claim does not require actual harm—the retaliatory action is the harm. Whereas to establish standing to assert an access-to-court claim, an individual must show "actual injury." *Lewis v. Casey,* 518 U.S. 343, 346 (1996). Specifically, a "plaintiff must show that he lost an actionable claim or was prevented from presenting such a claim because of the alleged denial." *Ramirez v. Delcore,* No. CV C-07-48, 2007 WL 2142293, at *5 (S.D. Tex. 2007) (citing *Lewis,* 518 U.S. at 356). A plaintiff must show "that his position as a litigant was prejudiced" as a direct result of the denial of access. *Eason v. Thaler,* 73 F.3d 1322, 1328 (5th Cir. 1996).

interfering with their ability to access counsel by placing "greater restrictions on their access to attorneys and legal mail," "suddenly and without prior notice, significantly restricting the number and length of attorney visits, which contradicted their policy allowing visits 'for any length of time,'" and "applied new rules restricting the hours that attorneys can meet with clients." (Dkt. #22. P. 27.)  Specifically, Plaintiff Robertson alleges that he was denied sufficient privacy during a meeting with habeas counsel on May 12, 2022.  Plaintiff Ford alleges that guards intercepted documents during a meeting with habeas counsel on May 27, 2022, and confiscated documents after a meeting with his defense counsel on June 6, 2022.  Plaintiff Cummings alleges that he was unable to meet with his federal habeas attorney on March 23, 2023, to discuss an evidentiary hearing, and that Defendant Anthony told his attorney to "be careful what you wish for" after she was unable to meet with him because of Defendants' newly implemented obstructions.  Plaintiff Ward alleges that guards searched his legal papers following a meeting with his defense attorney on April 25, 2023, and when he was discussing this lawsuit with his counsel, eleven guards walked past the booth in which he was speaking.  Many of them paused by his booth, listened to his conversation, and made eye contact with him, which he alleges was an effort to intimidate him.

.      Defendants argue that the Plaintiffs fail to show any concrete and particularized injury resulting from the alleged retaliation.  However, the Fifth Circuit's standard for retaliation claims does not require resulting "harm" or resulting constitutional violation for a claim to be actionable under § 1983.  *Bibbs v. Early*, 541 F.3d 267, 271-272 (5th Cir. 2008).  Instead, a plaintiff must allege "direct evidence of motivation" or "a chronology of events from which retaliation" is inferable, and that the defendant committed a qualifying retaliatory act against the inmate, which is "capable of deterring a person of ordinary firmness from further exercising his constitutional

rights," and that but for the retaliatory motive, the complained-of incident would not have occurred. *Morris*, 449 F.3d at 686; *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995). The retaliatory action is the measure of harm needed to establish standing. This places a significant burden on the inmate. *Woods*, 60 F.3d at 1166.

Plaintiffs' simple belief that the guards were trying to intimidate them is not sufficient to maintain a retaliation claim. *See Williams v. Errington*, No. 1:20-CV-24-RPM, 2022 WL 368817, at *4 (S.D. Miss. 2022) ("The prisoner's '[p]ersonal beliefs and conclusional allegations are not sufficient'" to show a link between the defendant's motivation and alleged retaliatory act.) (citing *Williams v. Cleer*, 123 F. App'x 591, 593 (5th Cir. 2005). Instead, the prisoner must plead that "but for the retaliatory motive[,] the complained of incident would not have occurred." *Brown v. Taylor*, 911 F.3d 235, 245 (5th Cir. 2018) (quoting *Woods*, 60 F.3d at 1166). Specifically, Plaintiffs must allege that "but for" their filing of this lawsuit, the Defendants' actions to limit their attorney access would not have occurred.

The Fifth Circuit has cautioned that claims of retaliation from prison inmates must "be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in penal institutions." *Woods* at 1166. Threats, harassment and verbal abuse by prison employees are not actionable under § 1983. *See e.g., Bender v. Brumley*, 1 F.3d 271, 274 n.4 (5th Cir. 1993) (noting that verbal abuse is insufficient to serve as the legal basis of a civil rights action); *United States v. Bigham*, 812 F.2d 943, 949 (5th Cir. 1987) (holding that technical batteries, angry words or passing thumps do not rise to the level of constitutional abuses); *Boettner v. Raimer*, 2004 WL 2853054, *1 (5th Cir. 2004) (citing *McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir. 1983)) ("[T]hreats made against inmates by prison officials do not amount to constitutional violations."); *but see Parker v. Carpenter*, 978 F.2d 190, 192–93 (5th Cir. 1992)

(transfer to a more dangerous section of the same prison is a sufficiently adverse retaliatory act to support a § 1983 claim); *Hart v. Hairston*, 343 F.3d 762 (5th Cir. 2003) (court recognized actionable retaliation claim where the alleged adverse act was twenty-seven days of commissary and cell restrictions).

Plaintiffs do not allege—beyond mere speculation—that "but for" the retaliatory motive, these restrictions would not have been implemented. Moreover, Plaintiffs fail to show that the Defendants' alleged retaliatory acts were more than *de minimis* or had any effect on their First Amendment rights. *See Ibenyenwa v. Wells*, 2022 WL 413941, at *1 (5th Cir. 2022) (per curiam), *cert. denied*, 143 S. Ct. 236, (2022) (prisoner's continued filing of grievances belied his assertion of First Amendment chill); *see also Serrano v. Garza*, No. 7:22-CV-347, 2025 WL 972828, at *8 (S.D. Tex. Mar. 10, 2025), *R. & R. adopted*, No. 7:22-CV-347, 2025 WL 963594 (S.D. Tex. Mar. 31, 2025) (holding that the defendants' retaliatory acts did not affect plaintiff's constitutional rights where plaintiff continued to file grievances and court filings).

The undersigned finds that the Plaintiffs' allegations are conclusory and do not adequately demonstrate a link between the Defendants' motive and resulting retaliatory action.[4] Accordingly, all Plaintiffs lack standing to pursue a claim for retaliation.

C.    Mold: All Plaintiffs Have Standing

Plaintiff Curry alleges his blood pressure increased noticeably while he lived in a mold-infested cell and Plaintiff Robertson states that he wakes up in the middle of the night struggling

---

[4] Some cases of retaliation are clear because of the temporal proximity and correlation between the plaintiff's action and defendant's retaliatory response. For example, in *Sinclair v. Fontenot*, 216 F.3d 1080 (5th Cir. 2000), a guard threatened to transfer a prisoner if he did not dismiss his habeas case. The same day the prisoner attended a hearing on his habeas action, the guard followed through with his threat and transferred the prisoner for violating rules. Several officials opposed the transfer and informed the prisoner that his conduct was not improper. The Fifth Circuit concluded that the prisoner's allegations established a "chronology of events from which retaliation may be plausibly inferred," and found the district court erred in dismissing his complaint. Here, the Defendants' alleged retaliatory actions are tenuous in comparison.

to breathe as a result of the mold exposure.  Defendants concede that Robertson and Curry allege concrete injuries from mold exposure.  (Doc. #29, p. 9-10.)  The undersigned finds that the alleged injury is traceable to the Defendants' conduct and likely to be redressed by a favorable decision.  Because Plaintiffs Curry and Robertson allege a concrete injury resulting from mold exposure, the remaining Plaintiffs also have standing to pursue this claim.

D.    Insects, Showers, and Mattresses: All Plaintiffs Lack Standing

Plaintiffs' allegations as to insects and lack of mattresses and showers are concerning, but they do not pose a reasonable risk of serious injury or death.  The Defendants acknowledge that although death row inmates are sometimes deprived of mattresses, all Plaintiffs are currently provided one, and no Plaintiff has described an injury resulting therefrom.  While Plaintiff Cummings alleges multiple instances between 2018 and 2020 where cockroaches were found in his food, he fails to identify any resulting harm.  Similarly, Plaintiffs fail to demonstrate how the temporary deprivation of the opportunity to shower resulted in a particularized injury.

Accordingly, the undersigned finds that the Plaintiffs allegations do not establish that Defendants' actions caused a "more than a *de minimis* injury," and therefore they lack standing to proceed on related individual claims.[5]  *See Conley v. Tangipahoa Par. Jail*, No. CV 23-860, 2023 WL 9209640, at *6 (E.D. La. 2023), *R. & R. adopted,* No. CV 23-860, 2024 WL 125181 (E.D. La. 2024) (dismissing where plaintiff does not allege that he sustained a physical injury as a result of observing roaches jump off of trays);  *Payne v. Almanza*, No. 1:18-CV-0175-BL, 2019

---

[5]    However, the Plaintiff can assert these conditions—collectively—in support of their claims under the Eighth Amendment if they "have a mutually enforcing effect that produces the deprivation of a single, identifiable human need ... for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991); *Gregory v. Texas Dep't of Crim. Just., John Middleton Unit*, No. 1:22-CV-00156-BU, 2025 WL 2496105, at *7 (N.D. Tex. Aug. 12, 2025), *R. & R. adopted,* No. 1:22-CV-00156-H, 2025 WL 2495541 (N.D. Tex. Aug. 29, 2025) (finding that a plaintiff alleged a plausible constitutional violation where he "was forced to sleep on a gym floor without a mattress, where rats were common, and forced to share a toilet with 200 other inmates for months without knowing when or if the conditions would cease.")

WL 1932760, at *7 (N.D. Tex. 2019) (dismissing where plaintiff fails to allege facts that denial of showers amounted to a denial of life's basic necessities); *Allen v. St. Tammany Par.*, No. CV 17-4091, 2018 WL 558503 (E.D. La. 2018), *R. & R. adopted*, No. CV 17-4091, 2018 WL 537495 (E.D. La. 2018) (denial of a mattress for fifteen days does not constitute a constitutional violation because the conditions were temporary in nature and did not cause substantial harm).[6]

E.    Access to Counsel: All Plaintiffs Lack Standing

To determine whether a plaintiff has meaningful and effective access to court, we require the plaintiff to identify: (1) a nonfrivolous, underlying claim; (2) the official acts frustrating the litigation; and (3) a remedy that may be awarded as recompense but that is not otherwise available in a suit or settlement. *Christopher v. Harbury*, 536 U.S. 403, 415 (2002); *see also Waller v. Hanlon*, 922 F.3d 590, 602 (5th Cir. 2019).  The second element requires actual prejudice to the plaintiffs by the hands of a defendant.  Some courts have held that "having a case dismissed, being unable to file a complaint, [or] missing a court-imposed deadline" demonstrate actual prejudice to pending or contemplated litigation.  *Jackson v. City of Cleveland*, 64 F.4th 736, 746 (6th Cir. 2023), *reh'g denied*, No. 22-3253, 2023 WL 3806460 (6th Cir. May 10, 2023).

Generally, Plaintiffs contend that "legal visits are few and far between," and when they are allowed, are hindered by heavy glass and poorly functioning phones in violation of the Defendants' own policies that requires privacy for attorney-client communication. Plaintiffs allege that these conditions compromise their ability to "provide a meaningful legal defense or appeal, particularly with respect to the presentation of mitigation evidence that often requires the client to disclose painful private memories and experiences."   (Dkt. #22, p. 24.)   More

---

[6]  Because there is no identifiable *injury-in-fact*, the Defendants' statute of limitations defense is not addressed.

specifically, Plaintiffs respond that they suffered prejudice from the Defendants' interference with their ability to respond to the original *Motion to Dismiss*.  Plaintiff Ford alleges correctional officers intercepted documents after a meeting with habeas counsel and confiscated documents after a separate meeting with defense counsel.  Likewise, Plaintiff Cummings asserts he was unable to meet with habeas counsel to discuss an evidentiary hearing, and Plaintiff Ward alleges correctional officers searched his legal papers after a meeting with defense counsel. Plaintiff Robertson claims he was denied sufficient privacy during a meeting with habeas counsel.

Defendants argue that the Plaintiffs failed to plead actual prejudice with respect to contemplated or existing litigation in order to have standing on a denial of access to court claim. Defendants respond that their *Motion to Dismiss* was based solely on the allegations in the original *Complaint*, thus, there was no need for Plaintiffs to confer with counsel, and no resulting prejudice resulted because the Plaintiffs amended their complaint rather than oppose the original *Motion to Dismiss*.

The undersigned agrees that the Plaintiffs' *Amended Complaint* does not sufficiently allege prejudice—or what consequence Defendants' alleged actions have cost them.  *Greene v. DeMoss*, No. 3:20-CV-00578, 2020 WL 7755690, at *9 (W.D. La. 2020), *R. & R. adopted* No. 3:20-CV-00578, 2020 WL 7755655 (W.D. La. 2020), *aff'd,* No. 21-30044, 2022 WL 3716201 (5th Cir. 2022) (finding no prejudice in access to courts claim where plaintiff is still actively and successfully litigating her claims). While the attorney conference conditions are disturbing, Plaintiffs fail to allege any concrete and particularized injury caused by the conditions.  Until Plaintiffs suffer "some concrete setback traceable to the defendants' alleged [actions denying them access to court]," their "allegation is no more than speculation about an event that may or may not come to pass."  *Waller*, 922 F.3d at 602.  Therefore, as the Fifth Circuit held in *Waller,*

the undersigned recommends dismissing the Plaintiffs' denial-of-access claims, without prejudice.[7]

G.    Food and Recreation: All Plaintiffs Have Standing

The Defendants concede that Plaintiffs Ford and Ward allege weight loss due to insufficient food, and that Plaintiffs Robertson, Curry and Ford describe identifiable injuries from insufficient recreation.  These actions are traceable to the Defendants and likely to be redressed by a favorable decision. Accordingly, the undersigned finds that the remaining Plaintiffs also have standing to pursue this claim.

H.    Statutory Right to Counsel: This Court Lacks Jurisdiction

The Defendants contend the court lacks jurisdiction to provide relief under 18 U.S.C. §3599, 28 U.S.C. §§ 2254 and 2255, and Article 11.071(a) of the Texas Code of Criminal Procedure.  The undersigned agrees that none of these statutes create a private right of action granting access to counsel in this case and finds that the court lacks jurisdiction over these claims.

"Section 3599(a) authorizes federal courts to provide funding to a party who is facing the prospect of a death sentence and is 'financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services.'" *Ayesta v. Davis*, 584 U.S. 28, 43 (2018).  However, in contrast to Section 1983, Section 3599 does not grant federal courts jurisdiction if the statute is allegedly violated.  *Beatty v. Lumpkin*, 52 F.4th 632, 636 (5th Cir. 2022).

Section 2254 confers jurisdiction on federal courts to "entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only

---

[7]  The possibility remains that Plaintiffs will be able to state such claims in the future if their § 1983 lawsuit "goes south in later stages of this litigation," upon which they should be allowed to replead and include these claims. *Waller*, 922 F.3d at 603.

on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Similarly, 28 U.S.C. § 2255 provides inmates challenging the constitutionality of their sentence to "move the court which imposed the sentence to vacate, set aside, or correct the sentence." While both sections indicate that counsel may be appointed, neither guarantees a right to counsel, much less provides a private cause of action for inmates challenging alleged restrictions on that right. *See* 28 U.S.C. § 2254(h); 28 U.S.C. § 2255(g); *see also Beazley v. Johnson*, 242 F.3d 248, 271 (5th Cir. 2011) (noting that "no constitutional right to habeas counsel in state collateral proceedings exists" under 28 U.S.C. § 2254). Article 11.071 allows Texas state courts to consider an application for writ of habeas corpus filed by a prisoner sentenced to death. Sections 2254, 2255, 3599, and Article 11.071(a), do not provide the court with jurisdiction to provide relief and these claims should be dismissed.

## IV.    TEXAS CONSTITUTION CLAIMS

"The Eleventh Amendment prohibits a private citizen from bringing suit in federal court unless the state consents." *Daigle v. Gulf States Utilities Co., Local Union No. 2286*, 794 F.2d 974, 980 (5th Cir. 1986). Eleventh Amendment immunity extends to suits for monetary damages against state officials in their official capacities. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). Federal claims against state officials in their official capacities are the equivalent of suits against the state. *Ganther v. Ingle*, 75 F.3d 207, 209 (5th Cir. 1996).

Defendants argue that Plaintiffs' official capacity claims under the Texas Constitution are barred by the Eleventh Amendment. (Dkt. #29, p. 13) (relying on *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99-100 (1984); *Simmons v. Smith*, No. 6:17-cv-557, 2018 WL 4999963, at *5 (E.D. Tex. 2018) (relying on *Pennhurst* and *McKinley* to dismiss official-capacity claims for equitable relief under the Texas Constitution), *rec. adopted*, 2018 WL 4269551 (E.D.

Tex. 2018), *aff'd*, 744 F. App'x 228 (5th Cir. 2019); *United Steel Paper & Forestry v. Anderson*, No. SA-17-CV-1242, 2018 WL 3017366, at *9 (W.D. Tex. June 15, 2018) (same); *Pharmacy Buying Ass'n v. Sebelius*, 906 F. Supp. 2d 604, 619 (W.D. Tex. Oct. 29, 2012) (same).

Plaintiffs respond that Defendants' actions were *ultra vires*–without legal authority.[8] However, the undersigned finds that the *ultra vires* exception is inapplicable because the relief Plaintiffs seek is institutional and official in character.  Plaintiffs allege that the Defendants violated the Texas Constitution.  However, an allegation that a government official violated Texas constitutional provisions is not the same as alleging that the official acted outside of their legal authority.  *Smith v. Univ. of Tex. at S.A.*, No. SA-CV-00538-OLG, 2024 WL 4256461, at *11 (W.D. Tex. 2024), *R. & R. accepted as modified*, 2024 WL 4256444 (W.D. Tex. 2024). While Defendants' actions were allegedly unconstitutional, the Defendants were acting within their roles as prison administrators and not *ultra vires*.   Thus, the Eleventh Amendment bars Plaintiffs' official capacity claims and any claims under the Texas Constitution should be dismissed.

## V.    CONSTITUTIONAL CLAIMS[9]

As the Fifth Circuit noted in *Gates v. Cook*, 376 F.3d 323, 332–33 (5th Cir. 2004):

> The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. Prison officials must provide humane conditions of confinement; they must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to ensure the safety of the

---

[8]  Under Texas law, "in certain narrow instances, a suit against a state official can proceed even in the absence of a waiver of immunity if the official's actions are *ultra vires*." *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017).  "To fall within this *ultra vires* exception, a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a ministerial act." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009).  The *ultra vires* exception applies where a state officer acts without any authority whatever. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 102 n.11, 114 n.25 (1984).

[9]  Plaintiffs have standing to proceed with Eighth Amendment claims regarding solitary confinement, recreation, mold, food, F-Pod (compensatory damages only), and medical care.  Therefore, individual claims related to showers, insects and mattresses are not addressed in this section.

inmates. This circuit has worded the test as requiring extreme deprivation of any "minimal civilized measure of life's necessities." Further, mental health needs are no less serious than physical needs. The Supreme Court has made clear that the standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society …"

(internal citations omitted). The Plaintiffs seek declaratory judgment, injunctive relief, and/or damages for violations of the First Amendment (Right to Petition), Sixth Amendment (Right to Counsel), Eighth Amendment (Cruel and Unusual Punishment), and Fourteenth Amendment (Due Process and Access to Courts). At this stage, the undersigned finds that the Plaintiffs have alleged sufficient facts to survive the Defendants' *Motion to Dismiss* for the following reasons.

A. Eighth Amendment Claims

Under the Eighth Amendment, conditions of confinement must be "humane" and "must not involve the wanton and unnecessary infliction of pain." *Palmer v. Johnson*, 193 F.3d 346, 351–52 (5th Cir. 1999) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), and *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). The use of solitary confinement—even long-term solitary confinement—"is not *per se* cruel and unusual." *Hope* at 582. Nevertheless, "[t]here is a line where solitary confinement conditions become so severe that its use is converted from a viable prisoner disciplinary tool to cruel and unusual punishment." *Id.* (citing *Gates v. Collier*, 501 F.2d 1291, 1304 (5th Cir. 1974).

To show a violation of the Eighth Amendment, the plaintiff must prove: (1) "objective exposure to a substantial risk of serious harm"; and (2) "that prison officials acted or failed to act with deliberate indifference to that risk." *Gobert v. Caldwell*, 463 F.3d 339, 345–46 (5th Cir. 2006).

The *Amended Complaint* alleges that the Defendants acted—or failed to act—in a manner that deprived, and continues to deprive, the Plaintiffs and all Class Members of their

constitutional right to be free from cruel and unusual punishment, in violation of the Eighth Amendment and contemporary standards of human dignity.  (Dkt. # 22, p. 35.)  Specifically, Plaintiffs allege Defendants' policy to house Plaintiffs and Class Members in automatic and permanent solitary confinement and systemic failure to provide adequate food, recreation or medical care violates their right to be free from cruel and unusual punishment.

The Defendants respond that they did not act with deliberate indifference to the Plaintiffs' conditions and concede that even if notice of the conditions was provided through grievances and letters, such actions do not show that Defendants subjectively knew what risks existed, or that Plaintiffs faced a substantial risk of serious harm.  They also argue that Plaintiffs improperly attribute the actions and mental states of non-party prison staff to demonstrate deliberate indifference.

    1.   *Objective Test:*  Plaintiffs' allegations—collectively—demonstrate that Defendants intended a risk of serious harm or intentionally ignored the risk.

A plaintiff can satisfy the first prong of the test by alleging that the particular risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it."  *Farmer* at 842 (internal quotation marks omitted); *Gray v. Brazoria Cnty.*, No. 3:16-CV-109, 2017 WL 713797, at *4 (S.D. Tex. 2017).  Whether a prison official had the requisite knowledge of a substantial risk is a question of fact, including inference from circumstantial evidence or from the very fact that the risk was obvious.  *Farmer* at 842; s*ee, e.g., Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (asking "Was the deprivation sufficiently serious?")  The condition complained of "must be so serious as to 'deprive prisoners of the minimal civilized measure of life's necessities,' as when it deprives the prisoner of some basic human need."  *Harris v. Angelina Cnty., Tex.*, 31 F.3d 331, 334 (5th

Cir. 1994) (citing *Wilson v. Seiter*, 501 U.S. 294 (1991)); *see, e.g., Hope*, 861 F. App'x at 584 (indefinite solitary confinement in the presence of urine and feces was sufficiently serious to invoke Eighth Amendment concerns); *Foulds v. Corley*, 833 F.2d 52, 54 (5th Cir. 1987) (allegations that inmate's solitary confinement cell was "extremely cold" and that he "was forced to sleep on the floor where rats crawled over him" were sufficient to state Eighth Amendment claim); *Bienvenu v. Beauregard Parish Police Jury,* 705 F.2d 1457 (5th Cir. 1983) (allegations of a cold, rainy, roach-infested jail cell, with inoperative toilet facilities, stated a cause of action under the Eighth and Fourteenth amendments).

In making this determination, the court employs a "totality of the circumstances" test. *Conley v. Tangipahoa Par. Jail*, No. CV 23-860, 2023 WL 9209640, at *6 (E.D. La. 2023), *R. & R. adopted*, No. CV 23-860, 2024 WL 125181 (E.D. La. 2024) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 363 (1981) (Prison "[c]onditions, ... alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities.")   Here, Plaintiffs allege a multitude of unsafe and unhygienic conditions (mold, insects, lack of recreation/mattresses, rotten food, inadequate medical and mental healthcare), and that the Defendants' policy and practice of automatically placing all death row prisoners in permanent solitary confinement violate their Eighth Amendment rights to be free from cruel and unusual punishment.   The *Amended Complaint* states that all Plaintiffs suffer from untreated mental health conditions— including depression, anxiety, bipolar disorder, and schizoaffective disorder–that are worsened by inadequate mental health treatment.  Plaintiff Ford repeatedly pleaded with TDCJ to reinstate his access to one-on-one mental health counseling, which he previously received at the Ellis Unit, for treatment of his depression. Plaintiff Ford made these requests in the form of sick call requests, verbal requests, and grievances—all of which TDCJ ignored, causing his symptoms to

worsen. Similarly, Plaintiff Ward repeatedly told TDCJ about his worsening mental health symptoms and ineffective medication, including by filing several I-60 forms and sick call requests. TDCJ ignored Ward's pleas for help, telling him they never received his request or that he would have to wait six months to see a doctor.[10]

As discussed *supra,* the unsavory allegations of mold, rotten food, and insect infestations might not rise to the level necessary to state a viable Eighth Amendment Claim if considered individually. *See* e.g., *Tilmon v. Chairman*, No. 21-4037, 2023 WL 5030677 (W.D. La. 2023) (granting summary judgment on conditions of confinement claim where plaintiff only alleged presence of cockroaches, bed bugs, and gnats) (citations omitted), *R. & R. adopted*, 2023 WL 5030092 (W.D. La. 2023); *Eaton v. Magee*, No. 10-112, 2012 WL 2459398, at *5 (S.D. Miss. 2012) ("Plaintiff's claim that the bathroom and shower area are unsanitary and contain black mold fails to rise to the level of a constitutional violation.") However, conditions of confinement may be considered collectively to determine whether they rise to the level of a constitutional violation "when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson*, 501 U.S. at 304.

There is no question that "prisoners are entitled to receive 'adequate ... medical care,'" which the Plaintiffs allege was not provided. *Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013) (internal citations omitted). This condition—compounded by allegations of other concerning conditions at the Polunsky Death Row Unit—satisfy the first prong of their Eighth Amendment claim.

---

[10] Plaintiffs also refer to "empirical studies of prisoners incarcerated in solitary confinement [that] document stress-related reactions, sleep disturbances, anxiety, panic, paranoia, ruminations, cognitive disfunction, hyper-sensitivity to stimuli, lethargy, and depression," and allege that "Plaintiffs have experienced all of these symptoms during their years of isolation," which they contend can be irreversible for people kept in prolonged solitary confinement. (Dkt. #22, p. 30.) Plaintiffs allege that "[a]s penological professionals, Defendants are aware of the harmful effects of their policies," and cite to TDCJ's internal policy that acknowledges "regular psychological assessment and treatment is necessary to preserve the behavior health of these offenders." (Dkt. 22, p. 31.)

2  *Subjective Test:* Plaintiffs adequately plead that Defendants exhibited deliberate indifference to their health and safety.

As to the second prong, Plaintiffs must allege that:

the defendant acted with more than mere negligence. To that end, the prisoner must show that those prison officials were (1) aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; (2) subjectively drew the inference that the risk existed; and (3) disregarded the risk. More simply, the prison officials must know of, and disregard, an excessive risk to a prisoner's health or safety. Evidence that a risk was obvious or otherwise apparent may be sufficient to support an inference that the prison official was aware of the risk.

*Hope*, 861 F. App'x at 583. "Deliberate indifference is an extremely high standard to meet," and not easily determined without discovery. *Domino v. Tex. Dep't of Crim. Just*., 239 F.3d 752, 756 (5th Cir. 2001). Ignoring or refusing to treat medical complaints can be "deliberate indifference." *See Coleman v. Sweetin*, 745 F.3d 756, 766 (5th Cir. 2014) (plaintiff established deliberate indifference where he alleged substantial harm due to defendant's persistent refusal to answer his "sick-call request slips" or provide pain medication even when he was in so much pain that he was unable to lie down in bed or use toilet properly); *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) (prisoner alleged that defendant refused to follow a prescribed course of treatment even though defendant was aware that prisoner had a medical condition that posed a substantial risk to his health); *Perez v. Anderson*, 350 F. App'x. 959, 962 (5th Cir. 2009) (vacating dismissal of Eighth Amendment claim where "Perez's allegations suggest that jail officials knew about his persistent pain yet delayed treatment by a physician for a substantial period"). "By the same token, medical attention may be so deficient that it amounts to deliberate indifference." *Gray*, 2017 WL 713797, at *5.

The undersigned recognizes that "[t]he isolation of Death Row, along with the inmates' pending sentences of death and the conditions on Death Row are enough to weaken even the

strongest individual."    *Gates v. Cook*, 376 F.3d 323, 335 (5th Cir. 2004).    The unsanitary conditions in the Polunsky Death Row Unit—if considered individually—might fail to establish that the Defendnats acted with deliberate indifference to the Plaintiff's health and safety. However, these conditions are compounded by the fact that Plaintiffs were not afforded individual risk assessments or adequate healthcare (outside earshot of other inmates and guards) despite repeated requests that went ignored.    The Fifth Circuit defined "a serious medical need" as "one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required."    *Id*., 463 F.3d at 345 n.12.    Further, when "balancing the needs of the prisoner against the burden on the penal system, the district court should be mindful that the essential test is one of medical necessity and not one simply of desirability."    *Woodall v. Foti*, 648 F.2d 268, 272 (5th Cir. Unit A 1981); *see also Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018).

Here, the Plaintiffs all suffer from various health problems, including mental illness, and allege that the health care provided at the Polunsky Unit is grossly inadequate. For example, prison staff have withheld prescribed medication, Plaintiff Ward had to wait thirty days for treatment when he broke his leg, and requests for mental health treatment have been denied or ignored.    They further contend that unhygienic, unsafe, and extreme conditions at the Unit negatively impact their overall health, and were so obvious and pervasive, that the Defendants were aware that the conditions violated their Eighth Amendment rights.    Plaintiffs allege that the Defendants were put on notice through the grievance process and multiple requests for medical treatment that were denied or ignored and despite this knowledge, Defendants failed to amend their practices or address the conditions of extreme social and sensory deprivation.    Defendants' pattern of denying routine and prescribed medical care—aggravated by the conditions at the

Polunsky Death Row unit—satisfies Plaintiffs' burden to adequately allege that the Defendants were deliberately indifferent to their serious medical needs.

B.    Fourteenth Amendment Claims: Denial of Due Process Regarding Solitary Confinement

The Due Process Clause of the Fourteenth Amendment "protects persons against deprivations of life, liberty, or property." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).  A state therefore cannot deprive a citizen of "life, liberty, and property … except pursuant to constitutionally adequate procedures*." Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).  Plaintiffs allege that the "Defendants' employment of isolated, indefinite solitary confinement, without providing ***any process*** by which Plaintiffs can challenge their confinement, violates the Fourteenth Amendment."  (Dkt. 32, p. 20) (emphasis in original).  Defendants respond that Plaintiffs cannot establish a base for protection under the Due Process Clause because they fail to "point to a Texas regulation or policy providing them with an expectation of avoiding their conditions of confinement *and* demonstrate that those conditions are harsh and atypical in relation to the ordinary incidents of prison life."  (Dkt. #29, p. 28.)  Because TDCJ policy requires that all male capital offenders be housed on Polunsky Death Row, the Defendants contend that Plaintiffs have no expectation in avoiding those conditions.  (*Id*.)

To invoke the procedural protections of the Fourteenth Amendment's Due Process Clause, Plaintiffs must establish two elements: first, that "there exists a liberty or property interest of which [he] ha[d] been deprived, and if so," second, that "the procedures followed by the State" were constitutionally insufficient.[11] *Swarthout v. Cook*, 562 U.S. 216, 219 (2011) (per curiam); *Wilkerson v. Goodwin*, 774 F.3d 845, 855 (5th Cir. 2014).

---

[11]  The parties disagree which standard is applied here.  Defendants, relying on *Prieto v. Clarke*, 780 F.3d 245, 250 (4th Cir. 2015), argue that Plaintiffs must first identify a state law creating a liberty interest, and then demonstrate that the denial of that interest imposes an atypical and significant hardship on them.  Plaintiffs contend that no specific reference to state policy or regulation is required, but that the court examines the confinement

*1.  Due Process Prong One: Protected Liberty Interest*
Plaintiffs have a liberty interest in avoiding indefinite solitary confinement (conditions of which result in constant social and sensory deprivation) without meaningful review.

Restrictive confinement, such as solitary confinement, is grounds for a due process claim only if it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Paulson v. Collier*, No. 6:22CV002, 2024 WL 4379736, at *11 (E.D. Tex. 2024), *R. & R. adopted sub nom. Paulson v. TDCJ*, No. 6:22-CV-2-JDK-KNM, 2024 WL 4346376 (E.D. Tex. 2024) (holding that "[a] prisoner's placement in administrative segregation absent extraordinary circumstances is an incident to the ordinary life as a prisoner, and therefore will never be a ground for a constitutional claim.") (citing *Pichardo v. Kinker*, 73 F.3d 612, 612 (5th Cir. 1996).  Courts are instructed to evaluate "the nature of the more-restrictive confinement *and* its duration in relation to prison norms." *Wilkerson* at 853.  The *duration* of confinement in restrictive conditions is a factor that courts deem especially relevant in determining whether a liberty interest has been shown to exist. *See, e.g.*, *Sandin v. Conner*, 515 U.S. 472, 482-84 (1995), 515 U.S. at 485-86 (comparing the "duration" and "degree of restriction" of confinement); *see also Reynolds v. Arnone*, No. 3:13-CV-1465 (SRU), 2025 WL 974843, at *3 (D. Conn. Mar. 31, 2025) (collecting cases).

"[T]ruly onerous conditions for a brief period of time may not be atypical; less onerous conditions for an extended period of time may be." *Bailey v. Fisher*, 647 F. App'x 472, 476 (5th Cir. 2016).  In terms of duration, the Fifth Circuit held there is no specific threshold length of administrative segregation required for a prisoner's sentence that establishes an "atypical"

---

conditions collectively to determine whether  a liberty interest exists.  The undersigned adopts the Plaintiffs' "nature of deprivation" inquiry that analyzes the *effect* of a state regulation rather than its *language*.  *See Wilkinson*, 545 U.S. at 221-24; *Wilkerson*, 774 F.3d at 852 (with regard to a liberty interest arising from an expectation or interest created by state laws or policies, "we focus on '***the nature of the deprivation***' resulting from a state regulation, rather than '***the language of a particular regulation***.'") (emphasis added) (quoting *Sandin v. Conner*, 515 U.S. 472, 482-84 (1995).

hardship on prisoner, as could support finding of a protected liberty interest. *Carmouche v. Hooper*, 77 F.4th 362 (5th Cir. 2023). Instead, the "[d]istrict courts should apply a nuanced analysis looking at length and conditions of confinement on a case-by-case basis to determine whether they give rise to a liberty interest—not the application of a 30-month threshold."). *Id.* at 367; *see also Bailey*, 647 F. App'x at 476 (explaining that courts employ a "sliding scale"); *Paulson v. Collier*, No. 6:22CV002, 2024 WL 4379736, at *13 (E.D. Tex. 2024), *R. & R. adopted sub nom. Paulson v. TDCJ*, No. 6:22-CV-2-JDK-KNM, 2024 WL 4346376 (E.D. Tex. 2024).

Federal courts are particularly concerned with indefinite placement in restrictive housing. *See, e.g., Wilkinson*, 545 U.S. at 224; *Wilkerson*, 774 F.3d at 856 (explaining that solitary confinement at the prison was "effectively indefinite" as a result of "rote repetition"). The question becomes whether the reason a prisoner has been placed in segregation can change—or, stated differently, if the prisoner "has substantial influence over his length of stay in restrictive housing." *See Hernandez v. Abbott*, 2021 WL 11721407, at *10 (E.D. Tex. 2021) (highlighting that the plaintiffs in *Wilkerson* were placed in restrictive housing for reasons that could never change: Their convictions of murdering a correctional officer and a fellow prisoner while in prison).

The amount of time Plaintiffs spent in solitary confinement ranges from 5 to 26 years. They allege the conditions at the Polunsky Death Row Unit restrict them to a constant state of extreme social and sensory deprivation, which is indiscriminate, indefinite, and without reprieve. Defendants do not apply any individualized assessment to determine whether less restrictive housing is appropriate, and Plaintiffs are confined to their cells all but a few hours per week, including mealtime, and are not allowed any communal or meaningful physical interactions.

While they are sometimes permitted recreation, they are only allowed to exercise alone in a concrete and metal cage.  They have not had a contact visit except for rare expert examinations. The Fifth Circuit has recognized that these restrictive conditions give rise to a liberty interest. *Wilkerson v. Goodwin*, 774 F.3d 845, 855 (5th Cir. 2014) ("Here, however, we consider the 23-hour-a-day in cell isolation, limited physical exercise, and limited human contact, together with the extraordinary length of time .... collectively, there can be no doubt that these conditions are sufficiently severe to give rise to a liberty interest.").  Plaintiffs' alleged conditions in the Polunsky Death Row Unit are similar to those described by *Wilkerson* inmates, and therefore successfully establish a protected liberty interest to proceed on a Due Process claim.

2. *Due Process Prong Two: Deprivation Without Constitutionally Adequate Procedures* Plaintiffs have no means to challenge indefinite solitary confinement that causes extreme social and sensory deprivation.

The Defendants assert that–even assuming *arguendo*–Plaintiffs established a liberty interest in avoiding solitary confinement, they cannot establish a basis for protection under the Due Process Clause because they were provided adequate process during sentencing. Specifically, Defendants contend that the process Plaintiffs received during sentencing was sufficient to warrant Plaintiffs' current conditions.  In response, Plaintiffs correctly assert they have a strong interest in avoiding mandatory indefinite solitary confinement in the extraordinary conditions of the Polunsky Death Row Unit, and that they are provided no process to challenge their conditions of confinement.

The court considers three factors in determining whether sufficient process has been afforded: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest,

including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *Hope*, 861 F. App'x at 580. However, the touchstone of this inquiry is whether the Plaintiffs had "fair warning." *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004).

The first step requires the court to determine "how much liberty [the Plaintiffs] are deprived of over and above what would normally be incident to prison life." *Hope*, 861 F. App'x at 580. As explained above, the Plaintiffs' conditions of confinement at the Polunsky Death Row Unit are severely restrictive and violative of the Defendant's own "Death Row Plan." Plaintiffs live in extreme social and sensory deprivation and are not allowed individualized risk assessment, in violation of the Defendants' Death Row Plan and counter to how other inmates' conditions of confinement are determined.

Second, concerning the risk of erroneous deprivation and probative value of procedural safeguards, even the Defendants concede there is no review process in place once Plaintiffs are incarcerated at the Polunsky Death Row Unit. Because the Plaintiffs have no means to challenge their conditions of confinement, there is significant risk of erroneous deprivation. Third, while the state has an interest in safely and efficiently operating its prisons, there is no indication that the fiscal and administrative burden of providing death row inmates with periodic individualized assessments is excessive. Plaintiffs state that death row inmates held at the Ellis Unit prior to Polunsky's opening were not held in mandatory solitary confinement but rather were held in conditions similar to the general prison population. (Dkt. #22, p. 2.) Accordingly, certain procedural safeguards (such as periodic reviews to determine whether an inmate would commit violent acts) could add probative value. Thus, the undersigned finds that Plaintiffs adequately

plead a plausible cause of action pursuant to the Fourteenth Amendment as it relates to their indefinite solitary confinement.

C.     Sixth and Fourteenth Amendment Claims: Denial of Right to Counsel

As explained in the preceding section, Plaintiffs lack standing to assert a Sixth or Fourteenth Amendment challenge based on the alleged denial of counsel.  Nevertheless, even setting aside the issue of standing, their claims fail on the merits.  Defendants argue that Plaintiffs do not have any constitutional rights to access counsel that are worthy of protection because the Sixth Amendment only establishes a right to counsel in direct appeal cases. The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."  U.S. Const. amend. VI. "Since the right to effective counsel under the Sixth Amendment extends only to criminal matters, it is applicable solely to pre-trial detainees or to a convicted prisoner being tried on additional charges or contesting the legality of a previous conviction."[12]  *Taylor v. Sterrett*, 532 F.2d 462, 472 (5th Cir. 1976) (citations omitted). Thus, Plaintiffs have no constitutional right to counsel in § 1983 proceedings. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("The right to appointed counsel extends to the first appeal of right, and no further."); *Cook v. Faulkner*, 214 F.3d 1349 (5th Cir. 2000); *Ulmer v. Chancellor,* 692 F.2d 209, 212-13 (5th Cir. 1982).

Furthermore, to the extent that Plaintiffs argue Sixth Amendment violations regarding their communications with counsel, "[t]he Fifth Circuit has long recognized that "[t]he attorney-client privilege constitutes an evidentiary privilege that is secured by state law, and not by the Constitution or laws of the United States. As a creature of state law, the attorney-client privilege

---

[12]     All Plaintiffs have exhausted their direct appeals except Plaintiff Ward.  Plaintiffs Robertson and Cummings have pending habeas proceedings in state and federal court, respectively.  While Plaintiffs Ward, Robertson, and Cummings have a right to counsel in those cases, it does not extend here.

cannot be asserted as a basis for recovery under § 1983." *Buffington v. Valdez*, No. 3-07-CV-260-P, 2007 WL 2719885, at *5 (N.D. Tex. 2007) (citing *Bradt v. Smith,* 634 F.2d 796, 800 (5th Cir. 1981)). Accordingly, the undersigned finds that Sixth Amendment rights do not extend to the Plaintiffs' pending civil claims and recommends granting the Defendants' *Motion to Dismiss* on those claims.

## VI.    <u>QUALIFIED IMMUNITY DEFENSE</u>

Here, the Defendants invoke qualified immunity for any Section 1983 claims against them in their individual capacities. Qualified immunity protects public officials from civil liability for damages when their conduct does not violate the plaintiff's "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss an action barred by qualified immunity. *See Bustillos v. El Paso Cnty. Hosp. Dist.*, 226 F. Supp. 3d 778, 793 (W.D. Tex. 2016) (dismissing a plaintiff's claim based on qualified immunity). While the qualified immunity playing field is quite favorable to defendants in most respects, factual uncertainties at this stage must be resolved in the plaintiff's favor. FED. R. CIV. P. 12; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014); *Bartlett v. City of Winona*, 748 F. Supp. 3d 413, 416 (N.D. Miss. 2024).

Evaluating qualified immunity is a two-step process, with the plaintiff bearing the burden of showing that the defendant is not entitled to immunity. *Wyatt v. Fletcher*, 718 F.3d 496, 502 (5th Cir. 2013). First, the court must determine whether a plaintiff's allegations, if true, could establish a constitutional violation. *Id.* Then, if a constitutional right was violated, the court must determine whether the right was clearly established at the time of the violation. *Freeman v. Texas Department of Criminal Justice*, 369 F.3d 854, 863 (5th Cir. 2004). A specific right is

clearly established if its contours "are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wooley v. City of Baton Rouge*, 211 F.3d 913, 919 (5th Cir. 2000).

It has been determined that Plaintiffs' Eighth Amendment claims regarding conditions of confinement in solitary confinement and medical care, as well as their claims regarding the denial of due process regarding indefinite placement in solitary confinement, establish a constitutional violation. To determine if the Defendants are entitled to qualified immunity with respect to these claims, the undersigned must consider whether the constitutional right allegedly violated was clearly established.

A.    Conditions in Solitary Confinement

Plaintiffs' allegations regarding conditions in solitary confinement sufficiently establish that they were deprived of certain minimal civilized measures of life's necessities. Based on the authorities cited above, this right was clearly established at the time Plaintiffs were subjected to these conditions. As a result, Defendants have not established a right to qualified immunity regarding this claim.

B.    Medical Care

The right to be free from deliberate indifference to serious medical needs is clearly established. "Since *Estelle v. Gamble*, 529 U.S. 97, 104 (1976), state officers have been on notice that deliberate indifference to a prisoner's serious medical needs violated the Eighth Amendment." *Domino*, 239 F.3d at 756. The Defendants are therefore not entitled to qualified immunity with respect to this claim.

40

C.    Denial of Due Process Regarding Solitary Confinement

For the reasons set forth above, Plaintiffs' allegations that they were denied due process in connection with their mandatory, indefinite placement in solitary confinement sufficiently state a plausible claim.    However, Plaintiffs cite no case where the analysis described in *Wilkinson, supra*, was applied to death row prisoners.    As a result, the undersigned concludes that not every reasonable prison official would have understood that the failure to provide death row inmates with periodic individualized risk assessments to determine whether they must remain in solitary confinement violated their right to due process. *Batyukova v. Daege*, 994 F.3d 717, 726 (5th Cir. 2021) (to withstand an assertion of qualified immunity, a Plaintiff must show that the law was sufficiently clear at that time such that every reasonable official would have understood that the actions alleged violated a constitutional right).    Therefore, Defendants are entitled to qualified immunity with respect to this claim.    This conclusion prevents Plaintiffs from receiving damages based on this claim but has no effect on whether or not they are entitled to injunctive relief.

## VII.    COMPENSATORY DAMAGES

The Defendants assert that pursuant to 42 U.S.C. § 1997e(e) (Prison Reform Act of 1996), in order to seek mental or emotional damages, a prisoner must allege a physical injury that is more than *de minimis*. *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997).    Based on the conclusions reached above, Plaintiffs are limited to pursuing compensatory damages on their claims regarding mold, loss of recreation and conditions of confinement (including inadequate medical care).    As a result, Section 1997e(e) bars them from recovering compensatory damages with respect to other claims.

## VIII.   SUMMARY OF FINDINGS

Standing
At this stage of the proceedings, Plaintiffs have standing to assert injunctive and compensatory claims for: mold, food, recreation, and conditions of confinement.  Plaintiffs lack standing to assert claims for injunctive or declaratory relief regarding F-Pod, insects, access-to-counsel, retaliation, showers, and mattresses.

Jurisdiction
The court lacks jurisdiction to provide relief under 18 U.S.C. § 3599,  28 U.S.C. §§ 2254-55, and Article 11.071(a) of the Texas Code of Criminal Procedure.

Texas Constitution Claims
Defendants did not act *ultra vires*.  Therefore, the Plaintiffs' claims that Defendants violated the Texas Constitution are barred by the Eleventh Amendment.

Constitutional Claims
> *Eighth Amendment*
> Plaintiffs sufficiently allege that conditions of confinement (indefinite solitary confinement and inadequate medical care), when considered collectively with all allegations, violate the Eighth Amendment.
>
> *Fourteenth Amendment Due Process Claim*
> The Plaintiffs have no opportunity to challenge their indefinite solitary confinement, which ranges from 5 to 29 years.  Therefore, Plaintiffs sufficiently allege a Fourteenth Amendment Due Process Claim.
>
> *Sixth Amendment Access-to-Counsel*
> Plaintiffs do not have a Sixth Amendment Right to Counsel in this case.
>
> *First Amendment Retaliation*
> Plaintiffs lack standing.

Qualified Immunity
Defendants are entitled to qualified immunity on claims of denial of due process in solitary confinement but are not entitled to qualified immunity on claims related to: conditions in solitary confinement or medical care.

Compensatory Damages
Section 1997e(e) allows Plaintiffs to pursue compensatory damages for physical injury caused by mold, loss of recreation and conditions of confinement (including inadequate medical care).

## IX.    <u>RECOMMENDATION</u>

Based on the foregoing, the undersigned recommends GRANTING the Defendants'

motion, in part, and dismissing the following counts of Plaintiffs' *Amended Complaint*:

> **Count I** — Declaratory Judgment and Injunctive Relief for Violations of the Eighth Amendment (Cruel and Unusual Punishment) Against Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants in Their Official Capacities as to conditions in F-Pod, insects, access-to-counsel, showers, and mattresses.[13]

> **Count II** — Declaratory Judgment and Injunctive Relief for Violations of Texas Constitution Art. I § 13 (Cruel or Unusual Punishment) Against Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants in Their Official Capacities.

> **Count IV** — Declaratory Judgment and Injunctive Relief for Violations of the Constitutional and Statutory Right to Counsel Against Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants in Their Official Capacity (Sixth Amendment, Fourteenth Amendment, 18 U.S.C. § 3599, 28 U.S.C. §§ 2254, 2255, Tex. Code Crim. Proc. Art. 11.071(a)).

> **Count VIII** — Damages for Violations of the Constitutional and Statutory Right to Counsel Against Defendants Collier, Lumpkin, Dickerson, and the Doe Defendants in Their Individual Capacities (Sixth Amendment, 18 U.S.C. § 3599, 28 U.S.C. §§ 2254, 2255, and Tex. Code Crim. Proc. Art. 11.071(a)).

> **Count IX** — Damages for Retaliation Against Plaintiffs for Exercising their First Amendment Right to Petition by Denying Plaintiffs' Access to the Courts Against Defendants Warden Daniel Dickerson and Corrections Officer Crystal Anthony, and the Doe Defendants in Their Individual Capacities (First Amendment, Fourteenth Amendment, and 42 U.S.C. § 1983).

## X.    <u>OBJECTIONS</u>

Objections to this Report and Recommendation must be (1) specific, (2) in writing, (3)

served and filed within 14 days after being served with a copy of this report, (4) and in

accordance with the Local Rules.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b) and 72(b).

---

[13]  Plaintiffs  Eighth Amendment declaratory and injunctive relief claims regarding conditions of confinement (indefinite solitary confinement, mold, lack of recreation, and inadequate medical care) remain viable.

A party's failure to object bars that party from (1) entitlement to *de novo* review by a district judge of proposed findings and recommendations, *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988), and (2) appellate review, except on grounds of plain error, of unobjected-to factual findings and legal conclusions accepted by the district court, *Douglass v. United Serv. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (*en banc*).

SIGNED this 8th day of October, 2025.

_____
Zack Hawthorn
United States Magistrate Judge