# EXHIBIT A



# Texas Department of Criminal Justice

—————————————————————————— **Brad Livingston**
**Executive Director**

SEP 6 2013

August 14, 2013

VIA REGULAR MAIL
Todd Hettenbach | WilmerHale
1875 Pennsylvania Avenue NW
Washington, DC 20006

     RE: Texas Civil Rights Project

Dear Mr. Hettenback:

In response to your open records request dated August 2, 2013 we have the "Death Row Plan (October 2004)" and "Administrative Segregation Plan (March 2012)", responsive to your request.

If you should have any questions, please do not hesitate to contact this office.

Sincerely,

Rosie Plattenburg, Administrator
Plans and Operations
Texas Department of Criminal Justice
Correctional Institutions Division

/klj

———————————————————————————————————

P.O. Box 99
Huntsville, Texas 77342-0099
www.tdcj.state.tx.us

# *TEXAS DEPARTMENT OF CRIMINAL JUSTICE*

# *Administrative Segregation Plan*

## FOREWORD

There are occasions within a correctional setting when it becomes necessary to administratively segregate offenders in order to preserve the safety and security of both offenders and staff. The Texas Department of Criminal Justice (TDCJ) policy, Administrative Directive (AD)-03.50, "Administrative Segregation" directs the TDCJ to develop an *Administrative Segregation Plan* which establishes uniform rules and regulations to guide staff in both the conditions and procedures relating to offenders housed in administrative segregation.

The TDCJ is fully committed to abide by and enforce the provisions outlined herein, and all employees are expected to comply with its requirements.

ACA References: 4-4140, 4-4235, 4-4250, 4-4251-1, 4-4253, 4-254, 4-4257, 4-4258, 4-4260, 4-4261, 4-4262, 4-4263, 4-4265, 4-4266, 4-4268, 4-4269, 4-4270, and 4-4273

Supersedes: *Administrative Segregation Plan*, August 2005

_____
Rick Thaler, Director
Correctional Institutions Division

Date

3-06-2012

# *Administrative Segregation Plan*
# Table of Contents
# March 2012

**SUBJECT**                                                                                          **PAGE NUMBER**

I.   Definitions ...........................................................................................................................1
  A.   Administrative Segregation...........................................................................................1
  B.   Security Detention.........................................................................................................1
  C.   Pre-Hearing Detention ..................................................................................................2
  D.   Protective Custody ........................................................................................................2
  E.   Temporary Detention ....................................................................................................2
  F.   Levels of Administrative Segregation............................................................................2
  G.   Administrative Segregation Committee.........................................................................3
  H.   Youthful Offender .........................................................................................................4
  I.   Cell Inspection ..............................................................................................................4
  J.   Cell Search ...................................................................................................................4

II.  Placement Procedures.......................................................................................................4
  A.   Categories of Administrative Segregation ....................................................................4
    1.   Security Detention/Protective Custody .................................................................4
    2.   Pre-Hearing Detention...........................................................................................6
  B.   Youthful Offenders ........................................................................................................7
  C.   Serious and Violent Offender Reentry Initiative (SVORI) Program .............................8
  D.   Recordkeeping Requirements .......................................................................................8
    1.   Administrative Segregation Confinement Record, I-201 ........................................8
    2.   Daily Activity Log, I-216 ......................................................................................10

III. Review Procedures After Initial Placement.....................................................................11
  A.   Review Procedures by the Unit Administrative Segregation Committee (ASC) ...........11
  B.   Review Procedures by the State Classification Committee (SCC)................................12
  C.   Hearing Temporarily Suspended .................................................................................13
  D.   Special Reviews ...........................................................................................................14

IV.  Conditions........................................................................................................................14
  A.   Housing .......................................................................................................................14
  B.   Solid Outer Door .........................................................................................................14
  C.   Cell Fixtures ................................................................................................................14
  D.   Recreation ...................................................................................................................15
  E.   Visitation......................................................................................................................16
  F.   Meals...........................................................................................................................16
  G.   Correspondence/Commissary ......................................................................................16
  H.   Property.......................................................................................................................17
  I.   Showering ....................................................................................................................19
  J.   In-Cell Programs .........................................................................................................19
  K.   In-Cell Correspondence Courses .................................................................................19
  L.   Other In-Cell Services..................................................................................................19

V.   Management Procedures ..................................................................................................20
  A.   Staffing.........................................................................................................................20

B.  Housing Practices.................................................................................................20
C.  Unit File ...............................................................................................................21
D.  Offender Management Restrictions ......................................................................22
E.  Cell Searches/Inspections ...................................................................................22
F.  Security During Visitation ...................................................................................23
G.  General Library....................................................................................................24
H.  Law Library..........................................................................................................24
I.  Parole Interviews..................................................................................................25
J.  Security Measures ................................................................................................25
K.  Weekly Inspections ..............................................................................................25

VI.  Recommendations for Release.........................................................................................26
A.  Security Threat Group Offenders.........................................................................26
B.  General Procedures ..............................................................................................26
C.  Youthful Offenders ..............................................................................................26

VII.  Appeal Process ..................................................................................................................27

VIII.  Attachment A - "Administrative Segregation Reference Chart"

# FORMS

I-169        Administrative Segregation Initial Placement and Notification

I-169A       Administrative Segregation Initial Hearing Record

I-188        Pre-Hearing Detention Log

I-189        State Classification Committee (SCC) Administrative Segregation Review Hearing Record

I-201        Administrative Segregation Confinement Record

I-203        Placement on Restriction/Administrative Segregation Level Review

I-206        Restriction Tracking Log

I-214        Referral To Mental Health Services

I-216        Daily Activity Log

# *ADMINISTRATIVE SEGREGATION PLAN*

The purpose of the *Administrative Segregation Plan* is to provide uniform rules and regulations for the use of administrative segregation within the TDCJ. This *Plan* is intended to guide TDCJ staff in matters of both the conditions and procedures relating to offenders housed in administrative segregation.

I.    DEFINITIONS

A.    "ADMINISTRATIVE SEGREGATION" is a non-punitive, maximum custody status involving the separation of an offender from general population for the purpose of maintaining safety, security, and order among general population offenders and correctional officers within the prison and the public. For the purpose of this *Plan*, administrative segregation shall consist of the following four (4) categories:

1.    Security Detention

2.    Pre-Hearing Detention (PHD)

3.    Protective Custody

4.    Temporary Detention

An offender shall be considered to be in administrative segregation anytime the offender is separated from the general population by confinement in a cell for 20 hours or more without a disciplinary hearing.

An offender is not considered to be in administrative segregation if the offender is segregated due to an institutional lockdown; undergoing intake and diagnostic evaluation; in transient status; or housed on a non-permanent unit of assignment.

At no time shall administrative segregation be used as punishment for misconduct. Punishment of an offender shall be assessed and imposed only pursuant to the provisions of the rules governing disciplinary procedures.

Procedures and standards for medical and psychiatric segregation shall be governed by the medical and special needs plans.

B.    "SECURITY DETENTION" is used for an offender who is a:

1.    Current escape risk;

2.    Threat to the physical safety of other offenders or staff, to include volunteers and contract employees;

3.    Threat to the order and security of the prison as evidenced by repetitive serious disciplinary violations; or

4.    Confirmed member of a security threat group (STG).

C. "PRE-HEARING DETENTION (PHD)" is used when an offender is charged with, or suspected of a disciplinary violation, when at least one of the following conditions exists:

    1. The offender is a current escape risk;

    2. The offender's presence in general population would create a threat to the physical safety of other offenders or staff; or

    3. It is necessary to maintain the integrity of an investigation, such as to preserve information or evidence either in the offender's possession or another offender's possession.

    **NOTE:** An offender shall not be placed in PHD solely because the offender is being reviewed by the unit for protection or is suspected of STG participation.

D. "PROTECTIVE CUSTODY" is for an offender who requires maximum supervision at all times, and the highest degree of protection, due to threats of harm by others or a high likelihood of victimization. The offender requires a higher degree of safety and security in a more controlled environment than general population offenders in order to provide for the offender's safety. These offenders may be housed in protective custody in order to provide the sufficient degree of safety and security. These offenders shall not be recreated, showered, or otherwise placed in the same proximity as offenders in any other custody designation.

E. "TEMPORARY DETENTION" is used between consecutive terms of solitary confinement for general population offenders under the following procedures and confinement guidelines:

    1. The offender has been sentenced to two (2) or more consecutive terms of solitary confinement. If an offender is assessed more than one (1) term of solitary confinement, each term must be separated by at least 72 hours of temporary detention; and

    2. The warden or designee determines the offender's presence in general population would create a threat to the physical safety of other offenders or staff.

Offenders placed in temporary detention shall be afforded the same privileges as Level I offenders and recreated at least once during the 72 hour period.

F. "LEVELS OF ADMINISTRATIVE SEGREGATION" are categories assigned to an offender based on the offender's behavior. The administrative segregation committee (ASC) and the state classification committee (SCC) shall have the authority to change an offender's assigned level.

    1. Level I:

        Administrative segregation offenders assigned this level generally maintain good behavior but require segregation from general population offenders. Level I offenders may have a history of assaultive behavior, but the offender's current behavior, within the last 90 days, is non-assaultive in nature.

2.    Level II:

Administrative segregation offenders assigned this level may be chronic rule violators or have a recent history of in-prison assaultive or aggressive behavior which occurred within the last 90 days. This behavior is documented with a major disciplinary case.

3.    Level III:

Administrative segregation offenders assigned this level have been charged with a major disciplinary case within the last 30 days. These offenders are assaultive or aggressive in nature, such as institutional violence, weapons possession, assaults or attempted assaults on staff or offenders, or fighting with or without a weapon.

G.    "ADMINISTRATIVE SEGREGATION COMMITTEE" (ASC) is comprised of staff members who are responsible to the warden:

1.    The ASC members shall consist of the following staff:

a.    The warden or designee, captain or above, shall serve as chairperson;

b.    A lieutenant, or above, or chief of classification;

c.    A correctional officer, or above, who is assigned to the administrative segregation area; and

d.    A representative from medical or psychiatric as an additional member, if needed, who shall function in a consultative capacity for issues impacting the physical or mental well-being of the offender.

2.    The warden or designee shall schedule the following systematic reviews by the ASC for offenders assigned to administrative segregation:

a.    Initial 7-day hearings;

b.    Review for possible changes in level of assignment; and

c.    Implementation of restrictions according to SM-01.29, "Offender Management Restrictions."

3.    The ASC shall be responsible for making the following recommendations in writing to the SCC for SCC's review and approval:

a.    Initial placement of an offender into administrative segregation; and

b.    Reassignment of an administrative segregation offender to general population.

4.    Promotions in time-earning status of administrative segregation offenders shall be submitted in writing to Classification and Records, Time Section, via email.

H.      "YOUTHFUL OFFENDER" is an offender who is 17 years old or younger.  Procedures for the placement of a youthful offender in administrative segregation are contained in Section II.B.  Procedures for the release of a youthful offender from administrative segregation are contained in Section VI.C.

I.      "CELL INSPECTION" is a visual examination to determine the compliance and structural integrity of the cell by examining the cell door, windows, bars, cell fixtures, locking mechanisms, and food slots if applicable, ensuring these items have not been tampered with or damaged.  Offenders shall be required to exit the cell so a proper cell inspection can be conducted.

J.      "CELL SEARCH" is a physical examination of an offender's assigned housing area for contraband.

## II.      PLACEMENT PROCEDURES

Confinement in administrative segregation shall be in accordance with the appropriate confinement procedures for the offender's specific category of administrative segregation.  Once a decision has been made to place an offender in administrative segregation, unit medical staff shall be notified.  Initial and regular medical evaluations of administrative segregation offenders are detailed in Correctional Managed Health Care Policy E-39.1, *"Health Evaluation and Documentation – Offenders in Segregation."*  Initial placement of offenders from general population into protective custody, security detention, or PHD shall be made by the highest-ranking security supervisor on duty, lieutenant or above.

A.      CATEGORIES OF ADMINISTRATIVE SEGREGATION

1.      Security Detention and Protective Custody:

a.      The warden or designee may place an offender in security detention or protective custody prior to the offender receiving a written notice specifying the reasons for confinement to administrative segregation and the initial hearing, as noted below:

(1)     Security Detention:

An offender may be placed in security detention in cases when the offender is an immediate threat to the physical safety of other offenders or staff, to include volunteers and contract employees.

(2)     Protective Custody:

An offender may be placed in protective custody in cases when an immediate threat to the offender's physical safety exists.

b.      Administrative segregation offenders shall be assigned to Level I status unless their behavior warrants a more restrictive level.  The initial decision related to an offender's assignment to a level shall be made by the highest ranking security supervisor on duty at the time the offender is placed in administrative segregation housing.

c.     If an offender is placed in security detention or protective custody prior to a written notice or an initial hearing, the offender shall, within 72 hours of being placed in administrative segregation, either be released or given a written notice specifying the reasons for confinement to administrative segregation.

d.     An offender shall be brought before the ASC for an initial hearing, unless medical, mental health, safety, or security concerns preclude the offender's presence in accordance with the following:

(1)     Within seven (7) days of the offender receiving written notice or placement in administrative segregation, whichever occurs first;

(2)     An Administrative Segregation Initial Placement and Notification, I-169, form shall be completed prior to the hearing and retained in the offender's unit file;

(3)     The offender shall be provided the same due process as followed for minor disciplinary hearings, unless otherwise required by this *Plan*;

(4)     The review by ASC shall be documented on the Classification Committee Docket, SSP-109, as the initial 7-day hearing; and

(5)     The initial decisions regarding the offender's placement into security detention or protective custody, such as category, level, restrictions, or any other similar decisions, shall require confirmation by the ASC at the 7-day hearing and shall be documented on the Administrative Segregation Initial Hearing Record, I-169A, form.

e.     Based on the evidence presented at the hearing, the ASC shall determine whether to continue the offender's confinement in administrative segregation or release the offender to general population.

f.     If the ASC determines the offender shall be housed in administrative segregation, the ASC shall further determine whether any of the following special conditions or restrictions are required for security purposes.

(1)     Level of administrative segregation;

(2)     Security precaution designator (SPD);

(3)     Recreation or exercise precautions;

(4)     Personal property restrictions;

(5)     Known enemies, by name and TDCJ number as found on the UCR 07 Screen;

(6)     STG affiliations;

(7)    Restraint requirements, for movement;

(8)    Physical health conditions;

(9)    Mental health conditions;

(10)    Special diet requirements to include medical or religious;

(11)    Medication requirements; or

(12)    Any other special circumstances related to the offender's assignment to administrative segregation.

g.    Upon assignment to administrative segregation by the ASC, the offender shall be advised of the criteria for release, which shall be considered at subsequent review hearings as outlined in Section V., "Review Procedures After Initial Placement."

h.    The offender shall have the right to appeal the decision of the ASC through the offender grievance procedures. The grievance shall not be reviewed by an individual who served on the ASC.

i.    The ASC shall notify the SCC, in writing, of its initial decision. The ASC's decision shall be affirmed or denied by the SCC. If the decision is affirmed, the SCC shall determine whether the offender's review schedule shall be 180 days or annually.

2.    Pre-Hearing Detention Log, I-188

a.    The decision to place an offender in PHD without written notice or an initial hearing shall be made by the warden or designee, lieutenant or above. Offenders housed in PHD shall generally be categorized as Level I; however, the authorizing official may decide to assign the offender a more restrictive level. Refer to the levels of administrative segregation for criteria. If the offender is housed in PHD for 10 days without a disciplinary hearing, the offender shall be released from PHD unless time in PHD is extended by the warden.

b.    The original 10-day period may be extended another 10 days if the warden certifies in writing via an IOC justifying in detail the reason for the extension, and that it is necessary in order to complete an investigation. Only one such extension may be granted. The IOC justifying the extension shall be placed in the offender's unit file. A completed I-169 is not necessary.

    c.      At the time the offender is placed into PHD, the Pre-Hearing Detention Log, I-188, shall be used to document the offender's placement in PHD. Each entry shall include the: date and time the offender was placed in PHD; the offender's name and TDCJ number; the reason for placement in PHD, such as the offender is an escape risk, a threat to the physical safety of other offenders or staff, or to preserve information or evidence either in the offender's or another offender's possession; the violation, such as a brief description or offense code; the authorizing official, lieutenant or above, including the printed name and signed initials; date out if applicable; and the date, time, printed name, and signed initials of the warden or designee, captain or above certifying review within 72 hours of the offender's placement in PHD.

    d.      If an offender in PHD temporarily departs the unit, such as for medical reasons, the offender's time in PHD shall continue after returning, with no credit given for the absent days. If the offender is permanently reassigned, the receiving unit may continue or discontinue PHD housing.

B.    YOUTHFUL OFFENDERS

1.    Prior to placement of a youthful offender in administrative segregation, a written request describing the specific reasons for placement in administrative segregation shall be presented to the unit classification committee (UCC) and maintained in the youthful offender's unit classification file. The UCC shall include the youthful offender program (YOP) director or designee as a voting member.

2.    If the UCC recommends the youthful offender be placed in administrative segregation, the request shall be e-mailed to the SCC. The e-mail shall include the specific reasons for the request. The SCC shall respond by concurring or non-concurring with the request.

    a.      If the SCC concurs, the youthful offender shall receive written notification specifying the reasons for confinement to administrative segregation. The regular procedures for an initial 7-day hearing shall be followed. The YOP director or designee must be a voting member of the ASC.

    b.      If SCC non-concurs, the unit shall release the youthful offender to general population or appeal the SCC's decision to the Departmental Review Board (DRB).

3.    The YOP director or designee shall continue to monitor the youthful offender's behavior while housed in administrative segregation. This allows the youthful offender to remain in touch with the YOP and provides an opportunity for the youthful offender to return to the YOP if deemed appropriate.

4.    The YOP staff shall document any visits they make, along with any pertinent observations, in the youthful offender's unit classification file.

C.    SERIOUS AND VIOLENT OFFENDER REENTRY INITIATIVE (SVORI) PROGRAM

The SVORI is a program which occurs prior to an offender's release based on a Texas Board of Pardons and Paroles (BPP) release vote. The program is designed to reduce recidivism while better preparing and assisting offenders in administrative segregation to successfully reenter their communities.

1.    General Procedures:

a.    Prior to placement of an administrative segregation offender in the SVORI pre-release program, an eligibility screening process shall be conducted by the SVORI director or designee.

b.    Once the administrative segregation offender has been screened and approved for the SVORI program, the SVORI director shall request a transfer of the administrative segregation offender to a unit which provides the program through the SCC.

c.    The SCC shall conduct a review of the administrative segregation offender's file and the Classification and Records Time Section shall audit the administrative segregation offender's time prior to approving or denying a transfer. Once approved, the SCC shall update the UCR 07 screen indicating the administrative segregation offender's enrollment in the SVORI program.

d.    Once the administrative segregation offender is transferred to the appropriate unit, the administrative segregation offender shall be reviewed by the ASC, which shall include the SVORI director or designee.

e.    The SVORI director or designee shall continue to monitor the administrative segregation offender's progress while involved in the SVORI program until the administrative segregation offender is transferred for release from TDCJ.

f.    Other program procedures can be found in the *Rehabilitation Programs Division SVORI Operations Manual*.

D.    RECORDKEEPING REQUIREMENTS

Administrative segregation activities are primarily documented on two (2) forms: the Administrative Segregation Confinement Record, I-201, and the Daily Activity Log, I-216. The I-201 shall be completed for each offender and the I-216 shall be completed for each housing area. Current forms shall be maintained in the administrative segregation housing area, accessible to staff for recording purposes as described below:

1.    Administrative Segregation Confinement Record, I-201

A separate I-201 form shall be initiated for each administrative segregation offender and maintained in cell order. The I-201 is divided into two (2) sections, "Placement Information" and "Activity Record." The color-coded form shall be used as follows: blue for Level I, yellow for Level II, and orange for Level III.

a.    Immediately prior to the actual placement of an offender in administrative segregation, the ASC or the warden or designee authorizing placement in administrative segregation shall initiate the I-201 by fully completing Section 1, "Placement Information." Completing Section 1 of the I-201 shall include identifying and recording all special conditions and restrictions relative to the administrative segregation of the offender, as noted below. If any of the items identified do not apply to a specific offender, the word "none" shall be recorded in the space provided.

   (1)   Recreation or exercise precautions, such as "single recreate only" or "not to be recreated with a certain offender," in the case of protective custody Level I offenders;

   (2)   Restrictions, such as property, paper mask, paper gown, food loaf, and recreation restrictions, imposed by the appropriate authority in accordance with SM-01.29, "Offender Management Restrictions;"

   (3)   STG affiliation, found on UCR07 Screen, or "unknown;"

   (4)   Security precaution designator (SPD);

   (5)   Special medical conditions, such as prosthetics, chronic conditions, or any similar condition; and

   (6)   Any other special circumstances related to the offender's placement in administrative segregation.

b.    If the offender is placed in administrative segregation by the warden or designee, the placement information entered by that individual shall require confirmation by the ASC at the initial seven (7)-day hearing.

c.    The initial and subsequent review dates for placement of an offender on any restriction pursuant to SM-01.29, "Offender Management Restrictions," shall be documented on the I-201.

d.    Once the placement information is complete on the I-201, and the appropriate placement criteria has been met, the offender may be placed in administrative segregation.

e.    The administrative segregation officer receiving the offender shall note the information recorded on the I-201, paying particular attention to the administrative segregation category and level, as well as any special conditions or restrictions.

f.    The administrative segregation officer shall make the first entry in Section II, "Activity Record," of the I-201 by recording the cell assignment for the offender. The administrative segregation officer shall then ensure the assigned cell is searched and the offender is strip searched prior to placement in the assigned cell.

g.    Thereafter, Section II of the I-201 shall be used for documentation when an administrative segregation offender:

(1) Does not receive some form of routine activity, such as recreation, shower, or meals;

(2) Departs from or returns to the housing area;

(3) Is placed on restriction;

(4) Exhibits inappropriate behavior, such as cleanliness issues, either personal hygiene or within the housing area, or inappropriate social interaction;

(5) Undergoes ASC action or subsequent reviews, or

(6) There must be a Placement on Restriction/Administrative Segregation Level Review, I-203, form accompanying an offender's placement on restriction. The additional use of the Restriction Tracking Log, I-206, is optional to assist staff with tracking the timeframes of offenders' restriction.

g. Every entry in Section II of the I-201 shall also reflect the date, time, and appropriate correctional officer's last name printed, and signed initials for the relevant activity.

h. If an administrative segregation offender is going to be transferred to another unit, prior to the transfer:

(1) Any special precautionary information shall be indicated on the UCR 24 screen; and

(2) The I-201 for that administrative segregation offender shall be filed in the offender's unit classification file.

2. Daily Activity Log, I-216

For administrative segregation housing at 2250, System I, and expansion cellblock facilities, a separate I-216 shall be used on each wing or pod, and identified alphabetically or numerically.

a. Based on housing location, a separate I-216 shall be kept for each category of administrative segregation offender, to include PHD, security detention, temporary detention, and protective custody. Each I-216 shall record the daily activities of that particular cellblock or pod, such as meals and showers. The administrative segregation officer shall document daily activities and note exceptions, such as an administrative segregation offender refuses to eat, recreate, and other similar events, on the I-216, including the location and reason. The administrative segregation officer shall also document any exceptions on each individual administrative segregation offender's I-201 in Section II.

b. The I-216's shall be filed at the unit where the form was originated.

III.    REVIEW PROCEDURES AFTER INITIAL PLACEMENT

All ASC hearings shall be documented on the appropriate form and maintained in the offender's unit classification file.

A.    REVIEW PROCEDURES BY THE UNIT ASC

1.    All administrative segregation offenders initially placed in administrative segregation, except for offenders placed in PHD and temporary detention, shall be afforded an initial hearing within seven (7) days and shall undergo a subsequent paper review by the ASC every seven (7) days for the first 60 days, and at least every 30 days thereafter.  These reviews shall be documented on the I-203 Form.

2.    The ASC shall review administrative segregation offenders assigned to Level III every 30 days for any major disciplinary infractions involving assaultive or aggressive behavior.  If there are none, the administrative segregation offender shall be promoted to a Level II.

3.    Within 90 days of the initial hearing, the ASC shall review administrative segregation offenders assigned to Level II for major disciplinary infractions.  If there are none, a Level II administrative segregation offender shall be promoted to Level I.  Subsequent review hearings shall be held within 30 days of the previous ASC hearing.  Once a Level II administrative segregation offender maintains a clear major disciplinary record for a period of 90 continuous days, the offender shall be promoted to a Level I.

4.    Administrative segregation offenders do not need to be present at the subsequent seven (7) day and 30 day reviews unless it is deemed appropriate by the ASC.

5.    The administrative segregation offender shall be notified in writing within 24 hours of any decision made by the ASC.

6.    At the subsequent seven (7) day and 30 day reviews, the ASC shall consider the administrative segregation offender for promotion in time-earning class if eligible, possible change in level, or recommend release from administrative segregation. If the administrative segregation offender is on any type of restriction, such as paper gown, paper mask, property, or food loaf restriction, the ASC shall also review the offender for continuation or removal of the restriction.  Units may elect to use the I-206, Restriction Tracking Log.

7.    Recommendations for promotions in time-earning class shall be made to the Classification and Records, Time Section, via email and shall be based on the same criteria used for consideration of general population offenders in accordance with AD-04.81, "Review Process for Promotion in Time-Earning Class." Recommendations for promotions in time earning class may be coordinated to coincide with a regularly-scheduled review, at which time an SCC member shall be present as a member of the reviewing committee.  However, administrative segregation offenders must be reviewed and considered for time-earning class promotion after maintaining a clear disciplinary record for 12 months.  Therefore, an offender must be reviewed after 12 months from the most recent major disciplinary conviction.  Boundaries for promotions in time-earning class for administrative segregation offenders shall be as follows:

a. Security Detention - An administrative segregation offender shall not be promoted above the time-earning class of SAT IV.

b. Protective Custody - An administrative segregation offender shall not be promoted above the time-earning class of SAT III.

8. Subsequent reviews regarding an administrative segregation offender's assignment to Level I, Level II, or Level III during confinement in administrative segregation may be made by the warden, assistant warden, major, administrative segregation security supervisor, or any regularly scheduled ASC. All such decisions made by an individual, other than the ASC, shall be affirmed or denied by the ASC.

9. When an administrative segregation offender is assigned a more restrictive level, the classification docket and the I-203 shall reflect the safety or security reasons for the change in level.

10. A subsequent review by the ASC for a change in an administrative segregation offender's level does not require notification to or confirmation by the SCC.

11. All decisions made by the ASC shall be documented on the SSP-109, Classification Committee Docket. Each section and column of the docket shall be accurate and completely documented.

12. Current administrative segregation levels and subsequent review dates shall be entered on the UC00 01 screen.

B. REVIEW PROCEDURES BY THE SCC

1. 60-day SCC Review Hearing

Within 60 days of the initial 7-day hearing, the offender's status shall be reviewed by the SCC and their decisions documented on the Classification Committee (SCC) Administrative Segregation Review Hearing Record, I-189.

a. The unit shall notify Classification and Records to schedule hearings;

b. The SCC shall consist of a representative of the SCC, the warden or designee, and other staff as deemed appropriate; and

c. The 60-day SCC review will not be necessary for STG members.

2. The following procedures address the SCC 180 day Subsequent Review Hearings:

a. SCC subsequent review hearings shall be held within 180 days of the previous SCC subsequent review hearing, except for offenders housed in administrative segregation due to a STG affiliation, who shall be reviewed annually by the SCC. SCC subsequent review hearings shall be documented on the I-189.

b.  An administrative segregation offender shall be provided a notice within at least 24 hours but no more than two (2) weeks prior to the SCC subsequent review hearing, unless unusual circumstances or an emergency prevents meeting the timelines.  The notice provided to the administrative segregation offender shall specify any reasons for continued housing within administrative segregation, unless there is no reason for the offender to know.  The administrative segregation offender shall have the right to attend the SCC subsequent review hearing, unless the administrative segregation offender presents a threat to the security of offenders or staff by attending the hearing, in these situations an explanation shall be noted on the I-189.  The administrative segregation offender shall also have the right to make a statement, submit written statements from witnesses, and submit other documentary evidence during the SCC subsequent review hearing.  If the administrative segregation offender refuses to attend, the hearing may be held in the administrative segregation offender's absence.

c.  Based on the evidence presented at the SCC subsequent review hearing and the criteria for an offender's release from administrative segregation, the SCC shall determine whether reasons exist to continue the confinement of the offender in administrative segregation.  If the SCC determines the offender shall remain in administrative segregation, the SCC shall further determine if any of the conditions or restrictions currently imposed shall change or if the level of assignment shall change.  If the SCC determines the administrative segregation offender shall remain in administrative segregation, the SCC shall further assess whether the conditions or restrictions currently imposed on the administrative segregation offender are appropriate or if the assigned level of administrative segregation is accurate.

d.  After the SCC subsequent review hearing, the SCC shall provide the administrative segregation offender with a written decision stating the reasons for the decisions and summarizing the information presented and considered.

C.  HEARING TEMPORARILY SUSPENDED

If an administrative segregation offender departs the unit of assignment but is not being assigned to another unit and will return to the original unit of assignment, the scheduled hearing shall be temporarily suspended.  Once the administrative segregation offender has returned to the unit of assignment, the hearing shall resume. The administrative segregation security supervisor shall not consider any of the time the offender was absent from the unit when calculating the administrative segregation offender's next classification committee review date, such as the 7-day, 30-day, 180-day, or an annual review for STG offenders.  The committee conducting the review hearing, either the ASC or the SCC, shall document the reason the hearing was delayed.

D.    SPECIAL REVIEWS

Unit administration may request to have an administrative segregation offender reviewed prior to the 180-day review.  The UCC shall make the request for a special review in writing to the chairman of the SCC and shall include justification for the removal from administration segregation in the request.

IV.    CONDITIONS

The following conditions shall apply to all administrative segregation offenders.

A.    HOUSING

1.    The warden or designee shall designate specific cells or housing areas capable of providing separation from the general population and the required degree of security and control to be used for offenders housed in administrative segregation.

2.    Cells designated to house offenders assigned to solitary confinement may not be used to house administrative segregation offenders unless:

a.    There is no space available in the administrative segregation housing area; and

b.    Extraordinary circumstances exist in which several offenders must be separated from the general population and prevented from communicating with each other.

3.    In situations when it is deemed appropriate to use a solitary confinement cell to house administrative segregation offenders, the cell shall contain all fixtures described in Section IV.C., except the fixtures shall not contain electric outlets.

B.    SOLID OUTER DOOR

The implementation of offender management status and use of a solid outer door shall be in accordance with AD-03.80, Implementation of Offender Management Status."

C.    CELL FIXTURES

Cells that house administrative segregation offenders shall have all the permanent fixtures of cells that house general population offenders.  Electrical outlets may be removed from cells housing Level III administrative segregation offenders for safety or management reasons on a case-by-case basis with approval by the appropriate regional director.

D.    RECREATION (See Attachment A for a quick reference)

    1.    Schedule:

Administrative segregation offenders in any category of administrative segregation shall be recreated at least one (1) hour within the first 72 hours of placement in administrative segregation. Thereafter, administrative segregation offenders shall be allowed physical recreation outside of their cells, to include the opportunity to recreate outdoors, weather permitting. The recreation of administrative segregation offenders shall be in accordance with the administrative segregation offender's assigned level, unless security or safety considerations dictate otherwise. If an administrative segregation offender refuses the offer to recreate, the refusal shall be noted on the I-201 and the I-216.

    a.    Level I Administrative Segregation Offenders

        (1)    One (1) hour per day, seven (7) days a week, with two (2) hours of the weekly out-of-cell recreation taking place outdoors; or

        (2)    Two (2) hours, five (5) days a week, with two (2) hours of the weekly out-of-cell recreation taking place outdoors.

It shall be at the warden or designee's discretion as to which one (1) of the two (2) schedules is used. Level I protective custody offenders may be group recreated. The size of the group of Level I protective custody offenders shall be determined by the square footage of the recreation yard, allowing at least 25 square feet per Level I protective custody offender.

    b.    Level II and Level III Administrative Segregation Offenders

One (1) hour, five (5) days a week, with one (1) hour of the weekly out-of-cell recreation taking place outdoors.

    c.    If an administrative segregation offender declines the offer to recreate, the administrative segregation offender shall be allowed to shower and then be returned to the cell.

    d.    Alternative days shall be made available when an administrative segregation offender is unable to go outside for recreation due to inclement weather.

    2.    Equipment:

Indoor recreational areas shall be equipped with a minimum of one exercise mat, one chinning bar, a game table, a toilet, and a drinking fountain. Only Level I protective custody offenders shall have television viewing privileges. Outdoor recreation yards shall have a hard surface, asphalt or concrete, one basketball goal, one basketball or handball, and one chinning bar.

3.    Denial of Recreation:

Administrative segregation offenders may, on a case-by-case basis, be denied the opportunity for out-of-cell recreation when fulfillment of the requirement would create an immediate and serious threat to the physical safety or security of the administrative segregation offender, other offenders, or staff. However, an administrative segregation offender shall not be denied recreation when the immediate and serious threat to the physical safety or security would not exist if this offender were recreated in an alternate location.

The decision to deny an administrative segregation offender recreation shall be in writing and shall explain the reasons for the denial and the reasons why the use of an alternative recreation area would not have prevented the immediate and serious threat to the physical safety or security of the administrative segregation offender, other offenders, or staff. Copies of the decision shall be placed in the administrative segregation offender's unit classification file.

E.    VISITATION (See Attachment A for a quick reference)

Administrative segregation offenders shall be allowed visitation privileges according to their assigned level: For additional information, refer to the TDCJ *Offender Visitation Plan*.

1.    Level I administrative segregation offenders:

a.    Security Detention: one (1) non-contact visit each week.

b.    Protective Custody: may be allowed a visit each weekend, with up to three (3) contact visits each month.

2.    All Level II administrative segregation offenders may be allowed two (2) non-contact visits each month.

3.    All Level III administrative segregation offenders may be allowed one (1) non-contact visit each month.

4.    Administrative segregation offenders housed in PHD may be allowed non-contact visits in accordance with the offender's custody designation.

F.    MEALS (See Attachment A for a quick reference)

Administrative segregation offenders shall have access to nutritional meals in accordance with the Food Service Policy. Safety precautions shall be followed in serving meals pursuant to PO-07.006, "Administrative Segregation Officer."

G.    CORRESPONDENCE/COMMISSARY (See Attachment A for a quick reference)

Administrative segregation offenders shall be provided writing instruments, stationery, and postage either by accessing their offender trust fund account or through the provisions for indigent supplies. Administrative segregation offenders shall have access to the commissary in accordance with their assigned Level. Commissary items shall be delivered to administrative segregation offenders.

1.    Level I administrative segregation offenders may spend $70 every two (2) weeks for regular purchase items. Administrative segregation offenders are allowed approved special purchases, such as a fan, typewriter, radio, and other similar types of purchases. Level I protective custody offenders may spend the same amount as G1/J1, G2/J2, or G3 offenders.

2.    Level II and III administrative segregation offenders may, every two (2) weeks, purchase one (1) of each personal hygiene items, such as a toothbrush, toothpaste, deodorant, soap, shampoo, comb, sunscreen, shower shoes, and tampons for female offenders, and administrative segregation offenders may purchase a maximum of $10 in correspondence supplies, including stamps, stamped envelopes, legal pads, writing tablets, envelopes, pens, and pencils. Additional correspondence supplies may be purchased upon submission of a special purchase request by the administrative segregation offender and approval by the warden or designee.

3.    No administrative segregation offenders shall be permitted to purchase razors.

H.    PROPERTY (See Attachment A for a quick reference)

Administrative segregation offenders shall retain personal property allowed in accordance with AD-03.72, "Offender Property," and the level to which they have been assigned. The ASC may restrict, on a case-by-case basis, only those items presenting a danger to the physical safety and security of staff, offenders, or others, or any item that may be used to assist in an escape. Restriction of those items shall be in accordance with SM-01.29, "Offender Management Restrictions."

1.    All administrative segregation offenders are allowed the following basic personal property items:

a.    Current legal materials or legal research materials without metal fasteners or paper clips;

b.    Approved religious books or articles necessary for the practice of the administrative segregation offender's religion that does not violate the security of the prison;

c.    Photographs, letters, and approved publications which shall not contain sexually explicit images as defined in BP-03.91, "Uniform Offender Correspondence Rules;"

d.    Correspondence supplies, pursuant to AD-14.09, "Postage and Correspondence Supplies;"

e.    "Keep-on-person" medications, in accordance with the *Pharmacy Policy and Procedures Manual* Number 50-05 or any medically-required items;

f.    Health care devices and supplies prescribed for the offender by heath care staff;

g.    One (1) each of the following personal hygiene items: small comb or brush, soap, a pair of shower shoes, toothbrush, toothpaste or tooth powder, deodorant, and shampoo and conditioner;

h.    One (1) roll of toilet tissue;

i.    Two (2) pairs of TDCJ authorized or TDCJ issued shoes that are non-steel toe; and

j.    Necessities items:

Clothing and shower towels shall be furnished at shower time and exchanged on a one-for-one basis. The clothing exchange shall be offered even if the administrative segregation offender refuses to shower. Units allowing administrative segregation offenders to keep a shower towel in their possession are not required to issue a cell towel.

(1)    Daily change of socks and undergarments;

(2)    A shower towel and outer clothing, including pants and a shirt or coveralls, with sleeves for female offenders, provided at least three (3) times per week;

(3)    One (1) cell towel, two (2) sheets, and a pillowcase, if appropriate, once per week;

(4)    One (1) gown per week for female offenders;

(5)    Mattress and pillow, or a mattress/pillow combination; and

(6)    Seasonal items, such as thermals, jacket, and a blanket.

k.    Wristwatch and wedding ring in accordance with AD-03.72, "Offender Property;"

l.    Gender-related items, such as menstrual and douche items; and

m.    Small amount of cleaning supplies, as unit administration deems appropriate.

2.    Level I administrative segregation offenders shall be allowed to possess the following additional property:

a.    One (1) state-issued razor, allowed at the warden's discretion;

b.    Items approved for purchase through the commissary;

c.    General library books;

d.    In-cell art and craft (piddling) items in accordance with AD-14.59, "Offender Piddling and Craft Sales;" and

      e.      Gender-related items to include make-up, a slip, a girdle, hair accessories, perfume, stud earrings, a curling iron, hair rollers, and a hair dryer.

3.      Property Storage

Upon assignment to administrative segregation, the administrative segregation offender's property shall be inventoried on a PROP-05, Offender Property Inventory. Property, other than that which is allowed in administrative segregation, shall be confiscated in accordance with AD-03.72, "Offender Property." However, if an administrative segregation offender has several similar personal hygiene items, the administrative segregation offender shall receive them when requested on a one-for-one exchange, until the supply is exhausted. The exchange shall be documented on a PROP-03, Offender Intake Inventory, with copies maintained with the property and original documentation.

I.      SHOWERING

Administrative segregation offenders shall be provided the opportunity to take a shower seven (7) days per week. If the administrative segregation offender is recreating, the shower shall be offered after recreation is completed. Administrative segregation offenders are expected to wear clean clothes and adhere to grooming standards as outlined in AD-03.83, "Offenders Who Refuse To Comply With Grooming Standards." All administrative segregation offenders are authorized the following items for showering: soap, shampoo and conditioner, a towel, shower shoes, and a razor. . For Level II and III offenders, (Level I at the warden's discretion) correctional officers shall issue male administrative segregation offenders a disposable razor to be replaced every week, and female administrative segregation offenders a disposable razor to be replaced once a month. Razors shall be issued to administrative segregation offenders after entering the shower, and returned before exiting the shower. Correctional officers shall store the razor in such a manner as to ensure each administrative segregation offender receives his own razor.

J.      IN-CELL PROGRAMS

Administrative segregation offenders may have access to in-cell programs consistent with security requirements. Administrative segregation offenders are allowed materials available through the unit commissary. The warden or designee may, on a case-by-case basis, suspend an in-cell program when an administrative segregation offender has abused that privilege.

K.      IN-CELL CORRESPONDENCE COURSES

Administrative segregation offenders may participate in in-cell correspondence courses in accordance with AD-07.02, "Offender Participation in Educational Programs and Services."

L.      OTHER IN-CELL SERVICES

Administrative segregation offenders shall have access to counselors, chaplains, in addition to medical care in accordance with Correctional Managed Health Care policy.

V.    MANAGEMENT PROCEDURES

The following are guidelines related to the management of administrative segregation areas. A current copy of the *Administrative Segregation Plan,* its attachments, and any additional guidance relating to the operation of administrative segregation areas shall be placed in a notebook to be maintained in each administrative segregation area. All assigned administrative segregation correctional officers shall be charged with the responsibility of becoming thoroughly familiar with all procedures maintained in the unit administrative segregation procedures notebook. Each warden shall be responsible for ensuring these procedures are followed.

A.    STAFFING

1.    Administrative segregation areas shall be staffed as Priority 1 Positions in accordance with AD-11.52, "Security Staffing."

2.    To the extent possible, administrative segregation areas shall be staffed with experienced correctional officers. Generally, correctional officers shall be regularly assigned to the administrative segregation area and are not to be rotated to other unit posts on a daily basis; however, the warden has the discretion to reassign or rotate correctional officers within administrative segregation based on the needs of the unit. For example, a correctional officer supervising Level III administrative segregation offenders should be rotated frequently to supervise Level I administrative segregation offenders, because of the required intensity of supervising Level III administrative segregation offenders.

B.    HOUSING PRACTICES

1.    Each unit shall implement procedures to ensure the categories and levels of administrative segregation can be identified by the cell number or row. Administrative segregation offenders in Level I, Level II, and Level III shall be housed in separate physical locations, such as different rows, or with partitions between the different levels. If a separation of levels cannot be accomplished in this manner, every effort shall be made to maintain an empty cell between the levels. Where possible, offenders in the various categories, such as security detention, pre-hearing detention, protective custody, temporary detention, and levels of administrative segregation shall be housed in separate physical locations as defined above. If an administrative segregation offender is mishoused, a housing justification must be placed on the UC00 mainframe program, Screen 2, Option A, indicating the specific reasons the offender cannot be appropriately housed.

The rows or group of cells designated for certain categories and levels of administrative segregation offenders shall remain constant to the extent possible. Only under special circumstances, such as a lack of bed space for another category or level of administrative segregation, shall the designation of rows or cells change in the administrative segregation housing area.

2.    Administrative segregation offenders shall be single-celled.

3.  Administrative segregation offenders shall be assigned to housing areas that are specifically designated for their custody requirements. The housing recommendations of treatment professionals, as noted in each administrative segregation offender's Health Summary for Classification Form, shall be followed by classification committees, classification staff, and correctional officers.

4.  Administrative segregation offenders who pose an imminent threat to the physical safety of staff or other offenders by throwing or intending to cause any substance or item to come into contact with staff or offenders may be placed on management status, pursuant to AD-03.80, "Implementation of Offender Management Status."

C.  UNIT FILE – ADMINISTRATIVE SECTION

One (1) unit classification file shall be maintained on each administrative segregation offender to include administrative segregation records and all pertinent information. However, the administrative segregation section of the unit classification file may be maintained in the administrative segregation office so that it is accessible to staff for daily use. This section must be combined with the unit classification file whenever the administrative segregation offender is transferred to another unit of assignment or if released into general population. The administrative segregation security supervisor shall be responsible for ensuring each unit classification file contains the following information:

1.  Forms to be retained in each administrative segregation offender's unit classification file:

    a.  Section 5

        (1)  Administrative Segregation Initial Placement and Notification, I-169

        (2)  Administrative Segregation Initial Hearing Record, I-169A

        (3)  State Classification Committee (SCC) Administrative Segregation Review Hearing Record, I-189

        (4)  Segregation Confinement Record, I-201

        (5)  Placement on Restriction/Administrative Segregation Level Review, I-203

        (6)  Referral to Mental Health Services, I-214

    b.  Section 6 - Disciplinary Reports

2.  Administrative segregation records shall be chronologically maintained at the unit.

    a.  Daily Activity Log, I-216

    b.  Pre-Hearing Detention Log, I-188

    c.  Restriction Tracking Log, I-206, if used.

D.    OFFENDER MANAGEMENT RESTRICTIONS

Additional restriction procedures may be found in SM-01.29, "Offender Management Restrictions."

E.    CELL SEARCHES/INSPECTIONS

1.    All administrative segregation offender searches and cell searches shall be in accordance with AD-03.22, "Offender Searches" and SM-03.02, "Security Searches," respectively.

2.    Cell Search

a.    To ensure all administrative segregation housing cells receive a cell search at least once (1) per calendar month, the warden or designee on each unit shall designate a number of administrative segregation cells to be searched daily in accordance with SM-03.02, "Security Searches." The configuration of the unit and the custody of the offenders shall be considered.

b.    The Security Search Log, located in SM-03.02, "Security Searches," shall be maintained in a centralized area, such as the lieutenant's office, to track the searches of administrative segregation offender housing areas on the unit. The major or designee shall review the Security Search Logs to verify all administrative segregation offender housing areas were searched at least once (1) per calendar month.

c.    Each administrative segregation cell shall be thoroughly searched and cleaned prior to assigning an offender to an administrative segregation cell.

d.    An administrative segregation officer may be given authorization by a security supervisor to conduct a cell search of an offender's housing area if the administrative segregation officer believes a cell search is appropriate due to security reasons.

3.    Cell Inspection

a.    A cell inspection shall be conducted at least once (1) every 72 hours of every cell located in administrative segregation housing, which may be accomplished when the offender is removed from the cell to shower, recreate, or other similar activities. Cell inspections shall be documented on the I-201. If an offender refuses to leave the cell to recreate or shower, a security supervisor shall be notified.

b.    A cell search may be conducted in conjunction with a cell inspection if the correctional officer assigned to the administrative segregation housing area determines a more thorough search is needed.

4. Comprehensive Searches

    a. In accordance with SM-03.01, "Comprehensive Unit Searches," administrative segregation housing areas shall be locked down for a comprehensive unit search at least four times per calendar year.

    b. If a comprehensive search is conducted in accordance with SM-03.01, Comprehensive Searches," in an administrative segregation housing area, this search may replace the cell search for the particular month in which it was conducted.

5. Administrative segregation offenders shall also be observed on a daily basis for healthy and adaptive behavior. The general areas to observe are house cleaning, personal hygiene, and social behavior. Through daily contact, cell inspections, and cell searches, correctional officers shall note any inappropriate behavior on the I-216 and I-201. Correctional officers shall observe the following specific areas:

    a. Bunk: shall be used for intended purpose and free of clutter;

    b. Floor: shall be clean and free of trash;

    c. Property: offender's property shall be stored in the storage space provided and in accordance with AD-03.72, "Offender Property;"

    d. Cell front: shall be uncovered and unobstructed;

    e. Toilet: the face bowl and toilet shall be kept clean and the toilet shall be flushed;

    f. Necessities: shall be neither altered nor soiled;

    g. Walls and windows: shall be uncovered, clean, and shall not have anything posted on them; and

    h. The overall structural integrity of the cell.

6. Following guidance provided in PO-07.006, "Administrative Segregation Officer," correctional officers shall submit a Referral to Mental Health Services, I-214, form to Mental Health Services on any administrative segregation offender exhibiting extreme or unusual behavior. The I-214 shall be used for *non-emergency* referrals only. For emergencies, staff shall contact a security supervisor and the Mental Health or Medical Department immediately by telephone or in person. Referrals to Mental Health shall also be noted on the I-201.

F. SECURITY DURING VISITATION

1. Security cubicles shall be used in unit visitation rooms for administrative segregation offenders.

2. Every precaution shall be taken to ensure the combinations of offenders receiving visits are compatible. Known enemies shall not be allowed to have visits simultaneously.

3. Administrative segregation offenders shall be escorted and restrained in accordance with provisions established in PO-07.006, "Administrative Segregation Officer."

4. Each administrative segregation offender shall be strip searched prior to exiting the cell for a visit, and prior to being returned to the cell from a visit.

5. Guidelines for correctional officers assigned to the visitation room:

   a. Administrative segregation offenders shall be placed into the security cubicle and a minimum of one (1) seat shall be left empty between each security cubicle.

   b. Correctional officers shall be present in the visitation room when administrative segregation offenders are present.

6. Only one (1) administrative segregation offender at a time shall be removed from the security cubicle and taken to the designated search area. This shall be done only after the escorting correctional officers are present.

7. The designated search area and the visitation room shall be searched prior to and after the completion of a visit.

8. Prior to each use, each security cubicle shall be thoroughly searched, and shall be thoroughly searched at the completion of the visit.

9. Restraints shall be removed from an administrative segregation offender once the administrative segregation offender is placed in the security cubicle. Restraints shall be placed on the administrative segregation offender in the security cubicle prior to leaving the visitation area.

10. Units with visitation rooms outside of the main building shall continue to use the inside visitation area for administrative segregation offenders, if available. These areas shall be modified to ensure each administrative segregation offender is contained in a closed area and separated from other offenders.

G. GENERAL LIBRARY

Each unit shall provide Level I administrative segregation offenders access to general library books. Administrative segregation offenders shall not be allowed to go to the unit's general library. Library books shall be delivered by staff.

H. LAW LIBRARY

An administrative segregation offender's access to law library books is governed by procedures established in BP-03.81, "Offender Access To The Courts, Counsel, and Public Official Rules." Law library books shall be delivered by staff.

I.    PAROLE INTERVIEWS

Administrative segregation offenders shall be afforded an opportunity for interviews with members of the Board of Pardons and Paroles (BPP).  The warden shall take steps to ensure necessary security precautions are taken to protect BPP members. The warden may deny the right to an interview or may terminate an interview if there is an immediate and legitimate threat to institutional security, but only for so long as the threat exists and only if no lesser action would alleviate the threat.

J.    SECURITY MEASURES

Each warden shall take all necessary steps to ensure the physical safety and security of offenders and staff in each administrative segregation area is maximized.

1.    All individuals shall present an identification (ID) card and be identified prior to entering or exiting an administrative segregation housing area.

   a.    When entering an expansion cellblock facility or a 2250-12 building, a sign-in log, specifically, Visitor's Log, shall be used.  Each individual shall complete the required entry on the sign-in log.

   b.    The administrative segregation officer shall ensure the names of all individuals not assigned to the administrative segregation housing area are recorded on the I-216.

   c.    The administrative segregation officer shall document the required information for offenders.

2.    All non-uniformed staff, contract employees, unit visitors, and volunteers shall be accompanied by a correctional officer at all times while in an administrative segregation housing area.

3.    Written special orders specific to offender movement within each administrative segregation housing area on each unit shall be attached to the unit post orders.  The procedures outlined in these post orders and special orders shall be followed at all times.

4.    Each administration segregation housing area shall be equipped with the necessary construction modifications, such as security screening and food tray slots.

5.    Any offender worker entering or departing the administrative segregation housing area shall be strip searched.  While within the administrative segregation area, offender workers shall be kept under direct supervision at all times.

K.    WEEKLY INSPECTIONS

The warden or duty warden shall conduct weekly inspections of the administrative segregation areas, activities, including housing and shall be responsible for initiating any appropriate corrective actions.

**VI.   RECOMMENDATIONS FOR RELEASE**

    A.    SECURITY THREAT GROUP OFFENDERS

    The release of STG offenders from administrative segregation shall be in accordance with the *Security Threat Group Plan.*

    B.    GENERAL PROCEDURES

    1.    The ASC may make recommendations to the SCC for removal of an administrative segregation offender from administrative segregation who is between routine SCC reviews.

    2.    When considering the release of an administrative segregation offender to the general population, the SCC shall base the decision on whether the offender would still be:

        a.    A current escape risk;

        b.    A physical threat to staff or other offenders;

        c.    A threat to the order and security of the prison as evidenced by repeated, serious disciplinary violations; or

        d.    If in protective custody, the offender still requires protection due to the threat of harm by other offenders.

    3.    In assessing the above criteria, the SCC shall consider the following factors relating to the offender's behavior while in administrative segregation:

        a.    Any disciplinary violations, including the seriousness and frequency of the violations;

        b.    Medical evaluations;

        c.    Relationships with other offenders and staff;

        d.    Participation in programs in which the offender is entitled to participate; and

        e.    The offender's expressed desire to remain in, or stated readiness to be released from administrative segregation.

    4.    If the offender is released from administrative segregation by the SCC, the SCC shall determine the offender's custody designation.

    C.    YOUTHFUL OFFENDERS

    Youthful offenders housed in administrative segregation shall be reviewed in accordance with the *Classification Plan* by the SCC to determine if the offender shall remain in administrative segregation. The YOP director or designee shall be present at the review.

VII.   APPEAL PROCESS

A.   Administrative segregation offenders shall have the right to appeal the decisions of the ASC and the SCC as outlined in the Offender Grievance Procedures.

B.   A warden may challenge an SCC decision by making an appeal to the DRB. The offender's status shall remain unchanged until the DRB hears the appeal and renders a decision.

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
### Administrative Segregation Reference Chart

| | Level | Classification Boundaries | Conditions |
|---|---|---|---|
| **SECURITY DETENTION** | I | Offenders in security detention shall be subject to the following classification boundaries:<br><br>(a) Ineligible for promotion above the time-earning class of SAT IV;<br>(b) Ineligible for contact visits; however, may have one (1) non-contact visit each week;<br>(c) Ineligible for an emergency absence;<br>(d) Ineligible for job assignment or for participation in educational programs;<br>(e) Requires constant armed supervision outside the security perimeter, and requires escort to and from activities outside the offender's assigned cell; and<br>(f) Must be housed in a single cell specifically designated for housing security detention offenders. | (a) Out-of-cell recreation, scheduled at warden's discretion:<br>→ One hour 7 days a week; or<br>→ Two hours 5 days a week.<br>(b) Meals – regular food tray.<br>(c) Commissary – allowed $70 every 2 weeks. Allowed special purchase items.<br>(d) Property – basic list items; plus additional items generally available to GP.<br>(e) Provided opportunity to shower 7 days a week.<br>(f) May have access to in-cell programs that are consistent with security requirements. Allowed materials available through the commissary and in-cell correspondence course materials, if approved.<br>(g) Shall have access to counselors, chaplains, and medical care.<br>(h) Eligible for in-cell arts and craft (piddling). |
| | II | Same as Level I – security detention, except for:<br><br>(b) Ineligible for contact visits; however, may have two (2) non-contact visits each month. | (a) Out-of-cell recreation –<br>→ One hour 5 days a week.<br>(b) Meals – regular food tray.<br>(c) Commissary – allowed one each of personal hygiene items and a maximum of $10 in correspondence supplies every 2 weeks.<br>(d) Property – basic list items; plus approved personal hygiene items.<br>(e) Eligible for in-cell correspondence course materials, if approved. |
| | III | Same as Level I – security detention, except for:<br><br>(b) Ineligible for contact visits; however, may have one (1) non-contact visit each month. | (a) Out-of-cell recreation –<br>→ One hour 5 days a week.<br>(b) Meals – regular food tray.<br>(c) Commissary – allowed one each of personal hygiene items and a maximum of $10 in correspondence supplies every 2 weeks.<br>(d) Property – basic list items; plus approved personal hygiene items. |
| **PROTECTIVE CUSTODY** | I | Offenders in Protective Custody shall be subject to the following classification boundaries:<br><br>(a) Ineligible for promotion about the time-earning class of SAT III;<br>(b) Eligible for contact visits, may have up to three (3) contact visits each month;<br>(c) Ineligible for an emergency absence;<br>(d) Ineligible for a job assignment or for participation in educational programs;<br>(e) Requires constant armed supervision outside the security perimeter, and requires escort to and from activities outside the offender's assigned cell; and<br>(f) Must be housed in a single cell specifically designated for housing Protective Custody offenders. | (a) Allowed to group recreate.<br>(b) Able to view television programs.<br>(c) Meals – regular food tray.<br>(d) No difference on commissary spend from G1, G2, or G3.<br>(e) No difference on property from G1, G2, or G3.<br>(f) The determination of need for restraints shall normally be made by the warden or designee or ASC that authorizes initial placement into administrative segregation and reviewed by an ASC during subsequent reviews. This use of restraints shall be considered routine and shall not constitute a Use of Force unless the offender resists the placement of restrains.<br>(g) Provided opportunity to shower 7 days a week.<br>(h) May have access to in-cell programs that are consistent with security requirements. Allowed materials available through the commissary and in-cell correspondence course materials, if approved.<br>(i) Shall have access to counselors, chaplains, and to medical care. |
| | II | Same as Level I – Protective Custody, except for:<br><br>(b) Ineligible for contact visits; however, may have two (2) non-contact visits each month. | (a) Out-of-cell recreation –<br>→ One hour 5 days a week.<br>(b) Meals – regular food tray.<br>(c) Commissary – allowed one each of personal hygiene items and a maximum of $10 in correspondence supplies every 2 weeks.<br>(d) Property – basic list of items; plus approved personal hygiene items.<br>(e) Eligible for in-cell correspondence course materials, if approved. |
| | III | Same as Level I – Protective Custody, except for:<br><br>(b) Ineligible for contact visits; however, may have one (1) non-contact visit each month. | (a) Out-of-cell recreation –<br>→ One hour 5 days a week.<br>(b) Meals – regular food tray.<br>(c) Commissary – allowed one each of personal hygiene items and a maximum of $10 in correspondence supplies every 2 weeks.<br>(d) Property – basic list of items plus approved personal hygiene items. |

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE

## Correctional Institutions Division



# DEATH ROW PLAN

## October 2004

## *ADOPTION OF DEATH ROW PLAN*

In my duties as Division Director of the Correctional Institutions Division, I hereby adopt the attached *Death Row Plan* for use in the operation of the Texas Department of Criminal Justice Death Row housing units and perimeter functions.  This *Plan* is in compliance with Texas Board of Criminal Justice Rule §152.51; §§492.013(a), 493.004, Texas Government Code, and Article 43.14 – 43.20, Code of Criminal Procedure.


Doug Dretke
Director, Correctional Institutions Division

*DEATH ROW PLAN*
TABLE OF CONTENTS

DEFINITIONS.................................................................................................1
    I.     Death Row Segregation ........................................................1
    II.    Death Row Work Capable .....................................................1
    III.   Death Row Classification Committee.......................................1

PROCEDURES.............................................................................................1
    I.     Classification Process .........................................................1
         A.    Intake and Orientation for Newly Received Death Row Offenders ......1
         B.    DRCC Review .........................................................3
         C.    Admission Summary..................................................4
         D.    Work Capable Review ...............................................4
         E.    Death Row Segregation .............................................6
         F.    Subsequent Reviews .................................................7
         G.   Removal or Temporary Transfer of a Death Row Offender
             From Work Capable Status..........................................8
         H.    Record Keeping ......................................................10
         I.    Appeal Process.......................................................10

    II.    General Provisions ..............................................................10
         A.    Visiting...................................................................10
         B.    Access to General Library ...........................................13
         C.    Access to Law Library.................................................13
         D.    In-Cell Programs.......................................................13
         E.    Security Measures .....................................................13

    III.   Management of Death Row Work Capable ...................................14
         A.    Confinement Procedures..............................................14
         B.    Recreation ..............................................................14
         C.    Visitation................................................................14
         D.    Meals:  Work Capable Feeding Procedures.........................14
         E.    Commissary .............................................................14
         F.    Property.................................................................15
         G.    Showering ...............................................................15
         H.    Correspondence........................................................15
         I.    Escort Procedures for Work Capable Offenders.....................15
         J.    Work ....................................................................15
         K.    Religious Services......................................................15

    IV.   Management of Death Row Segregation .....................................15
         A.    Confinement Procedures..............................................15
         B.    Special Conditions/Restrictions.....................................16
         C.    Recreation Schedule..................................................17
         D.    Visitation................................................................18

E.    Meals.................................................................................18
F.    Commissary ......................................................................18
G.    Property.............................................................................19
H.    Showering .........................................................................20
I.    Correspondence.................................................................21
J.    Management Procedures ...................................................21

## *DEATH ROW PLAN*

The purpose of the *Death Row Plan* is to provide uniform rules and regulations in managing Death-Sentenced offenders. Although the terms "his" or "he" are used throughout the *Death Row Plan*, the contents refer to male and female Death Row offenders, except where specifically limited (i.e., due to facility structural differences).

## DEFINITIONS

I.    Death Row Segregation - A death-sentenced offender who refuses to or is not allowed to work. Death Row Segregation offenders may be assigned to Levels I, II, or III. Offenders assigned to Levels II or III require more intensive supervision due to poor institutional behavior.

II.   Death Row Work Capable - A death-sentenced offender assigned to and required to work at a meaningful prison job, if available.

III.  Death Row Classification Committee (DRCC) – The Warden shall be responsible for appointing the members of the DRCC which shall be comprised of the following staff:

    A.   Warden or designee (Captain or above),

    B.   Lieutenant or above,

    C.   Security representative (Sergeant or Correctional Officers assigned to Death Row area, and

    D.   Representative from the Health Services Division (medical or psychiatric) shall be used as a member of the committee who would function in a consulting capacity for issues impacting the physical and mental well being of the offender. The representative will be a voting member along with the other members of the committee.

## PROCEDURES:

The classification process for death-sentenced offenders shall be governed by the following:

## I.   CLASSIFICATION PROCESS

    A.   Intake and Orientation for Newly Received Death Row Offenders

        1.   Initial Intake at Byrd/Woodman Units

            a.   Offender arrives from county.

            b.   Byrd/Woodman staff completes:

                (1)   Offender photographs (a set shall be sent to the housing unit)

(2) Offender Identification Card (not sent to housing unit until 2 – 4 weeks later)

(3) Fingerprints (2 sets) for the Correctional Institutions (CI) Division, FBI, and DPS (original is faxed to DPS and maintained by ID Classification). If the offender was not born in the U.S., a third set of fingerprints is made for the Immigration and Naturalization Service (INS).

(4) Cursory review of offender property for dangerous contraband

(5) Form CO2.1 – Biography and Information Sheet

(6) Offender Consolidated Report Form, Residence and Family Page

(5) Short information sheet containing:

    (a) Full name;

    (b) Date received;

    (c) Death Row number;

    (d) County of conviction;

    (e) Cause Number;

    (f) Date of birth; and

    (g) Race.

c. The offender is then transported to the unit of assignment.

2. Intake and Orientation at Unit of Assignment

a. Housing Unit receives offender, offender property and sealed envelope with initial intake and orientation information as well as photographs.

b. Death Row supervisors conduct an interview with the offender and complete several forms and information sheets (information is self-reported by the offender).

(1) Basic Unit Orientation (rules, property, commissary and other daily activities)

    (a) I-60 process explained

    (b) Contact with supervisors explained

    (c) Medical access explained

    (d) Law Library access (Access to Courts) explained

    (e) Recreation explained

    (f) Custody Levels and review process explained

    (g) Visiting List explained and blank form given to offender to complete

    (h) Forms for above processes given to offender as well as:

(i) *Offender Orientation Handbook*
(ii) *Disciplinary Rulebook*
(iii) *Legal-3*
(iv) *Physical Fitness: An In-Cell Exercise Program*
(v) Copy of Offender Property Policy (AD-03.72, "Offender Property")

(2) Offender strip-searched and issued jumpsuit
(3) Tattoos (photos taken of each and list made)
(4) Property receipt and registration completed
(5) Keep-on-person (KOP) medications brought from county taken from offender for review by medical staff (may be reissued back as KOP)
(6) Check from county signed, thumbprinted, and deposit slip completed
(7) Information sheet completed (self-reported)

(a) Criminal history
(b) Escape history
(c) Summary of current offense (offender's version – include information pertaining to drugs, alcohol, or sex-related incidents if involved in offense);
(d) Scars (list and photograph as necessary)
(e) STG affiliation
(f) Known enemies
(g) Fall partners
(h) Schools
(i) Occupations
(j) Family and friends incarcerated
(k) Others incarcerated they intend to correspond with
(l) Current attorney (name, address, phone number)
(m) New attorney for appeal (if applicable)
(n) Religious preference

(8) Offender escorted to medical and psychiatric evaluation (KOP medications given to medical staff).

B. DRCC Review

Newly received Death Row offenders shall be reviewed by the DRCC within 48 hours of arrival for their initial leveling. New arrivals shall generally be classified as Level I.

C.      Admission Summary

The Sociology Department shall complete an Admission Summary that will be used to create the Travel Card.

D.      Work Capable Review

The Work Capable program for male offenders is suspended pending further decision by the Texas Board of Criminal Justice. The female Work Capable program is functional. Therefore, the review procedures apply only to female offenders at this time.

A Death-sentenced offender shall undergo a ninety (90) day diagnostic process. The offender shall be reviewed by the DRCC for Work Capable status as indicated below.

1.      When assigning offenders to Work Capable, it is the policy of the TDCJ-ID to assign offenders to a meaningful prison job when available.

2.      Work Capable Criteria

When reviewing an offender for Work Capable status, the committee shall consider the following:

a.      History of serious destruction of State property;

b.      History of Security Precaution Designator (escape [ES], staff assault [SA], hostage [HS]);

c.      History of prior convictions involving assaultive behavior;

d.      History of Security Threat Group (STG) affiliation or involvement;

e.      History of offender misconduct resulting in the application of serious institutional disciplinary proceedings, as follows:

i.      Assaults on staff or offenders;

ii.     Possession of deadly or dangerous weapons;

iii.    Involvement in smuggling or trafficking in contraband;

iv.     Inciting or participating in a disturbance of a violent disruptive nature; or

          v.       Committing major disciplinary infractions or multiple minor disciplinary infractions.

    f.      History of below average performance in work;

    g.      History of medical (which would limit ability to work) or psychiatric conditions;

    h.      Presence within the unit of personal enemies or possibility of retaliation (e.g., former police officer or hate crime perpetrator);

    i.      Incapable of or refusal to work in available prison jobs;

    j.      Not psychologically cleared by unit Psychiatric Team; and

    k.      Refusal to participate during classification process.

Offenders assigned to Level II and Level III will be ineligible for Work Capable status.

3.      Offender Appearance at DRCC

The offender shall be given an opportunity to appear before the DRCC and be provided with a written record of the reasons for the committee decision upon conclusion of the review. An offender who is present at the DRCC shall be verbally advised of the committee's recommendation to the SCC. An offender who refuses to attend committee proceedings shall automatically be denied Work Capable status and shall be notified in writing by use of the I-204 (Management Level Review/Determination) form.

4.      Appeal of DRCC Decision

The offender may appeal the decision of the DRCC through the Offender Grievance procedures.

5.      Scheduling and Documentation of Hearing

    a.      A Death Row Segregation offender shall appear before the Death Row Classification Committee no less than six (6) months and not more than one (1) year after completing the intake process. The DRCC shall use the same time frames for subsequent Work Capable reviews.

    b.      Offenders shall be notified no less than 24-hours prior to a DRCC review for Work Capable status.

    c.    Each unit should utilize the Countroom Management System (R050 program) to issue a lay-in. These will be printed by the unit countroom and issued to offenders by segregation security staff.

    d.    All decisions by the DRCC shall be noted on the docket with the next scheduled review entered in the UC00 program screen 01, option A. A review code of "09" Death Row Review will be used for Work Capable status reviews.

6.    Review of DRCC Recommendation by SCC

    a.    Assignment of a Death Row offender to Work Capable status requires both a recommendation by the DRCC and an approval of the DRCC decision by the State Classification Committee (SCC).

    b.    Following a DRCC review of a Death Row offender for Work Capable status, the DRCC will submit a recommendation to the SCC for each Death Row offender recommended for Work Capable status. Recommendations concerning Work Capable status may be forwarded to the SCC by electronic mail (e-mail). The recommendation shall include the offender's name, TDCJ #, current unit of assignment, current custody status, date of DRCC review, appropriate reasoning for the DRCC recommendation and the name of the DRCC chairperson.

    c.    The SCC shall review the recommendation and notify the DRCC or Unit Administration by E-mail of the approval or denial for Work Capable status of each Death Row offender submitted by the DRCC.

7.    Death Row offenders shall not be assigned to Work Capable status (i.e., they will remain in Death Row Segregation status) until approval for Work Capable status is received from the SCC.

8.    Once a Death Row offender has been assigned to Work Capable status, housing and job assignments shall be made by a Death Row Supervisor based on the DRCC's decision. The offender shall then be required to work. Should a job assignment not be available, the offender's name shall be placed on a waiting list.

E.    Death Row Segregation

1.    Level I - Offenders assigned to Level I shall be reviewed for Work Capable status no less than six (6) months and not more than one (1) year after completing the initial intake process or no less than six (6) months

and not more than one (1) year from their last Work Capable status review.

2.      Level II – Within 90 days of the initial hearing, the offenders assigned to Level II status shall be reviewed by the DRCC. If a Level II offender has had a clear disciplinary record for the 90-day period he shall be promoted to Level I status. Subsequent review hearings shall be held within 90 days of the previous DRCC hearing. These 90-day hearings shall be documented on the I-204 form.

3.      Level III – Within 30 days of the initial hearing, the offenders assigned to Level III status shall be reviewed and promoted to Level II status by the DRCC provided the offender has not had any major disciplinary infractions. If the offender remains in Level III status after any 30-day hearing due to a major disciplinary infraction, written justification shall be required and included on the I-204 form. Subsequent review hearings shall be held within 30 days of the previous DRCC hearing. These 30-day hearings shall be documented on the I-204 form.

F.      Subsequent Reviews

1.      The following Death Row offenders may be reconsidered every six (6) months for Work Capable if no security concerns exist which would preclude the offender from participating:

a.      Death Row Segregation offenders who refuse or elect not to participate in the Work Capable program during the Death Row classification process and

b.      Offenders denied participation not based on Work Capable eligibility criteria (e.g., participates in program, withdraws from program, and wants back in two months later).

2.      The Warden or designee shall be responsible for scheduling systematic reviews by the DRCC of offenders assigned to Death Row Segregation to include:

a.      30/90 day unit reviews for possible change in level designation
b.      Paper gown/paper mask restriction
c.      Property restriction
d.      Food loaf restriction
e.      Work Capable Reviews

3.      The offender need not be present at the 30/90 day review hearings unless it is deemed appropriate by the DRCC. If the offender is on any type of restriction (i.e., property restriction, paper gown restriction, paper mask

restriction, or food loaf restriction) the DRCC shall also review the offender for continuation or removal of these restrictions. Offenders will be notified in writing of DRCC decisions by use of the I-204 (Management Level Review/Determination form). Offenders assigned to Level II or Level III will be ineligible for Work Capable status.

## DRCC REVIEW CODES

01   Assignment to Unit
09   Death Row Review (Work Capable Status)
10   Death Row Custody Change/No Committee Action
21   30-day Review
23   90-day Review
28   Administrative Segregation Restriction

G.   Removal or Temporary Transfer of a Death Row Offender from Work Capable Status.

Death Row Work Capable offenders shall not be transferred, as a matter of routine, to Death Row segregation status for isolated, minor offenses due to the policy of TDCJ to process these infractions without the offender's removal. The transfer to Death Row Segregation may occur due to specific security concerns or as a result of a conviction of a disciplinary infraction.

1.   The removal of an offender from Work Capable status shall be accomplished through the unit classification process. In determining whether to remove a Death Row offender from Work Capable status the DRCC shall review the characteristics for Work Capable and any other additional and relevant factors.

2.   The DRCC shall conduct a review within five (5) working days of the events requiring that committee's attention.

3.   Upon receipt of official notification that an offender classified Work Capable has received an execution date, he shall be scheduled for the DRCC to review his status within 24-hours. A Work Capable offender shall be given an opportunity to remain on the Work Program if security concerns are not apparent or the offender does not request his removal. An offender who remains Work Capable shall automatically be moved to Death Row Segregation thirty (30) days prior to his scheduled execution date. A Death Row offender shall be reviewed by the DRCC upon official notification of a stay of execution, or if the State is seeking vacatur of a stay or upon final denial of the State's motion to vacate. Official notification of a stay must be received from the CI Division_Director's Office, Warden's Office, Classification and Records Office in Huntsville,

*Death Row Plan*                            8                            *October 2004*

Huntsville, or the Attorney General's Office.  ** *Staff must not accept a stay of execution from the offender's attorney.*

4.   Offender Request:  An offender may request to be removed from the Work Capable program.  If requested, the offender shall be placed in segregation status and scheduled for review by the DRCC within five (5) working days.

5.   An offender's refusal to participate in the classification process shall automatically result in reclassification to Death Row Segregation.

6.   The DRCC shall notify the SCC concerning each offender removed from the Work Capable program.  Such notice shall include the date and the reason the DRCC removed the Work Capable status.

7.   The transfer of a Death Row Work Capable offender to Death Row Segregation Housing may be made for disciplinary or security reasons by the Warden or designee, pending review by the DRCC within five (5) days, for the following reasons:

a.   The offender is a current escape risk.

b.   The offender's presence in the Work Capable population would create a threat to the physical safety of other offenders or staff.

c.   It is necessary to maintain the integrity of an investigation, i.e., to preserve the integrity of information either in the offender' possession or another offender's possession.

d.   Offenders charged with a Level I, II, or III offense shall be brought before the Disciplinary Hearing Officer (DHO), as appropriate, within the applicable time frames set forth in TDCJ disciplinary procedures.

   i.   If found guilty by the DHO, the offender shall have his Work Capable status reviewed by the DRCC within five (5) working days of the disciplinary hearing.

   ii.   A finding of "not guilty" may result in the offender's reassignment to Work Capable housing unless other factors, excluding disciplinary reasons, prevent the DRCC from returning the offender to Death Row Work Capable status.

H.   Record Keeping

    1.   One (1) unit file shall be maintained on each Death Row offender to include Work Capable/Segregation records and all pertinent information. The Death Row Supervisor shall be responsible for ensuring that each file contains the following information:

        a.   I-203/I-204 forms
        b.   Disciplinary reports (major and minor)

    2.   The offender shall be reviewed by the DRCC and be provided with a written record of the reason for the committee's decision upon conclusion of the committee.

I.   Appeal Process

The offender shall have the right to appeal the decisions of the DRCC as outlined in the *Offender Grievance Procedures*.

In the event that the Warden wishes to appeal a decision made by the DRCC or SCC, the appeal shall be made to the Departmental Review Board (DRB).

## II.   **GENERAL PROVISIONS**

A.   Visiting: Security cubicles shall be utilized in the unit visiting room for Death Row Segregation offenders. Death Row Work Capable offenders shall be allowed to utilize the General Population non-contact visitation area. Death Row offenders are not allowed contact visits. Visitation shall be held in conformance with the rules established by the *TDCJ Offender Visitation Plan*.

    1.   Number of Visits

Death Row offenders are allowed visits based on the schedule below. Generally, visits shall be two (2) hours in length (except where noted in the *Visitation Plan*). Special security procedures may be utilized during visitation periods to ensure the safety and security of all offenders, offender visitors, staff and the security of the institution.

| Custody Level | # of General Visits Allowed |
|---|---|
| Work Capable & Level I | 1 per week |
| Level II | 2 per month |
| Level III | 1 per month |

2.    Visiting Hours

Visitation shall be held on the following days (except on State-approved holidays):

| Mountain View | Polunsky |
|---|---|
| Monday (8 - 5) | Monday (8 – 5) |
| Tuesday (8 – 12) | Tuesday (8 – 5) |
| Wednesday (8 – 5) | Wednesday (8 – 12) |
| Thursday (8 – 5) | Thursday (8 – 5) |
| Friday (8 – 5) | Friday (8 – 5) |
| Saturday (5:30 – 9:30) | Saturday (5:30 – 10:00) |

Death Row Visitation may be held by appointment during high-traffic times or due to physical configuration of the unit Visitation Room. Scheduling will only be used to ensure the minimum amount of waiting time for visitors and most efficient use of Visitation Room facilities. Visitation at the Mountain View Unit shall be scheduled with the Warden's office in advance for all visits. Visitation at the Polunsky Unit shall be held on a first-come, first-serve basis, except for Saturday evenings, which will be scheduled by appointment.

Any time a State-approved holiday falls on a weekday, Death Row visitation will not be conducted. However, any time a State-approved holiday falls on a Saturday, Death Row visitation will be conducted.

3.    Media

Press interviews of condemned prisoners shall be scheduled by the Public Information Office and conducted at the Polunsky Unit each Wednesday between the hours of 1:00 – 3:00 p.m. and on the Mountain View Unit on each Tuesday between the hours of 1:00 – 3:00 p.m.

4.    Death Row Ministerial/Spiritual Advisor Visitation Guidelines

a.    Outside ministerial/spiritual advisor visits are permitted on a case-by-case basis at the discretion of the Warden or designee. Permission for visits with spiritual advisors who are not listed on the offender's approved Visitors List may be obtained from the Warden. Spiritual advisors must satisfactorily identify themselves as such in order to obtain permission to visit.

i.    Each Death Row offender may not have more than one (1) outside ministerial/spiritual advisor visit per week, until thirty (30) days before the offender's execution date.

(a)    Special exceptions regarding spiritual advisor visitation shall be extended to Death Row offenders who are within thirty (30) days of their execution date.

(b)    Death Row offenders may visit with their spiritual advisors at a prearranged time, for two (2) hours, on a regular Death Row visiting day.

(c)    A Death Row offender may have a spiritual advisor visit and a regular visit on the same day. However, the spiritual advisor may not have a special visit and a regular visit with the same offender on the same day.

(d)    A spiritual advisor visit shall not count against a Death Row offender's regular visits.

ii.    Designating the Spiritual Advisor

(a)    Each Death Row offender may designate in writing one (1) outside spiritual advisor for witnessing purposes.

(b)    The designated spiritual advisor may be changed at the request of the Death Row offender, if adequate prior notice is given.

(c)    Spiritual advisors must satisfactorily identify themselves as such in order to obtain permission to visit (i.e., religious credentials such as ordination papers).

b.    In responding to requests for such visits, priority shall be given to offenders who have not recently had outside ministerial/spiritual advisor visits, and to their spiritual advisors who must travel great distances in order to visit.

i.    Spiritual advisors requesting visits must contact the Mountain View Unit or Polunsky Unit Offender Records weekdays between 8:00 a.m. and 5:00 p.m. by calling (254) 865-7226 (Mountain View) or (936) 967-8082 (Polunsky), to schedule the visit.

ii.    No more than three (3) outside spiritual advisor visits on Death Row shall be scheduled on any single visiting day.

     iii.  Visitation shall depend upon availability of time, space and staff.

B. Access to General Library: Each unit shall develop procedures to provide Death Row offenders access to general library books. The rules and procedures for Death Row offenders' access to general library books should closely resemble the unit's procedures for general population offenders' access to library books. Death Row Offenders shall not be allowed to go to the unit's general library (i.e., library books shall be delivered to offenders on Death Row).

C. Access to Law Library: A Death Row offender's access to law library books is governed by procedures established in the *Access to Courts Rules* and the *Access to Courts Procedures Manual.*

D. In-Cell Programs

Death Row Work Capable and Segregation Level I offenders may have access to in-cell programs that are consistent with security requirements. Only supplies available through the commissary may be used by male Death Row Offenders. Items available may be limited by the Warden if abused by an offender and property may be limited by the disciplinary process. These programs may be in the area of education as well as arts and crafts pursuant to AD-14.59 "Offender Piddling and Crafts Sales" with the exception of in-cell art programs. The Warden, Assistant Warden or designee may, on a case-by-case basis, suspend an in-cell program when an offender has abused that privilege. Offenders assigned to Level II or Level III are ineligible for In-Cell Programs.

E. Security Measures

Death Row security procedures shall be handled in accordance with the appropriate post orders.

1. Prior to and after each use, the shower areas, dayrooms, inside recreational areas and outside recreation areas are to be thoroughly searched.

2. Offenders shall be thoroughly strip-searched before and after recreation or leaving or returning to the assigned cellblock.

3. Frequent, thorough searches of cells, cell runs, shower areas and other locations within the housing area shall be conducted. Each cell shall be thoroughly searched prior to assigning an offender to the cell.

4. Support service inmates (SSIs) assigned to Death Row shall be strip-searched each time they enter or leave the Death Row area. While in the Death Row area, SSIs are to be kept under constant, direct supervision.

5.   At any time that a problem develops with a particular offender in Death Row, the Death Row supervisor shall ensure that the problem is identified and addressed as soon as possible. Unresolved problems are not to be left to escalate into larger problems.

## III.   MANAGEMENT OF DEATH ROW WORK CAPABLE

A.   Confinement Procedures

TDCJ-ID shall single cell all Work Capable Death Row offenders.

B.   Recreation

Each Death Row Work Capable offender shall be allowed two (2) hours of recreation per day (either dayroom or recreation yard) with at least two (2) days outside, weather permitting. Four (4) offenders may exercise at one time in the dayroom, which shall be equipped with a table for tabletop games as well as a television. Therefore, an offender may have the option to forgo outside recreation and choose dayroom recreation. Female offenders may recreate in groups of four (4) outside as well.

C.   Visitation

Visitation hours for Work Capable offenders shall be scheduled according to the *TDCJ Offender Visitation Plan*. Each Work Capable offender shall be allowed one (1) two (2) hour visit per week. Ministerial/Spiritual Advisor visits shall be conducted according to AD-07.30, "Procedures for Religious Programming," the *TDCJ Offender Visitation Plan*, and the *Death Row Plan*.

D.   Meals: Work Capable Feeding Procedures

Work Capable offenders shall receive the same food tray as general population and Level I Death Row Segregation offenders. Work Capable offenders shall eat their meals in their cells or at their work site, as the Warden or designee deem appropriate.

E.   Commissary

1.   Work Capable offenders have the same access to commissary items as minimum custody general population offenders.

2.   Work Capable offenders shall have their purchases delivered to their cells.

F.    Property

Work Capable offenders are required to maintain their property as outlined in AD-03.72, "Offender Property."

G.    Showering

Offenders in Death Row Work Capable shall be provided the opportunity to take a shower seven (7) days per week. Death Row Work Capable offenders will be furnished and are expected to wear clean clothes as outlined in AD-09.26, "Allocation of Necessities." They must also adhere to grooming standards as outlined in AD-03.83, "TDCJ Offenders Who Refuse to Comply With Grooming Standards." Items allowed during showering are the same as general population offenders.

H.    Correspondence

Death Row Work Capable offenders shall be provided with writing instruments, stationery and postage either from their Inmate Trust Fund account or through the provisions for Indigent Supplies.

I.    Escort Procedures for Work Capable Offenders

Within the building, Work Capable offenders are normally escorted unrestrained by one (1) officer. Outside of the building, the offender shall be handcuffed and escorted by two (2) officers. In the housing area, Work Capable offenders shall be allowed to walk unescorted to recreate and shower. During necessity turnout, all riot gates shall be shut to prevent unauthorized movement in the hallway or contact with general population SSI offenders.

J.    Work

Female offenders shall be employed doing special projects, to include sewing.

K.    Religious Services

Religious services shall be held in the dayroom areas by placing chairs in the dayroom. Space should allow for up to 20 offenders to be seated at a time.

IV.    MANAGEMENT OF DEATH ROW SEGREGATION

A.    Confinement Procedures

A Death Row Segregation offender may be assigned to Level I, Level II, or Level III, based upon his behavior. The Death Row Classification Committee (DRCC)

shall have the authority to change the level to which an offender is assigned. Regardless of level, Death Row Segregation offenders shall be single-celled.

1.  Level I - Offenders assigned to Level I are generally maintaining good behavior but for one or more reasons (see Work Capable review) are not eligible for Work Capable.

2.  Level II - Offenders assigned to Level II:

    a.  May be chronic rule violators but do not show a recent (within the last three [3] months) history of in-prison assaultive or aggressive behavior.

    b.  The offender may have been assigned to Level III but due to a positive change in behavior and attitude, the DRCC has reviewed his status and reclassified the offender to Level II.

    c.  The offender may have been involved in an incident or have received a disciplinary case that warrants placement in a more restrictive level.

3.  Level III - Offenders assigned to Level III are chronic rule violators and are assaultive or aggressive in nature (i.e., history of institutional violence, offender assaults with weapons, history of weapons possession, assaults or attempted assault on offenders or staff, fighting with or without a weapon). The offender may be:

    a.  A current escape risk (escape or escape attempt was assaultive in nature or it was determined on the basis of the circumstances surrounding the escape or escape attempt that the offender had a high potential for assaultiveness);

    b.  A threat to the order and security of the institution as evidenced by repeated serious disciplinary violations (assaultive in nature); or

    c.  A threat to the physical safety of other offenders or staff due to assaultive behavior that includes assaultive offenders identified and confirmed as being members of an STG.

B.  Special Conditions/Restrictions

    1.  The DRCC may also determine any special conditions or restrictions, which should be imposed on Death Row Segregation offenders for security purposes. These special conditions include:

        a.  Level of segregation;

       b.      Personal Property restrictions;

       c.      Known assault risks;

       d.      Known enemies (by name and TDCJ-ID number);

       e.      STG (gang) affiliations;

       f.      Restraint requirements (for movement);

       g.      Physical health conditions;

       h.      Mental health conditions;

       i.      Special diet requirements (medical and/or religious);

       j.      Medication requirements; and

       k.      Any other special circumstances related to the offender's segregation.

2.     A Death Row Segregation offender shall be advised of the criteria for Work Capable status, which will be considered at subsequent review hearings. The offender shall have the right to appeal the decision of the committee through the offender grievance procedure.

C.     Recreation Schedule

1.     Offenders in any category of Death Row Segregation shall be allowed physical recreation out of their cells in conformity with the level to which they have been assigned.

2.     Level I offenders shall be allowed out-of-cell recreation in accordance with one of the three following schedules at the discretion of the Warden or designee:

       a.      Seven (7) days per week with one (1) hour of out-of-cell physical recreation each day; two (2) hours of the weekly out-of-cell recreation shall be outdoors, weather permitting; or

       b.      Five (5) days per week with two (2) hours of out-of-cell physical recreation each of the five (5) days; two (2) hours of the weekly out-of-cell recreation shall be outdoors, weather permitting; or

       c.      Four (4) days per week with three (3) hours out-of-cell physical recreation each of the four (4) days; three (3) hours of the weekly out-of-cell recreation shall be outdoors, weather permitting.

3.     Level II - Offenders assigned to this level shall be allowed out-of-cell recreation four (4) days per week with one (1) hour out-of-cell physical recreation each of the four (4) days; one (1) hour of the weekly out-of-cell recreation shall be outdoors, weather permitting.

4.     Level III - Offenders assigned to this level shall be allowed out-of-cell recreation three (3) days per week with one (1) hour out-of-cell physical

recreation each of the three (3) days; one (1) hour of the weekly out-of-cell recreation shall be outdoors, weather permitting.

D.    Visitation

1.    Death Row Segregation offenders shall be allowed visitation privileges according to the level to which they have been assigned:

a.    Level I - one (1) general visit per week.
b.    Level II - two (2) general visits per month.
c.    Level III - one (1) general visit per month.

2.    Visitation hours for segregation offenders shall be scheduled according to the *TDCJ Offender Visitation Plan*. Ministerial/Spiritual Advisor and Execution visitation shall be scheduled in accordance with AD-07.30 and the *TDCJ Offender Visitation Plan*.

E.    Meals

Death Row Segregation offenders shall have access to nutritionally adequate meals. Specific dietary requirements shall be met for those offenders whose religious, medical or dental condition requires dietary management. The Death Row Segregation Supervisor and the Food Service Manager will need to coordinate the number and type of food trays to be delivered to Death Row Segregation offenders.

F.    Commissary

Death Row Segregation offenders shall have access to commissary in accordance with the level to which they have been assigned:

1.    Level I - same access to commissary as minimum custody general population offenders ($75.00 every two [2] weeks) to include approved TDCJ electrical appliances (i.e., fan, typewriter, radio, and other similar items).

2.    Level II - purchase of one (1) item each of personal hygiene items and correspondence supplies (correspondence supplies not to exceed $10.00) every two (2) weeks. The $10.00 refers to correspondence supplies only. Additional correspondence supplies may be purchased upon submission of a special purchase request by the offender and approval by the Warden.

3.    Level III – purchase of one (1) item each of personal hygiene items and correspondence supplies (correspondence supplies not to exceed $10.00) every two (2) weeks. The $10.00 refers to correspondence supplies only.

Additional correspondence supplies may be purchased upon submission of a special purchase request by the offender and approval by the Warden.

Specific limitations may be placed on an offender's property by the DRCC for documented reasons. Commissary items shall be delivered to Death Row Segregation offenders.

G.   Property

Death Row Segregation offenders shall retain personal property allowed in accordance to the level to which they have been assigned. Note: The DRCC may restrict any property of Death Row Segregation offenders that presents a danger to the security of staff, the offender, other offenders, or a danger of escape.

1.   Death Row Segregation offenders in Level I, Level II, and Level III are allowed the following basic personal property items:

a.   Legal materials/legal research materials (no metal fasteners/paper clips);

b.   Approved religious book or articles necessary for the practice of the offender's religion that does not violate the security of the institution;

c.   TDCJ approved publications in accordance with correspondence rules;

d.   Photographs;

e.   Letters;

f.   Correspondence supplies;

g.   "Keep-on-Person" medications per Health Service Policy (until 30 days prior to date of execution);

h.   Health care devices and supplies prescribed for the offender by Health Services;

i.   One (1) small comb or brush;

j.   One (1) bar of State-issued soap;

k.   One (1) pair of shower slides;

l.   One (1) pair of TDCJ-ID authorized or issued shoes (non-steel toe);

m.   One (1) roll of toilet tissue;

n.   One (1) toothbrush;

o.   One (1) tube of toothpaste/tooth powder;

p.   All offenders shall be provided with a daily change of socks, underwear, a clean towel, and a change of State-issued clothes not less than three (3) times per week. There is a weekly change of cell towel, set of sheets, pillowcase and gown. All necessity items are to be furnished at shower time and exchanged on a one-for-one basis per AD-09.26, "Allocation of Necessities." Units allowing offenders to keep a shower towel in their possession are not

required to issue cell towels. The exchange of necessity items shall be completed even if the offender refuses to shower;

q.    Personal jewelry items in accordance with AD-03.72, "Offender Property;"

r.    Gender-related items to include bras, panties, sanitary napkin belt, sanitary napkins, tampons, douche items;

s.    Small amount of cleaning supplies as the administration deems appropriate; and

t.    Mattress and pillow.

2.    The following additional property is allowed according to the level to which a Death Row Segregation offender is assigned:

a.    Level I -
   (1)    Items purchased through the Commissary to include approved TDCJ-ID electrical appliances (fan, typewriter, and other similar items);
   (2)    General library books;
   (3)    In-cell arts and crafts (piddling) items in accordance with AD-14.59, "Offender Piddling and Crafts Sales";
   (4)    Gender-related items in accordance with AD-03.72, "Offender Property."

b.    Level II - approved personal hygiene items purchased through the Commissary.

c.    Level III - approved personal hygiene items purchased through the Commissary.

Note:  The DRCC may restrict any property of Death Row Segregation offenders that presents a danger to the security of staff, the offender or other offenders or a danger of escape.

H.    Showering

Offenders in Death Row Segregation shall be provided the opportunity to take a shower seven (7) days per week. Death Row Segregation offenders shall be furnished and are expected to wear clean clothes as outlined in AD-09.26, "Allocation of Necessities." They must also adhere to grooming standards as outlined in AD-03.83, "TDCJ Offenders Who Refuse To Comply With Grooming Standards." Security staff shall issue the offender a disposable razor to be replaced every week and for female offenders to be replaced every month. Razors shall be issued to Level I offenders each week/month to be maintained in their personal property unless the Warden deems such possession to be a security risk. A razor shall be issued to a Level II or III offender after he enters the shower. The razor shall be returned to the security staff by the offender before he returns to his cell. Security staff shall store the razor in such a manner as to ensure each

offender receives his own razor. Items allowed in an offender's possession during showering are as follows:

1. Level I - soap, shampoo/conditioner, towel, shower slides, razor.
2. Level II – soap, shampoo/conditioner, towel, shower slides, razor.
3. Level III – soap, shampoo/conditioner, towel, shower slides, razor.
4. Female offenders may take undergarments and feminine hygiene products (as necessary) to the shower.

Thirty (30) days prior to an execution date, razors shall be issued to Level I offenders in the same manner as Level II and Level III offenders.

I.    Correspondence

Death Row Segregation offenders shall be provided with writing instruments, stationery and postage either from their Inmate Trust Fund account or through the provisions for Indigent Supplies.

J.    Management Procedures

The following are guidelines, in addition to those previously noted, related to the management of segregation areas. Each Warden is responsible for ensuring that these procedures are followed.

1.    Death Row Segregation Housing Practices:

a. Each unit shall ensure that categories and levels of Death Row Segregation can be identified by the cell number or row of the segregation housing area. Offenders in Level I, Level II, and Level III should be housed in separate physical locations (e.g., different rows, or with partitions between the groups). If this separation of levels cannot be accomplished in this manner, every effort shall be made to maintain an empty cell between the levels. It is recommended that whenever it is necessary to designate cells on a single row to house different levels of Death Row Segregation offenders (e.g., 10 cells for Level III and 15 cells for Level II with an empty cell between the groups), the first group of cells on the row should be designated for Level II offenders and the last group of cells should be designated for Level III offenders. The rows or group of cells designated for specific levels of Death Row Segregation offenders should remain constant to the extent possible (i.e., only under special circumstances such as lack of bed space for another level of Death Row Segregation shall the designation of rows or cells change in the Administration Segregation housing area).

b.   Offenders in Death Row Segregation shall be assigned to housing areas that are specifically designated for their custody requirements. The housing recommendations of treatment professionals, as noted in each offender's Health Summary for Classification form, shall be followed by classification committees, classification and security staff.

2.   Segregation Security Measures:

Each Warden shall immediately take all necessary steps to assure that the safety and security of offenders and staff in segregation area is maximized, in accordance with the applicable post orders and the *Administrative Segregation Plan.*

3.   Offender Restrictions

Offender restrictions (i.e., property, food loaf, paper mask, paper gown restrictions) shall be handled in accordance with the Security Memorandum, "Offender Restrictions."

4.   Death Row Segregation Escort Procedures:

Death Row Segregation offenders shall be strip-searched and placed in restraints before exiting their cells. Death Row Segregation offenders will be escorted according to procedures outlined in the Death Row Cellblock Officer post orders.

# APPENDIX A
# EXECUTION PROCEDURES

## PROCEDURES

I.   Procedures Upon Notification of Execution Date

   A.   The Office of the Attorney General shall officially notify the CI Division Director, the Death Row Unit Warden, and the Huntsville Unit Warden of an offender's execution date.   Once an execution date is received, the Death Row Unit Warden's office shall notify the Unit Classification Chief, and the Death Row Supervisor.

   B.   The Death Row Supervisor shall schedule an interview with the condemned offender and provide him with the Notification of Execution Date (Appendix A Form 1). This form provides the offender with a list of the information that shall be requested from him two week prior to the scheduled execution.

   C.   The condemned offender may be moved to a designated cell.  Any keep-on-person (KOP) medication shall be confiscated and administered to the offender as needed by Unit Health Services staff.

II.   Stays of Execution

   A.   Official notification of a stay of execution shall be delivered to the CI Division Director, the Death Row Unit Warden, and the Huntsville Unit Warden by the Office of the Attorney General.  **Staff must not accept a stay of execution from the offender's attorney.**  After the official stay is received, the Death Row Unit Warden's office shall notify the Unit Classification Chief and Death Row Supervisor.

   B.   Designated staff on the Death Row Unit shall notify the offender that a stay of execution has been received.

III.   Preparation of the Execution Summary and Packet

   A.   Two Weeks (14 days) Prior to the Execution

      1.   The Death Row Unit shall begin preparation of the Execution Summary. The Execution Summary (Appendix A Form 2) and the Religious Orientation Statement (Appendix A Form 3) shall be forwarded to the Death Row Supervisor or Warden's designee for completion. A copy of the offender's current visitation list and recent commissary activity shall also be provided.

2.    The Death Row Supervisor shall arrange an interview with the condemned offender to gather the information necessary to complete the Execution Summary and Religious Orientation Statement.

3.    An offender may request to have his body donated to the Texas State Anatomical Board for medical education and research. The appropriate paperwork shall be supplied to the offender upon request.

4.    The Execution Summary must be completed and returned by the Death Row Supervisor or Warden's designee in sufficient time to be forwarded to the CI Division Director's Office by noon of the 14th day. After approval by the CI Division Director, the summary shall be forwarded to the Death Row Unit Chaplain, the Huntsville Unit Warden's Office, and Public Information.

5.    If the offender wishes to change the names of his witnesses, and it is less than fourteen (14) days prior to the scheduled execution, the offender shall submit a request in writing to the CI Division Director through the Death Row Unit Warden, who shall approve or disapprove the changes.

6.    The Death Row Unit is responsible for completion of the Execution Packet, which shall include:

a.    Execution Summary;

b.    Religious Orientation Statement;

c.    Copy of the Offender Travel Card;

d.    Current Visitation List;

e.    Execution Watch Notification;

f.    Execution Watch Logs;

g.    I-25 Offender's Request for Trust Fund Withdrawal;

h.    Offender Property Documentation (PROP-05 and PROP-08); and

i.    Other documents as necessary.

7.    The Death Row Supervisor or the Warden's designee shall notify staff (Appendix A Form 4) to begin the Execution Watch Log (Appendix A Form 5).

8.    The Execution Watch Log shall begin at 6:00 a.m. seven (7) days prior to the scheduled execution. The seven (7) day timeframe shall not include the day of the execution. The offender shall be observed, logging his activities every 30 minutes for the first six (6) days and every 15 minutes for the remaining 36 hours. The Public Information Office may request information from the Execution Watch Log on the day of execution.

9.  The original Execution Packet and the offender's medical file shall be sent with the condemned offender in the transport vehicle to the Huntsville Unit or the Goree Unit for a female offender. The Death Row Unit Warden shall maintain a copy of the Execution Packet on the Death Row Unit.

10. If there are any changes necessary to the Execution Packet, staff shall notify the CI Division Director's Office and the Huntsville Unit Warden's Office.

B.  The Day of Execution

1.  On the morning of the day of the execution prior to final visitation, all of the offender's personal property shall be packed and inventoried. The property officer shall complete an "Offender Property Inventory" (PROP-05) detailing each item of the offender's property. The property officer shall also complete a "Disposition of Confiscated Offender Property" (PROP-08) indicating the offender's choice of disposition of personal property.

    a.  If disposition is to be made from the Huntsville Unit a copy of the property forms should be maintained by the Death Row Unit Property Officer and the originals forwarded to the Huntsville Unit with the property.

    b.  If disposition is to be made from the Death Row Unit a copy of the property forms will be placed in the Execution Packet and the original forms maintained on the Death Row Unit through the completion of the disposition process.

    c.  The Mountain View Unit Warden shall ensure that a female offender brings personal hygiene and gender-specific items to the Huntsville Unit as appropriate.

2.  Designated staff shall obtain the offender's current Trust Fund balance and prepare the Offender's Request for Trust Fund Withdrawal (I-25) for completion by the offender.

    a.  The following statement should be written or typed on the reverse side of the I-25, "In the event of my execution, please distribute the balance of my Inmate Trust Fund account as directed by this Request for Withdrawal." The offender's name, number, signature, thumbprint, date, and time should be below this statement. Two (2) employees' names and signatures should be below the offender's signature as witnesses that the offender authorized the form.

b.    This Request for Withdrawal form shall be delivered to the Inmate Trust Fund for processing by 10:00 a.m. CST the next business day following the execution.

3.    A Female offender may be transported to the Goree unit prior to the day of the execution. The Execution Transport Log for Female Offenders (Appendix A Form 7) shall be initiated at the Mountain View Unit. The Goree Unit staff will initiate the Execution Watch Log upon arrival on the Goree Unit, permit visitation as appropriate and transport the offender to the Huntsville Unit. The Transport Log shall resume when the offender departs the Goree Unit.

4.    The condemned offender shall be permitted visits on the Death Row Unit beginning at 8:00 a.m. the morning of the day of the scheduled execution. All visits for female offenders housed at the Goree Unit shall be approved by the Goree Unit Warden. Final visits for all condemned offenders shall be terminated by 12:00 noon CST on the day of execution. No media visits shall be allowed at the Goree Unit.

NOTE:   Special visits (minister, relatives not on the visitation list, attorney, and other similar circumstances) shall be approved by the Death Row or Goree Unit Warden or designee. Exceptions may be made to schedule as many family members to visit prior to the offender's scheduled day of execution. These are considered to be special visits. No changes shall be made to the offender's visitation list.

5.    The Execution Watch Log shall be discontinued when the Execution Transport Log for Male Offenders (Appendix A Form 6) is initiated.

6.    The final visits shall be terminated at 12:00 noon, and the offender shall be escorted to 12 building at the Polunsky or the designated area at the Mountain View or Goree Unit and placed in a holding cell. The appropriate Execution Transport Log shall be initiated and the offender shall be prepared for transport to the Huntsville Unit. The offender shall be removed from the transport vehicle at the Huntsville Unit and escorted by Huntsville Unit security staff into the execution holding area.

7.    Any transportation arrangements for the condemned offender between units shall be known only to the Wardens involved, the CI Division Director, as well as those persons they designate as having a need to know. No public announcement shall be made concerning the exact time, method, or route of transfer. The CI Division Director's Office and the Public Information Office shall be notified immediately after the offender arrives at the Huntsville Unit

8.    When the offender enters the execution holding area the Execution Watch Log shall immediately resume. The restraints shall be removed and the offender strip-searched.

9.    The offender shall be fingerprinted, placed in a holding cell, and issued a clean set of TDCJ clothing.

10.   The Warden shall be notified after the offender has been secured in the holding cell. The Warden or designee shall interview the offender and review the information in the Execution Packet.

11.   Staff from the Public Information Office shall also visit with the offender to determine if he wishes to make a media statement and to obtain authorization, if necessary, to release the statement.

12.   The offender may have visits with a TDCJ Chaplain(s), a Minister/Spiritual advisor who has the appropriate credentials and his attorney(s) on the day of execution at the Huntsville Unit; however, the Huntsville Unit Warden must approve all visits.

13.   There shall be no family or media visits allowed at the Huntsville Unit.

IV.   Pre-execution Procedures

A.    The Huntsville Unit Warden's Office shall serve as the communication command post and entry to this area shall be restricted.

B.    Inventory and Equipment Check

1.    Designated staff on the Huntsville Unit are responsible for ensuring the purchase, storage, and control of all chemicals used in lethal injection executions for the State of Texas.

2.    The drug team shall obtain all of the equipment and supplies necessary to perform the lethal injection from the designated storage area.

3.    An inventory and equipment check shall be conducted.

4.    Expiration dates of all applicable items are to be checked on each individual item. Outdated items shall be replaced immediately.

C.    Minister/Spiritual and attorney visits shall occur between 3:00 and 4:00 p.m. CST unless exceptional circumstances exist. Exceptions may be granted under unusual circumstances as approved by the Huntsville Unit Warden.

D.    The offender shall be served his last meal at approximately 4:00 p.m. CST.

E. The offender shall be afforded an opportunity to shower and shall be provided with clean clothes at some time prior to 6:00 p.m. CST.

F. The Huntsville Unit Warden or designee and the Huntsville Unit Chaplain or a designated approved TDCJ Chaplain shall accompany the offender while in the Execution Chamber.

V. Set up Preparations for the Lethal Injection

A. Three (3) syringes of normal saline shall be prepared.

B. Syringes for each of the lethal injection drugs shall be prepared as follows:

1. Sodium Pentothal – 30 milliliters of solution containing 3 grams of thiopental sodium.

2. Pancuronium Bromide – 50 milliliters of solution containing 100 milligrams of pancuronium bromide.

3. Potassium Chloride – 70 milliliters of solution containing 140 milliequivalents (mEq) of potassium chloride.

VI. Execution Procedures

A. After 6:00 p.m. CST and after confirming with the Office of the Attorney General and the Governors' Office that imposition of the court's order should proceed, the CI Division Director or designee shall give the order to escort the offender into the execution chamber.

B. The offender shall be escorted from the holding cell into the Execution Chamber and secured to the gurney.

C. A medically trained individual (not to be identified) shall insert intravenous (IV) catheters into a suitable vein of the condemned person, connect an IV administration set, and start a neutral saline solution to flow at a slow rate. The individual shall not use a "cut-down" procedure to access a suitable vein. Observation of the IV shall be maintained to ensure that the rate of flow is uninterrupted.

D. Witnesses to the execution shall be brought into the appropriate viewing area ONLY AFTER the Saline IV has been started and is running properly.

E. The CI Division Director or designee shall give the order to commence with the execution.

F. The Huntsville Unit Warden or designee shall allow the condemned person to make a brief, last statement.

G.    The Huntsville Unit Warden or designee shall instruct staff to induce, by syringe, substances necessary to cause death.

H.    The flow of normal saline through the IV shall be discontinued.

I.    The lethal dose of Sodium Pentothal shall be commenced.  When the entire contents of the syringe have been injected, the line shall be flushed with an injection of normal saline.

J.    The lethal dose of Pancuronium Bromide shall be commenced.  When the entire contents of the syringe have been injected, the line shall be flushed with an injection of normal saline.

K.    The lethal dose of Potassium Chloride shall be commenced.  If necessary, the line shall be flushed with an injection of normal saline.

L.    Upon completion of the injections, the Warden shall direct the physician to enter the Execution Chamber to examine the offender, pronounce the offender's death, and designate the official time of death.

M.    The body shall be immediately removed from the Execution Chamber and transported by a coordinating funeral home.  Arrangements for the body should be concluded prior to execution.

VII.    Employee participants in the Execution Process shall not be identified or their names released to the public.  They shall receive an orientation with the Huntsville, Goree, Polunsky, or Mountain View Unit Wardens, who shall inform the employees of the TDCJ Post Trauma Staff Support Program (AD-06.64).  The employees shall be encouraged to contact the Regional Post Trauma Team Coordinator following the initial participation in the execution process.

# Texas Department of Criminal Justice

## Correctional Institutions Division

### *Notification of Execution Date*

Date of Notification: _____

Offender Name: _____ TDCJ #: _____

The Office of the Texas Attorney General has notified this agency that by order of the Court, your execution date

has been set for after the hour of 6:00 p.m. on _____.

*The following information will be requested from you two weeks prior to the scheduled execution. A current copy of your visitation list has also been included, review it and make changes as necessary. Changes to your approved visitation list will not be made within 24 hours of the execution.*

1. Attorney Name, Address, and Telephone Number: _____

   _____

2. Spiritual Advisor: _____(If they wish to witness your execution they do not need to be on your visitation list).

3. If executed, it is my request that disposition of my remains be handled by: _____

   Relationship/Address: _____

   Telephone number: _____

   I would like my remains to be donated to the Texas State Anatomical Board for medical education and research. _____

4. I would like for _____ to pick up my personal property.

   The address is: _____

5. I have $_____ in my Trust Fund Account. I would like my money to go to: _____

6. Contact staff if you request the preparation of a Last Will and Testament. If you have less than $500, State Counsel for Offenders shall assist you with this request. However, if you have more than $500 you should arrange to hire a personal attorney.

<u>Witnesses to the Execution (include addresses)</u>

   1. _____

   2. _____

   3. _____

   4. _____

   5. _____

<u>Last Meal Request</u>                                                    <u>Clothing Sizes</u>

_____                    Pant Size: _____

_____

_____                    Shirt Size: _____

_____

_____                    Shoe Size: _____

*Death Row Plan*
*Appendix A Form 1 (10-2004)*

# Texas Department of Criminal Justice

## Correctional Institutions Division

### _Execution Summary_

OFFENDER NAME: _____     TDCJ# _____

EXECUTION DATE: _____

---

DOUG DRETKE, DIRECTOR

**Witnesses**    ☐ APPROVED    ☐ DENIED
I have been advised that pursuant to Article 43.20, relatives and friends, who are eligible, may be allowed to witness the execution. The relatives or friends may not exceed five (5) in number. However, a spiritual advisor to the condemned offender may be allowed to witness in addition to the five (5) offender witnesses. The spiritual advisor must be a bonafide pastor or comparable official of a church selected by the condemned offender.

1. _____

2. _____

3. _____

4. _____

5. _____

6. _(SPIRITUAL ADVISOR)_ _____

**Attorney(s) Handling Stay and/or Appeal**

1. _____

2. _____

3. _____

**Last Will and Testament**
I am further advised that the services of an attorney can be provided free of charge to prepare a simple will so I may dispose of my worldly possessions. I have indicated my desires by initialing one of the following:

_____    1. The disposition of my estate is complex and could not be handled by a simple will; therefore, I have made my own arrangements.

_____    2. Disposition of my worldly possessions is covered by an existing will.

_____    3. Services of an attorney are required to assist me in preparation of a simple will. (Offenders who have $500.00 or more are not indigent and should hire an attorney to prepare a simple will if they do not want to use the packet or prepare a handwritten will.)

_____    4. I do not desire a will.

_Death Row Plan_
_Appendix A Form 2 (10-2004)_

OFFENDER NAME: _____ TDCJ# _____

<u>Disposition of Trust Fund Account</u>

I have $_____ in my Trust Fund Account as of _____ and would like it to be handled as follows:

_____

_____

_____

<u>Disposition of Personal Property</u>

I have been advised that I may designate the method of disposition of my personal property. I have indicated my desires as follows:

_____ 1. I have arranged with _____, who lives at _____

_____. to pick up my property

from the _____ Unit.

_____ 2. I wish TDCJ to dispose of my personal property.

<u>Last Meal Request</u>

I have been advised that I may make choices regarding what is served for my last meal. I understand that my choices are restricted to what is available from the Huntsville Unit kitchen. I understand that no special purchases shall be made.

_____   _____

_____   _____

_____   _____

_____   _____

<u>Clothing Sizes</u>

Pant Size: _____   Shirt Size: _____   Shoe Size: _____

<u>Disposition of Remains</u>

I am also aware that a relative or bonafide friend can request, within 48 hours, delivery of my remains.

If executed, it is my request that disposition of my remains be handled by _____.

Whose relationship to me is that of _____, whose address is _____

_____ and whose telephone number is _____.

☐ I have completed the necessary documents to allow my body to be donated to the Texas State Anatomical Board for medical education and research.

_____
DATE

_____
SIGNATURE OF OFFENDER

_____
WITNESS (PRINT)

_____
WITNESS (PRINT)

cc: Huntsville Unit Warden
Public Information Office

****ORIGINAL REMAINS ON DEATH ROW UNIT UNTIL THE DAY OF THE SCHEDULED EXECUTION****

*Death Row Plan*
*Appendix A Form 2 (10-2004)*



# TEXAS DEPARTMENT OF CRIMINAL JUSTICE

Chaplaincy Department



### Religious Orientation Statement

*(The following statement of religious preference is offered as an attempt to clarify the religious beliefs and obligatory practices of committed offenders. It is intended to inform TDCJ staff of any special needs related to personal faith in order to provide appropriate considerations whenever possible.)*

"I _____ TDCJ # _____
(Offender's Name)

identify my religious beliefs as the following:" *(Circle one)*

    1.  Roman Catholic           4.  Muslim
    2.  Christian (Non Roman Catholic)     5.  Native American
    3.  Jewish                    6.  Other (please identify) _____

*(In the case of some of the above categories, a more specific description of the religion may be appropriate.)*

"I further identify myself as _____."

"The following individual is my 'spiritual advisor.' _____

_____

_____

Telephone # _____

"I request a visit with my above named spiritual advisor to take place at the Huntsville Unit, pending administrative approval."    ☐ Yes      ☐ No

"In witness whereof, I have hereto set my hand this _____ day of _____, _____."
                                                        (month)         (year)

_____     _____
*Offender's Signature*            *Date*

_____     _____
*Chaplain's Signature*           *Date*

cc:  Director of Chaplains
     Unit Warden
     Huntsville Unit Chaplain
     Offender File

*Death Row Plan*
*Appendix A Form 3 (10-2004)*

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## Correctional Institutions Division

## INTER-OFFICE COMMUNICATION

TO:   DEATH ROW SUPERVISORS          Date:

FROM: _____          Subject: Staff Notification of
      Assistant Warden, \<Death Row Unit\>          Pre-Execution Watch

OFFENDER:_____ TDCJ#: _____

Is within seven (7) days of his scheduled execution date and has been placed on EXECUTION WATCH.

The EXECUTION WATCH will begin at 6:00 a.m. on _____.

### Execution Watch Log

The Execution Watch Log (attached) shall be utilized to maintain a record of the offender's activities at the time of a security check. Foods offered to the offender should be logged noting exactly what the offender ate and/or drank. Medications given to the offender should also be logged noting whether he consumed them. In addition, all telephone calls and visits shall be logged to include the person called/visited and the duration of the call/visit. In the case of a visit, the relationship of the offender to the visitor shall also be logged

1.   Security checks are done every 30 minutes for the first six (6) days logging all activities noted during the check.

2.   Security checks are increased to every 15 minutes the last 36 hours prior to the execution continuing to log all activity noted during the check.

3.   The Execution Watch Log will be discontinued when the Execution Transport Log is initiated and shall resume upon the offenders arrival at the Goree or Huntsville Unit.

***BE SURE TO INTIAL EACH ENTRY ON THE LOG IN THE INITIAL BOX***

*Death Row Plan*
*Appendix A Form 4 (10-2004)*

*Instructions: ALL entries on the log must be specific. Indicate what the offender is doing at each log book check. Staff shall initial each entry at the time a security check is done. Indicate food was offered to the offender and exactly what he ate. Medication given to the offender should be logged indicating if it was consumed. Telephone calls should be logged to include the name of the person called and duration of the call. Log the name and relationship of all visitors as well as the duration of the visit.*

*The Execution Watch begins seven (7) days prior to a scheduled execution. Security checks will be conducted every 30 minutes for the first 6 days and every 15 minutes for the last 36 hours. The Execution Watch Log shall be discontinued when the Execution Transport Log is initiated and shall resume at the Goree and/or Huntsville Unit.*

Offender Name: _____ TDCJ #: _____ Housing Location: _____

(6 Days Prior to Execution) 30 Minute Security Checks Begin on _____ at 6:00 a.m.

(36 Hours Prior to Execution) 15 Minute Security Checks Begin on _____ at 6:00 a.m.

(Huntsville Unit) 15 Minute Security Checks or as Events Occur.

| DATE | TIME | OBSERVATIONS | INITIALS |
|------|------|--------------|----------|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

*Death Row Plan*
*Appendix A Form 5 (10-2004)*

# Execution Transport Log For Male Offenders

Offender Name: _____     TDCJ #: _____

*Instructions: The log is to be used to log the activity and movement of condemned MALE offenders beginning with the preparation for transport from the Death Row housing unit until the point the offender is escorted into the Huntsville Unit.*

*The Execution Watch Log is discontinued at the time the condemned offender is transported from the Death Row Unit. The Execution Watch Log shall resume at the time a condemned offender is escorted into the Huntsville Unit.*

| ACTIVITY | Date | Time | Staff Initials |
|---|---|---|---|
| Final Visitation concluded | | 12:00 noon | |
| Offender Escorted to a Death Row Holding Cell | | | |
| Offender Strip-searched and issued TDCJ Clothing | | | |
| Offender Placed in Handcuffs | | | |
| Offender Escorted to Boss Chair and examined for contraband | | | |
| Remaining Transport Restraints Placed on Offender | | | |
| Restraints Double Checked by the Warden or designee | | | |
| Offender Secured in Transport Vehicle | | | |
| Transport Vehicle Departs the Polunsky Unit | | | |
| Offender Removed from Transport Vehicle by Senior Huntsville Unit Staff | | | |
| Offender Escorted into the Huntsville Unit | | | |
| | | | |

**ADDITIONAL COMMENTS:**

Case 9:23-cv-00023-MAC-ZJH    Document 76-1    Filed 06/17/26    Page 74 of 80 PageID #: 1065

Offender Name: _____     TDCJ #: _____

*Instructions: The log is to be used to log the activity and movement of condemned FEMALE offenders beginning with the preparation for transport from the Death Row housing unit until the point the offender is escorted into the Huntsville Unit.*

*The Execution Watch Log is discontinued at the time the condemned offender is transported from the Death Row Unit. The Execution Watch Log shall resume during the time a condemned offender is housed at the Goree unit and at the time a condemned offender is escorted into the Huntsville Unit.*

| ACTIVITY | Date | Time | Staff Initials |
|---|---|---|---|
| Offender Escorted to appropriate area of Death Row Unit for transport preparation | | | |
| Offender Strip-searched and issued TDCJ Clothing | | | |
| Offender Placed in Handcuffs | | | |
| Offender Escorted to Boss Chair and examined for contraband | | | |
| Remaining Transport Restraints Placed on Offender | | | |
| Restraints Double Checked by the Warden or designee | | | |
| Offender Secured in Transport Vehicle | | | |
| Transport Vehicle Departs Mountain View Unit | | | |
| Transport Vehicle Arrives at the Goree Unit | | | |
| Offender Removed from the Transport Vehicle by Goree Unit Security Staff | | | |
| Offender Escorted to the Designated Holding Cell | | | |
| Final Visitation concluded | | 12:00 noon | |
| Offender Strip-searched and issued TDCJ Clothing | | | |
| Offender scanned with a hand held metal detector and examined for contraband | | | |
| Offender Placed in Handcuffs | | | |
| Remaining Transport Restraints Placed on Offender | | | |
| Offender Secured in Transport Vehicle | | | |
| Transport Vehicle Departs the Goree | | | |
| Offender Removed from Transport Vehicle by Senior Huntsville Unit Staff | | | |
| Offender Escorted into the Huntsville Unit | | | |

ADDITIONAL COMMENTS:

*Death Row Plan*
*Appendix A Form 7 (10-2004)*

# APPENDIX B
# EXECUTION WITNESS PROCEDURES

I.    General Rules for Witnesses

    A.    Witnesses to the execution should dress conservatively (no tank tops, no cut-off/shorts, no see-through fabrics, no exercise clothing, and no sleeveless tops).

    B.    Witnesses to an execution shall not be permitted to take purses, cameras, pictures, pocketknives, beepers, cell phones, signs, or any type of recording equipment into the Witness Room. It is suggested these items be secured in their vehicle.

    C.    All witnesses shall be subject to a "pat" search prior to entering the Witness Room. The witnesses shall also be searched with a handheld metal detector. It is advisable that nothing be in the witnesses' pockets (wallet or keys are acceptable).

    D.    Victim witnesses shall be escorted into the Witness Room at a time separate from the witnesses of the condemned person.

    E.    Once inside the Witness Room, all witnesses shall remain until the process is complete.

    F.    Witnesses shall refrain from verbal outbursts or any inappropriate action during the execution process.

    G.    At no time shall any witness introduce into or upon the grounds of State property any intoxicating beverages, tobacco products, drugs or firearms. Witnesses who arrive and are determined to be under the influence of drugs or alcohol may not be allowed to view the execution.

    H.    All witnesses must be approved by the Correctional Institutions (CI) Division Director. No offender witnesses are permitted in accordance with Article 43.20, Code of Criminal Procedure.

II.   Victim Witnesses

    A.    Individuals Who May Be Victim Witnesses

        1.    "Close relative of the deceased victim" means the following persons in relation to the victim for whose death an offender is sentenced to death:

            a.    The spouse of the victim at the time of the victim's death;

            b.    A parent or stepparent of the deceased victim;

            c.    An adult brother, sister, child, or stepchild of the deceased victim (adult is defined as anyone 18 years of age or older), or;

d. Another individual with a close relationship to the deceased victim, or to a close relative of the victim, upon the recommendation of the Victim Services Division (VSD) and approval of the CI Division Director.

2. Witnesses may be accompanied by support person(s) who are not agency employees and who shall not actually witness the execution; however, they may be present on the unit to provide emotional support for the victim witnesses. There shall be three (3) support persons per victim not to exceed six (6) persons if there are multiple victims identified.

3. Close relatives of the deceased victim, not to exceed five (5) in number, may be allowed to witness the execution of an offender condemned to death. However, when there are multiple victims identified, a total not to exceed six (6) in number, may be allowed to witness the execution upon recommendation of the VSD.

4. If there are fewer than five (5) persons, additional close relatives of a victim for whose death the offender is unequivocally responsible, may be considered upon the recommendations of the VSD and approval of the CI Division Director.

B. The VSD shall ensure close relatives and friends of deceased victims requesting to witness an execution have an opportunity to do so.

1. Upon receipt of a request to witness an execution, the VSD staff shall obtain the requestor's name, address, and telephone number.

2. The role of the VSD is to provide information and support to victim witnesses and support persons to include accompaniment on the execution date through the execution process. Through coordination efforts with other TDCJ departments, the VSD shall work to ensure a safe, secure, environment throughout the process.

3. On the execution date, the VSD shall contact appropriate TDCJ administrators and confirm the following:

a. Number of victim witnesses expected to arrive;

b. Any known concerns due to the emotional or physical state of the victim witnesses;

c. Any information that may impact the victim witnesses.

C. Notification

1. The VSD is responsible for notifying the relatives of the victim of the scheduled execution date, time, and location, upon request. It is the responsibility of the relatives to notify the VSD of any subsequent address changes and their intent to attend. Once the name is listed as a potential

victim witness, throughout the process, any desired mediation or direct contact with the offender shall be with the approval of VSD staff.

3. No later than five (5) days prior to the scheduled execution date. The VSD shall forward the victim witness list to the CI Division Director for final approval. Witnesses shall be informed that their participation shall not be confidential. Once submitted and approved, no changes shall be accepted without approval of the CI Division Director.

D. Procedures for the Date of Execution

1. All victim witnesses and support persons must arrive at the designated meeting location in Huntsville, Texas, no later than 3:30 p.m. CST on the date of the scheduled execution. They must have picture identification ( e.g., valid driver's license, Department of Public Safety ID card, or similar type of photo identification).

2. At 4:45 p.m. CST, VSD staff shall escort the victim witnesses and support persons to the Huntsville Unit.

3. Upon arrival, the victim witnesses and support persons shall be escorted to a designated waiting area by VSD staff.

4. Only those Victim Witnesses approved to witness the execution shall be permitted into the Witness Room. However, approved support person(s) shall be allowed to wait with the witnesses in the specified waiting area.

5. The VSD shall provide victim witnesses with information regarding the execution process and any updated information related to the execution, as it is received. Victim witnesses should understand that the condemned person may be granted a stay of execution on or before the scheduled date of execution. A VSD staff member shall accompany the victim witnesses to the witness viewing room and remain with the witnesses throughout the execution.

6. Following the execution, victim witnesses shall be escorted from the Witness Room to rejoin their support persons for a debriefing that is led by a VSD staff member. Victim witnesses are then escorted to the media conference to participate in a media interview if they choose, or to their vehicles, whichever is appropriate.

7. The TDCJ Public Information representative shall coordinate any interviews with the media. All media interviews are voluntary.

III. Offender Witnesses

A. Individuals Who May Be Offender Witnesses

1.  Relatives or friends requested by the condemned offender, and who are eligible under the following criteria may be allowed to witness the execution of an offender sentenced to death. The relatives or friends may not exceed five (5) in number. However, a spiritual advisor to the condemned offender may be allowed to witness in addition to the five (5) offender witnesses. The spiritual advisor must be a bona fide pastor or comparable official of a church selected by the condemned offender.

2.  Relatives, friends, or a spiritual advisor requested by the condemned offender are eligible to attend the execution of the condemned offender if:

    a.  The condemned offender provides a list of witnesses he wishes to attend the execution to the Death Row Supervisor or Warden's designee at least fourteen (14) days prior to the date of execution;

    b.  Witnesses requested by the offender are on the offender's approved "Visiting List"; and

    c.  The witnesses are 18 years of age or older.

B.  Witness Support Liaison (Chaplaincy)

1.  The Chaplaincy Department shall provide a list of TDCJ Chaplains who shall serve as Witness Support Liaison (WSL) to the offender's witnesses and family members. These chaplains shall be selected and assigned for duty on scheduled execution days by the Director of Chaplaincy or designee.

2.  The purpose of the WSL is to facilitate the execution process for the offender witnesses by coordinating information, activity, and compassionate care.

3.  The WSL shall answer directly to the Director of Chaplaincy or designee concerning responsibilities and performance of duties while serving as a WSL.

4.  A WSL is a TDCJ Chaplain with responsibility to provide a channel of information between the offender witnesses and the TDCJ. The WSL shall provide the following information to the witnesses:

    a.  TDCJ expectations and requirements for witnessing an execution;

    b.  Appropriate locations for gathering before, during, and after the execution;

    c.  Answer questions about the Agency, the process and the offenders; and

    d.  Answers to special requests that require contacting unit or Agency administrators during the eight (8) hours prior to an execution.

5.   The WSL shall provide the following information to appropriate TDCJ supervision (appropriate supervision is the Director of Chaplaincy or designee, but may also include Huntsville Unit personnel or other TDCJ Administrators as dictated by specific situational needs).

    a.    Location of the offender witnesses while in Huntsville;

    b.    Telephone numbers where the offender witnesses can be contacted;

    c.    Concerns arising due to the emotional or physical state of the offender's witnesses; and

    d.    Any special last-minute requests of the witnesses or family of the offender.

    e.    The WSL shall also serve as a support person for the witnesses and other friends or family members of the condemned offender during the day of a scheduled execution.

C.    Notification

1.    The Polunsky/Mountain View Unit Chaplains shall forward to the Director of Chaplains' office a copy of the first page of the Execution Summary identifying the witnesses chosen by the offender at least fourteen (14) days prior to the date of execution. Exceptions can only be granted by the CI Division Director.

2.    The WSL or designee shall contact the Polunsky/Mountain View Unit Chaplains for confirmation that the offender's witnesses have been notified. The Polunsky/Mountain View Unit Chaplains may appoint the WSL as the person to notify the offender's designated witnesses. Notification of the offender's witnesses consists of conveying the following information:

    a.    That the offender has requested the named person as a witness to the execution;

    b.    That he may choose not to be a witness;

    c.    The date and time of the scheduled execution;

    d.    There shall be a witness orientation session for the offender's witnesses prior to the execution;

    e.    The required reporting time and the designated meeting location;

    f.    Dress code expectations;

    g.    Appropriate identification;

    h.    Routine security procedures for an execution witness; and

    i.    A general time frame schedule for the execution.

It is also helpful to find out if a witness intends to be present for the execution, where he might be staying in Huntsville, and if a witness has information which would be helpful in contacting any of the other witnesses.

3. When the WSL completes a notification of the offender's witnesses, the Polunsky/Mountain View Unit Chaplains must be informed that notification has been accomplished.

4. Confirmation of witness notification shall be distributed as follows:

   a. Director of Chaplains;

   b. Huntsville Unit Chaplain; and

   c. Huntsville Unit Warden.

5. Whenever possible, the WSL shall arrange with the unit Chaplain for appropriate person to person contact to be made with the offender's witnesses during the 72 hours prior to a scheduled execution. The WSL shall introduce themselves as the official escort to the offender's witnesses during the interim between the final visit at the Polunsky/Mountain View Units and the departure of the offender's witnesses following the execution.

D. Procedures for the Date of Execution

1. The Execution Chaplain and the WSL shall conduct an orientation session with the offender's witnesses at a designated meeting place (Hospitality House, local church, or other facility).

2. The WSL shall escort the offender's witnesses to the Old Administration Building, 815 11th Street, Huntsville, Texas, at 5:00 p.m. on the date of the scheduled execution.

3. The WSL shall accompany the witnesses to the witness viewing room and remain with the witnesses throughout the execution.

4. The WSL shall remain with the witnesses for any post-execution meetings.

IV. Other Witnesses

Other than as listed above, the only persons authorized to witness an execution are as follows:

A. TDCJ staff as deemed necessary by the CI Division Director;

B. Members of the Texas Board of Criminal Justice;